# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KRISTIE SMALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| THE OFFICE OF CONGRESSMAN | ) | Case No. 1:19-cv-01314-TNM |
| HENRY CUELLAR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.      INTRODUCTION ...........................................................................................................1

II.     BRIEF FACTUAL SUMMARY ......................................................................................2

III.    STANDARD OF REVIEW ..............................................................................................8

IV.     ARGUMENT ...................................................................................................................8

        A.  COUNT 1—SEX DISCRIMINATION (TITLE VII).............................................8

            1.  *McDonnell Douglas* Burden-Shifting Framework....................................8

            2.  The Office Terminated Mrs. Small For Legitimate, Nondiscriminatory
                Reasons ...........................................................................................................9

            3.  Mrs. Small Cannot Prove Pretext Or Discriminatory Intent...................11

                a.  Mrs. Small's Temporal Proximity Arguments Are Specious ...................13

                    1.  The Office Knew Mrs. Small Was Pregnant By July 5, 2018 ............13

                    2.  Mrs. Small Cannot Succeed On Temporal Proximity Alone..............14

                    3.  Mrs. Small's Probationary Period Argument Is A Red Herring.........16

                b.  Record Evidence Belies How Mrs. Small Assesses Her Own
                    Performance ...................................................................................................17

                    1.  September 2018 90-Day Probationary Period Review ......................19

                    2.  Testimony Confirms Mrs. Small's Problematic Performance............22

                        a.  Mrs. Small Insufficiently Reviewed Draft Documents.................22

                        b.  Mrs. Small Was Inexplicably Absent And Inaccessible..............23

                        c.  Mrs. Small Inadequately Trained Staff........................................25

                        d.  Mrs. Small Perpetuated Workplace Conflict ...............................27

                        e.  Mrs. Small's Primary Concern Was Securing An
                            Enormous Pay Raise For Herself, Not Doing Her Job .................28

                    3.  Mrs. Small Received Negative Feedback Before
                        August 8, 2018 ......................................................................................29

                    4.  Post-August 8, 2018, Criticism Was Consistent And
                        Warranted ..............................................................................................33

                c.  Mrs. Small Cannot—And Does Not Even Try To—Otherwise
                    Show Pretext Or Discriminatory Intent ....................................................34

            4.  Conclusion As To Count 1 (Title VII Sex Discrimination Claim) ......................37

        B.  COUNT 2—PREGNANCY DISCRIMINATION (TITLE VII)................................39

        C.  COUNT 3—FMLA INTERFERENCE ........................................................................40

        D.  COUNT 4—FMLA REPRISAL....................................................................................42

V.      CONCLUSION.................................................................................................................43

i

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………….……………..…8

*\*Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008)……………………..………*passim*

*Butler v. D.C. Hous. Fin. Agency*, 593 F. Supp. 2d 61 (D.D.C. 2009)……………………………….…14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………………..…8

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)……………………………………………..…16

*Dudhi v. Temple Health Oaks Lung Ctr.*, No. 2:18-cv-3514,
2019 WL 426145 (E.D. Pa. Feb. 4, 2019)……………………………………………….39, 40

*\*Edmonds v. Engility Corp.*, 82 F. Supp. 3d 337 (D.D.C. 2015)……………………………...….9, 39, 42

*\*Galezniak v. Millville Health Ctr.*, No. 4:11–cv–1719,
2012 WL 140220 (M.D. Pa. Jan. 18, 2012)……………………………………………39, 40

*\*Gleklen v. Democratic Cong. Campaign Comm.*,
199 F.3d 1365 (D.C. Cir. 2000)……………………………………………………...…14, 15, 42

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553 (2d Cir. 1997)………………………………………………36

*Harris v. D.C. Water & Sewer Auth.*, 195 F. Supp. 3d 100 (D.D.C. 2016)…………………………………8

*Holloway v. District of Columbia*, 9 F. Supp. 3d 1 (D.D.C. 2013)…………………………34, 35, 37, 38

*\*Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146 (D.D.C. 2012)……………………..………15, 39, 41

*\*Hopkins v. Grant Thornton LLP*, 529 Fed. App'x 1 (D.C. Cir. 2013)………………………………..15, 41

*Kelly v. Richard Wright Pub. Charter Sch.*, No. 1:16-cv-1853,
2019 WL 451348 (D.D.C. Feb. 4, 2019)…………………………………………………………42

*\*Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275 (D.D.C. 2017)………………………………14, 15, 40, 41

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006)………………………………………15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)……………………..……...8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)……………………………………………..…….9

*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1 (D.C. Cir. 2010)……………………40

*Mount v. Johnson*, 174 F. Supp. 3d 553 (D.D.C. 2016)……………………………………………………15

*Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81 (2002)……………………………………………40

*Walker v. Johnson*, 798 F.3d 1085 (D.C. Cir. 2015)……………………………………………………12

*\*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002)………………………………*passim*

*_Waterhouse v. District of Columbia,_ 124 F. Supp. 2d 1 (D.D.C. 2000)……………………………… _passim_

_Woodruff v. Peters_, 482 F.3d 521 (D.C. Cir. 2007)……………………………………………...…14, 15

## STATUTES

2 U.S.C. §§ 1301-1438…………………………………………………………………………....…1

2 U.S.C. § 1311………………………………………………………………………………………....…1

2 U.S.C. § 1312…………………………………………………………………………………..……1

## RULES

Fed. R. Civ. P. 56……………………………………………………………………………………1, 2, 7

LCvR 7……………………………………………………………………………………...…1, 2

I.     **INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56 and LCvR 7, Defendant The Office of Congressman Henry Cuellar at the U.S. House of Representatives ("Office") respectfully moves for summary judgment on all counts of Plaintiff Kristie Small's Amended Complaint, ECF No. 5.  Mrs. Small, a former Office employee, brings four claims under the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301-1438.  The CAA makes applicable, to Congressional employers, provisions of various federal labor and employment laws, including Title VII of the Civil Rights Act of 1964 ("Title VII"), *see* 2 U.S.C. § 1311, and the Family and Medical Leave Act of 1993 ("FMLA"), *see* 2 U.S.C. § 1312.  Among other things, Title VII prohibits employment discrimination based on sex, to include pregnancy.  In pertinent part, the FMLA affords an eligible employee job-protected leave for the birth of a child.

All four counts of Mrs. Small's Amended Complaint relate to her termination, and each count is untenable.  Essentially, Mrs. Small claims that the Office terminated her because she was pregnant and had requested FMLA leave.  Count 1 alleges that the termination constituted Title VII-prohibited sex discrimination.  Count 2, which posits that the termination was based on her pregnancy, is a Title VII sex discrimination claim and thus is wholly duplicative of Count 1.  Count 3 asserts that the termination unlawfully interfered with Mrs. Small's FMLA rights.  Finally, in Count 4 Mrs. Small contends that her termination violated the FMLA's anti-reprisal provision.

In fact, Mrs. Small was terminated for legitimate, nondiscriminatory reasons—namely, her poor job performance—and not because of her pregnancy or leave request.  Because, in light of the undisputed material facts, Mrs. Small cannot show *either* (1) that the Office's reason for terminating her is untrue *or* (2) that her termination resulted from intentional discrimination or retaliation, the Office submits it is entitled to summary judgment on all counts, pursuant to Fed.

R. Civ. P. 56 and LCvR 7.  For the foregoing reasons, and as more fully explained below, the Office's motion for summary judgment should be granted *in toto*.

## II.   **BRIEF FACTUAL SUMMARY**[1]

In the months prior to Mrs. Small's employment, the Office experienced several significant changes, including the loss of its two long-serving, most senior managers.  SUF ¶¶ 4-5, 8-9.  After their departures, Rep. Cuellar hired Jessica Hernandez to serve as the Office's district director and most senior manager in the district offices located in Texas.  SUF ¶ 6.  In the Washington, D.C., office, Rep. Cuellar initially promoted the Office's legislative assistant/counsel, Patrick Malloy, to the position of deputy chief of staff, but Mr. Malloy resigned several months later.  SUF ¶¶ 10-11.  This departure left the Washington office without a senior manager, and Rep. Cuellar began to search for a "turnkey" candidate who could restore order to the Office's management and raise staff performance to a higher level.  SUF ¶¶ 13-14.

Mrs. Small expressed interest in the position, and Rep. Cuellar was impressed by her apparent qualifications.  SUF ¶ 13.  In her resume, Mrs. Small highlighted her eleven-year tenure as a professional staffer for the Committee on House Administration, claiming to be a "[m]aster of all working parts of Congress."  SUF ¶ 16.  Rep. Cuellar was also impressed by Mrs. Small's purported experience training Members and House staffers.  SUF ¶ 21.  He believed this background would enable her to train his own staff on best practices for functioning as a Congressional office.  SUF ¶¶ 21-22.  During her interview, Rep. Cuellar made it clear that he sets high expectations for his staff.  SUF ¶ 24.  Mrs. Small indicated that she could meet those expectations.  SUF ¶ 24.  When the interview process concluded, Rep. Cuellar decided to keep

---

[1] In addition to the facts discussed in this factual background section, the Office incorporates by reference its Statement of Undisputed Facts ("SUF"), filed herewith.  The facts in the SUF are supported by citations to the evidentiary record.  Therefore, in this memorandum, the Office cites only the numbered paragraphs of the SUF to support its factual assertions.

the chief of staff position temporarily vacant and to offer Mrs. Small the position of deputy chief of staff.  SUF ¶ 27.  Mrs. Small accepted the job offer.  SUF ¶ 28.  Significantly, Mrs. Small was aware at the time of what she describes as Rep. Cuellar's reputation for being "very tough," for being "a very high maintenance difficult person to work for," and for having a "stern" management style.  SUF ¶¶ 25-26.

Mrs. Small's first day of employment was June 1, 2018.  SUF ¶ 29.  Her employment was at-will, and consistent with the Office's past practices, she was subject to a 90-day probationary period.  SUF ¶¶ 30-31.  Her primary duties included managing the day-to-day operations of the Washington office (which is where, *inter alia*, the Office's scheduler, legislative team, and press secretary are based); reviewing press releases, talking points, and other written deliverables prior to their submission to Rep. Cuellar; and preparing and delivering staff trainings. SUF ¶ 32.

In Mrs. Small's opinion, she "dove" into her new job immediately.  Amd. Compl. ¶ 1.  Rep. Cuellar disagrees.  SUF ¶ 34.  One recurring problem was Mrs. Small's failure to thoroughly review press releases and other written deliverables for typographical errors and incorrect information.  SUF ¶¶ 35, 36, 67(b)-(d).  This meant that Rep. Cuellar was reviewing every press release and every other written deliverable not only for strength and accuracy of content, but for the minutia of typographical and grammatical errors as well.  SUF ¶ 67(d).

