**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————————
KRISTIE SMALL,                                              )
                                                           )
                              Plaintiff,                    )
v.                                                          )
                                                           )
THE OFFICE OF CONGRESSMAN                                   )       Case No. 1:19-cv-01314-TNM
HENRY CUELLAR,                                              )
                                                           )
                              Defendant.                    )
———————————————————————————)

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 7(h), Defendant, the Office of

Representative Henry Cuellar ("Defendant" or "Office"), hereby submits its Statement of

Undisputed Facts in Support of Defendant's Motion for Summary Judgment.  Defendant states

that the following facts are undisputed:

**The Parties**

1.       The Office was formed in 2005 after Representative Henry Cuellar ("Rep.

Cuellar" or "the Congressman") was elected to represent Texas's 28th Congressional District

("District").  Declaration of Ninamarie Andrews ("Andrews Decl.") (Attach. A) ¶ 5.

2.       Plaintiff Kristie Small ("Plaintiff" or "Mrs. Small") was employed by the

Office as deputy chief of staff from June 1, 2018 through October 16, 2018, when the Office

terminated her employment.  Am. Compl. (ECF No. 5) ¶¶ 1,3.

**Background Information on the Office and**
**Its Management Structure Prior to Plaintiff's Employment**

3.       In exercising his employing authority as the head of the Office, Rep.

Cuellar's practice has been to employ one senior manager in the District and another senior

manager in Washington, D.C.  Andrews Decl. (Attach. A) ¶ 6.

4.      In 2017, the Office's chief of staff, Cynthia Lafuente-Gaona, resigned her employment in order to become a U.S. Immigration Judge.  Declaration of Cynthia Lafuente-Gaona ("Lafuente-Gaona Decl.") (Attach. B) ¶ 7.

5.      Prior to her departure, Judge Lafuente-Gaona had been based in the District, and she had served variously as the Office's district director, deputy chief of staff, and chief of staff between 2005 and 2017.  Lafuente-Gaona Decl. (Attach. B) ¶¶ 3, 5-7.

6.      After Judge Lafuente-Gaona's departure, Rep. Cuellar hired Jessica Hernandez in March 2018 to serve as the most senior manager in the District, and he gave her the title of district director.  Deposition of Jessica Hernandez ("Hernandez Dep.") (Attach. C) 8:4-1, 13:2-14:8.

7.      Ms. Hernandez had previously worked for 12 years for Rep. Cuellar's campaign, but this was her first time working for the Office or any other congressional office. Hernandez Dep. (Attach. C) ¶¶ 13:2-8; 14:3-8.

8.      The Office experienced a second significant management change in 2017 when Amy Travieso, who was the deputy chief of staff and most senior manager in Washington, resigned her employment.  Declaration of Amy Travieso ("Travieso Decl.") (Attach. D) ¶ 8.

9.      Ms. Travieso had been employed by the Office since 2008 and had served as deputy chief of staff since 2011.  Travieso Decl. (Attach. D) ¶¶ 2, 6-8.

10.      After Ms. Travieso's departure, Rep. Cuellar promoted Patrick Malloy, the legislative assistant/counsel, to the deputy chief of staff position effective October 2017. Declaration of Patrick Malloy ("Malloy Decl.") (Attach. E) ¶¶ 3-7.

11.     Several months later, Mr. Malloy resigned his employment as deputy chief of staff, which left the Washington office without a senior manager.  Malloy Decl. (Attach. E) ¶ 7.

12.     With these departures, the Office's institutional memory suffered, including the administrative functions of the Office.  Andrews Decl. (Attach. A) ¶¶ 7-8.

### Mrs. Small's Hiring

13.     After Mr. Malloy's departure, Rep. Cuellar began to search for a senior manager to be based in Washington, and Mrs. Small applied for the job.  Deposition of Henry Cuellar ("Cuellar Dep.") (Attach. F.) 13:6-22; Deposition of Kristie Small ("Small Dep.") (Attach. G) 35:9-36:20; Am. Compl. ¶ 5.

14.     Rep. Cuellar wanted to hire a "turnkey" manager who "could just jump in and handle the office[]" with little direction.  Cuellar Dep. ("Attach. F") 99:1-100:9; *see also id.* 99:1-100:9 (further explaining "[t]hat was my expectation … [s]he said she could meet that expectation.").

15.     He also wanted someone who could immediately start to transform the Office.  Cuellar Dep. ("Attach. F") 34:17-41:13, 99:1-100:9.

16.     Mrs. Small's resume highlighted her congressional work history, which included, most recently, working as a Professional Staffer for the Committee on House Administration for the previous 11 years.  Small Dep. (Attach. G) Ex. 1.

17.     Mrs. Small's resume stated that she was a "[m]aster of all working parts of Congress."  Small Dep. (Attach. G) Ex. 1.

18.     When Rep. Cuellar interviewed Mrs. Small, they discussed her congressional work experience and her ability to meet his expectations.  Cuellar Dep. (Attach. F) 34:17-

41:13, 99:1-100:9; Small Dep. (Attach. G) 119:15-120:15; Am. Compl. ¶ 1.

19.     During the interview process, Rep. Cuellar became satisfied that Mrs. Small could meet his expectations.  Cuellar Dep. (Attach. F) 25:20-26:8.

20.     He believed and expected that Mrs. Small's congressional experience had prepared her to implement policies and procedures to restore order to the Office, which had been negatively impacted by the recent management changes.  Cuellar Dep. (Attach. F) 25:2—26:8; Small. Dep. (Attach. G) 126:15-127:11.

21.     Rep. Cuellar was also impressed by Mrs. Small's training experience, which, he understood, had included teaching Members and staffers best practices on both (1) how to run a congressional office, administratively-speaking, and (2) how to perform, substantively-speaking, in each position within those offices.  Cuellar Dep. (Attach. F) 34:17-41:13, 50:2-51:4, 53:3-57:11, 99:1-100:9, 104:16-108:7.

22.     Rep. Cuellar believed and expected that Mrs. Small, through her training and supervision of staff, could elevate the Office's talented but inexperienced staff to a "higher level."  Cuellar Dep. (Attach. F) 34:17-41:13, 50:2-51:4, 53:3-57:11.

23.     Rep. Cuellar further believed and expected that Mrs. Small understood how the House works in all respects, including as a legislative body.  Cuellar Dep. (Attach. F) 34:17-41:13, 50:2-51:4, 53:3-57:11, 99:1-100:9, 104:16-108:7; Small Dep. (Attach. G) Ex. 1.

24.     During the interview process, Rep. Cuellar recalls conveying to Mrs. Small that he sets high expectations for his staff.  Cuellar Dep. (Attach. F) 26:4-8 ("I set high expectations for myself.  I set high expectations for the office.  I communicated those high expectations to her when I first hired her.  And she said, 'Absolutely.  I can meet all those expectations.'").


25.     According to Mrs. Small, she believed at that time that Rep. Cuellar is, in her words, "known to be very tough" and "a very high maintenance difficult person to work for." Small Dep. (Attach. G) 101:13-14, 112:12-14, ; *see generally id.* 112:1-113:1; *see also id.*115:10-14 (stating that her pre-employment impressions of Rep. Cuellar did not change after she began working for the Office).

