**Case No. 1:19-cv-01314-TNM**

# ATTACHMENT C



# Transcript of Jessica Hernandez

**Date:** March 17, 2020
**Case:** Small -v- Office of Congressman

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

```
                                  1
 1        UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3                               )
 4  KRISTIE SMALL,               )
 5          Plaintiff,           )
 6                               )
 7      -vs-                     ) No. 1:19-cv-1314-TNM
 8                               )
 9  OFFICE OF CONGRESSMAN HENRY  )
10  CUELLAR,                     )
11          Defendant.           )
12                               )
13
14      TELEPHONIC DEPOSITION OF JESSICA HERNANDEZ
15               MARCH 17, 2020
16              PASADENA, MARYLAND
17                 12:01 p.m.
18
19
20  JOB NO.: 293155
21  PAGES:  1 - 73
22  REPORTED BY:  LAURA MAES, CSR 9836
```

```
                                  2
 1  Deposition of JESSICA HERNANDEZ, held telephonically from:
 2          Baltimore, Maryland
 3          888.433.3767
 4
 5
 6
 7
 8
 9
10
11
12
13
14          Pursuant to notice, before Laura Maes,
15  CSR 9836 and Notary Public for the State of
16  Maryland.
```

```
                                  3
 1              A P P E A R A N C E S
 2              [ALL COUNSEL BY PHONE]
 3
 4  FOR THE PLAINTIFF:
 5
 6      ALAN LESCHT & ASSOCIATES, P.C.
 7      BY:  SARA MCDONOUGH
 8           TAMARA L. SLATER
 9      1825 K Street, N.W.
10      Suite 750
11      Washington, D.C. 20006
12      202.463.6036
13
14  FOR THE DEFENDANT:
15
16      OFFICE OF HOUSE EMPLOYMENT COUNSEL
17      U.S. HOUSE OF REPRESENTATIVES
18      BY:  MARK STEWART HAYES
19           TREVOR ST. GEORGE BLAKE, II
20      4300 O'Neill House Office Building
21      Washington, D.C. 20515
22      202.225.7075
```

```
                                  4
 1              I N D E X
 2
 3  WITNESS
 4    JESSICA HERNANDEZ
 5
 6  EXAMINATION                              PAGE
 7    MS. MCDONOUGH                            6
 8    MR. BLAKE                                68
 9
10          E X H I B I T S
11             (NONE OFFERED)
```

**Page 5**

1  P R O C E E D I N G S
2
3  THE REPORTER: This is Laura Maes.
4  Before I swear in the witness, I will ask Counsel
5  to stipulate on the record that due to the
6  current national emergency pandemic, the court
7  reporter may swear in the deponent even though
8  she is not in the physical presence of the
9  deponent and that there is no objection to that
10 at this time, nor will there be an objection to
11 it at a future date.
12     MR. BLAKE: This is Trevor Blake for the
13 Defendant and we so stipulate.
14     MS. MCDONOUGH: This is Sara McDonough
15 for the Plaintiff and we also stipulate.
16     THE REPORTER: This is Laura Maes again.
17 And, Counsel, can you represent, to the best of
18 your knowledge and belief, the witness appearing
19 today via phone is, indeed, Jessica Hernandez?
20     MR. BLAKE: This is Trevor Blake. Yes,
21 I can. In fact, I've spoken to Ms. Hernandez a
22 number of times on the phone, including right

**Page 6**

1  before this deposition, and asked her -- or
2  confirmed with her that she was calling in, and
3  this is the voice that I recognize as hers.
4      And so in short, yes.
5
6  Whereupon, JESSICA HERNANDEZ, being first duly sworn or
7  affirmed to testify to the truth, the whole truth, and
8  nothing but the truth via telephone, as stipulated, was
9  examined and testified as follows:
10
11     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
12 BY MS. MCDONOUGH:
13   Q.  Hi, Ms. Hernandez. My name is Sara
14 McDonough.
15      And before we begin with the questions,
16 where are you -- where are you right now?
17      Are you at home or at an office?
18   **A. An office, my office.**
19   Q.  Okay. And so I just wanted to ask if --
20 for today what I want to do is to ask you
21 questions and to get your responses based on your
22 -- your personal knowledge and your recollection.