Another problem concerned Mrs. Small's failure to develop—let alone implement— staff training programs that met Rep. Cuellar's expectations.  SUF ¶¶ 35, 67(i)-(l).  On at least two occasions, Mrs. Small submitted training materials lifted directly from internet sources with no specific focus on the needs of a Congressional office.  SUF ¶¶ 46-47.  A different time, when Rep. Cuellar inquired about her progress on developing training programs, Mrs. Small gave him

3

a copy of the Members' handbook that is provided to **freshmen** Members of Congress.  SUF ¶ 48.  After this incident, Rep. Cuellar—then in his seventh term—lost confidence in Mrs. Small's ability to meet his expectations for staff training.  SUF ¶ 49.

In addition to these performance deficiencies, Rep. Cuellar became aware that Mrs. Small had intraoffice conflicts with three of the female staffers whom she supervised.  SUF ¶¶ 45, 56, 61.  One conflict involved his new district director, Ms. Hernandez, who complained to Rep. Cuellar that Mrs. Small was improperly trying to delegate her staff training duties.  SUF ¶¶ 42, 45.  Ms. Hernandez felt ill-prepared to develop training materials because she had never worked for a Congressional office before, and she shared her concerns with Rep. Cuellar.  SUF ¶¶ 43-45.  The conflict between Ms. Hernandez and Mrs. Small continued despite Rep. Cuellar's efforts to mediate, and he personally observed Mrs. Small speaking to Ms. Hernandez in an inappropriate and unprofessional manner during one telephone call.  SUF ¶¶ 53-55.  A second intraoffice conflict involved the scheduler, Madeline Abadie.  SUF ¶ 56.  Rep. Cuellar prefers to keep his specific travel information confidential, and he instructed Ms. Abadie not to share this information with anyone.  SUF ¶ 57.  While on an official trip, Rep. Cuellar received a call from Ms. Abadie, who told him that Mrs. Small had forced her to divulge the confidential information even after Ms. Abadie explained Rep. Cuellar's instruction against doing so.  SUF ¶ 58.  Ms. Abadie complained to Rep. Cuellar that this incident made her feel threatened and uncomfortable.  SUF ¶ 59.  Ms. Abadie later told him that she believed Mrs. Small was trying to ostracize her from her co-workers.  SUF ¶ 60.  A third apparent intraoffice conflict involved Nina Andrews, the Office's special assistant.  SUF ¶ 61.  Rep. Cuellar recalls that Mrs. Small once told him not to trust Ms. Andrews.  SUF ¶ 62.  This was unusual not only because Ms.

Andrews was a long-serving aide (she first began working for the Office in 2007), but also because Mrs. Small and Ms. Andrews had been personal friends for many years.  SUF ¶ 62.

On September 5, 2018, Rep. Cuellar and Mrs. Small met to discuss her performance during her 90-day probationary period.[2]  SUF ¶ 63.  In the meeting, he provided Mrs. Small with some encouraging words, but the bulk of his feedback entailed substantive criticisms of Mrs. Small's performance.  SUF ¶¶ 65-68.  Rep. Cuellar identified the heavy amount of editing to press releases he was having to do as one of the "main problems."  SUF ¶ 67(b)-(d).  He instructed Mrs. Small to get more involved with the staff and to supervise their work more closely.  SUF ¶ 67(e)-(h) .  Also, he expressed his dissatisfaction with Mrs. Small's progress on developing staff training.  SUF ¶ 67(i)-(l).  Finally, he raised the incident with Ms. Abadie involving Mrs. Small's improper efforts to obtain his private travel information.  SUF ¶ 67(m).  Rep. Cuellar admonished Mrs. Small for overriding his instructions and added: "If I have certain instructions, then that's it.  You ask me and I can say, okay, let's do that, but you cannot override and put her in a very difficult situation."  SUF ¶ 67(m).  After discussing these issues, Rep. Cuellar informed Mrs. Small that he was extending her probationary period an additional thirty days in effort to provide her with an opportunity to improve.  SUF ¶ 68.

In response, Mrs. Small stated that she understood and agreed with all of Rep. Cuellar's assessments and criticisms.  SUF ¶ 69.  Then, she suddenly switched the subject to her salary and requested a $40,000 pay raise (almost a 50% increase over her $90,000 salary).  SUF ¶ 70.  Rep. Cuellar found Mrs. Small's request for a raise to be "bizarre" given the negative feedback he just provided.  SUF ¶ 124.  After a protracted back and forth, he finally said to Mrs. Small: "Can …

---

[2] Rep. Cuellar recorded this meeting because he lacked a chief of staff senior to Mrs. Small who could attend the meeting with him.  SUF ¶ 64.

we just stick to the performance and then … in thirty days let's talk about salaries, let's talk about everything?"  SUF ¶ 71.  Mrs. Small then asked: "[I]f you truly think in thirty days, you might fire me . . .  so maybe it would be better if you made some sort of decision, if you don't want me here."  SUF ¶ 76.  Rep. Cuellar replied:  "No, I want you.  If I didn't have faith in you, I would not be giving the thirty days on that."  SUF ¶ 77.  He also said: "I want you to work hard the next 30 days.  I know you can do it.  I know you can do it.  So let's talk again in 30 days and see where we're at at that time with the evaluations and improvement at that time."  SUF ¶ 68. Before the meeting ended, Mrs. Small again expressed her agreement with Rep. Cuellar's critiques and stated: "Yeah, I . . .  100 percent agree.  If that's all, I don't really have any questions, because I agree with everything you said."  SUF ¶ 80.

Over the following 30 days, Mrs. Small's performance failed to improve and meet Rep. Cuellar's expectations.  SUF ¶ 81.  She continued to submit press releases and other written deliverables that contained errors and required editing.  SUF ¶¶ 84-87.  And she did not respond in a timely manner to a request for a vote recommendation from Rep. Cuellar.  SUF ¶¶ 82-83. Nor did she make progress on meeting Rep. Cuellar's expectations for staff training.  SUF ¶ 40. Mrs. Small did, however, once again request a pay raise, this time advocating for a $20,000 salary bump.  SUF ¶¶ 89, 127.  She further proposed a $4,000 bonus for herself.  SUF ¶ 127. Although Mrs. Small also recommended raises and bonuses for certain other staffers—but not for the three female staffers with whom she had conflicts—the raise she recommended for herself dwarfed theirs.  SUF ¶ 128-29.  Rep. Cuellar testified that Mrs. Small's repeated efforts to secure a substantial salary adjustment were a factor that weighed in favor of her termination, particularly given her ongoing performance problems.  SUF ¶ 135.

When the extended probationary period ended, Rep. Cuellar made the decision to terminate Mrs. Small's employment.  SUF ¶¶ 90-92.  He communicated this decision to her on October 16, 2018.  SUF ¶ 92.  Shortly thereafter, Rep. Cuellar discovered that Mrs. Small had impermissibly removed the Office's personnel files and taken them to her personal residence.  SUF ¶¶ 168-69.  He also discovered that Mrs. Small had lied to him.  SUF ¶¶ 137-39.  She misrepresented to Rep. Cuellar that her raise and bonus recommendations had been approved by Dean Lester, the Office's financial administrator.  SUF ¶¶ 137-39.  They had not.  SUF ¶¶ 137-39.  Moreover, both before and after Mrs. Small's termination, Rep. Cuellar learned that many of his staffers had a negative impression of Mrs. Small's performance, contributing to or corroborating his own reasoning.  SUF ¶ 93.  These staffers include Ms. Hernandez, Ms. Andrews, Mr. Lester, and Travis Knight (the legislative director/counsel, who was a legislative assistant during Mrs. Small's tenure).  SUF ¶ 93.  They report that Mrs. Small was frequently out of the office and unreachable for unknown reasons, particularly during recess periods when Congress was not in session and Rep. Cuellar was not physically present in the Washington office.  SUF ¶¶ 101-06, 113-16, 119-20.  Staff struggled to reach Mrs. Small when she was out of the Office, and they had difficulty getting Mrs. Small to review their work product in a timely manner, if at all.  SUF ¶¶ 101-06, 113-15.  These staffers also confirm that Mrs. Small perpetuated conflict in the Office, particularly with female staffers.  SUF ¶¶ 107-08.

On or before July 5, 2018—over three months before the termination of her employment—Mrs. Small informed the Office of her pregnancy.  SUF ¶ 148.  The Office has a history of providing extended family and medical leave to its employees, including for the birth and care of a newborn.  SUF ¶ 163.  Its policy has long been to pay employees for FMLA leave, going beyond what the law requires.  SUF ¶ 164.  Mrs. Small admits that Rep. Cuellar never

made negative comments about pregnancy or maternity leave, that he allowed her to take leave

for prenatal medical appointments, and that he continued to pay her for this leave even after she

exhausted her accrued paid leave.  SUF ¶¶ 154, 166-67.

## III.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To be material a factual

dispute must be able to "affect the outcome of the suit under the governing law . . . ."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Such a dispute is genuine only if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  When

deciding a summary judgment motion, courts will construe the facts, and make factual

inferences, "'in the light most favorable to the party opposing the motion.'"  *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citation omitted).  "The

nonmoving party's opposition, however, must consist of more than mere unsupported allegations

or denials and must be supported by affidavits, declarations, or other competent evidence, setting

forth specific facts showing that there is a genuine issue for trial."  *Harris v. D.C. Water & Sewer*

*Auth.*, 195 F. Supp. 3d 100, 103 (D.D.C. 2016) (citing Fed. R. Civ. P. 56(e) and *Celotex Corp.*,

477 U.S. at 324).

## IV.    ARGUMENT

### A.  COUNT 1—SEX DISCRIMINATION (TITLE VII)

#### 1.  *McDonnell Douglas* Burden-Shifting Framework

Given the uncontroverted material facts, a reasonable jury could not find that Mrs.

Small's termination violated Title VII's prohibition on sex-based discrimination.  Mrs. Small

does not purport to have direct evidence of discrimination.  Rather, she posits that she can prove

Title VII-proscribed discrimination relying on circumstantial evidence.  Courts evaluate such indirect evidence claims guided by the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973).  *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002).  Under this framework, "the plaintiff bears the initial burden to establish a prima facie case of discrimination . . . ."  *Edmonds v. Engility Corp.*, 82 F. Supp. 3d 337, 341 (D.D.C. 2015) (citing *McDonnell Douglas*, 411 U.S. at 802).  "The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its challenged action."  *Edmonds*, 82 F. Supp. 3d at 341 (citing *McDonnell Douglas*, 411 U.S. at 802).  Once that happens, in this circuit, the plaintiff's ability to make a prima facie case becomes irrelevant as to whether his/her claim can proceed.  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).  Instead, the court must only decide if the plaintiff "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason ***and*** that the employer intentionally discriminated against the employee on the basis of…sex . . . ."  *Id.* at 494 (citations omitted) (emphasis added).