26.     Mrs. Small recalls having a discussion with Rep. Cuellar about his "stern" management style during the interview process, which she recounts as follows:

> <u>Attorney Blake.</u> You don't challenge him?
>
> <u>Mrs. Small.</u> You do not challenge him.  That actually came up in my interview at the dinner meeting with him because I was trying to gauge his personality, and, like, how we would work together, and I said — he was, like ... you know, I — I — I'm stern. These aren't exact words.  I'm stern and I — you know, something, something. And I was, like, well, that's okay, sir, you know, as long as you're okay with me yelling back at you.  Because, you know, staffers do that —
>
> <u>Attorney Blake.</u> Right.
>
> <u>Mrs. Small.</u> — and I was joking, but not — and he was, like, oh, no, that will never happen.  Like, dead serious.  So I put [sic] in my place.  I understood what that meant. It was said very clearly and that's fine.

Small Dep. (Attach. G) 119:19-120:15.

27.     When the interview process concluded, Rep. Cuellar decided to leave the chief of staff position vacant and to offer Mrs. Small the deputy chief of staff position. Cuellar Dep. (Attach. F) 10:4-11:3; Small Dep. 41:1-7; Am. Comp. ¶ 27.

28.     Mrs. Small accepted the job offer.  Am. Compl. ¶ 27.

### **Mrs. Small's Performance During Her Initial 90 Days of Employment.**

29.     Mrs. Small's first day on the job was June 1, 2018.  Am. Compl. ¶ 28.

30.     Mrs. Small was given a copy of the Office's employee handbook, and she signed an acknowledgement that she had read and understood it and that her employment was

at will.  Small Dep. (Attach. G) Ex. 14.

     31.     Consistent with the longstanding Office policy of subjecting new hires to a probationary period, Rep. Cuellar considered Mrs. Small to be on probation during her first 90 days of employment.  Cuellar Dep. (Attach. F) 166:16-167:14.

     32.     In her new role as deputy chief of staff, Mrs. Small's duties included (1) managing the day-to-day operations of the Washington office, which is where, *inter alia*, the Office's scheduler and its legislative and communications staff are based; (2) understanding the legislative issues of Rep. Cuellar; (3) providing assistance in the execution of Rep. Cuellar's routine duties; (4) preparing and delivering staff trainings; (5) reviewing press releases, talking points, and other written deliverables prior to their submission to Rep. Cuellar; and (6) performing other management-related duties, such as making pay, bonus, and other budgetary recommendations in consultation with the Office's financial administrator.  Am. Compl. ¶ 31; Answer (ECF No. 11) ¶ 1.

     33.     Mrs. Small, who was the Office's highest-ranking manager, considered herself to be the "acting chief of staff."  Am. Compl. ¶¶ 29, 30.

     34.     Rep. Cuellar's assessment is that Mrs. Small failed to meet his performance expectations during her first 90 days of employment.  Small Dep. (Attach. G) 177:13-194:22.

     35.     Mrs. Small's performance problems included, without limitation:  (1) submitting, and/or allowing others to submit, press releases, talking points to be used by the Congressman at appearances, and other written deliverables that contained incorrect information and other errors; (2) providing insufficient staff oversight; (3) failing to effectively train staffers; and (4) clashing with other staffers as well as with Rep. Cuellar. Answer (ECF 11) ¶1; Cuellar Dep. (Attach. F) 34:17-41:13, 50:2-51:4, 53:3-57:11, 104:16-

108:21; Small Dep. (Attach. G) 177:13-194:22.

36.     Rep. Cuellar addressed Mrs. Small's performance issues in multiple email

exchanges during this 90-day period:

(a)     On June 19, 2018, the Congressman expressed dissatisfaction with a

draft letter to President Trump: "Kristie please get involved more."  Attach. H (HC000491).

(b)     In a June 25, 2018, email to Mrs. Small and her supervisees, Rep.

Cuellar wrote:  "Please keep me updated on any matter I refer to you.  I cannot be chasing

around for answers (when you have them already)[.]"  Small Dep. (Attach. G) 160:21-161:11

and Ex. 21 (HC000168).  Mrs. Small responded "yes" when asked in her deposition if this

"[i]s this an example of some negative feedback the congressman was giving you, you and

other staffers in June of 2018?"  Small Dep. (Attach. G) 160:21-161:11.

(c)     Similarly, on June 30, 2018, Rep. Cuellar emailed Mrs. Small and the

staff:  "I cannot chase you all for your work."  Small Dep. (Attach. G) 161:12-18 and Ex. 22

(HC000174).  Questioned in her deposition whether "that is negative feedback that he is

directing to you and other staffers[,]" Mrs. Small answered "yes."  Small Dep. (Attach. G)

161:12-18.

(d)     On July 2, 2018, Mrs. Small provided a daily report to Rep. Cuellar, to

which he responded with a request for more detail, particularly on the activities of the staffers

she oversaw.  Attach. I (HC000176).

(e)     On July 6, 2018, Rep. Cuellar directed Mrs. Small to "walk [the] floor

… everyday" to gather information on what staff were working on.  Attach. J (HC000188).

(f)     In a July 16, 2018, email to Mrs. Small and other staffers, Rep. Cuellar

wrote:  "Kristie I need help.  There are too many corrections!!!!!"  Small Dep. (Attach. G)

165:15-166:3 and Ex. 25 (HC000195-199).  In her deposition, Mrs. Small confirmed that

Rep. Cuellar wrote that.  Small Dep. (Attach. G) 165:15-166:3 and Ex. 25 (HC000195-199).

(g)     On July 31, 2018, the Congressman expressed dissatisfaction with a

press release that Mrs. Small had already reviewed and approved: "I don't like the second

paragraph.  Really.?  [Sic]  This is a stop gap?  Kristie please review."  Attach. K

(HC000203-204).

(h)     In another email sent on July 31, 2018, Rep. Cuellar asked Mrs. Small:

"What are u working on?  Where are more drafts for press releases?  What has been send

[sic] off.  Need details[.]"  Small Dep. (Attach. G) 172:18-173:15 and Ex. 24 (HC000201-

202).  Mrs. Small concedes that "this e-mail does give the impression that he [Rep. Cuellar]

doesn't know what you're working on, does not know the status of the drafts, does not know

what has been sent off, and does not have details that he wants[.]"  Small Dep. (Attach. G)

172:18-173:15

(i)     On August 2, 2018, when Rep. Cuellar received a draft press release

with a typographical error, he wrote to Mrs. Small and other staffers: "Crossing is not

capitalized.  Who is reading this guys?  Kristie?"  Mrs. Small replied: "I'm sorry, Sir, that

particular one was not sent to me before you."  Small Dep. (Attach. G) 166:4-167:16 and Ex.

26 (HC000212).  In her deposition, Mrs. Small answered "yes" when asked the following

questions about this email exchange: (1) "was it the ordinary practice for things to be sent to

you before they were sent to the congressman[,]" (2) "was that expected of staffers to send it

to you before sending it to the congressman[,]" and (3) "you would have to approve it before

it went to the congressman; is that right?"  Small Dep. (Attach. G) 166:4-167:18 and Ex. 26

(HC000212).

(j)     When a similar incident occurred on August 7, 2018, with a press release Mrs. Small had previously approved, Rep. Cuellar wrote to Mrs. Small and other staffers: "Kristie help out."  Attach. L (HC000515-16).