**Page 7**

1  And so I'm going to ask that you not refer to any
2  documents, anything on your computer, your phone,
3  any other kind of external information.
4      Can you agree to that?
5   **A. Yes, ma'am.**
6   Q.  Okay. Great.
7      And to help the court reporter out here,
8  if you could just provide verbal answers today
9  instead of shaking your head or nodding, saying
10 "Mm-hmm," "Uh-uh." If you could just say "Yes"
11 or "No" or indicate your response verbally.
12     And if you need to take a break, if
13 there's a question pending, I'll need you to
14 answer that, but after that, it's not a problem
15 for us to take a quick break.
16     Is there any reason that you would be
17 unable to provide complete and honest testimony
18 today?
19  **A. No, ma'am.**
20  Q.  What is your home address?
21  **A. 1436 Wilfrano Drive, Laredo, Texas**
22 **78046.**

**Page 8**

1   Q.  Who is your current employer?
2   **A. U.S. House of Representatives, and I**
3  **work for Congressman Henry Cuellar.**
4   Q.  How long have you worked for the
5  Congressman?
6   **A. 13 and a half years.**
7   Q.  What's your job title?
8   **A. District Director.**
9   Q.  And is that the same job title that you
10 had in 2018?
11  **A. Yes, ma'am.**
12  Q.  And do you have the same job duties now
13 that you had in 2018?
14  **A. Yes.**
15  Q.  How would you describe your work
16 relationship with Kristie Small?
17     MR. BLAKE: Wait one second. I'm sorry,
18 Sara. Just, again, because we're in a new
19 deposition, could we just say that we're
20 reserving objections, except for form and
21 privilege, for trial and this is being conducted
22 according to the Federal Rules? Sorry.

**9**

        MS. MCDONOUGH: Of course. No -- yes. Thank you.
        MR. BLAKE: Sorry. That's it.
BY MS. MCDONOUGH:
    Q. I'm sorry, Ms. Hernandez.
        How would you describe your working relationship with Kristie Small?
    A. I would say in the beginning, as I started to get to know her, I thought that we were going to be able to work together as a team. But as the -- as the time went by, it was not that. Things just started to get more complicated throughout the day.
        So I would say that we did not have a good relationship from my end.
    Q. Ms. Hernandez, when you say at the beginning it seemed okay but then you thought you wouldn't be able to work with her as a team, when was it that you started thinking -- or started having a more difficult relationship with Kristie?
    A. Within, I would say, the second week.

**10**

    Q. The second week?
    A. Mm-hmm, within -- yeah, in the second or third week of her, you know, being hired as the Deputy Chief of Staff.
    Q. How often did you interact with Kristie?
    A. Interacting as in face-to-face in-person, there was no interaction because she was based in D.C. and I was in Laredo in Texas. So it was mostly by phone.
    Q. About how often did you talk to Kristie on the phone?
    A. I would say three times a day. I would say three times a day, and other times, you know, if -- if we had, you know, things that we needed to talk about like staff, events that we had here in the district that we needed information from D.C.
        I would say three or four times a day with mostly e-mailing back and forth.
    Q. I understand.
        And what were the, I guess, work assignments or projects that you worked with

**11**

Kristie on?
    A. We would work -- usually I -- since I would manage or supervise the district, we just needed to make sure that the Congressman had his proper items and everything in order for his -- [inaudible] -- announcements.
        THE REPORTER: I'm sorry. I'm sorry. I didn't hear what you said. Wait, wait, wait.
        [Discussion off the record.]
        THE WITNESS: Usually the talking points or -- would come from D.C. and we would work with our legislative staff to have the talking points ready for him. So it was a process because we would, you know, prep for the Congressman and need to get it approved. So it -- it's a process, you know.
        So, yeah, that's the way that her and I communicated most of the time.
BY MS. MCDONOUGH:
    Q. And, Ms. Hernandez, when you said before that you and Kristie had a bad work relationship, why do you think that was?