As discussed below, the Office presents undisputed evidence that Mrs. Small's employment was terminated because Rep. Cuellar believed that she failed to perform anywhere near adequately, despite her contradictory pre-employment promises, extensive counseling, and multiple opportunities to improve.  There is ***no*** evidence that the Office's decision was a pretext for discrimination or that it was based on Mrs. Small's pregnancy or request to use FMLA leave.

## 2.   The Office Terminated Mrs. Small For Legitimate, Nondiscriminatory Reasons

As a key selling point supporting her employment application, Mrs. Small represented that, armed with her Committee on House Administration experience, she could immediately start to transform the Office.  SUF ¶¶ 15-19.  She dubbed herself a "[m]aster of all working parts

9

of Congress[,]" giving Rep. Cuellar the distinct impression that she knew how the House operates in all respects.  SUF ¶ 17.  Rep. Cuellar understood from Mrs. Small that her prior committee experience included, most relevantly, instructing Members and their staffers on best practices for both:  (1) how to run a Congressional office, and (2) how to maximize performance potential for each position within such an office.  SUF ¶ 21.  Drawing on her Hill background, Mrs. Small warranted, she would establish policies and procedures that were sorely needed after two longtime, senior aides left the Office in 2017.  SUF ¶ 20.  And she promised to create and implement training programs that would bring a talented but inexperienced staff to a "higher level."  SUF ¶ 22.  Rep. Cuellar believed, and relied on, Mrs. Small's representations regarding her 'mastery' of the House, her extensive and unique training background, and her ability to extract optimum performance from Congressional staffers.  SUF ¶¶ 18-23.  Further, he thought she would be—and, importantly, he wanted her to be—"turnkey," a deputy chief of staff who "could just jump in and handle the office[,]" with little direction from him.  SUF ¶ 14.  "That was my expectation[,]" Rep. Cuellar testified, and "[s]he said she could meet that expectation."  SUF ¶¶ 14, 18-19, 24.

Almost from the beginning of her employment, however, Mrs. Small's performance in the Office led Rep. Cuellar to realize that her pre-employment representations did not match reality.  SUF ¶¶ 34, 36.  She repeatedly failed to deliver.  Mrs. Small's performance problems included, without limitation:  (1) submitting, and/or allowing her subordinates to submit, written deliverables to Rep. Cuellar that contained incorrect information and other errors; (2) providing insufficient staff oversight, partly due to her unexplained absences and unresponsiveness; (3) failing to effectively train staffers; and (4) clashing with other staffers as well as with Rep. Cuellar, himself.  SUF ¶ 35.  Amplifying the contrast between her pre-employment sales pitch

and her flailing on-the-job performance, Mrs. Small seemed preoccupied with upping her salary by as much as $40,000—an almost 50% increase.  SUF ¶¶ 70-74, 121-24, 126-27.  That stark disconnect did not bode well for her ability to meet the very expectations that she had fanned. SUF ¶¶ 124, 132-35.  When repeated counseling yielded inadequate improvement, and it became clear that Mrs. Small was incapable of even coming close to actualizing her pre-employment assurances, the Office terminated the employment relationship.  SUF ¶¶ 80, 90-92.

### 3.  Mrs. Small Cannot Prove Pretext Or Discriminatory Intent

Given that the Office has produced evidence demonstrating its legitimate, non-discriminatory reasons for terminating Mrs. Small's employment, she can only survive summary judgment if she proves that the Office's asserted reasons are false and that the Office intentionally discriminated against her on the basis of sex or in retaliated against for requesting FMLA leave.  Specifically, because the Office has put forth its legitimate, nondiscriminatory reasons for terminating her employment, to survive summary judgment Mrs. Small must show that the Office's "asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against [her] on the basis of…sex . . . ."  *See Brady*, 520 F.3d at 494 (citation omitted) (emphasis added).  There are several ways a plaintiff may try to meet that burden, including by establishing that the employer:  (1) "is making up or lying about the underlying facts that formed the predicate for the employment decision[;]" (2) made "discriminatory statements[;]" (3) treated poorly others who are in the same protected category (or categories) as the plaintiff; (4) treated individuals who are not in plaintiff's protected category (or categories) "more favorably in the same factual circumstances[;]" (5) has proffered "changes and inconsistencies in the stated reasons for the adverse action;" and/or (6) "fail[ed] to

follow established procedures or criteria….” *Id.* at 495 & n.3 (citations omitted); *see also Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495 & n.3).

Entirely absent from the record here are allegations, much less evidence, that pretext and/or discriminatory intent can be proved via any—except for one—of the customary methods plaintiffs employ for that purpose. Tellingly, Mrs. Small does not charge that Rep. Cuellar made discriminatory statements. To the contrary, she testified that he had not. SUF ¶ 154. Conspicuously missing, too, is any comparator evidence, a hallmark of successful circumstantial evidence cases. Nor has the Office's explanation for the termination varied; it is, and always has been, that Mrs. Small's poor performance prompted the termination. And, there is no evidence that the Office failed to follow its established procedures or policies to Mrs. Small's detriment. If anything, the Office treated Mrs. Small better than its standard practice prescribes, when it extended her probationary period for an additional 30 days in hopes that she would improve.

Mrs. Small only challenges the basis for the Office's termination decision by quibbling over when she supposedly was first made aware of her probationary period. She relies on "temporal proximity" to try to establish discrimination and retaliation. Mrs. Small likewise calls upon her own view of her job performance as evidence that her termination was unlawful. As detailed below, these arguments fail for two main reasons. First, Mrs. Small's temporal proximity arguments are dubious. Second, the undisputed evidence shows that, throughout her employment, Rep. Cuellar frequently expressed his concerns to Mrs. Small about her performance, and it is ***his view of her performance, not Mrs. Small's***, that matters for purposes of summary judgment analysis.

### a) Mrs. Small's Temporal Proximity Arguments Are Specious

To support her allegation that revealing her pregnancy to Rep. Cuellar in August 2018 led to the downfall of her employment with the Office, Mrs. Small relies almost exclusively on one email exchange, which she tries to cast as a smoking gun of sorts. On August 8, 2018, Mrs. Small emailed Rep. Cuellar to discuss her schedule for the coming months, in light of her pregnancy. SUF ¶ 149; Am. Compl. ¶ 40. Given Mrs. Small's problematic performance to that point, Rep. Cuellar responded by effectively proposing that they address more immediate concerns before discussing leave that, at the time, was about five months out (and would be moot if Mrs. Small did not successfully complete her probationary period). SUF ¶¶ 150-51; Am. Compl. ¶ 41. From this August 8, 2018, email exchange and what she says followed, Mrs. Small posits that one *must* infer discriminatory intent. But that temporal proximity argument does not deliver the silver bullet Mrs. Small needs to survive summary judgment. That is because: (1) it is undisputed that the Office first learned of Mrs. Small's pregnancy on or before July 5, 2018— so Rep. Cuellar's August 8, 2018, email, sent nearly five weeks later, is not a reflexive response to news of her pregnancy; (2) her case effectively hinges on temporal proximity, which alone cannot satisfy her burden to prove pretext and discrimination; and (3) she cannot disprove that Rep. Cuellar honestly and reasonably believed she was on probation all along.

### (1) The Office Knew Mrs. Small Was Pregnant By July 5, 2018

Fatal to Mrs. Small's temporal proximity-dependent argument is when she first informed the Office that she was pregnant. Contrary to what Mrs. Small avers in her Amended Complaint, the record reveals that Mrs. Small advised the Office of her pregnancy on July 5, 2018, if not earlier. SUF ¶ 148. Indeed, Mrs. Small testified that: she submitted a leave request form on July 5, 2018; the form indicates that she sought the leave for pregnancy; and Rep. Cuellar signed

the form on July 8, 2018.  SUF ¶ 148.  So the Office did not discover Mrs. Small's pregnancy on August 8, 2018.   By then, the Office had known she was pregnant for more than a month.  That fact belies Mrs. Small's depiction of Rep. Cuellar's August 8, 2018, email as a kneejerk reaction to the news of her pregnancy that somehow evidences discrimination.

### (2) Mrs. Small Cannot Succeed On Temporal Proximity Alone

In any event, Mrs. Small cannot prevail based just on temporal proximity.  To be sure, a plaintiff can make a prima facie case, and overcome a motion to dismiss, by relying solely on a sufficiently short timespan between applicable events.  *See Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000).  That is not true for surviving summary judgment.  *Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 283 (D.D.C. 2017).  "While temporal proximity between an employment action and protected activity is evidence of pretext, it alone is not enough at the summary judgment stage to overcome an employer's non-discriminatory explanation…."  *Id.* (citing *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *Butler v. D.C. Hous. Fin. Agency*, 593 F. Supp. 2d 61, 66 n.13 (D.D.C. 2009); and *Gleklen*, 199 F.3d at 1367-68).  At that point, a "plaintiff must present additional evidence 'to defeat the presumption that the proffered explanations are genuine.'"  *Long*, 263 F. Supp. 3d at 283 (citing *Woodruff*, 482 F.3d at 530; *Butler*, 593 F. Supp. 2d at 66 n.13; and *Gleklen*, 199 F.3d at 1367-68).  "If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation [or discrimination] claim."  *Woodruff*, 482 F.3d at 530.  Accordingly, even when relevant events are quite close, courts will grant summary judgment for an employer when temporal proximity constitutes all, or virtually all, evidence of pretext and/or purportedly discriminatory or

retaliatory intent.  *See Gleklen*, 199 F.3d at 1368-70 (affirming summary judgment for employer

on Pregnancy Discrimination Act ("PDA") and FMLA claims where adverse action occurred ***a***

***few weeks after plaintiff revealed pregnancy***); *see also Long*, 263 F. Supp. 3d at 283-88

(granting employer's summary judgment motion where plaintiff was ***on FMLA leave when***

***terminated***); *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 152-55 (D.D.C. 2012)

("*Hopkins I*") (granting summary judgment for employer where plaintiff was fired ***five days after***

***requesting FMLA leave***), *aff'd sub nom Hopkins v. Grant Thornton LLP*, 529 Fed. App'x 1

(D.C. Cir. 2013) ("*Hopkins II*").