(k)     On August 15, 2018, the Congressman flagged another error in a press release about to be sent out and wrote to Mrs. Small and other staffers: "Please pay attention to details.  Kristie?"  Attach. M (HC000219-226).

(l)     A press release approved by Mrs. Small on August 31, 2018, contained incorrect information, which the Congressman flagged.  Attach. N (HC000605).

(m)     On September 4, 2018, Rep. Cuellar responded to proposed talking points approved by Mrs. Small as follows:  "Where is FBI director testimony in senate?  You are missing things.  Kristie?"   Small Dep. (Attach. G) 176:7-13 and Ex. 38.

37.     Rep. Cuellar and Mrs. Small had the following, more extended performance-related discussion in emails exchanged on July 31, 2018:

(a)     When Mrs. Small sought permission late that day—a Tuesday—to be out of the office the coming Thursday and Friday for training, the Congressman wrote: "Next time give me more notice and catch up with work because [you] have miss[ed] several days in the last week.  Als[o] get me daily reports on [the] office.  I need you to manage the office."  Small Dep. (Attach. G) 161:29-163:13 and Ex. 23 (HC000205-207).

(b)     Mrs. Small replied:  "Sir, I assure you I can manage the staff, review press releases, complete phone calls and take the training.  I wouldn't let you down.  I realize I should be providing you with more updates so you know what's going on and will do so moving forward.  If you still don't want me to go to training that is fine but again I assure you I am on top of things here."  Small Dep. (Attach. G) Ex. 23 (HC000205-207).

       (c)     Rep. Cuellar then replied: "Please wait for this training on another date.  There are two many press releases( you have to review pr)and calls to district that have to made.  Please manage.  Thanks." *Id.*

       (d)     Mrs. Small replied:  "Sir, I assure you I can manage the staff, review press releases, complete phone calls and take the training. I wouldn't let you down.  I realize I should be providing you with more updates so you know what's going on and will do so moving forward. If you still don't want me to go to training that is fine but again I assure you I am on top of things here." *Id.*

       (e)     Rep. Cuellar replied:  "Let's do training other date." *Id.*

       (f)     Mrs. Small testified "correct" when asked in her deposition:  "So, in this email chain, the congressman is denying your request to attend a training and citing some things that he feels are not being managed in the office that he wants you to focus on instead; is that right?"  Small Dep. (Attach. G) 163:8-13.

     38.     During this initial 90-day period, Rep. Cuellar also had concerns about Mrs. Small's approach to staff training.  *See generally* Answer ¶ 1.

     39.     When Mrs. Small first came on board, Rep. Cuellar had informed staff that she would be training them on best practices.  Cuellar Dep. (Attach. F) 12:5-14:7, 34:17-41:13, 54:21-60:7 (testifying to his belief that should could "bring the best practices and tell us how we can improve," *id.* 14:3-4, and that he conveyed the following to staff: "She has all this years of experience.  She's going to be training each of you.  She says she can train this and this.  She's going to bring in the best practices from, you know, different members, different staff people from the House Administration," *id.* 56:17-22).

     40.     Rep. Cuellar's assessment was that Mrs. Small "never did the training that I

asked her to do." Cuellar Dep. (Attach. F) 30:20-31:5.

      41.      This assessment was based in part on information provided to Rep. Cuellar by the staffers whom Mrs. Small supervised.  Cuellar Dep. (Attach. F) 54:21-60:7 (testifying that staffers "kept asking me for training").

      42.      One such incident occurred early in Mrs. Small's tenure, when Ms. Hernandez told Rep. Cuellar that Mrs. Small had improperly attempted to delegate some of her training duties to Ms. Hernandez and "demanded" that Ms. Hernandez develop certain training materials.  Hernandez Dep. (Attach. C) 15:6-17:7, 38:18-39:11; Small Dep. (Attach. G) Ex. 47 (HC000180).

      43.      Ms. Hernandez had no congressional experience prior to her recent employment with the Office, and she felt ill-equipped to develop the training materials requested by Mrs. Small, which was to include information on communications with the press.  Hernandez Dep. (Attach. C) 38:18-39:11; Small Dep. (Attach. G) Ex. 47 (HC000180); *see also* Hernandez Dep. (Attach. C) 13:2-18, 14:19-15:3 (testimony of Ms. Hernandez that that "I did not learn anything from her at all.  I didn't."; that she expected to learn from Mrs. Small "managing skills and how to work, you know, with – with staff, constituent work"; and that Mrs. Small "did not know how to do that at all").

      44.      In an email on July 3, 2018, Ms. Hernandez expressed her concerns directly to Mrs. Small, as follows: "I don't know what you want me to come up with.  I don't have the knowledge that you have as a chief of staff trainer….  Kristi [sic] they are bringing you [down] here for a reason which is to train[] the staff including me to better ourselves and the office."  Hernandez Dep. (Attach. C) 38:18-39:11; Small Dep. (Attach. G) Ex. 47 (HC000180); *see also* Hernandez Dep. (Attach. C) 38:18-39:4 (further testifying that she said

to Mrs. Small: "I – there's nothing that I can put because I don't know.  That's why you were hired to do a certain job, so you're here to train us").

45.       Ms. Hernandez then forwarded this email exchange to Rep. Cuellar and complained to him about Mrs. Small's attempt to delegate her training duties.  Hernandez Dep. (Attach. C) 38:18-39:11 (testifying that "I do remember that I had actually e-mailed and I'd told the Congressman about this.  And I said, 'You hired her to do a certain job and she has not done it.  She hasn't.'  And he'd just say, 'Well, you're right.  She's here to train you.'  So I'd need something from her, but she wasn't giving me anything."); *id.* 54:18-56:20 (further testifying about her impression of Mrs. Small: "She's not what I expected her to be."); *see also supra* ¶¶ 50-55 (discussing Rep. Cuellar's awareness of conflict between Mrs. Small and Ms. Hernandez).

46.       Rep. Cuellar's concerns about Mrs. Small's approach to training extended to the substance of the training materials that she submitted for his review, which included content lifted directly from internet sources.  Attach. O (HC000495-498) (email dated July 7, 2019, from Mrs. Small to Rep. Cuellar forwarding a document on "Dealing with Difficult Constituents," which consisted of materials she pulled directly from a third-party website — not from any materials she created); Attach. P (HC000216)  (email dated August 8, 2018, from Mrs. Small to Rep. Cuellar sharing "just a couple of things I found when I did a google search" on how to write a press release).

47.       Mrs. Small's reliance on internet sources to develop training materials did not meet Rep. Cuellar's expectations.  Cuellar Dep. (Attach. F) 30:20-31:5 ("I think she would Google up from third sites how to write a press release that she would share with me.  And I mean. . . why are you giving me something about how to write a press release from Google

— from a Google search when she was supposed to have done that training?"), 58:7-59:5 (testifying as follows: "When –  I found it interesting, because why is she looking at third-party sites when she supposedly had all this knowledge on training people?").

48.      Rep. Cuellar asked Mrs. Small about her progress on the development of training programs, and on one occasion she responded by bringing him the House's "freshman members handbook that freshman members are given."  Cuellar Dep. (Attach. F) 30:13-15.