**12**

        Do you think it was -- was it a personality conflict? Was it because of Kristie's performance?
        Or just kind of generally, why -- why did you have a bad relationship?
    A. I would say because she was not -- how can I say this? At the time that we needed her guidance -- because the reason -- my understanding was that she was hired because she was going to be coming in to train the staff.
        So I was -- I had a clear -- you know, I had a clear vision that she was going to be able to help us all, but that was not the case. There was -- she was, you know, difficult to work with in the sense that she had a strong personality and I -- I'm not tolerant to that. I won't -- I did not tolerate that. So I think that because she thought that she was superior from me, that she was going to be able to do, you know, what she could, but I did not tolerate that.
        So, yeah, she did not -- in other words, she did not -- what my expectations were from

**13**

1  her, she did not meet them, in other words.
2   Q.  And what exactly did you expect Kristie
3  to do that was going to help the district office?
4   A.  Because when she was hired, the
5  Congressman mentioned that she's trained other
6  staffers in -- in the Capitol. And me as a new
7  employee as a District Director -- because prior
8  to that, I used to work for the Congressman on
9  the camp- -- on an unofficial side. I was a
10 Finance -- Assistant Finance Director on the
11 unofficial side.
12      So when I took this position, I was new
13 to it as well. And she came in a little later,
14 so I was thinking that she was going to be able
15 to train me, you know, because she's had this
16 experience before. But it was not like that. It
17 was not. I did not learn anything from her at
18 all. I didn't.
19  Q.  So you -- and so, I'm sorry, just to
20 back up, Ms. Hernandez. So I know you'd said
21 that you'd worked for the Congressman for 13 and
22 a half years, and you were the District Director

**14**

1  in 2018; is that right?
2   A.  Yes. 2018 'till present, yes, ma'am.
3   Q.  When -- do you remember when you started
4  your position as District Director?
5   A.  March.
6   Q.  Of 2018?
7   A.  The last week of February of 2018 and
8  then -- yes.
9   Q.  And so it was your expectation that
10 Kristie would train you on how to perform the
11 District Director job; is that accurate?
12  A.  Not necessarily, not necessarily of
13 her -- that I expected her to train me, but I
14 thought that I was going to be able to learn
15 something from her, knowing that she had a
16 background and experience. Not necessarily I
17 expected her to teach me every single thing, but
18 some guidance would have been good, you know.
19  Q.  And what did you expect to learn from
20 her?
21  A.  Manage -- in other words, like, she had
22 a background, again -- then again, on managing --

**15**

1  you know, managing skills and how to work, you
2  know, with -- with staff, constituent work, but
3  she did not know how to do that at all.
4   Q.  And what led you to believe that she
5  didn't know how to do those things?
6   A.  Because the Congressman had asked her to
7  type up a memo on how to -- like, a step-by-step
8  that, you know, we -- she could be able to give
9  the district, you know, tasks and show that --
10 how to complete them, how to work better with
11 constituents.
12      She -- she had something, but it was
13 something that we already had on file, and she
14 demanded that I put something into it, like put
15 something that I've learned. But the thing is
16 that, since I was new to the position, I didn't
17 know certain things very well, and she kept on
18 demanding and demanding that I, you know, include
19 something so she can, you know, provide that to
20 the Congressman, and the Congressman thinking
21 that it came from her when it didn't.
22      So I rejected that. I did not do so

**16**

1  because I told her, "You're here to train me.
2  How am I going to tell you something that I don't
3  know?"
4      So that's -- that's when she got a
5  little -- I would say defensive that -- you know,
6  she even realized, she's like, "I know you and I
7  have very strong personalities."
8      And I did tell her, "This is nothing to
9  do with a personality. It's just about you
10 completing" -- or, you know, "You were hired to
11 do something. Just show us what you are here to
12 do." And -- and that was it.
13  Q.  And you mentioned that she demanded that
14 you include something in this -- this memo.
15      What did she ask you to include?
16  A.  Items that -- in the district that --
17 that I, you know, know of or that I've had
18 experience. But I did not have any experience
19 just yet. I did not. And so I didn't know what
20 she was referring for me to input. I did not
21 have any experience.
22  Q.  Okay. When you say "items in the