Thus, even assuming *arguendo* that Mrs. Small can establish a prima facie case, temporal

proximity will not propel Mrs. Small to trial.  Once more, to proceed to a jury Mrs. Small must

be able to show that the Office's "asserted non-discriminatory reason was not the actual reason

and that the employer intentionally discriminated against [her] on the basis of…sex . . . ."  *See*

*Brady*, 520 F.3d at 494 (citation omitted).  "[I]t is by now well established that mere proximity in

time—standing alone—is not sufficient to rebut an employer's legitimate proffered reason and/or

to give rise to a reasonable inference that the actual motive for the challenged employment

decision is an improper one."  *Mount v. Johnson*,  174 F. Supp. 3d 553, 565 (D.D.C. 2016)

(citing *Woodruff,* 482 F.3d at 530).  Besides temporal proximity, Mrs. Small cites just ***her own***

***opinion*** of her job performance as evidence the Office unlawfully terminated her.  But her own

subjective opinion of her job performance cannot stave off summary judgment.  *See Waterhouse*

*v. District of Columbia*[3]*,* 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("*Waterhouse I*") (recognizing that

a plaintiff "cannot establish pretext simply based on her own subjective assessment of her own

---

[3] *Waterhouse I* has been abrogated on other, unrelated grounds—for the prima facie case burden
it articulates.  *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

performance"), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002) ("*Waterhouse II*").[4]   That leaves temporal proximity as her ***only*** purported "proof" of pretext and discriminatory intent.   Again, that is not enough.[5]

### (3)  Mrs. Small's Probationary Period Argument Is A Red Herring

With few other options, if any, Mrs. Small appears intent on manufacturing a factual dispute out of whole cloth to try to avoid summary judgment.   She now contends that the probationary period was not mentioned to her until after her August 8, 2018, email.   Therefore, she will presumably insist that:  (1) there is a factual dispute as to whether she was on probation before that date, and (2) a jury should resolve the dispute.   That strategy is fatally flawed.   Even if a jury might conclude that the probationary period was not ***mentioned to*** Mrs. Small before August 8, 2018, no evidence contradicts the fact that Rep. Cuellar ***believed*** that Mrs. Small was a probationary employee throughout her Office employment.

Declarations and deposition testimony from Rep. Cuellar and several former and current Office staffers show that, since 2005, the Office has subjected its new hires to an initial probationary period.[6]   SUF ¶¶ 140-47.   In fact, in October 2017, the Office promoted Patrick

---

[4] Mrs. Small's self-assessment is thoroughly contradicted by the record.  *See* Part IV.A.3.b, *infra*.
[5] Given when the Office actually learned of her pregnancy (July 5, 2018) and when it terminated her (October 16, 2018), one wonders whether Mrs. Small can even clear the lower bar of making a prima facie case of discrimination.  *See generally Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (suggesting gap of three months without more will not suffice to establish prima facie case's causation element in Title VII retaliation case) (citations omitted).
[6] One of the declarations confirming this longstanding practice comes from U.S. Immigration Judge Cynthia Lafuente-Gaona.  SUF ¶ 4.  For nearly 13 years (from 2005 until 2017), Judge Lafuente-Gaona assumed responsibility for implementing the probationary period policy, while serving variously as the Office's district director, deputy chief of staff, and chief of staff.  SUF ¶¶ 4-5.  She advised new hires about the policy, assessed their performance during the probationary period, and decided whether to retain them when the period ended.  SUF ¶¶ 142-43. Amy Travieso corroborates much of this.  From 2008 until 2017, Ms. Travieso occupied several roles in the Office, including deputy chief of staff (2011-2017).  SUF ¶¶ 8-9.  In that capacity,

Malloy, Mrs. Small's immediate predecessor, to deputy chief from the legislative assistant/counsel position he had held in the Office since 2016.  SUF ¶¶ 10, 145-46.  With that promotion came a new 90-day probationary period.  SUF ¶ 146.  Similarly, in March 2018, after approximately twelve years as a staffer on Rep. Cuellar's reelection campaigns, Jessica Hernandez joined the Office as its district director.  SUF ¶¶ 6-7, 145-46.  Her Office tenure also began with a 90-day probationary period.  SUF ¶¶ 146.

Against this backdrop, and regardless of when Mrs. Small claims to have learned about her probationary status, it is inconceivable that the Office would bring on Mrs. Small—then a virtual stranger to Rep. Cuellar and a wholly unknown quantity—but exempt her from its longstanding probationary period requirement.  Still, what matters is that the Office "honestly and reasonably believed" Mrs. Small was on probation beginning June 1, 2018.  *See Brady*, 520 F.3d at 496.  The Office's impression need not have been correct  *Id.*  No evidence calls Rep. Cuellar's belief into question.

### b)  Record Evidence Belies How Mrs. Small Assesses Her Own Performance

Mrs. Small submits that she performed her job so well that discrimination must be why the Office terminated her.  As support, she claims that:  (1) the Office did not advise her of performance problems until after her August 8, 2018, email; and (2) post August 8, 2018, the Office increasingly, and groundlessly, criticized her performance.  Importantly, a "[p]laintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for 'plaintiff's perception of herself, and of her work performance, is not relevant.  It is the perception of the decisionmaker which is relevant.'"  *Waterhouse I*, 124 F. Supp. 2d at 7

---

she assisted then-Chief of Staff Lafuente-Gaona in effectuating the probationary policy.  SUF ¶ 144.

(collecting cases).  The D.C. Circuit has found that "courts are without authority to 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"
*Waterhouse II*, 298 F.3d at 995 (citations omitted).  As such, "to rebut the employer's nondiscriminatory explanation 'it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.'"  *Id*. (citations omitted).  Nor does it suffice to prove erroneous the "honestly and reasonably believed" assumptions underlying an employer's action.
*See Brady*, 520 F.3d at 496.  Given the record and the law, invoking her own assessment of her job performance does not advance her ability to prove pretext and discriminatory intent.

Mrs. Small's performance-based arguments are addressed below as follows: first, the Office summarizes Rep. Cuellar and Mrs. Small's September 2018 review meeting, which occurred shortly after her initial 90-day probationary period ended.  During that review, Rep. Cuellar and Mrs. Small discussed some of her performance problems to that point.  Also at that time, Mrs. Small acknowledged that those problems existed.  The problems persisted.  And, as described further below, when combined with Mrs. Small's tone-deaf response to the performance criticisms she wholeheartedly conceded were accurate, this prompted the Office to terminate Mrs. Small.  Second, the Office presents deposition testimony reflecting that, from its perspective, Mrs. Small under-performed throughout her employment.  Such evidence corroborates both the failings Rep. Cuellar specifically outlined in the probationary meeting (with which, again, Mrs. Small agreed) and other reasons justifying Rep. Cuellar's decision to terminate Mrs. Small's employment.  Third, the Office refutes Mrs. Small's contention that, prior to August 8, 2018, it had not advised her of any performance deficiencies.  That contention is categorically false.  Finally, the Office rebuts Mrs. Small's claim that, post August 8, 2018, it criticized her more often and that such criticism was undeserved.  That claim, too, is untrue.

### (1) September 2018 90-Day Probationary Period Review

On September 5, 2018, Rep. Cuellar met with Mrs. Small to conduct her post-probationary period review.[7]  SUF ¶ 63.  Using the sandwich approach for conveying negative feedback, Rep. Cuellar started and ended the meeting with encouraging words.  SUF ¶ 65.  But he primarily addressed her main shortcomings, which he categorized in three ways—her failure to take things off his proverbial plate, her failure to adequately train the staff, and her brazen disregard for his instructions.  SUF ¶ 66.

Perhaps most significantly, Rep. Cuellar repeatedly expressed both his desire for Mrs. Small "to help me take some of that load off," to "help me with the overload that we have here[,]" and his consternation that she had not been doing that.  SUF ¶ 67(a).  Rep. Cuellar cited two examples.  Written work products regularly came to him, after Mrs. Small had approved them, with erroneous information or otherwise requiring revision.  SUF ¶ 67(b).   Based on the work's (lacking) quality, Rep. Cuellar indicated that "sometimes I think you just put, okay, thanks[,]" implying that Mrs. Small approved documents for submission to him without having reviewed them.  SUF ¶ 67(c).  Rep. Cuellar counseled Mrs. Small that "by the time they bring something to me, you have to scrub it and make sure because otherwise I'm editing" and pointed out that he had been "editing most of the work for you."  SUF ¶ 67(d).  Also, Rep. Cuellar reiterated that Mrs. Small must "walk the floor"—manage the Office in a hands-on way by actually spending time with staffers "to know what everybody is working on" and not just ask for emailed bullet point summaries.  SUF ¶ 67(e) - (f).  He wanted her to "know what everybody is talking about" in staff meetings and to help staffers, especially those lacking experience, with

---

[7] Rep. Cuellar recorded that meeting.  SUF ¶ 64.  During Mrs. Small's deposition, the recording was played and transcribed.  SUF ¶¶ 64.

their projects.  SUF ¶ 67(g).  Rep. Cuellar implored her to "[h]elp me with more things because I am doing a lot with the staff."  SUF ¶ 67(h).  To that, Mrs. Small responded: "I completely agree with that and that's all on me."  SUF ¶ 69.  Notably, at multiple points during their meeting Mrs. Small conceded that Rep. Cuellar's criticisms were valid.  SUF ¶¶ 69, 79, 80.  In fact, near the end of the review after hearing Rep. Cuellar's multiple concerns with her performance deficiencies, Mrs. Small *concurred with his assessment that she needed to improve her performance*, stating : "I 100 percent agree.  That's all.  I don't really have any questions because I agree with everything you said . . . ."  SUF ¶ 80.

Additionally, Rep. Cuellar highlighted Mrs. Small's training-related failings.  SUF ¶¶ 67(i)–(l).  He explained that "my expectation[] when you came was that you were training people" and "this is something that I need is for her to come in and train staff."   SUF ¶ 67(i). With her alleged prior experience training new Members of Congress, Rep. Cuellar thought that Mrs. Small should be able to train the Office's staffers, that it is "even easier to train staff" than Members.   SUF ¶ 67(k).  He conveyed to Mrs. Small his "need for you to be able to sit down and – and – and help train, you know, bring the staff up to a different level . . . ."  SUF ¶ 67(j).

Finally, Rep. Cuellar admonished Mrs. Small about unilaterally preempting his directives to staff, touching on the issue of her intraoffice conflicts (especially with other women).  SUF ¶ 67(m).  "I don't like when somebody goes against an instruction that I left[,]" he said.  SUF ¶ 67(m).  As an example, Rep. Cuellar cited an incident where Mrs. Small relentlessly demanded his agenda from a staffer, even though the staffer had repeatedly protested because Rep. Cuellar told her to provide it to no one.  SUF ¶67(m).  He advised Mrs. Small that "[i]f I have certain instructions, then that's it.  You ask me and I can say, okay, let's do that, but you cannot override and put her in a very difficult situation.  Okay?"  SUF ¶67(m).