49.      After this incident, Rep. Cuellar — then a seven-term Member of Congress — lost confidence in Mrs. Small's ability to meet his expectations with respect to staff training.   Cuellar Dep. (Attach. F) 30:15-19 (testifying "that's when I said — in my mind, I said, 'She's not going to train people, 'cause she's asking me to read this freshman manual that she dropped off'").

50.      Rep. Cuellar's also had concerns about Mrs. Small's treatment of staff and was made aware of "conflict" between Mrs. Small and Ms. Hernandez.  Cuellar Dep. (Attach. F) 59:6-60:1.

51.      The conflict between Mrs. Small and Ms. Hernandez began "within the first month" of Mrs. Small's employment. Cuellar Dep. (Attach. F) 31:17-33:1, 153:20-156:14, 157:13-158:10, 160:16-161:5.

52.      Referring to Mrs. Small, Ms. Hernandez told Rep. Cuellar the following: "I don't like the way she's talking to me[;]" "I cannot work with her[;]" "I[] don't want to work here[;]" and that she "was ready to quit because the way Kristie would talk to her[.]"  Cuellar Dep. (Attach. F) 31:17-33:1, 160:16-161:5.

53.      On one occasion, with Mrs. Small in his Washington office, Rep. Cuellar

called Ms. Hernandez on the phone to try to mediate the conflict.  Cuellar Dep. (Attach. F)
31:17-33:1, 153:20-156:14.

54.     Rep. Cuellar believed that Mrs. Small acted unprofessionally toward Ms.
Hernandez during that call.  Cuellar Dep. (Attach. F) 153:20-156:14 (testifying that "it got to
a point where Kristie was raising her voice," "she raised her voice several times," and "the
tone and raising the voice that Kristie would bring up that I thought was not professional, and
especially right in front of her boss").

55.     This incident made Rep. Cuellar question his decision to hire Mrs. Small.
Cuellar Dep. (Attach. F) 153:20-156:14 ("'What am I doing with this individual?  Why is she
fighting with people and right in front of — of her boss? She's actually fighting with my
district director.'").

56.     Rep. Cuellar became aware of another intraoffice conflict between Mrs.
Small and a staffer, this time with Madeline Abadie, the Office's Scheduler.  Cuellar Dep.
(Attach. F) 27:1-13, 117-119.

57.     Rep. Cuellar had previously instructed Ms. Abadie to maintain the privacy of
his travel information on his calendar and not to share this information with anyone.  Cuellar
Dep. (Attach. F) 117-119.

58.     While on an official trip, Rep. Cuellar received a call from Ms. Abadie, who
told him that she was forced by Mrs. Small to divulge the Congressman's specific travel
information even after Ms. Abadie explained that Rep. Cuellar had instructed her not to share
the information.  Cuellar Dep. (Attach. F) 116:22-118:7, 120:19-123:21.

59.     Ms. Abadie complained to Rep. Cuellar that this incident made her feel
threatened and uncomfortable, and he believed Ms. Abadie's complaint and took it seriously.

Cuellar Dep. (Attach. F) 25:20-27:19, 116:22-118:7, 120:19-123:21 (testifying to his understanding that Mrs. Small "forced" Ms. Abadie to defy Rep. Cuellar's order not to share his itinerary, that "Madeline felt threatened by" Mrs. Small's conduct, and that "Madeline told me how uncomfortable she felt" when Mrs. Small put her in that position).

60.     Rep. Cuellar believed Ms. Abadie when she also told him that "she felt Kristie was going to the back office telling people . . . don't trust Madeline."  Cuellar Dep. (Attach. F) 161:6-19 (testifying to his understanding that Ms. Abadie "almost felt like she was being ostracized").

61.     A third conflict involved Nina Andrews, the Office's special assistant, who has worked for the Office off and on since 2007.  Andrews Decl. (Attach. A) ¶ 2.

62.     Rep. Cuellar recalls that Mrs. Small once said that he should not trust Ms. Andrews, who served as the Office's special assistant and had been personal friends with Mrs. Small even prior to her employment with the Office.  Cuellar Dep. (Attach. F) 162:17-163:16, 164:3-6 (testifying that Mrs. Small said: "Don't trust Nina. Don't trust other people. Trust me."); Deposition of Ninamarie Andrews ("Andrews Dep.") (Attach. Q) 37:5-12; 92:9-19 (testifying about her friendship with Mrs. Small).

### Mrs. Small's 90-Day Performance Review

63.     Rep. Cuellar and Mrs. Small met for her 90-day performance review on September 5, 2018.  Am. Compl. ¶ 47; Small Dep. (Attach. G) 177:11-195:2.

64.     Lacking a chief of staff who could attend and witness the meeting, Rep. Cuellar recorded the meeting.  Cuellar Dep. (Attach. F) 21:20-22:15; Small Dep. (Attach. G)

177:11-195:2.[1]

65.     Rep. Cuellar offered both positive and negative feedback to Mrs. Small during the meeting.  Small Dep. (Attach. G) 178:1-6, 191:9-15.

66.     Rep. Cuellar categorized his criticisms of Mrs. Small's performance in three ways: she was failing take things off his plate; she was not adequately training the staff; and she was disregarding his instructions.  Small Dep. (Attach. G) 177:11-195:2.

67.     More specifically, Rep. Cuellar conveyed the following to Mrs. Small:

(a)     "I need for you … to help take some of that load off" and "help me with the overload we have here[,]" and he gave examples of where that was not happening.  Small Dep. (Attach. G) 178:1-181:17, 189:16-190:12, 191:16-193:13

(b)     Rep. Cuellar identified "press releases" as one of the "main" problems, stating: "There's been times when it's like — four or five times it's like — front, back, front, back, front, back …"  Small Dep. (Attach. G) 178:1-181:17, 192:7-193:13.

(c)     Rep. Cuellar stated that "sometimes I think you [Mrs. Small] just put, okay, thanks" when reviewing written deliverables prior to their submission to him.  Small Dep. (Attach. G) 192:7-193:13.

(d)     Rep. Cuellar counseled Mrs. Small that, "by the time [staff] bring something to me, you have to scrub it and make sure because otherwise I'm editing," and he pointed out that he had been "editing most of the work for you."  Small Dep. (Attach. G) 192:7-20.

---

[1]  During Mrs. Small's deposition, this recording was played, transcribed, and entered into the record.  Small Dep. (Attach. G) 177:11-195:2.

(e)     Another problem Rep. Cuellar identified was Mrs. Small's failure to closely supervise staff: "[Y]ou have to know what everybody is working on … you need to sit down with them and say, okay, what are you working, how is this, all that."  Small Dep. (Attach. G) 179:11-17.

(f)     Rep. Cuellar told Mrs. Small that she needed to "walk the floor" and "to know what everybody is working on," rather than just asking staff to send her emailed bullet point summaries of their work.  Small Dep. (Attach. G) 178:1-181:17, 181:21-185:17.

(g)     Rep. Cuellar said that he wanted Mrs. Small to "know what everybody is talking about" in staff meetings and to help staffers, especially those lacking experience, with their projects.  Small Dep. (Attach. G) 182:8-185:17.

(h)     Rep. Cuellar asked Mrs. Small to "[h]elp me with more things because I am doing a lot with the staff."  Small Dep. (Attach. G) 191:18-192:4.

(i)     With respect to her training duties, Rep. Cuellar told Mrs. Small that "my expectation[] when you came in was that you were training people" and that "this is something that I need is for her to come in and train staff."   Small Dep. (Attach. G) 178:1-181:18.