**17**

1  district," do you just mean, like, important
2  issues in the district or events?
3      A.  Yes, mm-hmm.
4      Q.  Which?  Was it important issues or
5  events?
6      A.  It was important issues.
7      Q.  Okay.  I understand.
8          When did you learn that Kristie had been
9  fired?
10     A.  I learned that same day that she was let
11 go.  Because the Congressman never mentioned this
12 to me before that there was -- you know, he was
13 planning to do so.  He never mentioned it to me
14 before.  I learned that she was fired the day of
15 because I was a witness.  I was there with him.
16     Q.  I understand.
17         Okay.  And so how did you learn or -- so
18 my understanding is that Mr. Cuellar was in Texas
19 when he fired Kristie and that Kristie was on the
20 telephone in D.C.
21         Is that accurate?
22     A.  Yes, ma'am.

**18**

1      Q.  So you were present with Mr. Cuellar
2  when he was on the phone with Kristie?
3      A.  Yes, ma'am.
4      Q.  And so what did -- what did the
5  Congressman say?  Like, did he say, "Can you come
6  into my office?  I need to call Kristie"?
7          Or did he indicate, like, what he needed
8  you to do and why?
9      A.  No, he just said -- I was in my Laredo
10 office and he was in his office in Laredo as
11 well, and he said, "I'm wondering if you can come
12 by my office.  I need you to -- I need you to be
13 present for something."
14         And I'm like, "Okay.  Yes, sir."  I went
15 by and that's when he decided to call Kristie.
16 And --
17     Q.  Okay.
18     A.  -- he -- he said, "I need for you to be
19 present for this."
20         And I'm like, "Yes, sir."  So I was a
21 witness for the conversation that went on.
22     Q.  And so you learned that Kristie was

**19**

1  being fired at the time he told her?
2      A.  Yes, sir.  I'm sorry.  Yes, ma'am.
3      Q.  Were you surprised that the Congressman
4  was firing Kristie?
5      A.  I was not surprised.
6      Q.  Why do you say that?
7      A.  Because her -- I could tell that her
8  performance was already out of hand, but he would
9  never mention anything to anyone.  He would just
10 keep it to himself.  Because he was not happy
11 with the way she was doing things at the office
12 and the way she was, so he -- he just kept
13 everything to himself.  I think he just waited
14 for -- for that day to be able to let her go.
15     Q.  When you say "her performance was
16 already out of hand," what exactly do you mean by
17 that?
18     A.  Out of hand in the way that she was
19 treating staff.  Because the Congressman was not
20 aware of how she was treating staff.  The
21 staff -- the staff would actually tell me the
22 way, you know, she was handling them.

**20**

1          So, you know, you should be -- the staff
2  does not go to the Congressman.  The staff either
3  goes to their superiors or their bosses and let
4  them know their concerns.  So nothing was -- the
5  Congressman was unaware of what was going on in
6  D.C. because -- I don't know if they were
7  intimidated by her or she intimidated them, but
8  they kept everything to themselves.  But they
9  will tell me and that's when I heard about it.
10         And I -- at times, I did talk to her
11 about that, and she was always very defensive,
12 very defensive.
13     Q.  Ms. Hernandez, which staff members
14 complained to you about Kristie?
15     A.  A -- a former scheduler, Madeline.
16     Q.  When did Madeline first complain to you
17 about Kristie?
18     A.  I cannot recall that.  There were
19 multiple times, but I can't recall that.
20     Q.  Was that by telephone?
21     A.  Yes, ma'am.
22     Q.  And what did Madeline tell you?

**21**

1    A.   That she did -- there was a time that
2  the Congressman left to a CODEL. So when you're
3  -- when he's out on a CODEL, time changes from
4  where he's at to where they're from in D.C. So
5  the scheduler is the only one that has access to
6  the Congressman's schedule times, locations where
7  he's at. Only but her can know them -- those
8  because it's privacy.
9         So she demanded from Madeline that
10 schedule because her knowing where he was was
11 going to give her a sense of if she would come
12 into the office or not. Because at the time she
13 was gone, she was not at the office.
14   Q.   Okay. How do you -- I'm sorry. At the
15 time the Congressman was gone, Kristie wasn't at
16 the office?
17   A.   Yes.
18   Q.   How do you know that?
19   A.   Because the staff would tell me.
20   Q.   Okay. So when you say "staff," who do
21 you mean?
22        You mean Madeline and who else?