Despite his dissatisfaction with Mrs. Small's performance, Rep. Cuellar opted to extend her probation by thirty days rather than terminate her.  SUF ¶ 68.  (That act severely undercuts Mrs. Small's accusation that her probationary period was a ruse to oust her for being pregnant. *See generally* SUF ¶¶ 68, 77.)  Furthermore, Rep. Cuellar told Mrs. Small:  "I want you to work hard the next 30 days.  I know you can do it.  I know you can do it.  So let's talk again in 30 days and see where we're at at that time with the evaluations and improvement at that time."  SUF ¶¶ 68.

Strikingly, however, and in a particularly acute display of chutzpah, ***after agreeing with Rep. Cuellar's extensive criticisms of her performance***, Mrs. Small nevertheless proceeded to request a $40,000 pay raise.  SUF ¶¶ 69-70.  To be clear, she asked for that raise ***immediately after*** Rep. Cuellar provided the foregoing feedback, extended her probation, and unequivocally expressed how tenuous her future employment was at that moment.  SUF ¶¶ 67-68.  A $40,000 raise would have yielded an almost 50% salary increase, after just three rather dire months on the job.  SUF ¶ 70.  Considering further salary discussion to be potentially pointless given the circumstances, Rep. Cuellar tried to redirect the conversation several times.  SUF ¶¶ 71-75.  Even after Rep. Cuellar said "in 30 days let's talk salaries" and "first, you've got to get past an extra 30 days," Mrs. Small ***continued to press the matter***.  SUF ¶¶ 71-73.  She stopped only after Rep. Cuellar made clear that "at that time," after 30 days, "we'll decide whether you stay or go" and thus that "[i]t's a little premature to talk about this.  Let's get past the – the next 30 days."  SUF ¶ 78.

**(2) Testimony Confirms Mrs. Small's Problematic Performance**

Deposition testimony corroborates that, throughout her Office tenure, Mrs. Small's performance fell short of Rep. Cuellar's expectations, both as specifically discussed during the 90-day probationary period review and in other, related ways.

**(a) Mrs. Small Insufficiently Reviewed Draft Documents**

Like Rep. Cuellar, others in the Office questioned whether Mrs. Small actually read draft documents she was supposed to revise before they reached Rep. Cuellar.  In her deposition, the Office's former press secretary, Olya Voytovich, responded "yes" when asked if "there were concerns about whether Kristie was editing some of the press releases . . . ."  SUF ¶ 95.  Ms. Voytovich also testified that Rep. Cuellar "had asked why there were, for example, things that needed to be edited within a document and why they weren't edited" and that she had replied "we had sent them to Kristie for edits, we had received the documents back, you know, a minute later saying that it was good, so I wasn't sure whether or not it had been edited."  SUF ¶ 96.  During her deposition, Ms. Voytovich discussed at some length Rep. Cuellar's vocal displeasure with the press releases drafted on Mrs. Small's watch, specifically his critique about the "need to proofread press releases and to double-check information in the things that we were producing . . . ."  SUF ¶ 97.

Along the same lines, Travis Knight, currently the Office's legislative director/counsel, testified that "the majority of the talking points that we had for [Mrs. Small's] approval were not responded to during the [August] recess period . . . ."  SUF ¶ 102.  According to Mr. Knight, during Congress's five-week August 2018 recess the Office's staff prepared talking points for three to four events per week.  SUF ¶ 101.  In a statement describing his experience with Mrs. Small as a supervisor, Mr. Knight wrote:  "I believe [Mrs. Small] was not reviewing any staff

work with little exception during her last two months at the office . . . ."  SUF ¶ 103.  When asked in his deposition "what was it that Kristie was not reviewing[,]" he specified "[t]alking points and press releases . . . ."  SUF ¶¶ 102-03.

Nina Andrews, the Office's special assistant, similarly testified that Mrs. Small "should have been the last sign-off on anything before it went to the congressman" but that "that rarely happened, because she didn't actually review the document."  SUF ¶ 111.  "Because rudimentary mistakes were not caught[,]"  Ms. Andrews elaborated, "clearly, it was not read" by Mrs. Small "before it was handed over to the boss."  SUF ¶ 111.

Likewise, Jessica Hernandez, the Office's district director, described how Mrs. Small would more obviously approve items without having first reviewed them.  SUF ¶¶ 113-15.  Ms. Hernandez testified that Mrs. Small "would just say, 'Oh, just tell the Congressman that I did look at it and I approve it[,]'" but that the Office's media "person would say, 'Jessica, she didn't even look at it and she approved it.'"  SUF ¶ 113.

In sum, multiple Office personnel expressed doubt that Mrs. Small gave anything more than short shrift to draft documents Rep. Cuellar expected her to edit into final form before they arrived on his desk.

### (b) Mrs. Small Was Inexplicably Absent And Inaccessible

On a related note, several deponents testified about Mrs. Small's unexplained absences from the Office, her unavailability when she was not there, and how both affected the staff.  According to Mr. Knight, "often during all the recess periods" (when Rep. Cuellar was in Texas, not Washington), "probably three times a week[,]" Mrs. Small left the Office for the day around noon.  SUF ¶ 104.  Her absences were so recurrent that the staff "wouldn't presume her to be around for the entire given -- given day during any given recess[,]" Mr. Knight further testified.

SUF ¶ 105.   Asked in his deposition "when was the first time that you couldn't get ahold of Kristie when she was not at the office[,]" Mr. Knight replied "I can undoubtedly say that occurred multiple times during August and continued."   SUF ¶ 106.   Queried "when Mrs. Small was not in the office, did you ever have occasion to try to contact her, whether by, you know, phone or text or e-mail and have her not respond[,]" Mr. Knight answered "yes."   SUF ¶ 106.

Dean Lester, the Office's financial administrator, expressed similar points when deposed. SUF ¶¶ 119-20.  A shared employee who concurrently works for nine Congressional offices, Mr. Lester is not based in the Office.  SUF ¶ 117.  Addressing Mrs. Small's unknown whereabouts during the August 2018 recess especially, Mr. Lester testified "I would go over [to the Office] a -- you know, a couple times and -- during the month, and she wasn't around at all.  She had not come in all day."  SUF ¶ 119.  Mr. Lester also recounted that "when I would visit the office, if she was not there, I would ask where she was, and [the staffers] said -they would say something like, 'Who knows?  We never know where she goes.'"  SUF ¶ 120.

In the same vein, Ms. Hernandez testified about the district press secretary's inability to reach Mrs. Small to review drafts.  SUF ¶ 114.  Per Ms. Hernandez, when finally connecting, Mrs. Small would indicate that she was away from the office, approve documents sight unseen, and authorize them to go to Rep. Cuellar nevertheless.  SUF ¶ 115.  Knowing how infrequently Mrs. Small was in the Office when Rep. Cuellar was not in Washington, Ms. Hernandez assumes that, when Mrs. Small overrode Rep. Cuellar's instructions and demanded his itinerary from the Office's scheduler, it was because Mrs. Small wanted "that schedule because her knowing where he was[,] was going to give her a sense of if she would come into the office or not."  SUF ¶ 116.

With Mrs. Small often inexplicably gone and inaccessible when not present, her absences meant staff had little choice but to operate without the managerial expertise that Mrs. Small had touted during pre-employment discussions with Rep. Cuellar.

### (c)  Mrs. Small Inadequately Trained Staff

Moreover, the record shows that Office staffers complained about Mrs. Small's failure to train them.  Ms. Hernandez testified that she repeatedly expressed frustration about the lack of training from Mrs. Small to Rep. Cuellar—and to Mrs. Small, herself.  SUF ¶¶ 43, 45.  Because Rep. Cuellar hired Mrs. Small to train his talented but inexperienced staff, Ms. Hernandez, then new to working in a Congressional office, expected to learn from Mrs. Small about, for instance, "managing skills and how to work, you know, with -- with staff, constituent work . . . ."  SUF ¶ 43.  However, Ms. Hernandez observed, Mrs. Small "did not know how to do that at all[,] and "I did not learn anything from her at all.  I didn't."  SUF ¶¶ 43.  As recounted by Ms. Hernandez, when ostensibly preparing a training program for Ms. Hernandez and others, Mrs. Small continually "demanded" that Ms. Hernandez—whom Mrs. Small was supposed to train—devise some of that training herself.  SUF ¶ 42.  Ms. Hernandez testified that she felt ill-equipped to do that and told Mrs. Small "'there's nothing that I can put because I don't know.  That's why you were hired to do a certain job, so you're here to train us.'"  SUF ¶¶ 44.  Ms. Hernandez elevated the matter to Rep. Cuellar.  SUF ¶¶ 44-45.  According to Ms. Hernandez:  "I do remember that I had actually e-mailed and I'd told the Congressman about this. And I said, 'You hired her to do a certain job and she has not done it.  She hasn't.'"  SUF ¶ 45.  Ms. Hernandez further summarized her communications with Rep. Cuellar on this issue as follows:  "'Sir, she wants me to write something up that I don't even know.' And he'd just say, 'Well, you're right. She's here to train you.'  So I'd need something from her, but she wasn't giving me anything."  SUF ¶ 45.  Rep.

Cuellar recalls the "conflict" between Mrs. Small and Ms. Hernandez.  SUF ¶¶ 50-55.  Their

conflict flowed, partly, from Ms. Hernandez's desire for Mrs. Small to train her and Mrs. Small's

apparent disinterest in providing any such training.  Adding insult to injury, Mrs. Small then

proceeded to delegate the training responsibility to, of all people, Ms. Hernandez.  SUF ¶¶ 44-45**.**

About these and similar exchanges, Rep. Cuellar testified that, during Mrs. Small's

tenure, his Office staffers "kept asking me for training . . . ."  SUF ¶ 41.  That is because, when he

brought Mrs. Small on board, he indicated to the staff that:  "She has all [these] years of

experience.  She's going to be training each of you.  She says she can train this and this.  She's

going to bring in the best practices from, you know, different [M]embers, different staff people

from the House Administration."  SUF ¶ 39.  Rep. Cuellar hired Mrs. Small to apply her

purported Committee on House Administration experience training Members and staff to "bring

[his Office's] staff to a higher level" by "bring[ing] the best practices" from all over the House

and "tell[ing] us how we can improve . . . ."  SUF ¶ 39.

But the promise of the self-proclaimed expert trainer went unfulfilled.  At times, when

she deigned even to go through the motions of educating staff, Mrs. Small disseminated

information not from her self-trumpeted committee experience, but from Google.  SUF ¶¶ 46-47.

After Mrs. Small circulated generic internet search results to staff—putatively "training" them—

Rep. Cuellar remembered wondering "why is she looking at third-party sites when she

supposedly had all this knowledge on training people?"  SUF ¶¶ 47.  In a sentiment put simply

by Ms. Hernandez, shared by Rep. Cuellar, and encapsulating why the Office terminated Mrs.