(j)     Rep. Cuellar stated, "I need for you be able, to sit down and help train the, you know, bring the staff up to a different level."  Small Dep. (Attach. G) 178:1-181:18.

(k)     Given her prior experience training new Members of Congress, Rep. Cuellar conveyed his expectation that Mrs. Small train the Office's staffers because it should be "even easier to train staff" than Members.  Small Dep. (Attach. G) 178:1-181:18.

(l)     Rep. Cuellar expressed his "need for you to be able to sit down and — and — and help train, you know, bring the staff up to a different level on that."  Small Dep.

(Attach. G) 178:1-181:18.

        (m)    Rep. Cuellar also raised the incident with Ms. Abadie, *see supra* ¶¶ 56-60, and said the following to Mrs. Small: that she "overrode my instructions," that "I don't like when somebody goes against an instruction that I left," that "[y]ou just never do that," and that "[i]f I have certain instructions, then that's it.  You ask me and I can say, okay, let's do that, but you cannot override and put her in a very difficult situation.  Okay?"  Small Dep. (Attach. G) 178:1-181:18.

68.      Based on these performance deficiencies, Rep. Cuellar told Mrs. Small that he was extending her probationary period for 30 days and stated to her: "I want to extend this for another 30 days. I want you to work hard the next 30 days. I know you can do it. I know you can do it. So let's talk again in 30 days and see where we're at at that time with the evaluations and improvement at that time."  Small Dep. (Attach. G) 178:1-181:18.

69.      Mrs. Small responded affirmatively to the Congressman's criticisms, stating: "I completely agree with that and that's all on me."  Small Dep. (Attach. G) 191:18-192:4.

70.      Mrs. Small then took the conversation in a different direction by asking for a substantial salary increase of $40,000 dollars over her then-current salary of $90,000 — or almost a 50% pay raise.  Small Dep. (Attach. G) 35:9-36:20, 185:18-190:17.

71.      After Mrs. Small requested the raise, Rep. Cuellar responded: "Can … we just stick to the performance and then, you know, in 30 days let's talk about salaries, let's talk about everything? . . .  first, you've got to get past an extra 30 days."  Small Dep. (Attach. G) 187:1-5.

72.      Mrs. Small then asked Rep. Cuellar: "Is this more of a review after 30 days? Or is my job on the line?"  Small Dep. (Attach. G) 188:2-3.

73.     The Congressman responded: "We'll talk in thirty days."  Small Dep. (Attach. G) 188:4.

74.     Mrs. Small once against raised the subject of her pay, which prompted the Congressman to ask: "[W]e'll talk about this; but, basically, you're asking for it to go to $40,000 increase?"  Small Dep. (Attach. G) 189:2-4.

75.     Rep. Cuellar then said to her: "At the end of thirty days, I mean, I want you to improve . . .  I'll be very honest, but that's when we decide whether you stay or go . . . ."  Small Dep. (Attach. G) 189:19-22.

76.     At this point in the conversation, Mrs. Small raised the possibility of her departure from the Office: "[I]f you truly think in 30 days, you might fire me, I don't want to have to worry about that.  So maybe it would be better if you made some sort of decision if you don't want me here."  Small Dep. (Attach. G) 191:3-8.

77.     Rep. Cuellar replied: "No, I want you.  If I didn't have faith in you, I would not be giving the 30 days on that. I mean, I – I have faith that you can elevate it and I want you to do that. I want you to do that. I mean, I want you to do your best. We'll talk in 30 days and see where we are at that time."  Small Dep. (Attach. G) 191:9-15, .

78.     Rep. Cuellar also told Mrs. Small during this meeting: "[W]e'll decide whether you stay or go . . . [i]t's a little premature to talk about this.  Let's get past – the next 30 days."  Small Dep. (Attach. G) 189:21-190:12.

79.     Rep. Cuellar wrapped up the conversation by recapping his concerns, beginning with the need for Mrs. Small to help with his workload, to which Mrs. Small replied: "I completely agree."  Small Dep. (Attach. G) 192:5-6.

80.     Mrs. Small also said: "I 100 percent agree.  That's all.  I don't really have any

questions because I agree with everything you said . . . ." Small Dep. (Attach. G) 193:10-13.

**Mrs. Small's Performance After the September 5 Review**

81.    In Rep. Cuellar's opinion, Mrs. Small's performance did not improve during the 30-day extended probationary period that followed the September 5 review. Cuellar Dep. (Attach. F) 176:10-178:4.

82.    Two days after the review, on September 7, 2018, the Congressman emailed Mrs. Small at 8:58 p.m., asking for a recommendation on a vote to occur the next day. Attach. R (HC000347).

83.    Mrs. Small replied the next morning: "Sorry Sir I fell asleep early. Let me look at this." Attach. R (HC000347).

84.    On September 8, 2018, Rep. Cuellar found edits to a press release Mrs. Small had already approved. Attach. S (HC000359).

85.    When a draft Tweet approved by Mrs. Small on September 10, 2018, referred to "approximately 1,00 [sic] franchises in District 28," the Congressman wrote Mrs. Small: "Kristie there is a mistake. Please catch things. 1,00??" Attach. T (HC000391).

86.    On October 4, 2018, the Congressman corrected another typo in a release that Mrs. Small had previously approved. Attach. U (HC000400).

87.    On October 16, 2018, Rep. Cuellar edited another press release that Mrs. Small had approved, and he advised Mrs. Small and other staffers in a follow up email that he had "[c]hanged titles to past tense[.]" Small Dep. (Attach. G) 175:19-176:6 and Ex. 37 (HC002803-06).

88.    Mrs. Small forwarded Rep. Cuellar's follow-up email to Ms. Voytovich with the message: "How did I miss that . . . ugh." Small Dep. (Attach. G) 175:19-176:6 and Ex.

37 (HC002803-06).

89.       Mrs. Small then requested a pay raise of $20,000.  Attach. V (HC000716-728).

### Mrs. Small's Separation from the Office.

90.       On September 28, 2018, Rep. Cuellar told Mrs. Small that he would be absent on October 5 and stated: "[W]e have agreed to extend the date to review your performance until I get back to the office in Laredo.  The date should be October 16th.  Talk to you soon.  Have a good weekend."  Attach. W (HC000399).

91.       In emails on October 15 and 16, 2018, Rep. Cuellar and Mrs. Small arranged to conduct the 30-day review by telephone at the end of the day on October 16th.  Attach. X (HC000431-433).

92.       During this October 16th call, which both parties recorded, Rep. Cuellar informed Mrs. Small that he was terminating her employment.  Cuellar Dep. (Attach. F) 21:12-19.

### The Assessment of Office Staff Regarding Mrs. Small's Failure to Perform

93.       Several current or former employees of the Office corroborate aspects of Rep. Cuellar's assessment of Mrs. Small's performance, including the following: Olya Voytovich; Travis Knight; Nina Andrews; Dean Lester; and Jessica Hernandez.  *See infra* ¶¶ 94-120 (summarizing the testimony of these individuals).

### Olya Voytovich

94.       Olya Voytovich is a former employee who served as the Office's press secretary during Mrs. Small's tenure.  Deposition of Voytovich ("Voytovich Dep.") (Attach. Y) 8:7-14.