**22**

1    A.   District and D.C.
2    Q.   How would the district staff know
3  whether Kristie was in the D.C. office or not?
4    A.   Because whenever we needed something
5  approved from D.C., she would be the person who
6  needed to get it approved. And our media person
7  here in the district -- our former media person
8  here in the district would say that she would try
9  calling her but she would never pick up. And
10 when she would pick up, she'd contend that she
11 was either driving or not in the -- you know, not
12 in the office. And she would just say, "Just say
13 that I looked at it and I approved it."
14        THE REPORTER: Say it again. I'm sorry.
15 I'm sorry. She would say what? She would just
16 say..?
17        THE WITNESS: She would just say, "Oh,
18 just tell the Congressman that I did look at it
19 and I approve it."
20        And my media person would say, "Jessica,
21 she didn't even look at it and she approved it."
22 So that's how we would find out that she was not

**23**

1  at the office.
2  BY MS. MCDONOUGH:
3    Q.   Okay. So the media person you
4  mentioned, what was that person's name?
5    A.   Leslie Martinez.
6    Q.   So Leslie -- Leslie didn't know for a
7  fact that Kristie wasn't in the office. She just
8  assumed Kristie wasn't in the office.
9         Is that fair to say?
10   A.   Yes.
11   Q.   And you said that other staff said that
12 Kristie wasn't in the office.
13        Aside from Madeline and Leslie, who else
14 told you that Kristie wasn't in the office?
15   A.   I can't recall. I cannot recall.
16   Q.   Okay. So Madeline told you about this
17 time that Kristie demanded that she provide the
18 Congressman's schedule.
19        What else did Madeline complain to you
20 about?
21   A.   That's about it that I can recall.
22   Q.   And who else complained to you about

**24**

1  Kristie?
2    A.   My district staff.
3    Q.   And what are their names?
4    A.   Well, it's -- it's not necessarily some
5  -- you know, like, everyone would say, you know,
6  like, "Hey, Jessica. We can't -- she's like a
7  roadblock."
8         Because whenever we would have a
9  conference call just to make sure that we had
10 everything ready -- because there were times
11 that, you know, we needed items from D.C., so I
12 would call her directly as soon as possible
13 because the Congressman had asked for it.
14        So she would say they're working on
15 that, but then as the time, you know, went by --
16 you know, we had a deadline, so I would get
17 everyone on the line, even her, with all my
18 district staff and I would say, "Guys, let's go
19 down the list one by one," since we all knew what
20 we were missing.
21        And there were times that, for example,
22 if he's going to be doing --

**37**

1  telling anyone.
2    Q.  Okay.  So she said she was two to three
3  months pregnant?
4    A.  Mm-hmm.
5    Q.  And that was in September?
6    A.  I think -- I can get you a specific date
7  of when we visited the district, but I would need
8  to go get my files.
9    Q.  Okay.  No, that's fine.
10      Okay.  So, Ms. Hernandez, when was the
11 next time you observed bad performance from
12 Kristie?
13   A.  I'm trying to think.  I'm trying to
14 think.
15      Oh, when -- at the end of the day, we
16 would always send our daily reports of our
17 whole -- what we did throughout the day.  So our
18 media person, Leslie, she's like, "Jessica, she
19 put on the daily report that her and I had a
20 conversation in regard to media items when I
21 hadn't spoken to her all day."
22      So, you know, things like that.

**38**

1    Q.  And when was that?
2    A.  I can't recall.  If you're asking me for
3  specific dates, I can't recall, but it was at the
4  time that our media person was still here.
5    Q.  When did Leslie leave?
6    A.  Leslie left two months ago.  She --
7  yeah, left two months ago -- three months ago,
8  three months ago or so, mm-hmm.
9    Q.  Left two to three months ago?
10   A.  Mm-hmm.
11   Q.  Okay.  What was the next time that you
12 observed bad performance from Kristie?
13   A.  Let me see.  That's -- that's the only
14 thing that I can think of.  I think the D.C.
15 staff will be able to give you more of that
16 because they're the ones that would deal with her
17 in person.
18   Q.  Okay.  So aside from what we've already
19 discussed, can you think of any other times when
20 you thought that Kristie's performance was bad?
21   A.  Well, that time that she demanded me to
22 give my input into that memo that the Congressman