Small:  "She's not what I expected her to be."  SUF ¶¶ 45.

### (d) Mrs. Small Perpetuated Workplace Conflict

Several deponents relayed how Mrs. Small clashed with coworkers, and even with Rep. Cuellar.  For instance, at multiple points in his deposition Rep. Cuellar described the strife between Mrs. Small and Ms. Hernandez that began "within the first month" of Mrs. Small's employment.  SUF ¶ 51.  He testified that Ms. Hernandez repeatedly told him, referencing Mrs. Small:  "'I don't like the way she's talking to me[;]'" "'I cannot work with her[;]'" "'I[] don't want to work here[;]'" and that she "was ready to quit because the way Kristie would talk to her . . . ."  SUF ¶ 52.  On one occasion, with Mrs. Small in his office, Rep. Cuellar called Ms. Hernandez to try to mediate.  SUF ¶ 53.  According to Rep. Cuellar, during that call:  "it got to a point where Kristie was raising her voice[;]" "she raised her voice several times[;]" and "the tone and raising the voice that Kristie would bring up that I thought was not professional, and especially right in front of her boss . . . ."  SUF ¶ 54.  That made Rep. Cuellar wonder, as he stated when deposed:  "'What am I doing with this individual?  Why is she fighting with people and right in front of -- of her boss?  She's actually fighting with my district director.'"  SUF ¶ 55.

In addition, Mrs. Small had serious conflicts with Ms. Abadie, the Office's scheduler, and Ms. Andrews, the Office's special assistant.  As Ms. Abadie described to Rep. Cuellar, and as he testified, Mrs. Small "forced" Ms. Abadie to defy Rep. Cuellar's order not to share his itinerary, demanding it in a way that "Madeline [Abadie] felt threatened by . . . ."  SUF ¶¶ 58-59.  Rep. Cuellar further recalled that "Madeline told me how uncomfortable she felt" when Mrs. Small put her in that position.  SUF ¶ 59.  Moreover, Ms. Abadie informed Rep. Cuellar that "she felt that Kristie was going to the back office and telling people…don't trust Madeline."  SUF ¶ 60.  In Rep. Cuellar's words, Madeline "almost felt like she was being ostracized."  SUF ¶ 60.  Also evidencing tension between Mrs. Small and yet another female staffer, Rep. Cuellar testified that

Mrs. Small once told him, about Ms. Andrews: "'Don't trust Nina. Don't trust other people. Trust me.'" SUF ¶ 62. Conspicuously, when Mrs. Small suggested raises (and bonuses) for herself and almost all other Office staffers[8], she recommended no raises for the women with whom she had clashed during her tenure—Ms. Abadie, Ms. Andrews, and Ms. Hernandez. SUF ¶ 129.

Notably, per Mr. Knight, Mrs. Small would criticize Ms. Abadie, Ms. Andrews, and Ms. Hernandez openly, in front of most other staffers. SUF ¶ 107. Mr. Knight testified that he found it inappropriate how, regarding these women, Mrs. Small "outranked them and was sharing, you know, her critiques [about their performance] with junior staff." SUF ¶ 108.

### (e) Mrs. Small's Primary Concern Was Securing An Enormous Pay Raise For Herself, Not Doing Her Job

Perplexingly, rather than concentrate on bettering her poor performance to save her job, Mrs. Small opted to fixate on increasing her compensation. Rep. Cuellar testified that he found it "bizarre" that, during the above-referenced performance review meeting, "I was telling her that she was not doing her job" and "[i]nstead of focusing on the job performance and what she needed to improve, she's asking me for a $40,000 pay raise . . . ." SUF ¶ 124. Undeterred by either Rep. Cuellar's lack of receptivity to her $40,000 raise request on September 5, 2018, or her tenuous standing in the Office, just days before her termination Mrs. Small recommended to Rep. Cuellar that she receive a $20,000 salary bump plus a $4,000 bonus. SUF ¶ 127. Tellingly, as even Mrs. Small now admits, when she gave her salary and bonus suggestions to Rep. Cuellar, she lied.[9] SUF ¶ 137. On October 12, 2018, Mrs. Small advised Rep. Cuellar that Mr. Lester

---

[8] While Mrs. Small also suggested raises (and bonuses) for other staffers that were hefty by the Office's standards, her proposed raise dwarfed the rest. SUF ¶ 128.
[9] Around the same time, likely sensing that her termination was drawing nigh, without authorization, Mrs. Small opened a private file cabinet in Rep. Cuellar's office, removed

had considered the budget and approved the figures.  SUF ¶ 138.  Not true.  Mrs. Small *first*

provided that information to Mr. Lester on October 15, 2018—three days *after* representing to

Rep. Cuellar that Mr. Lester had already approved the figures.  SUF ¶ 139.

### (3)  Mrs. Small Received Negative Feedback Before August 8, 2018

According to Mrs. Small, until her August 8, 2018, email "she had no issues" regarding

performance and only after that did Rep. Cuellar "start[] following up with emails, Kristie, can

you help me, can you do this, can you do that."  SUF ¶¶ 153.  Not so.  What follows are just

some examples of the negative feedback Rep. Cuellar provided to Mrs. Small via email in June,

July, and very early August 2018.  These samples, too, show that Mrs. Small consistently

performed below par her entire time with the Office.

- In a June 25, 2018, email to Mrs. Small and her supervisees, Rep. Cuellar wrote:
  "Please keep me updated on any matter I refer to you.  I cannot be chasing around for
  answers (when you have them already) . . . ."  SUF ¶ 36(b).  *Mrs. Small responded*
  *"yes" when asked in her deposition "[i]s this an example of some negative feedback*
  *that the congressman was giving you, you and other staffers in June of 2018?"*
  SUF ¶ 36(b). (emphasis added).

- Similarly, on June 30, 2018, Rep. Cuellar emailed Mrs. Small et al:  "I can not chase
  you all for your work."  SUF ¶ 36(c).  *Questioned whether "that is negative*
  *feedback that he is directing to you and other staffers[,]" Mrs. Small conceded,*
  *testifying "yes."*  SUF ¶ 36(c) (emphasis added).

---

confidential personnel files for all of the Office's staff, and took those files to her home.  SUF ¶¶
168-69.  After her termination, per Rep. Cuellar, Mrs. Small tried to use returning the files to
barter for access to her former Office computer.  SUF ¶¶ 168-69.

- In a July 16, 2018, email to Mrs. Small et al. Rep. Cuellar wrote:  "Kristie I need help.  There are too many corrections!!!!!"  SUF ¶ 36(f).  When deposed, Mrs. Small confirmed that Rep. Cuellar wrote that to her, also during the time (before August 8, 2018) when she supposedly "had no issues . . . ."  SUF ¶ 36(f).

- On July 31, 2018, Mrs. Small exchanged emails with Rep. Cuellar regarding her desire to attend a two-day training.  SUF ¶¶ 37.  ***When deposed, Mrs. Small replied "correct" to the question:  "So, in this email chain, the congressman is denying your request to attend a training and citing some things that he feels are not being managed in the office that he wants you to focus on instead; is that right?"***  SUF ¶¶ 37(f) (emphasis added).  Rep. Cuellar first responded to Mrs. Small's request with:  ***"Please wait for this training on another date. There are two [sic] many press releases (you have to review pr) and calls to district that have to [be] made. Please manage. Thanks[.]"***  SUF ¶¶ 37(c) (emphasis added).  Mrs. Small pushed back, writing:  "Sir, I assure you I can manage the staff, review press releases, complete phone calls and take the training. I wouldn't let you down. ***I realize I should be providing you with more updates so you know what's going on and will do so moving forward.*** If you still don't want me to go to training that is fine but again I assure you I am on top of things here."  SUF ¶¶ 37(d) (emphasis added).  Unconvinced, Rep. Cuellar held firm:  "Let's do training other date[.]" SUF ¶¶ 37(e).

- Also on July 31, 2018, Rep. Cuellar conveyed his dissatisfaction with a press release that Mrs. Small had approved, emailing her and others:  "I don't like the second paragraph. Really.? This is a stop gap? Kristie please review[.]"  SUF ¶ 36(g).

- In another email he sent on July 31, 2018, Rep. Cuellar asked Mrs. Small: "What are u working on?  Where are more drafts for press releases? What has been send [*sic*] off. Need details[.]"  SUF ¶ 36(h).  ***Mrs. Small replied "correct" in her deposition, when asked:  "[T]his e-mail does give the impression that he doesn't know what you're working on, does not know the status of the drafts, does not know what has been sent off, and does not have details that he wants, right?"*** SUF ¶ 36(h). (emphasis added).

- On August 2, 2018, in an email to Mrs. Small and her supervisees about a draft press release, Rep. Cuellar wrote: "Crossing is not capitalized. Who is reading this guys? Kristie?"  SUF ¶ 36(i).  ***Mrs. Small replied:  "I'm sorry Sir, that particular one was not sent to me before you."*** SUF ¶ 36(i) (emphasis added).  Of note, Mrs. Small replied "yes" to each question when asked, during her deposition: (1) "[w]as it the ordinary practice for things to be sent to you before they were sent to the congressman[,]" (2) "[w]as that expected of staffers to send it to you before sending it to the congressman[,]" and (3) "you would have to approve it before it went to the congressman; is that right?"  SUF ¶ 36(i).

- Via email on August 7, 2018, using a refrain that was common throughout her employment with the Office, Rep. Cuellar pleaded:  "Kristie help out . . . ."  SUF ¶¶ 36(j).

Thus, the record debunks the myths Mrs. Small puts forward that:  (1) Rep. Cuellar "had no issues" with her performance before August 8, 2018; and (2) only after August 8, 2018, did he "start[] following up with emails, Kristie, can you help me, can you do this, can you do that."

Even Mrs. Small's own deposition casts doubt on these theories.  Mrs. Small testified that, before she joined the Office, based on media reports and communications with people who had worked for Rep. Cuellar:  "[m]y impressions were that he was a very high maintenance difficult person to work for."  SUF ¶ 25.   Those impressions never changed.  SUF ¶ 25. According to Mrs. Small:  Rep. Cuellar "was just very inconsistent, and there was never – nothing was ever really right.  Every single thing had a problem with it.  Every single, you know, project or plan or – and – and none of that's – like 98 percent of the st[u]ff wasn't true.  Like, it was just him being difficult."  SUF ¶ 156.  Significantly, Mrs. Small made clear that, in her view, Rep. Cuellar's criticism—"his demands and his fickleness"—were not limited **_to her_**, nor did such criticism suddenly commence on, or after, August 8, 2018.  SUF ¶ 158.  In her deposition, Mrs. Small acknowledged that, after her August 8, 2018, email:  "[T]here wasn't really a change in [Rep. Cuellar's] attitude, I don't believe.  I mean, the attitude was poor on his part, naturally, how he was to everybody.  So, like, there was no change."  SUF ¶ 157.  She specifically admits: "I don't think he was a difficult boss for me.  I think he was a difficult boss in general."  SUF ¶ 159.  When asked whether "other people in the office, then, experienced the kinds of things that you experienced with respect to how difficult the congressman can be[,]" Mrs. Small replied "yes."  SUF ¶ 160.