95.     Ms. Voytovich had concerns about whether Mrs. Small was actually editing press releases submitted for her review prior to their submission to Rep. Cuellar.  Voytovich Dep. (Attach. Y) 33:13-34:8 (responding "yes" when asked if "there were concerns about whether Kristie was editing some of the press releases").

96.     According to Ms. Voytovich, on at least once occasion, when Rep. Cuellar "had asked why there were, for example, things that needed to be edited within a document and why they weren't edited," Ms. Voytovich told the Congressman: "[W]e had sent them to Kristie for edits, we had received the documents back, you know, a minute later saying that it was good, so I wasn't sure whether or not it had been edited."  Voytovich Dep. (Attach. Y) 30:9-31:10.

97.     Ms. Voytovich testified that Rep. Cuellar was displeased with the draft press releases generated on Mrs. Small's watch because they did not meet his expectations on the "need to proofread press releases and to double-check information in the things that we were producing[.]"  Voytovich Dep. (Attach. Y) 25:17-43:17 (testifying at length on this issue).

98.     Ms. Voytovich further testified that Rep. Cuellar "has very high standards" and is a "demanding boss across the board, both to male and to female staffers."  Voytovich Dep. (Attach. Y) 59:18-60:13.

<u>Travis Knight</u>

99.     Travis Knight served as a legislative assistant during Mrs. Small's tenure and is currently as the legislative director/counsel.  Deposition of Travis Knight ("Knight Dep.") Attach. Z 10:3-11.

100.     One of the duties of the Office's legislative staff is to generate "talking points" for Rep. Cuellar.  Knight Dep. (Attach. Z) 39:18-40:5

101.      Mr. Knight estimates that, during the five-week recess period of August 2018 when Congress was out of session and Rep. Cuellar was not physically present in Washington, staff prepared talking points for three to four events per week.  Knight Dep. (Attach. Z) 67:1-68:12.

102.      According to Mr. Knight, "the majority of the talking points that we had for [Mrs. Small's] approval were not responded to during the [August 2018] recess period[.]" Knight Dep. (Attach. Z) 67:1-68:12.

103.      In a statement describing his experiences with Mrs. Small as a supervisor, Mr. Knight wrote:  "I believe [Mrs. Small] was not reviewing any staff work with little exception during her last two months at the office[.]"  Knight Dep. (Attach. Z) 73:11-18 and Ex. 2; *see also id.* (when asked "what was it that Kristie was not reviewing[,]" testifying "[t]alking points and press releases").

104.      Mr. Knight recalls that Mrs. Small was often out of the office during recess periods when Rep. Cuellar was not physically present in Washington.  Knight Dep. (Attach. Z) 59:1-61:4 (testifying that "often during all the recess periods" Mrs. Small left the office for the day around noon "probably three times a week").

105.      According to Mr. Knight, Mrs. Small's absences were so recurrent that the staff "wouldn't presume her to be around for the entire given — given day during any given recess."  Knight Dep. (Attach. Z) 69:13-20.

106.      When Mrs. Small was out of the office, there were "multiple times" when she was unresponsive to Mr. Knight's attempts to discuss work-related matters.   Knight Dep. (Attach. Z) 63:8-12 (testifying, when asked what "was the first time that you couldn't get ahold of Kristie when she was not at the office[,]" as follows: "I can undoubtedly say that

occurred multiple times during August and continued."); *id.* 93:6-10 (responding "yes" when asked whether "when Mrs. Small was not in the office, did you ever have occasion to try to contact her, whether by, you know, phone or text or e-mail and have her not respond?").

107.    Mr. Knight recalls the conflicts between Mrs. Small and Ms. Hernandez, Ms. Abadie, and Ms. Andrews, and he testified that Mrs. Smith would openly criticize these employees in front of other staffers.  Knight Dep. (Attach. Z) 93:17-94:8.

108.    Mr. Knight found it inappropriate that Mrs. Small, with respect to Ms. Hernandez, Ms. Andrews, and Ms. Abadie, "outranked them and was sharing, you know, her critiques [about their performance] with junior staff."  Knight Dep. (Attach. Z) 93:17-94:8.

109.    Based on his experience as an employee of the Office, Mr. Knight believes that Rep. Cuellar is "a tough boss."  Knight Dep. (Attach. Z) 51:9-15.

<u>Nina Andrews</u>

110.    Nina Andrews serves as the Office's special assistant, a position she also held during Mrs. Small's tenure.  Andrews Dep. (Attach. Q) 11:11-17.

111.    Ms. Andrews believes that Mrs. Small often failed to review documents thoroughly prior to their submission to Rep. Cuellar.  Andrews Dep.  (Attach. Q) 69:11-70:11 (testifying that Mrs. Small "should have been the last sign-off on anything before it went to the congressman," but "that rarely happened, because she didn't actually review the document"); *see also id.* 70:7-11 ("Because rudimentary mistakes were not caught, clearly, it was not read [by Mrs. Small] before it was handed over to the boss.").

112.    Based on her experience as an employee of the Office, Ms. Andrews believes that Rep. Cuellar is a "challenging" boss and that his demands are "taxing, but, yet, understandable."  Andrews Dep. (Attach. Q) 101:18-102:14.

<u>Jessica Hernandez</u>

113.     Ms. Hernandez believes that Mrs. Small approved written deliverables for
submission to Rep. Cuellar without thoroughly reviewing them first.  Hernandez Dep.
(Attach. C) 22:2-23:1 (testifying that Mrs. Small "would just say, 'Oh, just tell the
Congressman that I did look at it and I approve it[,]'" but the Office's "media person [in the
District] would say, 'Jessica, she didn't even look at it and she approved it'").

114.     According to Ms. Hernandez, the District press secretary complained of
being unable to reach Mrs. Small when drafts of written deliverables required her review.
Hernandez Dep. (Attach. C) 22:2-23:1.

115.     Ms. Hernandez testified that, on occasions, Mrs. Small would indicate that
she was out of the office, approve documents sight unseen, and authorize them to go to Rep.
Cuellar.  Hernandez Dep. (Attach. C) 22:2-23:1.

116.     Given how infrequently Mrs. Small was in the office when Rep. Cuellar was
not in Washington, Ms. Hernandez believes that Mrs. Small required Ms. Abadie to provide
the Congressman's travel information and that Mrs. Small wanted "that schedule because her
knowing where he was[,] was going to give her a sense of if she would come into the office
or not."  Hernandez Dep. (Attach. C) 20:16-21:19.

<u>Dean Lester</u>

117.     Dean Lester is a shared employee who serves as a part-time financial
administrator for multiple Member offices, including the Office.  Deposition of Dean Lester
("Lester Dep.") (Attach. AA) 10:17-13:16.

118.     Except for one break in service, Mr. Lester has served as the Office's
financial administrator since 2007.  Lester Dep. (Attach. AA) 10:17-13:16.

119.     Based on his personal observations, Mr. Lester believes that Mrs. Small was frequently out of the office, especially during the August 2018 recess.  Lester Dep. (Attach. AA) 22:5-24:6 (testifying that "I would go over a — you know, a couple times and — during the month, and she wasn't around at all.  She had not come in all day").

120.     Mr. Lester testified that, "when I would visit the office, if she was not there, I would ask where she was, and [the staffers] said — they would say something like, 'Who knows?  We never know where she goes.'"  Lester Dep. (Attach. AA) 22:5-24:6.