**39**

1  had requested from her, and I said to her, "I --
2  there's nothing that I can put because I don't
3  know.  That's why you were hired to do a certain
4  job, so you're here to train us."
5      And I do remember that I had actually
6  e-mailed and I'd told the Congressman about this.
7  And I said, "You hired her to do a certain job
8  and she has not done it.  She hasn't."
9      And whenever the Congressman would ask
10 her to do something as well, she would demand the
11 D.C. staff to work on it and she wouldn't do it.
12   Q.  Okay.  So when was the first time that
13 you're aware of that Kristie asked -- that
14 Kristie wouldn't do something and required the
15 D.C. staff to do it?
16   A.  I don't know who it was.  I can't recall
17 who the person was that I spoke to, but she
18 demanded something from Travis Knight, our
19 legislative person.  The Congressman had
20 specifically asked her to work on something, but
21 she didn't do it.  So she asked Travis to work on
22 it, but she was, like, demanding, like, "Do it

**40**

1  right away."
2    Q.  And do you remember what it was?
3    A.  No, I -- I don't.
4    Q.  And so do you remember -- how did you
5  know that the Congressman specifically asked
6  Kristie to do it?
7    A.  Because this person -- in D.C., I can't
8  recall who it was that I spoke to.  I can't
9  recall who it was.  It was a male or a female
10 told me, "The Congressman demanded this from --
11 from Kristie and she asked Travis to work on it,
12 so now Travis is working on it and getting it to
13 her for her to give to the Congressman."
14   Q.  So Travis did -- did you talk to Travis
15 about this?
16   A.  No.
17   Q.  And you don't remember who told you
18 that?
19   A.  I -- I can't remember.
20   Q.  And do you remember when it was?
21   A.  No, I -- I didn't know when it was.
22   Q.  And did you talk to Kristie about it?

**49**

Q. Okay. So Colin Strother, did -- was he an employee of the House of Representatives or did he work for the campaign?
A. The campaign.
Q. Do you know -- so he was paid by the -- the campaign?
A. I wouldn't -- I wouldn't know. He's always been our campaign person. I wouldn't know if he's paid by the House. I wouldn't know.
Q. Okay. So aside from what we've already discussed, did you ever complain to the Congressman about Kristie?
A. Yes, multiple times.
Q. Okay. And so when was the first time you complained to him about Kristie?
A. On our drive back from the -- the first meeting that we had in -- in the Valley.
Q. Okay. So you complained to the Congressman at that time?
A. Mm-hmm, I did.
Q. So Kristie was in the car with you when you were complaining about her?

**50**

A. Oh, no, no, no. No, obviously not. I was with the Congressman on the phone.
Q. Okay. So you were in the car by yourself and you were talking to the Congressman on the phone?
A. No, it was when I got home from the meeting --
Q. Okay.
A. -- that I talked to the Congressman. It wasn't in the vehicle.
Q. So you called him from your home?
A. Yes.
Q. And what did you tell him?
A. I just -- he did ask, "Hey, how did it go? How did the meeting go?"
    And I did tell him, "It went well. I have a couple of notes, but I did not see her once write one note, Congressman. I did not see her once ask questions. I did not see her once being interested in being there." I did tell him that.
    And he's like, "Oh, okay." So -- and I

**51**

did tell her -- I did tell him about her wanting my notes, and he did say, "No, you do your own individual report and she's supposed to do her own individual report."
    And at the time -- I'm going to go back to where we were driving. When he would call me, she would demand me putting him on the speaker because she wanted to hear -- she wanted to hear what he was saying. She would say, "Put him on the speaker. I want to hear what he's saying." And then every time he would call me, she would say, "What did he say? What did he tell you?"
Q. Well, what was wrong with that?
A. Well, if he's calling me specifically, it's because he wants to ask me a question. If he wanted to talk to her, he would call her. I wouldn't ask, "What did he want? Put him on a speaker. I want to hear what he's saying." I wouldn't ask that.
Q. Okay. All right. So when was the next time you complained to the Congressman about Kristie?