Other deponents agree with these sentiments to an extent.  For instance, when deposed Mr. Knight described Rep. Cuellar as "a tough boss."  SUF ¶ 109.  Similarly, Ms. Andrews testified that Rep. Cuellar is a "challenging" boss and that his demands are "taxing, but, yet, understandable."  SUF ¶ 112.   Likewise, in her deposition Ms. Voytovich observed that Rep. Cuellar "has very high standards" and that he is a "demanding boss across the board, both to male and to female staffers."  SUF ¶ 98.

**(4)  Post-August 8, 2018, Criticism Was Consistent And Warranted**

Mrs. Small's charge that the Office hurled more criticism her way post August 8, 2018, is unavailing for several other reasons.  First, without more, increased criticism means nothing. Any uptick could be unquestionably legitimate—attributable to, for instance, Mrs. Small's diminished engagement with Office personnel during the August 2018 recess when Rep. Cuellar was in Texas; her decreased Office presence during that recess (as noted above, she was frequently absent when Rep. Cueller was out of town); her declining performance; and/or the Office's heightened frustration with unabating performance deficiencies.  Second, Mrs. Small offers no evidence of increased negative feedback after August 8, 2018.  Both before and after that date, the same kinds of problems plagued Mrs. Small (even after Rep. Cuellar counseled her on September 5, 2018), and the Office responded to similar deficiencies in similar ways.

To illustrate, consistent with the pre-August 8, 2018, emails referenced above, on August 15, 2018, Rep. Cuellar emailed Mrs. Small et al. flagging an error in a draft press release and writing further:  "Please pay attention to details. Kristie?"  SUF ¶ 36(k).  And on September 4, 2018, Rep. Cuellar responded to proposed talking points Mrs. Small had approved with:  "Where is FBI director testimony in senate? You are missing things. Kristie?"   SUF ¶ 36(m).  On October 16, 2018, Rep. Cuellar found himself again editing a press release that Mrs. Small had okayed.  Emailing Mrs. Small et al., he advised that he had "[c]hanged titles to past tense[.]" SUF ¶ 87.  Mrs. Small forwarded that email to Ms. Voytovich with the message:  "How did I miss that... ugh."  SUF ¶ 88.

Finally, while Mrs. Small concedes the facts underlying some of Rep. Cuellar's criticisms, she nevertheless attempts to disclaim responsibility and deflect blame.  Facing similar maneuverings in an analogous case, the D.C. Circuit:  (1) determined that the plaintiff had not

presented "'sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision'" where she "did not contravene—and in fact admitted—many of the deficiencies cited concerning her performance[;]" and (2) dismissed the excuse that "she was not solely responsible" for the deficiencies because "she should have received greater support from" colleagues. *Waterhouse II*, 298 F.3d at 994 (citation omitted).

Remarkably, when questioned about her responsibility for her supervisees' work product, Mrs. Small testified: "I wasn't the press people…if Congressman Cuellar had a problem with the press team and how they were doing, then that should have been addressed with them, and it wasn't." SUF ¶ 161. Curiously, although confirming her job entailed supervising the press team, Mrs. Small also expressed that "I don't understand how I could be held responsible for the direct actions and work of other individuals." SUF ¶ 162. That is akin to an NFL coach with a losing record protesting that the team's owner could not fire him because the team, not its coach, was to blame for the losses. In both instances, the claim is preposterous. Mrs. Small was hired to manage and lead the entire staff; she testified, however, that the buck stopped with everyone but her.

### c) Mrs. Small Cannot—And Does Not Even Try To—Otherwise Show Pretext Or Discriminatory Intent

Having demonstrated the fallacy of her temporal proximity argument and provided ample evidence of the legitimate business reasons for terminating her employment, Mrs. Small is left with no support for her claims. In fact, also telling, as to Mrs. Small's inability to show pretext or discriminatory intent, are some things that she does not allege here.[10] *Holloway v. District of*

---

[10] In her deposition, when asked whether "every basis that you have for believing that the congressman discriminated against you based on pregnancy or the FMLA is in your complaint," Mrs. Small responded affirmatively. SUF ¶ 152. Additionally, answering a deposition question seeking the "specific reasons for believing that the congressman terminated your employment

*Columbia*, 9 F. Supp. 3d 1 (D.D.C. 2013), is instructive on this point.  There, the plaintiff argued

that, by terminating his employment about a month after he commenced FMLA leave, the

employer committed FMLA-proscribed retaliation.  *Id*. at 9.  Absent more than that temporal

proximity as evidence of retaliation, the court granted summary judgment for the employer.  *Id*.

at 10.  In doing so, the *Holloway* court highlighted what was markedly missing from the

plaintiff's proof of retaliation, including that:  (1) the plaintiff "does not provide any evidence of

discriminatory statements directed at him or at people seeking FMLA leave in general[;]" (2) the

plaintiff "does not submit any evidence that employees with similar [performance] records who

did not seek FMLA leave were treated differently[;]" (3) "the rationale behind the termination of

[plaintiff's] employment remained constant[;]" and (4) the plaintiff "does not point to any

examples of the defendant violating its procedure."  *Id*.  Similarly, these deficiencies are fatal to

Mrs. Small's.

Like in *Holloway*, Mrs. Small does not accuse Rep. Cuellar of having demonstrated

unlawful animus, such as by making discriminatory remarks concerning pregnancy or FMLA

leave.  *See* Am. Compl.; *see also* SUF ¶ 154.  To the contrary, she testified that Rep. Cuellar

never said "anything disparaging about pregnancy or women or children or medical leave or

FMLA leave."  SUF ¶ 154.  Casting more doubt on the proposition that Rep. Cuellar's decision

to terminate Mrs. Small was fueled by illicit animus is the fact that, when he hired her, Rep.

Cuellar knew that Mrs. Small was married and the mother of a very young child.  SUF ¶ 165.

*Cf. Waterhouse II*, 298 F.3d at 996 (recognizing that "'when the person who made the decision

---

because of your pregnancy and/or your desire to use FMLA leave for maternity leave," Mrs.
Small identified the August 8, 2018, email from Rep. Cuellar regarding her probationary period
and an alleged increase in negative, unmerited performance-related feedback she received after
August 8, 2018.  SUF ¶¶ 152-53.

to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire,' especially 'when the firing has occurred only a short time after the hiring'") (citing *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).

Additionally, the Amended Complaint does not allege that the Office denied anyone else FMLA leave for the birth of a child or for any other qualifying reason.  Am. Compl.; *see also* SUF ¶¶ 152-53.  Nothing in the record indicates that the Office ever refused to provide an eligible employee with FMLA leave.  Rather, the record reflects that, over the years, the Office has approved such leave for multiple employees, including for the birth and care of a newborn.[11] SUF ¶ 163.   And though not legally required, the Office's policy has long been to pay employees while they are on FMLA leave.  SUF ¶ 164.   Significantly, Mrs. Small testified that Rep. Cuellar authorized her to attend all of the prenatal medical appointments she had while employed by the Office.  SUF ¶ 166.  Rep. Cuellar even paid Mrs. Small for leave she took after she had exhausted her accrued paid sick and annual leave.  SUF ¶ 167.

Moreover, Mrs. Small introduces no comparator evidence of discrimination.  Am. Compl.; *see also* SUF ¶¶ 152-53.  She fails to identify a single person:  (1) who was not pregnant and/or did not request FMLA leave, (2) who had performance deficiencies akin to hers, and (3) whom the Office nevertheless retained.

---

[11] Because this fact is not contested, and to protect the privacy of non-party individuals, the Office has not included leave requests and similar corroborating documents in its summary judgment submission.  The Office did produce these documents to Mrs. Small in discovery.  If the Court would like to view such documents and/or if Mrs. Small changes course and challenges the Office's FMLA leave-providing history, then the Office will provide them pursuant to the protective order entered in this case.

Nor does Mrs. Small contend that over time the Office has changed, or otherwise been inconsistent with, its reasons for terminating her.  Am. Compl.; *see also* SUF ¶¶ 152-53.  She could not do that.  In the audio-recorded September 2018 review, the audio-recorded termination meeting in October 2018,[12] the August 2019 Answer, and Rep. Cuellar's March 2020 deposition, among other places in the record, the Office's rationale has been consistent: the Office terminated Mrs. Small for performance-related reasons.  SUF ¶¶  35.

Finally, the Amended Complaint does not claim that the Office diverged from some entrenched Office practice, such as using a progressive discipline paradigm, when it terminated Mrs. Small.  Am. Compl.; *see also* SUF ¶¶ 152-53.  Indeed, Mrs. Small's discharge was consistent with the Office's undisputed practice of employing people only on an at-will basis.  SUF ¶ 30.  Her discharge likewise aligned with the Office's probationary period practice, which began when Rep. Cuellar entered Congress in 2005.  SUF ¶¶ 140, 143, 144.

### 4.  Conclusion As To Count 1 (Title VII Sex Discrimination Claim)

In light of the indisputable evidence, a reasonable jury could not find that the Office's reasons for terminating Mrs. Small are pretextual and that sex discrimination was the real reason.  Again, Mrs. Small does not allege that Rep. Cuellar made any discriminatory statements about pregnancy.  *See generally Brady*, 520 F.3d at 495 & n.3; *Holloway*, 9 F. Supp. 3d at 9-10.  Nor does she contend that the Office:  (1) mistreated any other pregnant (or leave-requesting) employee, (2) more favorably treated any similarly situated nonpregnant (or non-leave-requesting) employee, (3) changed its rationale for termination, or (4) deviated from its standard operating procedures by terminating her.  *See generally Brady*, 520 F.3d at 495 & n.3; *Holloway*,

---

[12] Both Mrs. Small and Rep. Cuellar recorded the October 16, 2018, phone call during which the Office terminated Mrs. Small.

9 F. Supp. 3d at 9-10.  Essentially, Mrs. Small's case hinges on her own opinion about her performance.  That is not enough.  *See Waterhouse I*,  124 F. Supp. 2d at 7 (acknowledging that a plaintiff "cannot establish pretext simply based on her own subjective assessment of her own performance").