### Mrs. Small's Focus on Raising Her Salary During Her Tenure

121.     Rep. Cuellar testified that, even before Mrs. Small's employment began, "she kept asking for more money[,]" which he considered to be inappropriate.  Cuellar Dep. (Attach. F)  203:19-205:10.

122.     Rep. Cuellar got "the impression from Mrs. Small that she was more interested in money" than in the opportunity to be the Office's deputy chief of staff.  Cuellar Dep. (Attach. F) 203:19-205:10.

123.     Rep. Cuellar recalled that Mrs. Small brought up increasing her salary in multiple budget meetings.  Cuellar Dep. (Attach. F) 203:19-205:10.

124.     When Mrs. Small requested a $40,000 pay raise during her 90-day performance review on September 5, 2018, Rep. Cuellar found this request "bizarre" because he had just informed her that her performance was not meeting his expectations.  Cuellar Dep. (Attach. F) 176:5-178:4 (testifying that it was "bizarre" that "I was telling her that she was not doing her job, and, at the same time, she's asking me for a pay raise"); *id.* 203:19-205:10 ("Instead of focusing on the job performance and what she needed to improve, she's asking me for a $40,000 pay raise.").

125.     Mrs. Small disagrees with Rep. Cuellar's assessment regarding the appropriateness of asking for a substantial raise during her performance review.  Small Dep. (Attach. G) 200:2-12 (when asked in her deposition what "your request for a raise in that meeting says…about your judgment[,]" Mrs. Small testified: "I think it says that I have good judgment."); *id.* 200:13-20 (when questioned whether it was "an inappropriate time or questionable time to talk about a raise when you were meeting to talk about performance issues that the congressman was identifying," Mrs. Small responded "absolutely not" and stated that "[i]t was not bad judgment.").

126.     After the 90-day review, Mrs. Small continued to request a pay raise.  Small. Dep. (Attach. G) 240:2-242:20 and Ex. 48 (HCOO1158-73).

127.     Just days before her termination, Mrs. Small recommended to Rep. Cuellar that she receive a $20,000 salary increase plus a $4,000 bonus.  Small Dep. (Attach. G) 240:2-242:20 and Ex. 48 (HC001158-73).

128.     While Mrs. Small also suggested raises (and bonuses) for other staffers that were hefty by the Office's standards, the largest raise she proposed was for herself.  Small Dep. (Attach. G) 240:2-242:20 and Ex. 48 (HC001158-73).

129.     For the female staffers with whom Mrs. Small had clashed during her tenure — Ms. Abadie, Ms. Andrews, and Ms. Hernandez — Mrs. Small recommended no raises. Small Dep. (Attach. G) 241:20-22, 242:17-19, and Ex. 48 (HC001158-73).

130.     Mrs. Small cited Ms. Abadie's brief tenure with the Office as a reason why Mrs. Small did not recommend a raise for Ms. Abadie, even though Ms. Abadie started shortly after Mrs. Small and Mrs. Small was recommending a substantial raise for herself. Small Dep. (Attach. G) 242:1-10.

131.     Mrs. Small also proposed a pay raise for Mr. Knight even though he, too, was new to the Office at that time.  Small Dep. (Attach. G) 242:1-10; Knight Dep. (Attach. Z) 9:15-10:2.

132.     At some point after her September 5, 2018, review, Mr. Lester cautioned Mrs. Small not to let "getting bonuses and raises for the staff" and for herself "be her total focus."  Lester Dep. (Attach. AA) 14:11-20.

133.     Based on Mr. Lester's long-time experience as the Office's financial administrator, Mr. Lester testified that Mrs. Small, "who had just come on board just a few months prior[,] was not in a position to try to make those kind of changes within such a short period of time."  Lester Dep. (Attach. AA) 14:21-15:16; *see also id*. 31:20-33:10 ("It was just inconsistent with what the — the office has done in the past and how the congressman approaches raises and bonuses for people.").

134.     Mr. Lester believes that Mrs. Small was "acting inappropriately" by requesting a pay raise under these circumstances, particularly given her short tenure.  Lester Dep. (Attach. AA) 31:20-33:10.

135.     Both Rep. Cuellar and Mr. Lester believe that Mrs. Small's attempts to secure a pay raise under the circumstances weighed in favor of termination.  Cuellar Dep. (Attach. F) 203:19-205:10; Lester Dep. (Attach. AA) 19:12-20:14.

136.     Mrs. Small disagrees with the assessment of Rep. Cuellar and Mr. Lester regarding the inappropriateness of her repeated attempts to secure a pay raise under these circumstances.  Small Dep. (Attach. G) 246:14-16 (responding "no" when asked, in her deposition: "Did you think it was odd to make a recommendation for your own salary increase?"); *id.* (further testifying as to her belief that her requested pay raise was

appropriate).

137.     Mrs. Small admits that she when she gave her salary and bonus suggestions to Rep. Cuellar, she misrepresented facts.  Lester Dep. (Attach. AA) 29:7-30:10; Small Dep. (Attach. G) 248:9-249:17, 250:7-251:21, and Ex. 48 (HC001158-73); Cuellar Dep. (Attach. F) 146:6-150:7.

138.     Specifically, on October 12, 2018, Mrs. Small advised Rep. Cuellar that Mr. Lester had considered the budget and approved her recommendations, including the recommended pay raises and bonuses for herself and other staffers.  Lester Dep. (Attach. AA) 29:7-30:10; Small Dep. (Attach. G) 248:9-249:17, 250:7-251:21, and Ex. 48 (HC001158-73); Cuellar Dep. (Attach. F) 146:6-150:7.

139.     In fact, Mrs. Small only provided this budgetary information to Mr. Lester three days later on October 15, 2018.  Lester Dep. (Attach. AA) 29:7-30:10; Small Dep. (Attach. G) 248:9-249:17, 250:7-251:21, and Ex. 48 (HC001158-73).

**The Office's Probationary Period Policy**

140.     The Office has a long-standing practice of placing new employees on a probationary period.  Cuellar Dep. (Attach F.) 166:16-167:14; ; Gaona Decl. (Attach. B) ¶¶ 8-15.

141.     Rep. Cuellar testified that the policy since the Office was founded in 2005 to put every employee on probation.  Cuellar Dep. (Attach. F) 166:16-167:14.

142.     For nearly 13 years (from 2005 until 2017), Judge Lafuente-Gaona assumed primary responsibility for implementing the probationary period policy.  Gaona Decl. (Attach. B) ¶¶ 8-15; Cuellar Dep. (Attach. F) 167:15-168:1, 168:20-169:4.

143.     Judge Lafuente-Gaona advised new hires about the policy, assessed their

performance during the probationary period, and made related personnel decisions, including whether to retain the employee.  Gaona Decl. (Attach. B) ¶¶ 8-15.

144.    In her role as deputy chief of staff (from 2011 to 2017), Ms. Travieso assisted Judge Lafuente-Gaona in effectuating the probationary policy, particularly for Washington-based employees.  Travieso Decl. (Attach. D). ¶¶ 9-13.

145.    After Judge Lafuente-Gaona and Ms. Travieso departed the Office in 2017, their immediate replacements were Ms. Hernandez and Mr. Malloy, respectively.  *See supra* ¶¶ 4-11.