**52**

A. The time that she asked for me to write something in the memo that she was prepping for him. And I did tell him, "Sir, she wants me to write something up that I don't even know."
    And he'd just say, "Well, you're right. She's here to train you."
    So I'd need something from her, but she wasn't giving me anything.
Q. And when you complained to the Congressman about that, was that on the phone or an e-mail?
A. On the phone, mm-hmm.
Q. What --
A. And I think I -- I think I also e-mailed him asking -- telling how, I think, also, like, that she was here to train us.
Q. And did he respond to that e-mail in e-mail or on the phone or at all?
A. No, he wouldn't -- he wouldn't respond on the e-mail.
Q. When was the next time you complained to the Congressman about Kristie?

**53**

1     A.  Let me see.
2         I think it was the time of the CODEL,
3 when she demanded the schedule -- the schedule
4 from the scheduler.  And she did send -- and the
5 scheduler did tell me something that she said:
6 "I don't care if you're the only one that can get
7 access to it.  If I'm asking you to get me what I
8 want, you better get me what I want," which was
9 the schedule.
10     Q.  And so when you told the Congressman
11 that, was that on the phone, in person, or by
12 e-mail?
13     A.  On the phone.
14     Q.  And what did you tell the Congressman?
15     A.  The same way I said it right now, that
16 she had demanded the schedule from Madeline.  And
17 the Congressman did say, "Nobody gets access to
18 my schedule.  No -- nobody should get anything
19 from my schedule except for the scheduler.
20 Nobody else should demand it."
21         And I think they spoke and the
22 Congressman said not to give her anything.

**54**

1 Madeline and the Congressman spoke.
2     Q.  How do you know that?
3     A.  Because Madeline told me.
4     Q.  What was the next time you complained to
5 the Congressman about Kristie?
6     A.  I'm trying to think.  I think that was
7 it that I can recall.
8     Q.  Is there anything that would help you
9 recall?
10     A.  No.
11     Q.  Did you ever take any notes or write any
12 memos to yourself or put anything in writing
13 about concerns you had with Kristie?
14     A.  No.
15     Q.  And why not?
16     A.  Because I -- I wasn't asked to do so, so
17 I didn't.
18     Q.  During Kristie's employment, did the
19 Congressman ever ask you about Kristie's
20 performance or conduct?
21     A.  Yeah.
22     Q.  When was the first time he did that?

**55**

1     A.  I would say it would be towards the
2 end -- towards the end of her -- of her
3 probationary period, I would say.  Not towards
4 the end, but getting close to her probationary
5 period.
6     Q.  What do you mean by "her probationary
7 period"?
8     A.  When the three months came up, before
9 then, he would ask, "So how -- how is she doing?"
10 She -- he already knew because there was a lot of
11 conflict between her and I, so he more or less
12 had an idea.
13     Q.  And so when was it that he contacted you
14 to ask how she was doing?
15     A.  I cannot recall.  I cannot recall.  I
16 can't recall specific days and times.  I can't
17 recall.
18         But he did -- I think it was more in
19 person, not by phone or anything, so -- and I did
20 tell him.  Or maybe, you know -- yeah, I did tell
21 him, you know, "She's not what I expected that
22 she was going to be."

**56**

1     Q.  And what else did you say?
2     A.  That's it.
3     Q.  Did you explain why she wasn't what you
4 expected her to be?
5     A.  No, not really because we'd already
6 multiple conversations that we've had, and I
7 would always -- because I would always go to him.
8 You know, whenever I had a concern, I would
9 always go to him.
10         Like, for example, like I mentioned, the
11 time that we had the meetings with the officials,
12 at night I called him and gave him an update and
13 I told him what was really going on.  So when he
14 asked, you know, "How's she doing?" I just would
15 tell her -- tell him, "She's not what I expected
16 her to be."
17         And that's about it.  He didn't ask me
18 anything else and I didn't tell him.  He didn't
19 ask me anything else and I didn't tell him
20 anything else.
21     Q.  Okay.  And when he's asking -- you
22 mentioned that it was toward the end of her