The record teems with incontrovertible evidence that, throughout her employment, before and after learning she was pregnant, the Office deemed Mrs. Small's performance subpar—with no improvement despite repeated counseling and countless chances.  By all accounts, Rep. Cuellar is demanding.  By Mrs. Small's account, he is also "high maintenance," "difficult," "inconsistent," and prone to "fickleness."  Importantly, he can be all of those things and still not violate the law.  And he can make decisions that Mrs. Small disagrees with.  Indeed, he can make decisions with which everyone takes issue.  But "courts are without authority to 'second-guess an employer's personnel decision absent demonstrably discriminatory motive . . . .'" *Waterhouse II*, 298 F.3d at 995 (citations omitted).  That is true even if the decision is "'not just, or fair, or sensible . . . .'"  *See id*.  Significantly, Mrs. Small "did not contravene—and in fact admitted—many of the deficiencies cited concerning her performance[,]" *id.* at 994.  Also significant is that she blames others for her failings.  That charge, ironically, hurts Mrs. Small's case more than it helps.  *Id*.  Statements like "***I don't understand how I could be held responsible for the direct actions and work of other individuals***" and "***I wasn't the press people…if Congressman Cuellar had a problem with the press team and how they were doing, then that should have been addressed with them***" are jaw-dropping, given the role for which Mrs. Small was hired and the representations she made to land the position.  SUF ¶¶ 161-62 (emphasis added).  Her job was to supervise and train those people, to assume responsibility for them and their work.  Mrs. Small's testimony about her role vis-à-vis the Office's staff

underscores the wide gulf between what Rep. Cuellar wanted from Mrs. Small and what he got. On top of that, and knowing how disappointed Rep. Cuellar was with various aspects of her performance, she audaciously and unremittingly hounded him for more money.  In short, Mrs. Small over-promised and under-delivered.  That—not her pregnancy, and not her leave request— is why she was terminated.

### B.   COUNT 2—PREGNANCY DISCRIMINATION (TITLE VII)

Count 2 should be dismissed because it is identical to—and thus duplicative of—Count 1. Instructive on this point is *Galezniak v. Millville Health Ctr.*, No. 4:11–cv–1719, 2012 WL 140220 (M.D. Pa. Jan. 18, 2012).  In *Galezniak*, count 1 of the complaint alleged that the plaintiff's termination was Title VII-proscribed sex discrimination, and count 5 claimed the termination was Title VII-prohibited pregnancy discrimination.  *Id.* at *4.  Arguing that the two counts were identical, the defendant moved to dismiss the latter.  *Id.*  The *Galezniak* court concluded that "[u]nder each claim, [plaintiff] seeks recovery under Title VII because she was discriminated against as a result of her pregnancy."  *Id.*  Accordingly, the court held that "[b]ecause pregnancy discrimination is a form of sex discrimination, and not an independent type of discrimination, the claims are duplicative and the claim in [c]ount 5 must be dismissed."  *Id.*; *see also Dudhi v. Temple Health Oaks Lung Ctr.*, No. 2:18-cv-3514, 2019 WL 426145, at *3 (E.D. Pa. Feb. 4, 2019) (dismissing PDA claim as duplicative of Title VII claim where "the underlying discrimination in [plaintiff's] Title VII and PDA claims is her pregnancy"); *cf. Hopkins I*, 851 F. Supp. 2d at 152 (dismissing FMLA "discrimination" count that "is essentially the same claim he makes in" his FMLA "retaliation" count); *Edmonds*, 82 F. Supp. 3d at 340-41 (noting that Title VII "makes it unlawful to discriminate ***on the basis of sex, including pregnancy***" and using PDA and Title VII interchangeably to refer to a single count) (emphasis added).

Mrs. Small's pregnancy discrimination claim (Count 2) should likewise be dismissed.  As in *Galezniak* (and *Dudhi*, for that matter), Mrs. Small's requested relief, and the purported basis for that relief, are the same for her sex discrimination and pregnancy discrimination claims. *Compare* Am. Compl. at ¶¶ 61-65 (Count 1) *with id*. at ¶¶ 66-70 (Count 2).  Via both claims she "seeks recovery under Title VII because she was discriminated against as a result of her pregnancy," *Galezniak*, 2012 WL 140220, at *4.  Since her Count 2 mirrors her Count 1, dismissing Count 2 is warranted.  *Id*.; *see also Dudhi*, 2019 WL 426145, at *3.  Count 2's resemblance to Count 1 makes summary judgment appropriate for another reason as well.  The analysis of both counts is identical.  *See Dudhi*, 2019 WL 426145, at *3 (observing that PDA claims are "evaluated under the same framework as other intentional sex discrimination cases under Title VII").  As a result, the case for why summary judgment on Count 1 is merited, which is set forth above in Part IV.A, applies equally to Count 2.

### C.  COUNT 3—FMLA INTERFERENCE

Because the Office lawfully terminated Mrs. Small's employment, summary judgment on Count 3 should be granted.  To prevail on her FMLA interference claim, Mrs. Small must "show both [1] that her employer 'interfere[d] with, restrain[ed], or den[ied] the exercise of or the attempt to exercise, any right provided' by the FMLA… and [2] that she was prejudiced thereby." *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010) (citing *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89 (2002)).  Importantly, "[a]lthough terminating a person's employment necessarily interferes with the person's rights under the statute, an employer is not liable for interference with FMLA rights if it can prove it would have fired the employee even if she had not [requested] leave." *Long*, 263 F. Supp. 3d at 288 (citations omitted).  "Rights to FMLA leave—whether in the application phase, medical

certification phase, or off-work phase—do not protect an employee's job against a legitimate, unrelated, reason for separation from employment." *Hopkins I* 851 F. Supp. 2d at 155; *see Long*, 263 F. Supp. 3d at 288 (same) (quoting *Hopkins I,* 851 F. Supp. 2d at 155); *see also Hopkins II*, 529 Fed. App'x at 2-3 (concluding FMLA leave request "does not bar termination for a valid business reason") (citations omitted).  Thus, an employer can defeat an FMLA interference claim when analysis through the *McDonnell Douglas* lens reveals that the plaintiff "would have been dismissed regardless of the employee's request for leave."  *See Hopkins I* 851 F. Supp. 2d at 155 (granting summary judgment on FMLA interference claim where plaintiff failed to show employer's legitimate, nondiscriminatory reason for discharge was pretext) (citations omitted), *aff'd Hopkins II*, 529 Fed. App'x at 3; *see also Long*, 263 F. Supp. 3d at 288-89 (finding employer is entitled to summary judgment on termination-as-FMLA-interference claim where "Defendant was dissatisfied with Plaintiff's performance for an extended period and took efforts to address her shortcomings without seeing significant or lasting improvement") (citations omitted).

As detailed above in Part IV.A, the Office terminated Mrs. Small for legitimate, nondiscriminatory reasons, which were unrelated to any request for FMLA leave.  Also, Mrs. Small "was an at-will employee who could be discharged at any time and for any reason as long as the reason was not illegal." *Hopkins I*, 851 F. Supp. 2d at 156.  Requesting FMLA does not shield her from lawful termination. *Id.*; *see also Long*, 263 F. Supp. 3d at 288-89.  For these reasons, she cannot show that her termination constituted illegitimate interference with her FMLA rights, so her FMLA interference claim necessarily fails.

### D.  COUNT 4—FMLA REPRISAL

Finally, Mrs. Small cannot succeed on her FMLA reprisal claim.  Absent direct evidence of FMLA retaliation—which is not alleged here—courts in this circuit evaluate such claims aided by the *McDonnell Douglas* burden-shifting framework commonly employed to assess Title VII claims that are based on circumstantial evidence.  *See Gleklen*, 199 F.3d at 1367; *see also Kelly v. Richard Wright Pub. Charter Sch.*, No. 1:16-cv-1853, 2019 WL 451348, at *5-7 (D.D.C. Feb. 4, 2019).  As such, when a plaintiff alleges that her discharge amounted to both Title VII-proscribed sex (pregnancy) discrimination and retaliation for seeking (or taking) pregnancy-related FMLA leave, those claims "may be analyzed simultaneously."  *See Gleklen*, 199 F.3d at 1367-1370 (considering a plaintiff's PDA and FMLA claims using *McDonnell Douglas* schema and affirming district court's summary judgment decision for defendant on both counts); *see also Edmonds*, 82 F. Supp. 3d at 341-44 (using *McDonnell Douglas* framework to assess PDA and FMLA claims and granting summary judgment for employer as to both).

Where the analysis is the same, so, too, should be the result.  As demonstrated above in Part IV.A, the Office terminated Mrs. Small for legitimate, nondiscriminatory reasons—not because she was pregnant and/or requested FMLA leave.  And there is no evidence to suggest that Mrs. Small's revelation of her pregnancy—or request to use FMLA leave—factored into the termination decision.  Of note, the Office afforded Mrs. Small leave to attend all prenatal appointments that occurred during her employment.  The Office even provided paid leave to her after she had exhausted such leave.  Accordingly, like her other claims, Mrs. Small's FMLA reprisal claim is untenable.

V.    <u>**CONCLUSION**</u>

Defendant Office of Congressman Henry Cuellar respectfully submits that this Court should grant summary judgment in its favor as to all counts.  On this case's record, Mrs. Small cannot prove that the Office's stated reasons for terminating her—that she continually fell far short of its legitimate performance expectations—are untrue or that her termination resulted from sex/pregnancy discrimination.  Accordingly, Mrs. Small's Title VII sex discrimination claim (Count 1) necessarily fails.  Because it is wholly duplicative of Count 1, Count 2, which alleges pregnancy discrimination under Title VII, should also be dismissed.  Given that Mrs. Small was terminated on permissible grounds, she cannot prevail on her FMLA interference claim (Count 3).  That is also true for her FMLA reprisal claim (Count 4).


Date:   May 22, 2020                    Respectfully submitted by,

                        By:    /s/ *Mark Stewart Hayes*
                               /s/ *Trevor St. George Blake II*
                               _____
                               Ann R. Rogers, D.C. Bar # 441622
                               Russell H. Gore, D.C. Bar # 449231
                               Mark Stewart Hayes, D.C. Bar #976878
                               Trevor St. George Blake II, D.C. Bar # 974319
                               U.S. House of Representatives
                               Office of House Employment Counsel
                               4300 O'Neill House Office Building
                               Washington, D.C.  20515
                               (202) 225-7075
                               Ann.Rogers@mail.house.gov
                               Russell.Gore@mail.house.gov
                               Mark.Hayes@mail.house.gov
                               Trevor.Blake@mail.house.gov

                               Counsel for Defendant
                               Office of Congressman Henry Cuellar
                               United States House of Representatives