146.    Both Ms. Hernandez and Mr. Malloy were placed on a 90-day probationary period when they began their new roles as district director and deputy chief of staff, respectively.  Hernandez Dep. (Attach. C) 8:4-1, 13:2-14:2; Malloy Decl. (Attach. E) ¶¶ 5-7.

147.    Mr. Malloy's 90-day probationary period was extended beyond 90 days, and he resigned his employment during the extended probationary period.  Malloy Decl. (Attach. E) ¶¶ 5-7.

### Mrs. Small's Pregnancy and Request for Maternity Leave

148.    Mrs. Small notified Rep. Cuellar of her pregnancy on July 5, 2018, when she submitted leave paperwork indicating "pregnancy" as the reason for the requested leave and Rep. Cuellar approved the leave request.  Small Dep. (Attach. G) 142:20-143:11 and Ex. 20; Cuellar Dep. (Attach. F) 175:4-17.

149.    Approximately five weeks later, Mrs. Small sent the August 8, 2018, email to Rep. Cuellar to discuss maternity leave and scheduling issues in light of her pregnancy.  Am. Compl. ¶ 40.

150.    The August 8th email was sent several weeks before Mrs. Small's 90-day

probationary period was scheduled to end on or around September 1, 2018, and several months before her maternity leave was expected to begin approximately in or around the January 2019 timeframe.  Am. Compl. ¶ 60; Cuellar Dep. (Attach. F) 175:4-17.

151.     Given Mrs. Small's problematic performance to that point and the imminent conclusion of her probationary period, Rep. Cuellar replied: "Ok let's talk about this and probation period for you as I have for every new employee."  Am. Compl. ¶ 41; Cuellar Dep. (Attach. F) 175:4-17.

152.     Mrs. Small alleges that her termination was based on her pregnancy and request for maternity leave and that, after this August 8th email, Rep. Cuellar's treatment of her changed.  Am. Compl. ¶¶ 2, 40-41; *see also* Small Dep. (Attach. G) 264:17-265:1 (testifying that "every basis that you have for believing that the congressman discriminated against you based on pregnancy or the FMLA is in your complaint").

153.     Mrs. Small testified that the August 8th email and the alleged increase in negative feedback thereafter are the bases of her belief that her termination was unlawful. Small Dep. (Attach. G) 91:18-92:18 (testifying that she "she had no issues" regarding performance prior to this email and only after the email did Rep. Cuellar "start[] following up with emails, Kristie, can  you help me, can you do this, can you do that"), 265:2-10 (when asked the "specific reasons for believing that the congressman terminated your employment because of your pregnancy and/or your desire to use FMLA leave or maternity leave," Mrs. Small identified the August 8th email from Rep. Cuellar regarding her probationary period and an alleged increase in negative, unmerited performance-related feedback she received after advising the Office that she was pregnant); *see generally id.* 262:10-264:5.

154.     At deposition, Mrs. Small testified that Rep. Cuellar never said "anything

disparaging about pregnancy or women or children or medical leave or FMLA leave." Small Dep. (Attach. G) 265:2-10; *see generally id.* 264:17-265:7.

155.    Mrs. Small further testified that her initial pre-employment impression that Rep. Cuellar is a difficult boss to work for never changed. Small Dep. (Attach. G) 115:10-14; *see also supra* ¶¶ 24-26.

156.    According to Mrs. Small, Rep. Cuellar "was just very inconsistent, and there was never — nothing was ever really right. Every single thing had a problem with it. Every single, you know, project or plan or — and — and none of that's — like 98 percent of the st[u]ff wasn't true. Like, it was just him being difficult." Small Dep. (Attach. G) 115:20-117:16.

157.    Mrs. Small testified that, in her view, Rep. Cuellar's treatment of her did not change after her August 8, 2018, email requesting maternity leave: "[T]here wasn't really a change in [Rep. Cuellar's] attitude, I don't believe. I mean, the attitude was poor on his part, naturally, how he was to everybody. So, like, there was no change." Small Dep. (Attach. G) 148:1-149:14.

158.    Mrs. Small further testified that Rep. Cuellar's criticisms — "his demands and his fickleness" — were not limited to her but extended to other staffers. Small Dep. (Attach. G) 118:5-16, 122:5-18.

159.    According to Mrs. Small, "I don't think he was a difficult boss for me. I think he was a difficult boss in general." Small Dep. (Attach. G) 115:15-19.

160.    When asked at her deposition whether "other people in the office, then, experienced the kinds of things you experienced with respect to how difficult the congressman can be[,]" Mrs. Small responded "yes." Small Dep. (Attach. G) 118:5-16.

161.     With respect to her supervision of other staffers, Mrs. Small testified that "I wasn't the press people . . . if Congressman Cuellar had a problem with the press team and how they were doing, then that should have been addressed with them, and it wasn't."  Small Dep. (Attach. G) 131:14-132:20.

162.     Mrs. Small further testified on this point: "I don't understand how I could be held responsible for the direct actions and work of other individuals."  Small Dep. (Attach. G) 131:14-132:20.

163.     With respect to the Office's leave practices, the Office has provided extended leave to multiple employees, including for the birth and care of a newborn.  Andrews Decl. (Attach. A) ¶¶ 9-13.

164.     The Office's policy has been to pay employees while they are on leave covered by the Family and Medical Leave Act ("FMLA") and/or the Office's FMLA policy. Small Dep. (Attach. G) 107:9-22; Andrews Decl. (Attach. A) ¶ 9.

165.     When Mrs. Small was hired, Rep. Cuellar was aware that she was married and a mother with a young child.  Small Dep. (Attach. G) 47:21-49:1, 50:6-10.

166.     Mrs. Small testified that Rep. Cuellar authorized her to take leave for all the prenatal medical appointments she had while employed by the Office.  Small Dep. (Attach. G) 143:12-144:8.

167.     Mrs. Small further testified that Rep. Cuellar continued to pay Mrs. Small for this leave after she exhausted her accrued paid leave.  Small Dep. (Attach. G) 141:10-142:18.

## The Office's Personnel Files

168.     Prior to her separation from the Office, Mrs. Small improperly took confidential personnel files out of Rep. Cuellar's private file cabinet and took the files to her

home.  Cuellar Dep. (Attach. BB) 133:2-144:8.

169.    Rep. Cuellar believes that, after her termination, Mrs. Small improperly tried to use returning the files to barter for access to her former Office computer.  Cuellar Dep. (Attach. BB) 140:4-8.


Date:   May 22, 2020                    Respectfully submitted by,

                                        DEFENDANT THE OFFICE OF
                                        CONGRESSMAN HENRY CUELLAR

                        By:
                                        _____/s/_____
                                        Mark Stewart Hayes, D.C. Bar #976878
                                        Trevor St. George Blake II, D.C. Bar # 974319
                                        Ann R. Rogers, D.C. Bar # 441622
                                        Russell H. Gore, D.C. Bar # 449231
                                        U.S. House of Representatives
                                        Office of House Employment Counsel
                                        4300 O'Neill House Office Building
                                        Washington, D.C.  20515
                                        (202) 225-7075
                                        Mark.Hayes@mail.house.gov
                                        Trevor.Blake@mail.house.gov
                                        Ann.Rogers@mail.house.gov
                                        Russell.Gore@mail.house.gov

                                        *Defendant's Counsel*