**Case No. 1:19-cv-01314-TNM**

# <u>ATTACHMENT F</u>



# Transcript of Henry Cuellar

**Date:** March 26, 2020
**Case:** Small -v- Office of Congressman

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

1

```
1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3  - - - - - - - - - - - - - - - - - -x
4  KRISTIE SMALL,              : Case No.
5      Plaintiff,              : 1:19-cv-1314-TNM
6  v.                          :
7  OFFICE OF CONGRESSMAN HENRY :
8  CUELLAR,                    :
9      Defendant.              :
10  - - - - - - - - - - - - - - - - - -x
11
12          DEPOSITION OF HENRY CUELLAR
13              CONDUCTED VIRTUALLY
14          Thursday, March 26, 2020
15              7:24 a.m. PST
16
17
18
19
20  Job No.:  293146
21  Pages:  1 - 207
22  Reported By:  Charlotte Lacey, RPR, CSR No. 14224
```

2

```
1      DEPOSITION OF HENRY CUELLAR, CONDUCTED VIRTUALLY.
2
3
4
5      Pursuant to subpoena, before Charlotte Lacey,
6  Certified Shorthand Reporter, in and for the State of
7  California.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

3

```
1              A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF KRISTIE SMALL:
3      SARA McDONOUGH, ESQUIRE
4      TAMARA SLATER, ESQUIRE
5      ALAN LESCHT AND ASSOCIATES, PC
6      1825 K Street, Northwest, Suite 750
7      Washington, D.C.  20006
8      (202) 463-6036
9
10  ON BEHALF OF DEFENDANT OFFICE OF CONGRESSMAN HENRY
11  CUELLAR:
12      MARK STEWART HAYES, ESQUIRE
13      TREVOR ST. GEORGE BLAKE, II, ESQUIRE
14      U.S. HOUSE OF REPRESENTATIVES
15      OFFICE OF HOUSE EMPLOYMENT COUNSEL
16      4300 O'Neill House Office Building
17      Washington, D.C.  20515
18      (202) 225-7075
19
20  ALSO PRESENT:
21      Andrew Wert, AV Technician
22      Kristie Small
```

4

```
1              I N D E X
2  WITNESS                              PAGE
3  HENRY CUELLAR
4  Examination by        Ms. McDonough        6
5  Examination by        Mr. Hayes          203
6
7
8        I N D E X   O F   E X H I B I T S
9  EXHIBITS      DESCRIPTION              PAGE
10          (None offered)
11
12
13
14
15
16
17
18
19
20
21
22
```

9

1  working with me, I guess, 13 years.  I think late
2  December or late 2017, she got a job as an
3  immigration judge.  So she left the office.  So I
4  did not have a chief of staff at that particular
5  time.
6      Q.  Who was your deputy chief of staff at
7  that time?
8      A.  At what time?
9      Q.  Let's say in December 2017?
10     A.  At that time, I don't remember -- I did
11  have a person named Pat Malloy I believe -- I
12  believe, as deputy.  But, in that time, I don't
13  know if I had anybody.  Because my deputy also had
14  left earlier that year, also to work with U.S.
15  Chamber of Commerce.  So I lost a combined of
16  13 years plus another 9 years of experience from
17  my deputy and from my chief that same year.
18     Q.  Do you recall when Pat Malloy left the
19  deputy position?
20     A.  I don't recall.
21     Q.  Did he serve as your deputy chief of
22  staff for any part of 2018?

10

1      A.  I want to say yes.  Well, I don't
2  recall.  I don't remember.  I want to say yes, but
3  not -- I don't know.  I don't recall.
4      Q.  And so while Kristie was your deputy
5  chief of staff, who was performing the chief of
6  staff duties?
7      A.  There was no chief of staff at that
8  time.
9      Q.  So is it fair to say that during
10  Kristie's employment, she was performing the
11  duties of both chief of staff and deputy chief of
12  staff?
13     A.  Well, she was -- she got hired to be a
14  deputy chief of staff.
15     Q.  So that doesn't quite answer my
16  question.  What I asked was is it fair to say that
17  Kristie was performing the duties for both chief
18  of staff and deputy chief of staff?
19     A.  I don't know how to answer that.  I
20  hired as the deputy.  I gave her -- I told her
21  what my expectations were, and she told me as she
22  could do those expectations.  So I hired her as a

11

1  deputy chief of staff with expectations that I
2  gave her and what I wanted her -- for her to do,
3  and she accepted those -- those requirements.
4      Q.  During Kristie's employment, was there
5  some other employee who was performing duties that
6  your chief of staff would have typically
7  performed?
8      A.  No, ma'am.
9      Q.  Were there any chief of staff duties
10  that you did not expect Kristie to perform during
11  her employment?
12     A.  Well, you know, I hired her to -- I'll
13  say it again, ma'am.  I hired her and I told her
14  what the job requirements were for deputy, and she
15  met those -- she said she could meet those
16  requirements.
17     Q.  So, Congressman, you're not answering my
18  question.
19     A.  I'm answering it the best I can.  You
20  asked me the question.  I hired her as a deputy
21  chief of staff.  I gave her -- I asked her this is
22  what I -- you know, this is what I need to be

12

1  done, and she said, "I can absolutely do all of
2  that."
3          So that is the way I can answer that
4  question.  I'm sorry.
5      Q.  What was it that you told Kristie you
6  needed her to do?
7      A.  Well, you know, when she first, you
8  know, when I talked to her, I said, "First of all,
9  I need for you to help me administer the office.
10  You know, there is a lot of work that I'm doing,
11  administrative work, that I need somebody to help
12  me take the load off for me, because I need to do
13  my job to legislate."  And, you know, I've told
14  her like, for example, "Deliverables, when they
15  get to me, I have to make sure that that is done.
16  And by the time it gets to me, I need those
17  deliverables to be in final form, so I don't have
18  to spend time on that."  I said, "I need for you
19  to walk" -- what I call walk the floor.  That is
20  go and talk to everybody and ask them what they --
21  what they're working on and -- and then report
22  back to me as to what each person is working on,

Transcript of Henry Cuellar
Conducted on March 26, 2020

13

1 what you can help them to -- to work on.
2        I also asked her to make sure that --
3 that, you know, the -- the -- you know, 'cause she
4 had told me that she had worked I don't know how
5 many years, 13, 14 years at the House
6 Administration, and she had sold herself that she
7 had trained members and staff.
8        And so I said, "So you can help train
9 and bring up to a higher level the scheduler?"
10 She said, "Yes."
11        "The legislative people?"
12        "Yes, I can -- I can train them."
13        "The outreach people?"
14        "Yes."
15        "The press persons?"
16        "Yes."
17        So I went down the line on every job,
18 person, category that I had.  And she said, "I did
19 that for" -- I don't know how many years -- "13,
20 14 years.  I trained members.  I trained staff.
21 So I can bring your staff to a higher level."
22        So I said, "I need for you to go ahead

14

1 and make sure that we train our office.  And --
2 and since you did that for 14 years and you
3 trained members and staff, you can bring the best
4 practices and tell us how we can improve.  We run
5 a good office, but if you have the best practices
6 and you train other members and staff, I want you
7 to do that also."
8    Q.   This conversation you're describing,
9 where did this occur?
10    A.   Well, you know, we — we spoke several
11 times about it.  I think, initially, I met her one
12 time there at the Capitol.  There was another time
13 that, you know, I told her, "Look, I'm working
14 late."  And so we met at a restaurant.  And then
15 there was another time that we came back and
16 that -- I think it was at the office.  I'm trying
17 to recall.  I'm not sure.  But we did talk about
18 this for sure.
19    Q.   And so you're telling me that you went
20 through with Kristie, said, "Have you trained
21 legislative staff?  Have you trained schedulers?"
22 You went through each of these positions and

15

1 specifically asked her about them?
2    A.   That is correct.
3    Q.   And so she explicitly told you that she
4 had for 13 or 14 years been training people in all
5 these different positions?
6    A.   I asked her that specific question.  She
7 said she trained members and staff in the House
8 Administration.  And that was one of the selling
9 points to bring somebody that had this expertise
10 of -- of having the best practices from — from
11 the House Administration and implementing that,
12 helping us there at the office to bring us to a
13 different level.
14    Q.   And so you made the decision to fire
15 Kristie, right?
16    A.   That is correct.
17    Q.   Was anyone else involved in making the
18 decision?
19    A.   No, ma'am.
20    Q.   Did you tell anyone that you were going
21 to fire Kristie?
22    A.   Well, I mean, I did talk to counsel

16

1 beforehand, but -- but, yes, that was my decision.
2    Q.   Did you tell anyone other than counsel
3 that you were going to fire Kristie before you
4 fired her?
5    A.   I don't recall.
6    Q.   I'm sorry.
7        MR. HAYES:  Excuse me.  This is Mark
8 Hayes here, counsel for defendant.  The audio is
9 really bad.
10        Especially, Sara, for you.  It sounds --
11 it's very hard to hear.  I don't know if anyone
12 else is experiencing that.  I don't know if it's
13 because it's through the computer rather than
14 through your phone.
15        MS. McDONOUGH:  Let's see if I can --
16 let's go off the record here.
17        (A recess ensued from 7:38 a.m. to
18 7:40 a.m.)
19 BY MS. McDONOUGH:
20    Q.   All right.  So -- I'm sorry.  My
21 question was did you tell anyone that you were
22 to fire Kristie before you fired her?

21

1  at the reviewables, you know, that things were
2  given to me, the deliverables.  There were still
3  mistakes on them.  She was still not meeting
4  the -- you know, going and talking to people,
5  making sure that we -- she knew what was going on
6  in the office.
7          So I went over a couple things.  I don't
8  remember everything I told her, but there should
9  be a recording on -- on that one, when I let her
10  go.  And there should be a recording on when I
11  gave her the 90-day review, probation period.
12    Q.   Okay.  And the recordings you're talking
13  about, there was one recording from the 90-day
14  review that your attorneys provided to us.  And
15  then there was a recording from the termination
16  call that we provided to you.  Are those the
17  recordings that you're referring to?
18    A.   Well, I -- yeah.  I mean, one -- I -- I
19  recorded both of them.
20    Q.   Why did you record them?
21          MR. HAYES:  So this is -- this is Mark
22  Hayes here.  We provided you two recordings, both

22

1  of those recordings, in discovery.  I just wanted
2  the record to reflect that.  Thank you.
3    Q.   Okay.  I'm sorry.
4          All right.  So, Mr. Cuellar, why did you
5  record those conversations?
6    A.   Well, you know, I did not have a chief
7  of staff.  Usually, you know, I always want to
8  have a witness.  So I didn't have anybody that was
9  higher than her to be there on the review.  On the
10  second time, I did say, "Well, let me just bring
11  my district director to be present."
12          So what I did is just record, because I
13  wanted to make sure that, you know, since I have a
14  witness that I -- you know, this will be
15  memorialized.
16    Q.   Mr. Cuellar, you mentioned that you told
17  Kristie she was being fired 'cause she wasn't
18  looking at the reviewables.  What reviewables are
19  you referring to?
20    A.   Well, there are so many.  And, again, I
21  don't have them in front of me.  I assume those
22  have been provided to you.  But, I mean, there

23

1  were just press releases that she says she would
2  review.  And, you know, there were times I would
3  get it four or five times.
4          There were times where she would tell
5  people, review this, triple times, and it's
6  approved.  There's times where she would review
7  things in a minute.  So there were things that --
8  reviewables, letters -- you know, there was one
9  time a letter to the president, and then it was
10  just not written well, and I asked her to help us
11  with that.
12          There were times where there were
13  conference committees coming up and appropriations
14  that she was not aware of.  So, I mean, there are
15  just so many of them.  And those are all
16  documents -- it's all documented by e-mails where
17  I have asked her to help out, help on this.  So
18  those are some of the reviewables.
19    Q.   During the 90-day review meeting you had
20  with Kristie, did you go into the level of detail
21  that you just did right now?  Did you provide that
22  information to her at that meeting?

24

1    A.   I told her about different documents.  I
2  mean, I told her about the -- the press things
3  that have to come in and had to be reviewed.  She
4  was not reviewing -- reviewing that.  I would ask
5  her -- you know, I told her also to make sure --
6  yes.  I mean, I did explain a lot.  I don't know
7  if I said exactly the same words that I did, but I
8  did go over it.  And it was not the first time
9  that I asked her to do that.  I think I started
10  doing that from almost the first month that she
11  was there.
12          I asked her to make sure that she knew
13  what the office was doing and send me reports and
14  talk to people personally.  And I think there was
15  one time she copied me by mistake where she's
16  asking staff, "Hey, send me in what you are
17  working on."  And she would basically I guess,
18  just copy and paste where people were sending her
19  what they were working on, when she was supposed
20  to be talking to people personally about this.
21          Her reports were very general.  Her
22  daily reports were very general.  In fact, she had

Transcript of Henry Cuellar
Conducted on March 26, 2020

25

1 her daily -- you know, after she would talk to the
2 office and what she worked on, you're supposed to
3 write down what you worked on. And hers were
4 always very general. And I would ask her to get
5 more details on that.
6         There were times -- and I would ask her
7 to look at the reports so she would know what
8 everybody was working on. And we found on the
9 computer that she actually would just trash them.
10 She would trash some of those daily reports
11 without even opening up the daily reports.
12        The day she got go, her daily report
13 came in at around 6 o'clock. And so I asked, "Why
14 did she send this daily report?"
15        And it turned out that she had her daily
16 on automatic. So she had the same things that --
17 same general comments on her daily report that
18 were on automatic that would be e-mailed automatic
19 to all staff.
20    Q.   Okay. So you've mentioned here -- I
21 guess you mentioned -- or we've talked generally
22 about what -- what the information was that you

26

1 conveyed to Kristie during the performance review
2 and during the termination meeting. Were there
3 any other reasons that you fired Kristie?
4    A.   I set high expectations for myself. I
5 set high expectations for the office. I
6 communicated those high expectations to her when I
7 first hired her. And she said, "Absolutely. I
8 can meet all those expectations."
9         From almost that first month, she was
10 not doing what she was supposed to be doing. So I
11 went -- as I mentioned, it was not at that
12 review -- that was not the first time I had talked
13 to her about several times. I e-mailed her
14 several times about all of this. And I -- she did
15 not meet those expectations.
16        So I talked to her about deliverables
17 and her review and everything. I talked to her
18 about making sure she was talking to staff and
19 making sure that she knew what people were working
20 on so she can manage it and supervise the staff,
21 which she was not.
22        I told her also about making sure that

27

1 she did not disregard my instructions. And I
2 mentioned one time, because my scheduler had told
3 me, Madeline had told me that -- that Kristie had
4 asked for my -- my schedule. And she said, "No.
5 I'm sorry, but I can't give it to you."
6         And -- and she walked up to her and --
7 and the way Madeline described it in an almost
8 threatening way and said, "Hey, you give me this
9 now."
10        And, you know, Madeline told me how
11 uncomfortable she felt. And so I talked to her
12 about making sure that if I have instructions, she
13 does not violate those instructions. So I went
14 over some of those things, but I also, throughout
15 the -- her employment, almost from the first
16 month, I sent her e-mails, talked to her about
17 doing all this work. So she had notice, you know,
18 from the very beginning of her tenure that she was
19 not performing.
20    Q.   Okay. So I'm not really asking you at
21 this point what you told Kristie or talked to
22 Kristie about. What I'm asking you is what your

28

1 reasons were for firing her.
2         So, so far, it sounds like she was --
3 you say she was not managing and supervising your
4 staff, she disregarded instructions regarding your
5 schedule, she wasn't producing status reports that
6 were meeting your expectations, and she wasn't
7 reviewing deliverables in a way that met your
8 expectations. Were there any other reasons that
9 you have for firing Kristie?
10    A.   Well, you know, again, it was all high
11 expectations that I set, and she was not meeting
12 those high, reasonable expectations. No --
13    Q.   Wait. So, Congressman, what I'm asking
14 you is what were the expectations about? Saying
15 you weren't meeting my expectations is very vague.
16 And I believe it would be unreasonable to just say
17 "you're not meeting my expectations" without
18 providing detail and specifics as to how Kristie
19 wasn't meeting those expectations. And that's
20 what I'm asking you about is what were those
21 expectations in connection with? What were the
22 discrete tasks or duties that Kristie failed to

29

1  perform that lead to her termination?  Can you
2  answer that question?
3      A.  Yes.  I have.  And I'll -- I'll repeat
4  myself.  I went over the deliverables several
5  times from the very beginning of her tenure.  I
6  sent her e-mails.  I talked to her, as she was not
7  doing the review by the -- I told her that I
8  wanted -- by the time something got to me, she has
9  to review it and make sure that there are no
10 typos, mistakes, things -- wrong information.
11      Those are public documents that we send
12 out, so those are high expectations.  And she was
13 supposed to be doing that; reviewing all that
14 before it got to my desk, which she was not doing.
15 And I -- there are e-mails there that should
16 document this from the very, very beginning of her
17 tenure.
18      She was not supervising the office by
19 going and talking to people and knowing what they
20 were working on; not knowing when appropriation
21 conference committees were coming up; not knowing
22 when all of this was supposed to be submitted.

30

1  And I asked her to make sure she was aware.  I
2  asked her for recommendations of legislation.  And
3  so she -- it's a series of things on deliverables
4  and running the office.
5      I -- I asked her over and over and over
6  again, "Can you train each of the office?"
7      And I kept asking her several times in
8  front of other staff, you know, "Can you start
9  training the staff, because you come in with" --
10 whatever it was -- "13, 14 years of experience of
11 teaching members and staff.  I need for you to do
12 that."
13      She finally brought me the freshman
14 members handbook that freshman members are given
15 that has all of those different categories.  I
16 don't remember when she did that, but that's when
17 I said -- in my mind, I said, "She's not going to
18 train people, 'cause she's asking me to read this
19 freshman manual that she dropped off."
20      So she never did the training that I
21 asked her to do.  I think she would Google up from
22 third sites how to write a press release that

31

1  would share with me.  And, I mean, you know, I
2  don't -- you know, why are we -- you know, why are
3  you giving me something about how to write a press
4  release from Google -- from a Google search when
5  she was supposed to have done that training?
6      She didn't follow my instructions.  As I
7  mentioned, she violated my instructions.  And so
8  there were a series of things on the high
9  expectations that I set for her.  And from the
10 very beginning, there are e-mails to her almost
11 within two, three weeks from the very beginning
12 she started that I'm saying, "Hey, you need to do
13 this.  Hey, you need to do this.  Hey, you're not
14 doing this.  Hey, what about this?"
15      So there are -- it's documented
16 throughout her period that she was not performing.
17     Q.  Okay.  So, Congressman, here's the list
18 that I have created here in listening to you.  You
19 fired Kristie because she was not supervising
20 staff; she did not know when appropriation
21 conference committees and deadlines were; she was
22 not conducting training; she disregarded your

32

1  instructions regarding your schedule; she didn't
2  provide adequate status reports; she didn't review
3  deliverables.  Is there anything -- any other
4  reason that you would like to add to that list?
5      A.  Well, that -- that is, you know, the
6  expectations that I set for her.  You know, those
7  are the things -- she had conflict with different
8  staff people also.  There was -- I think within
9  the first month, she -- my district director was
10 telling me that she was ready to quit because the
11 way Kristie would talk to her.
12      I put them on the phone together.  I sat
13 in my office with Kristie and asked her to say
14 what's going on.  We can't lose my district
15 director at this time.
16      So they started talking.  And then, you
17 know, Kristie got into it with her and raised her
18 voice and, you know, I'm here wondering what is
19 going on.  You know -- you know, why are they --
20 why is this happening right now?
21      So she had conflict with her, with my
22 scheduler.  So, yeah, I mean, it's also office

33
1  conflicts that she brought in.
2      Q.  Okay.  So other than office conflict,
3  are there any other reasons you had for firing
4  Kristie?
5      A.  Again, those, you know -- again, there
6  are e-mails that documented several different
7  things of --
8      Q.  Congressman, I'm not asking you about
9  documentation.  I'm asking you a very specific
10 question.  I'm asking you about the reasons --
11     A.  I --
12     Q.  -- you had for firing Kristie.  I don't
13 need you to rehash everything.  I get seven hours
14 to question you without breaks.  And I'll take
15 every minute of that if I need to.  I'm hoping
16 that we won't, but I will get through my
17 questions.
18     A.  Yes, ma'am.
19     Q.  So aside from the reasons that I have
20 restated to you, are there any additional reasons
21 you have for firing Kristie?
22     A.  At this time, that's all that I can

34
1  recall at this time.
2      Q.  Is there anything that would help you
3  recall?
4      A.  Well, I just mentioned to you all the
5  e-mails that I sent to her about all of that.  She
6  was not --
7      Q.  So is there any -- I'm sorry?
8      A.  I'll repeat myself.  She was not
9  performing to the high expectations that I set for
10 the office and she agreed to when she was hired.
11     Q.  So aside from those e-mails, is there
12 anything else that would help you recall any
13 additional reasons you may have had for firing
14 Kristie?
15     A.  Again, that's all I can recall at this
16 time.
17     Q.  Okay.  So let's talk about -- let's talk
18 about the staff training.  What did you tell
19 Kristie about the training you wanted her to
20 conduct?
21     A.  When I first talked to her about coming
22 on board, she expressed to me the experience she

35
1  had training members, training staff, and that got
2  my -- my -- you know, that was a selling point
3  that, you know, when she sold herself that she
4  could do all this.
5      And I -- again, I asked her
6  specifically, "Can you do this?"  And I went down
7  every single position.
8      And she said, "Absolutely.  I can do
9  that."
10     "So can you train the media people?"
11     "Absolutely."
12     "Can you train the legislative people?"
13     "Absolutely."
14     "Can you train the scheduler?"
15     "Absolutely."
16     "Can you train the district director?"
17     "Absolutely."
18     "Can you train the district outreach
19 people?"
20     "Yes."
21     "Can you train the constituent workers?"
22     "Yes."

36
1      So I went down the line and asked her
2  specifically.  And she said, "Absolutely.  I've
3  done that.  I've trained members, and I've trained
4  staff, and I can train all of them."
5      Q.  What instruction did you give Kristie
6  about how you wanted her to train members?
7      A.  Members?
8      Q.  Yes.
9      A.  Or --
10     Q.  You mentioned that you said she can
11 train members?
12     A.  No.  I -- not to train members.  I said
13 she told me she could -- she had trained members
14 and staff.  So she said she had all this
15 experience about training members and staff.  So
16 I'm telling you she said she had the experience of
17 training members and staff.
18     So I take it from asking her those
19 specific questions, "So therefore, you can train
20 each position in my office and bring them to a
21 higher level?  They do a good job, but can you
22 bring them to a higher level?"

37

1      And she said, "Absolutely."
2          In fact, I -- I believe that when I
3  first introduced her to the whole staff in a video
4  conference, I specifically mentioned that, that
5  she had all these years of experience.  She had
6  trained members and staff, and she's going to help
7  train everybody, because she said she can train
8  each of the specific positions.
9      Q.  And so you've mentioned the positions;
10 media, legislative, scheduler, district director,
11 district outreach, constituent workers.  Is there
12 any position that I missed?
13     A.  I mean, you know, every -- I went down
14 the list of everybody that works for me, all the
15 categories.
16     Q.  Right.  So are there any categories that
17 weren't included in the list?
18     A.  Whatever categories I have in my office.
19     Q.  What instruction did you give Kristie
20 about training media people?
21     A.  Well, same thing.  I went one by one and
22 I said, "Can" -- you know, when I asked her, "Can

38

1  you train those media people?" -- so I said, "Just
2  start training."  I asked her several times from
3  the very beginning, the first month she was there,
4  "Hey, can you start training people?"
5          And her response, "Yes.  I will get to
6  it.  I'm going to get to it."
7          And I asked her several times.  And I
8  believe I did it in front of other people there.
9  And I said, "Can you start training the people
10 that you said you were going to train?"
11         And she kept saying, "Yes, I will do
12 that.  Yes, I will do that."
13         She never got to training anybody.
14     Q.  What subject matter did you expect
15 Kristie to train media staff on?
16     A.  Well, she's the one that said that she
17 was the expert in training people.  So whatever
18 the media people needed; outreach, how to write
19 press releases, how to get the press releases out.
20 So, I mean, it's whatever they train media people.
21         She's the one that said that she would
22 train people.  So I wanted to see the training for

39

1  media, scheduler, legislative persons.  And she
2  never got to it.
3      Q.  So you said many times that Kristie did
4  not meet your high expectations.  What did you
5  expect Kristie to teach the media people to do?
6      A.  Again, you know, how to write press
7  releases, making sure that there were no mistakes.
8  Those are all public documents.  The documents
9  that I would get, that she supposedly reviewed,
10 had mistakes.  So she --
11         I had told her at the very beginning,
12 "By the time something comes to me, any
13 deliverable, I want to make sure that there are no
14 mistakes on it.  And it's your job to make sure
15 you review all those documents before they come to
16 me, because they're public documents."
17     Q.  Right.  So that happened after this
18 discussion about her training people.  From what
19 it sounds like to me is you just said, "Train
20 people.  Get them to do their job better," without
21 giving her any explicit instruction as to what she
22 was to cover, how she was to conduct the training.

40

1  Am I wrong?
2      A.  Well, that's not the way I would
3  categorize it.  I mean, she -- she was supposed to
4  come up on training, how to train people, so we
5  would review that with -- with the staff.  And she
6  never -- she never gave a training schedule as to
7  how she was going to do all of this.
8          But, I mean -- I mean, I'm -- I'm busy
9  trying to legislate.  And if somebody says that
10 they can train, you know, each of the different
11 positions, I can't dictate every single thing that
12 she needs to teach, because she's supposed to know
13 that already.  So she was supposed to come up with
14 how to train each of the different positions.
15         And, finally, she just gave me the --
16 the notebook that every freshman gets.
17     Q.  Is it fair to say that you expected
18 Kristie to teach all of your staff members how to
19 do their jobs?
20     A.  Not how to do their job; how to do their
21 job better, because she says that she had 13,
22 14 years of experience, of teaching members,

41

1  staff.  And, therefore, she would bring them to a
2  higher level.
3        I said, "Can you bring in the best
4  practices from different places?  Look at what
5  we're doing.  How do we make it better?"
6        So she was supposed to bring all this
7  years of experience of teaching staff and members
8  and -- and analyze what we're doing and make
9  things better.
10       You know, my job is -- you know, I want
11 to have staff that are well trained and can -- and
12 can do their job well.  Anything that we can do to
13 improve, I certainly want them to improve.
14    Q.  Your former deputy chief of staff, that
15 was Pat Malloy, you said?
16    A.  I think he was the last one before
17 Kristie.
18    Q.  What training did he conduct for media
19 people, legislative staff, schedulers, district
20 director, district outreach, and constituent
21 workers?  When did he conduct training for those
22 people?

42

1     A.  I don't know if he did any training.  He
2  did a lot of the legislative work, because he came
3  from the legislative body, from the legislative
4  experience.  So he would supervise.  And when I
5  would get things, I would not get the mistakes
6  that I would get when Kristie was there.
7     Q.  Right.  That's not my question.  My
8  question is what did he do to train your staff?
9  Did he conduct training sessions?  Did he give
10 them resource materials?  Was the training in
11 person?
12    A.  I don't know about any training that he
13 did, but he did not come in and sell himself that
14 his expertise was to train members and staff.  And
15 when Kristie said she could do that, then, in my
16 mind, I said, "Oh, here's somebody that can bring
17 a very different type of skill and provide
18 training."
19       That was what Kristie sold -- how she
20 sold herself.
21    Q.  Before Kristie, did any of your prior
22 chiefs of staff or deputy chiefs of staff conduct

43

1  training for your staff members?
2     A.  Cynthia would do that herself.  So she
3  would talk to people, tell them how to improve,
4  how to do this.  So Cynthia was constantly
5  improving people, training people.
6     Q.  And who is Cynthia?
7     A.  Cynthia was my chief of staff.
8     Q.  When was that?
9     A.  I want to say she left at the end of
10 2017.  She was with me --
11    Q.  What --
12    A.  -- overall 13 years.
13    Q.  What did Cynthia do to train your media
14 staff?
15    A.  I don't know what she did to train, but
16 she was constantly talking to them.  At that time,
17 I had a deputy chief there, Amy.  And Amy would,
18 again, review the documentations before they got
19 in.  And I did -- I wouldn't get those mistakes
20 that we saw under Kristie.
21    Q.  So what were they doing to train the
22 media people?

44

1     A.  I don't -- I don't recall.  I don't
2  know.
3     Q.  Do you know for a fact that Cynthia or
4  Amy were conducting training with the media staff?
5     A.  Well, again, I'll say it again.  The
6  reason we emphasized the training with Kristie was
7  she sold herself that she did training for House
8  members and staff members, and that was a selling
9  point for her.  And I saw that this was an
10 opportunity to get somebody who had all of these
11 years of experience of training people, that she
12 would bring in a different facet into the office
13 of training people.
14    Q.  So, to be more direct, it sounds like to
15 me that, prior to Kristie, you did not expect any
16 of your chiefs of staff or deputy chiefs of staff
17 to train all your different categories of staff
18 members.  Is that a fair assessment?
19    A.  No, I wouldn't say --
20       MR. HAYES:  Objection.  I believe that
21 mischaracterizes the witness's testimony.
22       MS. McDONOUGH:  I'm not characterizing

49

1  develop for the training, if any?
2      **A.  Well, if -- I asked her to develop**
3  **training.  She never gave me anything.  In fact,**
4  **if you look at the documentation, I -- I'd venture**
5  **to say I don't remember much work product from**
6  **her.  She wouldn't produce work product that was**
7  **hers on -- not only -- not only on training, but**
8  **almost on anything.  There was no work product**
9  **from her.  You know, if you look at the**
10 **documentations and e-mails, there's really no work**
11 **product from her.**
12     Q.  Okay.  So we're going to get to that
13 later.  But what I'm asking about now is did you
14 ask her to develop any specific materials for the
15 purpose of training, like standard operating
16 procedures, policies, presentations?  Was there
17 anything you asked her to produce in connection
18 with training your staff?
19     **A.  Again, since she said she was the -- she**
20 **had the expertise, I asked her to come up with the**
21 **training for the legislative people, for**
22 **everybody.  So that was up to her to get it done,**

50

1  **and she never got it done.**
2      Q.  So did you give Kristie any explicit or
3  specific instructions about your expectations for
4  training the staff?
5      **A.  From the very beginning -- and I'll**
6  **repeat myself.  From the very beginning, she said**
7  **she could train people.**
8          **And I told her, "Okay.  You can train**
9  **each of these members -- staff members?"**
10 **"Yes."**
11 **"Go ahead and start bringing the best**
12 **practices that you learned from -- from your**
13 **training of members and staff.  And go ahead and**
14 **train those people.  Show me what -- how you're**
15 **going to be training those people."**
16 **So, I mean, if I was supposed to write**
17 **the training, then I didn't need to have her.  You**
18 **know, but that's not my job.  She said she could**
19 **train people.  And so I assumed she could come up**
20 **with the training.  And I kept asking her, "Can I**
21 **see it?  Can we -- show me what you're doing."**
22 **She never did that.  I mean, if you look**

51

1  **at the -- you know, the documentation in the**
2  **files, there's really -- there's -- besides the**
3  **training, there's really no work product from her,**
4  **directly from her.**
5      Q.  So when you asked her to send you the
6  training materials or about the status of
7  training, was that -- did you ever do that over
8  e-mail?
9      **A.  When I make the requests of her?**
10     Q.  Yes.
11     **A.  I -- I don't recall if there was**
12 **anything.  I'm sure there is.  But I'm not sure.**
13 **But, verbally, more than once.**
14     Q.  Prior to Kristie, did your office have
15 any procedures or standard operating procedures,
16 practices, any kind of, like, guidebooks of, like,
17 you know, this is how we write press releases,
18 this is how this -- these are the tasks the
19 scheduler will perform?  Did you have any written
20 documents or resources like that?
21     **A.  Yes.  Yes, we did.**
22     Q.  Okay.  So tell me about those.  What

52

1  were they?  Were they -- was it a handbook or a --
2  what -- was it a brochure?  Like, I guess, what
3  was the format of those materials?
4      **A.  Well, you know, there were things**
5  **that -- that the media people over time would put**
6  **together.  And so there were -- there were -- I**
7  **don't know what you call them.  But there were**
8  **documents out there on how to do this, how to**
9  **write a press release, how to engage the -- the**
10 **legislative team.  So, yeah, there were different**
11 **guidelines out there.**
12     Q.  And who put those -- those things that
13 you mentioned, the media documents, how to write a
14 press release, how to engage a legislative team,
15 who created those?
16     **A.  Those were just done over time**
17 **through -- through different office staff members.**
18     Q.  And so who maintains those documents?
19     **A.  I think everybody.  It's in a common**
20 **drive.  So it's available to everybody.**
21     Q.  And so was Kristie supposed to update
22 those documents?

53

1    A.   She was supposed to review them and
2 train people.
3    Q.   I'm just -- and I'm sorry.  I just don't
4 understand quite what you mean by that.  And
5 that's why I'm asking you these questions.  I'm not
6 sure what you expected her to do to train people?
7    A.   Well, she was the one that came into the
8 office -- and I'm sorry I'm giving you the same
9 answer, but you keep asking me the --
10   Q.   You are.
11   A.   Can I finish, please?
12        So I am trying to answer your question
13 to the best of my ability.  Again, she came in.
14 She could train.  So if somebody says they have
15 13, 14 years of experience of training members and
16 all that, she's supposed to come in and say this
17 is what I can do.  She told me she could do all of
18 this work from the very, very beginning.
19        So, you know, I'm -- I'm not going to
20 specifically tell her I need for you to do this
21 and this and this, because she was supposed to
22 come in -- she said she could do all of this.  So

54

1 I kept asking her, "Show me what you can do."  You
2 know, there's all this information that's
3 available in the -- in the general drive that's --
4 you know, all the employees have access to too.
5 Like, I mean, there's all these things that we've
6 done in the past about office procedures.
7        So, yes, there were a whole bunch of
8 documents on office procedures in the general
9 drive.
10   Q.   And what are the office procedures on?
11   A.   Again, different aspects of -- different
12 parts of the -- the office.  I mean, literally on
13 scheduling, literally on -- on press releases, on
14 legislative outreach, basically, you know, the
15 office operation in all aspects.  It's -- over the
16 years, we've put things together on it, on what we
17 call the general drive.
18   Q.   So I'm just unclear as to what you
19 expected Kristie to do to train your staff.
20   A.   I -- I --
21   Q.   What were your expectations as to what
22 she would do to train them?  I don't mean the

55

1 results.  I mean, what did you -- what actions did
2 you expect her to take to conduct the training?
3        MR. HAYES:  I'm going to object here
4 again.  Asked and answered several times.
5        MS. McDONOUGH:  He has not answered.
6        THE WITNESS:  I'm sorry.  I --
7        MS. McDONOUGH:  He's explained what he
8 wants --
9        MR. HAYES:  In your opinion maybe --
10       MS. McDONOUGH:  -- the outcome to be.
11       MR. HAYES:  -- he hasn't but, I believe
12 he has.
13       But you may answer the question.
14       But asked and answered.
15   A.   I -- I have -- you've asked me that
16 question, and I will answer it again.  When I
17 hired her, she said she had 13, 14 years of
18 experience training members and staff.  I went
19 over the different positions.  So can you train
20 these people?
21       Absolutely.  She said, "Absolutely.  I
22 can do this.  I have all these years of

56

1 experience."
2        So she -- I went down the line.  "Can
3 you do this?"
4        "Yes, this."
5        "All right.  Will you set up a training
6 for each of them and bring the best practices that
7 you learned at the House Administration?"
8        The House Administration puts all this
9 training for members and staff on, you know, how
10 to -- how to do this, how to do this, here are the
11 best practices.  So she was supposed to come in
12 with all that.
13       In fact, when -- I'll say it again.
14 When I introduced her to the staff on the -- on
15 the video conference, you know, the -- all staff
16 meetings that we have, I specifically introduced
17 her that way.  She has all this years of
18 experience.  She's going to be training each of
19 you.  She says she can train this and this.  She's
20 going to bring in the best practices from, you
21 know, different members, different staff people
22 from the House Administration.

Transcript of Henry Cuellar
Conducted on March 26, 2020

57

1       I said, "I know all of you all work
2 hard, do a good job, but if we can bring best
3 practices and bring you up to a different level,
4 we will do that."
5       That was one of her main selling points
6 when she sat down with me about the job.  And so
7 am I going to write out everything I need?  No,
8 because she says she could do this.  So I -- if
9 somebody sells themselves that they can do the
10 training, then I expect them to do the training.
11 And I kept asking her over and over again.
12     Q.   So is it your contention that Kristie
13 did not train staff at all?
14     A.   In -- at all?  I don't know what you
15 mean by "all."  But I would say the -- if you talk
16 to different staff, they would tell you -- like my
17 district director, she would have asked me, "Hey,
18 you know, you said she was going to train me.
19 When is she going to train me?  You said -- you
20 know, you brought her in to train people.  When is
21 she going to train me?"
22       I mean, there were folks that kept

58

1 asking me for training, because I introduced her
2 to the whole staff, the introductory call, when I
3 brought her in, and people expected the training
4 from her and expected this -- you know, the --
5 this knowledge that she said she could bring in to
6 each aspect of it.
7     Q.   Are you aware of any training that
8 Kristie conducted?
9     A.   Well, I know she -- we had a retreat in
10 the -- in the district.  And so she attempted --
11 and I say attempted, because she kept asking --
12 you know, I said, "Can you put it all together,
13 the training?"
14       And what she did was she expected people
15 to put things together for that training and, you
16 know, I -- I think -- I don't know what -- I don't
17 know if she did something or she, you know, spoke
18 at that time.  I think it was how to deal with
19 difficult people.  And some of the work -- and I
20 don't know at that time exactly -- I don't recall
21 exactly, but I know that, you know, she would look
22 up third-party sites and say, "Oh, I found this in

59

1 Google."
2       When -- I found it interesting, because
3 why is she looking at third-party sites when she
4 supposedly had all this knowledge on training
5 people?
6     Q.   So you said that Kristie asked other
7 people to put stuff together for the training.
8 What do you mean by that?
9     A.   She would ask Jessica, "Hey, can you put
10 this together about outreach?"
11       And Jessica and her had different
12 conversations and say, "Hey, you're supposed to be
13 training me how to do this outreach.  I just
14 started" -- I think -- "two, three months before.
15 You're supposed to train me."
16       And -- and you could see through, you
17 know, there was a conflict there, you know, where
18 Kristie kept asking somebody who didn't have the
19 experience that she had to do -- put something
20 together when Kristie was supposed to be doing
21 that.  And Jessica said, "Hey, why am I doing
22 this?  I thought she was supposed to be training

60

1 each of us."
2     Q.   What exactly did Kristie -- Kristie ask
3 Jessica to do for the training?
4     A.   I don't know.  You know, you would have
5 to ask her.  But from what I recall was how to do
6 outreach, how to do this.  I -- I -- again, I
7 don't recall exactly.
8     Q.   Is there anything that would help you
9 recall?
10     A.   I don't know at this time.  I don't
11 recall, should I say.
12     Q.   And so, I guess, is it your position
13 that whatever Kristie asked Jessica do -- to do
14 was improper?  Or what -- why was it wrong to ask
15 Jessica to do whatever it was that she asked her
16 to do?
17     A.   All right.  I wouldn't categorize --
18 characterize it as improper.  I'm just saying, you
19 know, Jessica felt that she was not prepared to,
20 you know, put something together as she was
21 asking.  I mean, that's what she would relate to
22 me.  And Jessica said, "Well, I thought she was

Transcript of Henry Cuellar
Conducted on March 26, 2020

26 (101 to 104)

---

101

1  together and everything was reviewed so by the
2  time it came to me, we had things on the calendar,
3  things that, you know, have been proofed already
4  and reviewed and all put together in one -- one
5  notebook.  That was -- she was deputy chief of
6  staff and that was her job.
7      Q.  So is it fair to say that other people
8  may have been responsible for providing some of
9  the things that were included in the notebook, but
10 she was responsible for making sure it was all
11 together?
12     A.  Other people would put things together.
13 It was her job to make sure that they were turned
14 in on time, they were proofread, that they all
15 were in order, where I could just review it, and
16 if we had any adjustments, to make it.  Her job
17 was to make sure that everything was put together.
18 That's what a deputy chief should be doing.
19     Q.  Okay.  Got it.
20         All right.  So you mentioned -- and
21 we've talked about it some -- that there were
22 issues with her reviewing deliverables.  What were

102

1  the -- the categories of deliverables that Kristie
2  was responsible for reviewing?
3      A.  Anything that was supposed to come to my
4  desk, her job was to help me review, take things
5  off the loads where I would not be the editor.
6  She would review them, make sure -- not only for
7  content, but, basically, anything that came to my
8  desk, it was her job to make sure it was in
9  final -- final mode.
10     Q.  What was your office's procedure for
11 drafting and reviewing press materials?
12     A.  Again, there were procedures there that
13 were in place.  Basically, the press person would
14 put it together.  Kristie would review it.
15 Legislative people -- I mean, the legislative
16 people would work it with the person.  And then she
17 would review and get it to me in a final form.
18     Q.  Okay.  So there would be a press person
19 who would draft the document and maybe would work
20 with the legislative staff; is that accurate?
21     A.  Yes, they would have to work with the
22 legislative staff.

103

1      Q.  And then it would go to Kristie for
2  review; is that right?
3      A.  Before it came to my table -- to my
4  desk, she was supposed to review all of that.
5      Q.  Okay.
6      A.  And -- and --
7      Q.  And so --
8      A.  And, actually, you know, she was not --
9  she should have been involved with the whole
10 process from the very beginning.  'Cause if she
11 would go to the back room, walk the floor, like
12 she was told when she was hired, then, you know,
13 she could, you know, shepherd this process from
14 the very beginning.
15     Q.  Okay.  And so by the time it got to
16 Kristie, was there anyone else who should have
17 reviewed the draft?
18     A.  If she was there at the very beginning,
19 meeting with them at the very beginning, she would
20 have -- know what was coming in from the very,
21 very beginning.
22     Q.  I mean, like, was there another person

104

1  that was supposed to have reviewed it?  Like,
2  after somebody drafted a press release, for
3  example, was someone in legislative supposed to
4  review it for accuracy or anything like that or --
5  or was Kristie the only person who was
6  proofreading these?
7      A.  No.  I mean, everybody was supposed to
8  be working as a team; the legislative people,
9  'cause they know the issues, or if there was a
10 press -- I mean, if there was a grant, the
11 grant writer -- I mean, the grant coordinator, the
12 press working.  And if she was -- if she would be
13 with them in the back every -- from the very
14 beginning, she would know exactly what was being
15 structured from the very beginning.
16     Q.  So when was the first time that Kristie
17 approved a written deliverable that, I guess, was
18 unacceptable?
19     A.  At the very beginning.  June.
20     Q.  And do you remember what the -- what the
21 work product was?
22     A.  No, ma'am.  But it was at the very, very

105

1  beginning, June.
2      Q.  Do you remember what was wrong with the
3  version that Kristie sent to you?
4      A.  Again, I don't recall.  There were so
5  many times while I would ask her to review
6  things, I just can't recall.  There were just
7  numerous times that -- that she was just not
8  reviewing things, not being involved with the
9  staff, dwell with them and be there with them and
10 understand the process, understand the issue.  And
11 this was from the very, very beginning, at the
12 first month.
13     Q.  And so the -- the written deliverables
14 that Kristie was presenting to you, what was wrong
15 to them?  Was it typographical errors?  Did they
16 have incorrect information?  Were they not
17 current?  What were the issues?
18     A.  Again, I can't recall everything.  But
19 it -- it went from having wrong information to,
20 you know, not -- typos, I mean, it was just
21 various, different things.  I can't -- can't give
22 you specifics as to every single time, but there

106

1  were just mistakes from the very beginning that I
2  asked her -- this is one of the things when I
3  hired her was high expectations.
4          I want to get something given to me, and
5  I want it in formal form.  I don't want to be an
6  editor.  I don't want to be checking the accuracy
7  of the information there.  "Can you handle this?"
8          "Yes."
9          Again, I didn't bring her in to train
10 her.  She -- she was a turnkey person -- if I can
11 use that term -- where she said, "I've got all
12 this, Congressman.  I've got all this.  I got the
13 training.  I can do this.  I can come in
14 immediately, parachute immediately and -- and be
15 an asset to you immediately on it."
16         And from the very beginning, in the
17 first month, I could see that she was not doing
18 what she told me she could do when she got hired.
19     Q.  Did she use that term?  Did you say she
20 could parachute in?
21     A.  I don't recall the exact terms that she
22 used.  But she said, "I can just come in and --

107

1  and run the office.  I've got 13, 14 years of
2  experience of training members, training staff.  I
3  got all of this experience, and I can use my
4  experience to come in and do all this work, not
5  only train people, but do all this work."
6      Q.  So when the written deliverables
7  included typos, was it Kristie who made the typos,
8  or did someone else make the typo and Kristie just
9  didn't correct it?
10     A.  Well, you know, the press releases are
11 put together by the legislative team.  Her job was
12 to review documents before they got to me to make
13 sure they were accurate in any sense or form.  I
14 mean, whatever -- you know, this is going to be a
15 public document, that it had accurate information,
16 that it had, you know, no misspelling, no typos,
17 and all that.
18         When -- I mean, when I got a work
19 product that went through my deputy chief, I
20 expected that to be a -- something that would be
21 ready to go, subject to any suggestions from me,
22 but it would be ready to go.  But it was like if

108

1  there's no person in between the legislative
2  people, the media people, and myself.  It was --
3  it was almost the same thing -- the problems I had
4  before she came in, that I didn't have a deputy, a
5  lot of them just continued with her.  That told me
6  she was not doing the supervision and the managing
7  of the office.
8      Q.  What do you mean when you say the
9  problems you had before she came in?
10     A.  Well, I didn't have a deputy.  So I had
11 to manage everything directly.  I had to -- I had
12 to administer the office.  My job is not to
13 administer the office.  I hire people, like I
14 thought I'd hired Kristie with her experience, to
15 manage the office, make the recommendations, so I
16 could do -- you know, review the documents, the
17 deliverables, before they got to me.
18         She -- that was her selling point.  She
19 had all these years of experience.  All these
20 years of experience.  And -- and that's not what I
21 saw from her from the very beginning.
22     Q.  So during the time that you didn't have

113

1       A.   Well, I mean, I would definitely take a
2   look at them before they went out.  I wanted to
3   look at it, 'cause it would be my name on -- on
4   that press release.  So I would look at that.
5       Q.   Oh, no.  I would -- I would feel the
6   same way.  I just wanted to confirm there weren't
7   times when -- like, the media team was releasing a
8   social media post or a press release that you had
9   never looked at?
10      A.   I would ask them that anything that went
11  out, I would be the person that would take a look
12  at it.  At the end.
13      Q.   I understand.
14      A.   Yeah.
15      Q.   Do you -- and so I understand that any
16  written deliverable that was to -- to make it to
17  your desk should have been reviewed by Kristie
18  before it got there, right?
19      A.   Yes, ma'am.
20      Q.   But Kristie wasn't actually drafting any
21  of these deliverables; is that accurate?
22      A.   I would assume that she did not draft

114

1   those.
2       Q.   So do you know for a fact that these
3   deliverables were always sent to Kristie for
4   review?  Like was -- do you know for a fact that
5   she was always given a chance to review them
6   before they got to you?
7       A.   When I hired her, I asked her to make
8   sure she reviewed any deliverable that would be
9   sent to me.
10      Q.   Sure.  But, do you know, were there
11  times when the press team or legislative staff
12  would send you a deliverable without having given
13  Kristie an opportunity to review it?
14      A.   I mean, everybody knew that it had to go
15  through her as the deputy chief.  So I -- I don't
16  know if there was any occasion of that, but, you
17  know, it was -- I think it was understood that
18  everything would have to go through her.
19      Q.   Okay.  So is it -- is it fair to say
20  that, as far as you know, everything was provided
21  to Kristie to review before it went to you?
22      A.   Again, I -- I would assume, but I don't

115

1   know for sure.  But, again, if she would walk the
2   floor, go back, talk to everyone on a daily basis,
3   first thing in the morning, like I asked her to
4   do, then she would know what everybody would be
5   working on, and she would talk to them about what
6   they were working on, any press releases, any of
7   the deliverables, any recommendations.  If she
8   would be doing that from the very beginning like
9   she was asked to do so, she would know everything
10  that would be coming out of the -- out of the back
11  office.
12      Q.   Wait.  No.  I understand that.  I
13  understand that you wanted her to review
14  everything, that -- that your staff understood
15  that she was supposed to review everything.  What
16  I'm saying, though, is, as far as you know, she
17  had an opportunity to review and make edits to any
18  document before it got to you?
19      A.   I -- I --
20      Q.   Is -- is that accurate?
21      A.   I don't know about -- if everything was
22  sent to her.  Everything was supposed to be going

116

1   through her as the deputy.  And, again, I'll say
2   it again, if she was back there, talking to
3   people, she would know exactly what was being
4   worked on, and she would not be surprised by
5   any -- any -- anybody that was working on
6   something, if she would just sit down with them on
7   a daily basis like I asked her to do that time
8   after time after time.
9       Q.   Right.  No.  I understand that.  What
10  I'm asking you, though, is do you have any reason
11  to believe that your press team or legislative
12  staff weren't sending documents to Kristie to
13  review?
14      A.   I -- I don't know.  They were supposed
15  to do that.  If she was not at the office, as I
16  understand she would leave sometimes, I don't know
17  what they would do at that time.
18      Q.   But they were -- they were still -- even
19  if Kristie wasn't at the office, they were still
20  supposed to send it to her, right?
21      A.   I assume so.
22      Q.   Okay.  You mentioned there was this

Transcript of Henry Cuellar
Conducted on March 26, 2020

---

117

1 issue with Kristie disregarding instructions about
2 your schedule.  What happened with that?
3     A.  I was on a trip and -- well, let me
4 start again.
5        You know, my -- my schedule was -- I
6 like to keep that schedule on just -- you know,
7 pretty much to myself.  And so I had told the
8 scheduler, any time I travel, flights or anything
9 like that, that you put that in private.  That
10 means that only she and I can look at that.
11        There was a time that I was on a trip
12 abroad and somewhere during the day, my scheduler
13 says, "Hey, I'm sorry.  But I was forced to give
14 your schedule to Kristie."
15        And I said, "Well, we'll talk about it."
16        I asked her, "What happened?  Madeline,
17 what happened?"
18        And she says that Kristie asked, "Hey, I
19 want to know about the schedule."
20        She said, "Well, as you know,
21 Mr. Cuellar says that those schedules are
22 private."

---

118

1        And -- and she walked up to her and --
2 according to Madeline -- in a threatening way
3 says, "You give me this schedule right now."
4        So she gave her the schedule and -- and
5 Madeline basically told me later, said, "Hey, I'm
6 sorry.  I had to that, but I was forced to give
7 this information."
8     Q.  So when did that happen?
9     A.  I -- I don't remember when it happened
10 exactly.  But it was before the -- the 90-day
11 review that I had with her, the probation.  I just
12 don't remember, because I brought it up to her at
13 that time, but I just don't remember the -- the
14 exact.
15    Q.  Oh, okay.  That's fine.  I can go back
16 and find the date.  But it was before the 90-day
17 review?
18    A.  I'm almost sure it was, 'cause I think I
19 brought it up to her.
20    Q.  Okay.  And so why -- I mean, Kristie was
21 your deputy chief of staff.  Why didn't you want
22 her to know your schedule?

---

119

1     A.  It's my own preference, you know.  I
2 keep my travel schedule to myself.
3     Q.  And your -- this travel that you were
4 on, was this personal travel?
5     A.  No, it was official.
6     Q.  And so if you weren't traveling, did
7 Kristie have access to your schedule?
8     A.  Well, the travel schedule was -- again,
9 was put on private.
10    Q.  Okay.  So it was just your travel
11 schedule that you didn't want people to see?
12    A.  That is correct.
13    Q.  Okay.  I mean, was there something about
14 this trip or about your travel that you didn't
15 want Kristie to know about?
16    A.  Well, I think there was an incident at
17 the very beginning, the first month she was there,
18 that there was something about a trip that I was
19 taking.  So she sends out an e-mail to all staff
20 about my travel.  There was something about it.  I
21 just don't recall.  So I told her, "Hey, you can't
22 give out information about, you know, what I'm

---

120

1 doing."
2        And so I don't know if it was because of
3 that or what.  I mean, I've always kept things
4 private.  I kept my travel schedule to myself.
5     Q.  So your current chief of staff, does he
6 or she have access to your travel schedule?
7     A.  I don't know if -- same thing is I don't
8 know.  I think they know when I fly in and fly
9 out, but as to the flight numbers, as to what
10 flight I'm in, as to where I sit and all that
11 stuff, all that should be private.  Should be
12 private.
13        I just -- I mean, people know when I go
14 in and go out.  You know, what time my flights
15 are.  But as to flight numbers and all that
16 personal information, I just don't -- don't like
17 to give people flight numbers and all that
18 information.
19    Q.  So do you know what Kristie said to
20 Madeline about the schedule?  Like, do you know
21 exactly what she said?
22    A.  I -- I don't recall exactly, but

---

Transcript of Henry Cuellar
Conducted on March 26, 2020

---

121

1  Madeline told me she said, "I can't give you that
2  set of instructions from the congressman."
3         That she walked up to her and said, "You
4  give me this information right now."
5         And Madeline felt threatened by her, so
6  she gave it to her.  Then she communicated with
7  me, "I'm sorry.  I had to give her that
8  information."
9         And that's one of the reasons I brought
10 it up to her in her 90-day probation was because
11 she disregarded specifically an instruction that I
12 had given.
13    Q.   When did you tell Kristie that she
14 couldn't have your travel schedule?
15    A.   I don't recall.  All I recall is that
16 she did send an e-mail to all staff about a trip.
17 I don't remember -- it was at the very beginning.
18 I mean, literally, at the very beginning.  I just
19 don't remember where or what.  So when I saw she
20 was giving out -- information out, that's -- you
21 know, that's when -- I mean, from what I recall,
22 you know, I told her, "Hey, don't talk to anybody

---

122

1  what my schedule is."
2     Q.   So you said that Kristie, you know,
3  disregarded your instruction.  But it sounds to me
4  like Madeline disregarded your instruction.  And
5  so what I want to know is what was the instruction
6  that Kristie disregarded?
7     A.   No, that's not what happened.  I said
8  that she was told that I did not want to give
9  my -- my -- my travel information.  And she said,
10 "I'm sorry.  I cannot give you this information.
11 The congressman told me not to give it."
12        And she walked up to her and said, "You
13 better give me this information."
14        And Madeline says she felt threatened by
15 her, so she gave her the information.  So she was
16 specifically told the congressman does not want to
17 give this information.
18        So, no, the violation was not by
19 Madeline.  The violation was by Kristie herself.
20    Q.   So Madeline gave Kristie the schedule
21 even though you explicitly told her not to?
22    A.   She was told to give that information,

---

123

1  and she felt that she had to give it.  She called
2  me up and said, "I'm sorry I had to give it.  I
3  felt threatened by her.  And I had to give her the
4  information."
5         So Kristie was told, you know, "I cannot
6  give you this information."
7         And she went up there even though she
8  was told that the congressman did not want to give
9  that travel information, she went up to her and --
10 and, basically, according to Madeline, threatened
11 her and said, "You give me this information right
12 now."
13        Madeline felt threatened and she gave
14 that information.  So the violation was done by
15 Kristie.  She was given a specific -- she was told
16 she was not supposed to give that by me.  If she
17 had an issue, she could have called me or text me
18 or e-mail me, and she didn't.  But she went up to
19 the scheduler, used her influence as the deputy
20 chief and said, "Give me this information."  And
21 Madeline felt --
22    Q.   So -- so your understanding of what

---

124

1  happened is based on what Madeline told you,
2  right?
3     A.   That is correct.
4     Q.   Did you ever talk to Kristie and ask for
5  her side of the story?
6     A.   Yeah.  I mean, if you hear the
7  recording, I brought it up to her attention at
8  that time.  If you hear the recording, she
9  basically said she agreed with everything I told
10 her.  100 percent.  I believe that's what she
11 said.  So, yes, that was her side of the story.
12 She said, "I understand.  I agree with you
13 100 percent."
14    Q.   So when you found out from Madeline that
15 Kristie had asked for your schedule, did you call
16 Kristie?
17    A.   I was -- I don't remember where I was,
18 but I think I was on the other side of the world.
19 So, you know, I don't think I make that call from
20 the other side of the world.
21        And did I bring it to attention later?
22 I don't recall, but I know that I did bring it to

---

145

1         MS. McDONOUGH:  Wait.  Let's go off the
2    record for a minute.
3         MR. HAYES:  Okay.
4         (A recess ensued from 10:27 a.m. to
5    10:29 a.m.)
6         MS. McDONOUGH:  All right.  On the
7    record, I will -- I would like to state that as we
8    have through all of the depositions in this case,
9    counsel have agreed that these depositions are
10   taken pursuant to the Federal Rules of Civil
11   Procedure, that all objections are preserved
12   except as to form and privilege.
13        And so I, during our sidebar, I have
14   noted to opposing counsel and have asked him to
15   refrain from making speaking objections on the
16   record so that we can continue moving along here.
17        MR. HAYES:  And I would just like to
18   note that I disagree with the characterization
19   that I've made a speaking objection.  And that's
20   it.
21   BY MS. McDONOUGH:
22    Q.  All right.  So, Mr. Cuellar, to get back

146

1    to the issue -- I'm sorry.  Could you remind me,
2    did you say you did not discover Kristie had taken
3    the files from your office until after you already
4    fired her?
5     A.  That is correct.
6     Q.  Okay.  So other than the two incidents
7    we've discussed, the removing the files and asking
8    for your schedule, was Kristie insubordinate on
9    any other occasions?
10    A.  Well, she had -- I think it was the last
11   week she was there, she was -- I was out of DC,
12   and she kept calling me and e-mailing me about
13   doing bonus and pay raises.  And she sent me this
14   e-mail that says that she spoke to Dean Lester,
15   our financial person, you know, person that does
16   our finances, and that he had agreed -- or he was
17   okay that -- that we could do a pay raise.  I
18   think she gave herself -- she recommended the
19   biggest pay raise to herself at 20,000.  And she
20   gave recommendations on some other people, and she
21   left out certain people from the recommendations.
22   She made a bonus recommendation to her and

147

1    everybody.  She recommended that we hire, I think,
2    one other person.  And she kept asking me to do
3    this and that Dean was okay with this.  And it
4    turns out that she basically -- the e-mail that
5    she sent me with the information was false.  She
6    falsified the information.
7         Dean had not okayed this pay raise.
8    She -- you know, we didn't even know if it was
9    something we could afford, you know, her $20,000
10   pay raise, you know, which was the biggest one
11   that she suggested, and other pay raises and not
12   include some people, and then bonuses for
13   everybody, and she wanted to make this, you know,
14   effective pretty well -- I mean, pretty quickly,
15   and that we could hire another person to do
16   legislation.
17        It turned out that, one, we were capped
18   out at 18 individuals.  And I think anybody that's
19   worked at the Capitol for many years, and she knew
20   how many people worked for me, she knew that we
21   could not hire another person.  She knew that Dean
22   had not okayed this.  And she lied to me on the

148

1    phone and by e-mail when Dean had not said yes,
2    that we could hire somebody, because we were
3    capped out.  And she should have known that we
4    were capped out, known that, you know, we did
5    not -- we didn't know if we had enough money for
6    the publicist or for the pay raises and especially
7    her giving herself the biggest pay raise of the
8    recommendations she made.
9         And I find that as false information.
10   She's lying to a member of Congress.  And, yes, we
11   found out afterwards, but she did that the last
12   week.  She lied to me that Dean had okayed all of
13   this when she knew she was providing to the member
14   of Congress, the senior person, the deputy chief
15   of staff, she was falsifying the information.  She
16   had lied, what Dean said.  And -- and -- yeah, I
17   find that as somebody that has violated office
18   policy and -- and violated my trust.
19    Q.  How was -- so the issue was that Kristie
20   falsely told you that Dean had approved the pay
21   raises; is that the -- is that the issue?
22    A.  That he had approved the pay raises,

Transcript of Henry Cuellar
Conducted on March 26, 2020

149

1  that they were maintainable, that means we could
2  afford it inside the budget, that we could hire
3  another person.  And either she didn't know or she
4  falsified that we could hire another person when
5  we were already capped, I believe, at 18
6  individuals.  So this information that we could
7  hire another person was not accurate.  It was
8  false.
9       This thing that Dean had okayed the pay
10  raises and the bonuses -- she wanted this --
11  bonuses in October, right away -- was all false
12  information.  So she'd literally call me on the
13  phone, e-mail me, and she lied directly to me.
14  She lied to a member of Congress.  One of the -- I
15  mean -- I mean, this is one of the most basic
16  things that as a deputy, you know, you cannot lie
17  to the Congress and say our -- "Dean Lester said
18  okay.  He says we can maintain the -- that we can
19  maintain another staff.  We can hire another
20  staff."
21       That was not correct.
22       Yes.  We can give pay raises.  And, by

150

1  the way, I'm giving myself a $20,000 -- or I'm
2  recommending that you give me a $20,000 pay raise,
3  which is the biggest pay raise of anybody there.
4  I'm not including everybody in the pay raise.  I'm
5  saying also that we can pay ourselves bonuses.
6       And, yeah, I mean, she -- she lied.  She
7  falsified all that information.
8       Q.  So 'cause -- what I asked you was
9  whether there were any other times that she was
10  insubordinate.  So are you saying she was
11  insubordinate that time or just that she engaged
12  in misconduct?
13       A.  I don't know -- I don't recall of any
14  other ones.  I'm giving you the ones that I do
15  recall.
16       Q.  Okay.  And so -- I'm sorry.  You said
17  that you found out that she provided this false
18  information after you had fired her?
19       A.  I believe it was afterwards, but she
20  provided all this information -- I believe it was
21  the last week she was there with me.
22       Q.  Okay.  And aside from --

151

1       A.  Which I -- which I found it interesting,
2  because I had -- at her 90-day probation I had, I
3  told her, "You need to include this and this and
4  this."
5       But her focus was instead of her coming
6  back and saying, "Sir, when you and I sat down at
7  the 90-day probation, you told me to improve this
8  way, improve this way, improve this and this.
9  This is what I've done, this is what I've done to
10  improve.  This is what I have improved, the
11  deficiencies that you brought up to me."  She
12  didn't even bring that up.
13       All she said, "I want the largest pay
14  raise of anybody in the office.  I want a bonus.
15  I want you to hire somebody else.  And -- and I've
16  already checked it out with my -- you know, with
17  our financial person."  And all that was false.
18       Q.  Did Kristie tell you that she -- that
19  Dean had approved the actual numbers she was
20  proposing?
21       A.  Yes.  I believe it's all documented
22  there.  And I -- she called -- we spoke several

152

1  times.  I was out of DC.  And it was very urgent
2  for her.  She wanted this done as quickly as
3  possible.  It was very important to get pay
4  raises, very important to get the bonuses.  I
5  believe she wanted to do it effective that month
6  of October.
7       Q.  Is it fair to say as your deputy chief
8  of staff, Kristie had more job responsibilities
9  than any of your other staffers?
10       A.  As the deputy chief who comes in and
11  says she has 13, 14 years of experience and
12  working in offices and she knew how to run an
13  office, I don't think there was anything not
14  reasonable to ask of her to do.  Everything -- I
15  have high expectations.  She agreed to those high
16  expectations, reasonable expectations.
17       But, as a deputy chief, I don't expect
18  that person to steal -- or should I say take files
19  without authorization.  And -- and I expect that
20  deputy chief to not lie to me and say that our
21  financial person has okayed the biggest pay raise
22  for herself, the bonus, and other people, hire

153

1  another person.  And I assume that any, you know,
2  person with any type of responsibility would not
3  lie to a member of Congress.
4      Q.  Okay.  So I'm really asking a different
5  question.  Was there some other staff member that
6  you employed in 2018 who was senior to Kristie or
7  who had more job duties than she did?
8      A.  No, ma'am.  She was the deputy chief.
9      Q.  Thank you.
10     Okay.  So I think we've gone through all
11 the others.  The last reason for firing Kristie
12 that you had mentioned was that she had conflict
13 with different staff.  Who were the staff members
14 Kristie had conflict with?
15     A.  From what I recall, Jessica Hernandez,
16 Madeline, and Nina.
17     Q.  Okay.  So let's start with -- with
18 Jessica.  Jessica, I understand, was your district
19 director; is that right?
20     A.  Correct.
21     Q.  And so, for these questions, what I'm
22 going to ask you about is your firsthand

154

1  knowledge.  So when was the first time that you
2  observed Kristie mistreat Jessica?
3      A.  It was within the first month of
4  employment.  Jessica started calling me up and
5  says, "I -- you know, I'm don't want to work here,
6  the way this person talks to me.  I don't like the
7  way she's talking to me."
8      And so this was at the very, very
9  beginning.  And I did bring it up to her
10 attention.  As I mentioned, I talked to her to --
11 to Kristie.  And she says, "No, that's not true."
12     And then I put them -- I brought her
13 into my office.  I called Jessica -- this is all
14 the -- I'm almost sure it was the first month, in
15 June.  And so I said, "Hey, guys.  You know,
16 what's going on?  How do we make this thing
17 operate?  I cannot have Jessica leave.  What's
18 going on?"
19     And then they started discussing it.
20 And it got to a point where Kristie was raising
21 her voice.  And, literally, at that time, what am I doing
22 thinking to myself, you know, "What am I doing

155

1  with this individual?  Why is she fighting with
2  people and right in front of -- of her boss?
3  She's actually fighting with my district
4  director."
5      So all of this was at the beginning, in
6  June.
7      Q.  So what was Kristie saying to Jessica?
8      A.  Again, I -- you know, I'm not privy to
9  their conversations.  I'm just -- what Jessica
10 said is that she would talk to her in a very --
11 you know, in a very demeaning way.  And there was
12 just this conflict with her, the way she would
13 talk to Jessica.
14     Q.  Oh.  I mean, during that conversation in
15 your office, what was Kristie saying to Jessica?
16     A.  It was just -- you know, it was -- I was
17 asking them, "Hey, what's -- what's the conflict?
18 You know, can we make this work?  I'm a little
19 busy.  As a congressman, I cannot have my deputy
20 chief and my district staff be at conflict."
21     And then I don't recall the exact words.
22 Jessica would say something, and Kristie would

156

1  say, "No, that's not true."  But it was the -- the
2  tone and raising the voice that Kristie would
3  bring up that I thought was not professional, and
4  especially right in front of her boss.
5      Q.  Okay.  So I understand it was -- it was
6  her tone and things like that.  But, like, do you
7  remember what Kristie actually said?
8      A.  I -- I don't recall.  There were just --
9  she raised her voice several times.  And I had to
10 say, "Hey, calm down.  Let's talk about it.
11 Let's -- you know, I don't want to have conflict
12 in the office.  I want the office to operate
13 smoothly.  I need my deputy chief and district
14 director to get along."
15     Q.  Did you document that incident in
16 writing, that Kristie raised her voice at Jessica?
17     A.  I don't know if I -- I mean, if you ask
18 me document, if I put it in e-mail or something, I
19 don't recall at this time.
20     Q.  When was the next time you observed
21 Kristie mistreat Jessica?
22     A.  Well, if you're asking from personal

Transcript of Henry Cuellar
Conducted on March 26, 2020

157

1 knowledge, I don't know.  I know that when she
2 came down to the district, it was -- they had -- I
3 think I asked them to travel together.  And
4 Jessica would say that they were -- you know, they
5 would get into, you know, very heavy discussions,
6 disagreements on it.  And, again, you would have
7 to ask Jessica on that.
8     Q.  Sure.  No.  I just want to know what did
9 Jessica tell you that Kristie did?
10    A.  Oh.  It was just basically the fact
11 that -- that, you know, when they would travel,
12 they were disagreeing with each other.
13    Q.  Did Jessica tell you what they were
14 disagreeing about?
15    A.  I -- again, my -- I'm so busy with my
16 job, I just don't recall what it was, but she
17 brought it up to me more than --
18    Q.  I understand.
19    A.  Yeah.  And she brought it up more than
20 once and to the point where she was ready to quit.
21 She said, "I cannot work with her."
22    Q.  And so, aside from that call that you

158

1 were on with Jessica and Kristie and Jessica
2 talking to you about the trip to the district,
3 were there any other times that Kristie mistreated
4 Jessica?
5     A.  I -- I -- I mean, it was -- if you're
6 asking me for every specific time, I can't
7 remember.  But it was more than once.  And, again,
8 I don't recall at this time.  But I know that
9 Jessica brought it over -- over and over and over
10 to a point where she wanted to quit.
11    Q.  Did you ever counsel Kristie about,
12 like, her conduct on -- towards Jessica on that
13 trip to the district?
14    A.  I think I brought it up to -- to -- I
15 mean, this is a phone call I had.  I mean, that
16 was the counsel that I had with them.
17    Q.  Oh.  I mean -- so it sounded like
18 Jessica called you and said, you know, that when
19 Kristie came to visit the district, that they got
20 into these heavy discussions and agreements.  Did
21 that happen before or after you had that phone
22 call in your office with Jessica and Kristie?

159

1     A.  I don't recall.
2     Q.  Can you remember any other specific
3 times that Jessica complained about Kristie?
4     A.  Well, yeah, there was a time where
5 Jessica said that when they travel, they -- she
6 had a -- I think it was a little red notebook
7 where she would keep track of, you know, every
8 meeting that they had and, you know, she said,
9 "Hey, by coincidence my notebook is gone.  You
10 know, it was in the car."  And she complained.
11 She didn't accuse anybody, but she -- she was
12 saying it's a coincidence that this red notebook
13 that had all the work that, you know, I was doing
14 disappeared from the car.
15    Q.  And so was -- I mean, was she implying
16 that she thought Kristie took it?
17    A.  That's my implication.  She said,
18 "Nobody else was in the car except her and me."
19    Q.  When did Jessica tell you that?
20    A.  Whenever they were down there traveling.
21    Q.  Okay.  So it was -- so -- so Jessica
22 told you about losing the notebook when Kristie

160

1 was still working there; is that your
2 recollection?
3     A.  I -- I don't remember exactly when it
4 happened, but it was because of that trip that
5 they took together.  They were traveling together.
6     Q.  And did you ever talk to Kristie about
7 Jessica's missing notebook?
8     A.  Well, you know, it was awkward, you
9 know, to accuse somebody of doing something
10 without any proof.  So, yeah, I mean, it was
11 brought to my attention, but I never brought it up
12 to her.  It was a little awkward to say, "Hey, by
13 the way, did you take this?"
14        So, no, I -- that particular one I did
15 not bring it to her attention.
16    Q.  I understand.
17        Were there any other times that Kristie
18 mistreated Jessica?
19    A.  I mean, that's all I can recall.  But, I
20 mean, it was a series of times that she kept --
21 you know, that Jessica kept bringing up, you know,
22 "I cannot work with her.  I cannot work with her.

161

1  I cannot work with her."
2       And I kept saying, "No.  You know -- you
3  know, work it out, sit down, and talk to her and
4  make things work.  You know, I'm busy up here.
5  And you guys work it out as two adults."
6      Q.  So you also mentioned Madeline.  So I
7  know we discussed the incident where Kristie was
8  asking Madeline for your schedule.  Aside from
9  that time, did you ever observe Kristie mistreat
10 Madeline?
11     A.  Madeline told me -- again, I'm usually
12 not at the office.  Usually, I'm at my desk.  So I
13 base it on what people tell me.  There was -- you
14 know, Madeline told me about, you know, she felt
15 that Kristie was going back to the back office and
16 telling people about don't trust Kris -- I mean,
17 don't trust Madeline.  And she almost felt like
18 she was being ostracized.
19         But then --
20     Q.  And when did Madeline tell that?  I'm
21 sorry.  Go ahead.
22     A.  I don't recall.

162

1      Q.  Do you know if it was before or after
2  the 90-day meeting?
3      A.  I don't recall.
4      Q.  And did you ever talk to Kristie about
5  what Madeline said?
6      A.  That, no.  I don't think so.  I mean, it
7  was -- everything was all general about, hey --
8  you know, when I would say, "Hey, make sure we all
9  work together.  We stick together."  Points like
10 that.
11     Q.  And did you talk to anyone else about
12 whether Kristie was mistreating Madeline?
13     A.  I don't recall at this moment.
14     Q.  And were there any other times that
15 Kristie mistreated Madeline?
16     A.  I -- I don't recall at this time.
17     Q.  What about Nina?  When did Kristie
18 mistreat Nina?
19     A.  Well, there was one particular incident
20 where I was about to fly out -- I was about to fly
21 out and Madeline and I were about to -- I -- you
22 know, we were about to rush off to the airport.

163

1      And then Kristie says, "Nope, sir.  I need to talk
2  to you."
3          So she closes the door.  And in front of
4  Madeline, she says, "Sir, I want you to know that,
5  you know, the only person you can trust is me.
6  Don't trust Nina.  Don't trust other people.
7  Trust me."
8          And I looked at her.  I said, "Okay."
9          And that was it.  I thought it was --
10 Madeline and I, we took off.  I said, "Look.  I've
11 got a plane.  I'm running late."
12         I mean, I just thought it was really
13 strange that she would come in, close the door,
14 talk to me before we left.  "Don't trust her.
15 Don't trust anybody.  Trust me."  And then that
16 was -- that was it.
17     Q.  Was -- so Nina wasn't present then,
18 right?  That was just you and Madeline and
19 Kristie?
20     A.  That is correct.
21     Q.  Were there any other times that you
22 think Kristie mistreated Nina?

164

1      A.  I don't -- I don't know from anything in
2  particular.  I mean, I don't recall.
3      Q.  And -- and, this incident where Kristie
4  told you, you know, that you couldn't trust Nina,
5  do you remember when that happened?
6      A.  No.  At this time, I don't recall.
7      Q.  Do you remember if it was before or
8  after the 90-day meeting?
9      A.  I don't know exactly when it -- it
10 happened.  I don't know.  But I -- but I remember
11 it was -- you know, here I am rushing off to the
12 airplane.  And we're trying to rush to the get to
13 the airport and face traffic.  And I just thought
14 it was kind of strange that she would come in and
15 tell me that before I left.
16     Q.  Were there any other times where Kristie
17 mistreated staffers?
18     A.  I don't know.  I don't know.  I don't
19 recall.  I don't know.
20         MR. HAYES:  Counsel, can we go off the
21 record for just one second?
22         MS. McDONOUGH:  Sure.

Transcript of Henry Cuellar
Conducted on March 26, 2020

---

165

1        (A recess ensued from 10:53 a.m. to
2  10:53 a.m.)
3  BY MS. McDONOUGH:
4        Q.   And so, Congressman, I know we kind of
5  talked about Jessica and Madeline.  Did you
6  ever -- were there any other times that we haven't
7  discussed that you counseled Kristie about how she
8  was treating staffers?
9        A.   I don't recall.
10       Q.   And aside from the e-mails that your
11 counsel produced, are you aware of any other
12 written documentation of any incident where
13 Kristie mistreated staffers?
14       A.   I don't recall.
15       MS. McDONOUGH:  All right.  And,
16 actually, I think this is probably a good time to
17 take a break if that's okay with you all.  So we
18 could go off the record.
19       (A recess ensued from 10:54 a.m. to
20 11:33 a.m.)
21       MS. McDONOUGH:  Back on the record.
22 BY MS. McDONOUGH:

---

166

1        Q.   All right.  So, Mr. Cuellar, we have
2  discussed, I think, each of the reasons that you
3  identified for firing Kristie.  So, just as a
4  reminder, we talked about Kristie not supervising
5  staff, not knowing when appropriation conference
6  committees and deadlines were, not conducting
7  training, disregarding instructions regarding the
8  schedule, not providing adequate status reports,
9  not reviewing deliverables, and conflicts with
10 staffers.  Are there any other reasons that you
11 fired Kristie -- or were there any other reasons
12 you fired Kristie aside from what we've already
13 discussed?
14       A.   As far as -- as far as I can remember,
15 that should be it.
16       Q.   Okay.  So do you put all of your
17 employees on a 90-day probationary period?
18       A.   The policy of the office has been that
19 we -- since I started in 2005 -- is to put
20 everybody on a 90-day probation.
21       Q.   And is that for both DC and district
22 staff members?

---

167

1        A.   That is correct.
2        Q.   And so -- I'm sorry.  You said you've
3  had that policy since two thousand...
4        A.   And five.
5        Q.   Was it 2005?
6        A.   Since I started.
7        Q.   2005.  Thank you.
8            And so it's always 90 days?
9        A.   That is correct.
10       Q.   What is the purpose of the probationary
11 policy?
12       A.   The purpose is to see if somebody is
13 going to be able to perform the job that they were
14 hired to do so.
15       Q.   Do you always conduct a review with the
16 employee at the end of the probationary period?
17       A.   If you're asking me personally, I would
18 let the chief of staff or -- or a deputy chief do
19 that.  I had Cynthia, who was with me, I think,
20 13 years.  Basically, what I would do, we would
21 hire somebody on a 90-day probation.  And then,
22 from there, she would follow up with that

---

168

1  individual, make sure that that was done.
2        Q.   And so did you tell -- or did you expect
3  Kristie to have reviews with new employees at the
4  end of their probationary periods?
5        A.   Sorry.  My family's texting me.  I
6  apologize.  What was the question again?
7        Q.   Do you -- do you need to take a break?
8        A.   No.  I think I'm -- I'm good.  Let me
9  see.  My daughters are texting me.
10       MS. McDONOUGH:  Lets go off the record
11 for just a minute.
12       (A recess ensued from 11:36 a.m. to
13 11:37 a.m.)
14 BY MS. McDONOUGH:
15       Q.   Okay.  So I'm sorry.  Just to backtrack,
16 did you -- did you ask Kristie to conduct reviews
17 with new employees at the end of their 90-day
18 probationary periods?
19       A.   I don't recall.
20       Q.   And so you mentioned that Cynthia
21 previously conducted these reviews at the end of
22 the 90-day probationary period; is that right?

---

169
1     A.   That is correct.  And I want to say that
2 Amy Travieso, my -- my deputy chief, might have
3 done some of them, but it was mainly Cynthia,
4 the -- the chief of staff.
5     Q.   And so did -- Cynthia or Amy, did they
6 send you any documentation that they had completed
7 the review?
8     A.   I want to say there is documentation on
9 that.  I can't recall right now, but there should
10 be something there on the -- either on the files
11 or e-mail or something.
12    Q.   Okay.  And did you all use a -- like a
13 performance review form?  Or was there any written
14 component of the review that was provided to the
15 employee?
16    A.   Yes, there is a form.  And, again, I
17 don't know, you know, how it was -- it was used.
18 But there's a performance review that specifically
19 calls for a 90-day performance review.  And the --
20    Q.   So --
21    A.   The employee manual also has that --
22 that our office would do periodic performance

170
1 reviews also.
2     Q.   Prior to Kristie's firing, did you
3 advise any employees in writing of the 90-day
4 probationary period?
5     A.   The job fell on my chief of staff to do
6 that.
7     Q.   And so who would tell a chief of staff
8 or a deputy chief of staff that they were on a
9 90-day probationary period?
10    A.   Well, that would be -- that would be me.
11    Q.   And did you advise your chiefs of staff
12 and deputy chiefs of staff of the 90-day
13 probationary period in writing?
14    A.   I don't recall, 'cause, like I said,
15 Cynthia was with me 13 years.  So I don't recall
16 exactly.  Amy was with me 9 years.  So I can't
17 recall on that.
18    Q.   And you have an employee handbook,
19 right?
20    A.   Yes, ma'am.
21    Q.   What's the purpose of the employee
22 handbook?

171
1     A.   I mean, the purpose is that everybody
2 knows what the -- what is expected from the
3 office, what's expected from them.  So it -- it
4 has a series of things; how employees should be
5 conducted and what responsibilities and what
6 rights they have.
7     Q.   And you provided -- or I'll say either
8 you or your chief of staff, deputy chief of staff
9 would provide a copy of the employee handbook to
10 new employees, right?
11    A.   Correct.  They would -- all employees
12 were supposed to sign the employee handbook.
13 Sign.  And it was part of the -- the file.  Along
14 with, you know, other documents.
15    Q.   And so it's my understanding that prior
16 to 2019, your handbook did not mention the 90-day
17 probationary period.  Would you agree with that?
18    A.   Before 2019, it just had periodic
19 reviews.  But -- but there was a -- a form that
20 was supposed to be used for performance that had a
21 specific 90-day performance review.
22    Q.   So why didn't the employee handbook

172
1 mention the 90-day probationary period before
2 2019?
3     A.   Well, I can't tell you that.  It does --
4 it does talk about performance reviews, periodic
5 performance review.  There was a extra form that
6 did talk -- when you review somebody, it had
7 specific -- a 90-day mention there.
8     Q.   So it's my understanding that your
9 office issued an updated handbook in 2019 and that
10 that version does say that employees are on a
11 90-day probationary period; is that correct?
12    A.   That is correct.
13    Q.   Why did you issue a new handbook that
14 mentions the 90-day probationary period?
15    A.   I guess just to make sure that it was
16 specifically mentioned there and that people would
17 sign that.  Even though that would fall upon the
18 chief of staff to follow up on 90-day probation --
19 probation.  And we just decided to go ahead and
20 take that -- that extra step.
21    Q.   Did you ever send any e-mails to Dean
22 Lester about employees' probationary periods?

173

1    A.  I don't recall.

2    Q.  It's my understanding that -- from Dean,
3  that you would sometimes send e-mails when a new
4  employee started about their salary and their
5  title and that you sometimes mention the 90-day
6  probationary period.  Do you have any recollection
7  of e-mails like that?

8    A.  Again, I don't recall.  But if that's
9  what the e-mails say, that's what the e-mails say.

10   Q.  And so was Kristie on a 90-day
11 probationary period?

12   A.  She was.

13   Q.  Did you tell Kristie about the 90-day
14 probationary period?

15   A.  Yes, ma'am.

16   Q.  When did you tell her that?

17   A.  When she was first hired.  Might have --
18 might have been at two different times.  I talked
19 to her several times, but it was at the very, very
20 beginning.

21   Q.  What did you tell her?

22   A.  Just basically, I said these are the

174

1  high expectations that I have.  This is what I'm
2  looking for.  She told me she could meet those
3  expectations.  And she was asking for more money
4  for the salary.  And I told her that at the end of
5  the 90 days, we can talk about whether there is,
6  you know, movement forward on that issue or not,
7  but it will be at a 90-day probation performance
8  review.

9    Q.  Were there any witnesses to that
10 conversation?

11   A.  No, ma'am.  Not -- not that I recall.

12   Q.  Was that in person or on the phone?

13   A.  In person.

14   Q.  Prior to August 8th, 2018, did you have
15 any written correspondence with Kristie about the
16 probationary period?

17   A.  No.  It was all just on her performance.

18   Q.  Prior to August 8th, 2018, did you have
19 any written correspondence with anyone about
20 Kristie's probationary period?

21   A.  I don't recall.

22   Q.  Are you aware that Kristie had any

175

1  communications with anyone about her probationary
2  period prior to August 8th, 2018?

3    A.  I -- I don't know.

4    Q.  So when Kristie e-mailed you on
5  August 8th, 2018, to ask about maternity leave,
6  why did you respond to that e-mail stating that
7  you needed to discuss her probationary period?

8    A.  Well, you know, she -- she knew there
9  was a 90-day probation and that we had to get to
10 that point first.  And so I just decided to bring
11 that to her attention to remind her that there's a
12 90-day probation.

13         I found out about her pregnancy.  She
14 told the whole staff.  She told me.  Very happy.
15 I was very happy for her.  But I decided to go
16 ahead and just say, "This is -- you know, don't
17 forget.  You also have a 90-day probation also."

18   Q.  What do you mean by that?  Do you mean
19 that, like, she wouldn't need maternity leave if
20 she didn't make it past her 90-day probationary
21 period?

22   A.  It was just a -- it was just a reminder

176

1  of her that she had a probation period also.

2    Q.  Why did you extend Kristie's
3  probationary period by 30 days?

4    A.  What do you mean by that?

5    Q.  'Cause I understand you had the
6  probationary period meeting on -- I think it was
7  September 5th.  And then you agreed to extend
8  Kristie's probationary period for an extra month;
9  is -- is that accurate?

10   A.  Oh, okay.  Yeah.  I see what you're
11 saying.  Well, listen.  I -- I wanted her to
12 succeed.  I know she was having difficulties.  I
13 know she was not meeting my expectations; just
14 wanted to give her a second chance to see if she
15 could go ahead and improve on the different items
16 that I told her to.

17         She -- you know, when I talked to her
18 the -- you know, that particular time of the
19 90 days, she came in, and I told her what the
20 expectations were and what she needed to improve.
21 And instead of her coming back with a "here's my
22 plan to improve my deficiencies," she asked for, I

Transcript of Henry Cuellar
Conducted on March 26, 2020

177

1 think it was a $40,000 pay increase, which I
2 thought was a little bizarre, if I can use that
3 term.  I mean, if you're talking to somebody about
4 their performance, how do you turn around -- if
5 somebody's telling you you're not doing a good
6 job, how do you turn around and say, "Oh, by the
7 way, I need a $40,000 pay increase"?
8        She did give me a document on her
9 performance when she showed up on the 90 days, but
10 that -- she called it a performance review, but
11 all she did was explain why she needed a $40,000
12 pay increase.
13        When people have asked me for pay
14 raises, they usually come in and say, "Hey,
15 listen, sir.  I've done this.  I've done this.
16 I've met this expectation.  I've done this.  Can I
17 have a pay increase?"
18        In this case, we had an individual who,
19 basically, I was telling her that she was not
20 doing her job, and, at the same time, she's asking
21 me for a pay raise.  But, nevertheless, I
22 wanted -- I wanted her to succeed, you know.  I

178

1 always look at the best of individuals.  And I
2 wanted her to succeed.  So I decided to, you know,
3 extend it and give her another chance and see if
4 she would improve things.
5        Q.   Prior to her termination, did you ever
6 tell Kristie that she was in danger of being
7 fired?
8        A.   I -- I would assume from all the
9 communications I had with her by e-mail, verbally,
10 what she needed to work on.  I would tell her over
11 and over and over -- and this happened from the
12 very, very beginning, from the very beginning, the
13 first month.  I think it was almost the first, you
14 know, couple weeks, I was telling her, "You need
15 to do this.  You need to do this.  You need to do
16 this.  You need to do this."
17        So, yes, I did tell her in many ways she
18 needed to improve her improvements -- I mean,
19 increase -- I mean, meet the expectations that I
20 had set and she had agreed to.
21        Q.   Did you ever tell Kristie something to
22 the effect that if she did not improve her

179

1 performance or meet expectations, that she would
2 be fired or let go or terminated?
3        A.   Well, when I talked to her at the very
4 beginning and I told her my expectations, she knew
5 this was a very fast-moving office, you know,
6 where we work very hard for our constituents.  I
7 told her what I expected.  And I assumed she
8 knew -- she understands clearly my expectations.
9        Within the first couple weeks, I was
10 telling her she needed to do this.  She needed to
11 do a better job with deliverables.  She needed to
12 do a better job at managing the office, sitting
13 down with them, talking to them.  From the very,
14 very beginning I was telling her what she needed
15 to do to meet those expectations.  And I think any
16 reasonable person would say, "Hey, I'm getting too
17 many complaints from the boss," that they would
18 understand that they were not meeting the
19 expectations.
20        Q.   Okay.  So is it fair to say, though, you
21 never put it to her so bluntly as to say,
22 "Kristie, if you don't improve, I'm going to have

180

1 to let you go"?
2        A.   Using those words?  Not exactly those
3 words.  But, again, it was very clear to her that
4 she was not meeting the expectations.  And it was
5 within the first couple of weeks that she was
6 there, there are -- there's documentation there
7 where I'm asking her, "You need to do this.  You
8 need to train staff.  You need to walk back there.
9 You need to talk to them.  You need to understand
10 what's going on."
11        I think any reasonable person would
12 understand that her -- that she would be in -- in
13 trouble, you know, and whether she verbalized that
14 to anybody, you know, there was a middle office
15 there -- I don't know if she verbalized anything
16 like that to the middle office, but she -- she
17 knew that she was not meeting the expectations.
18        Q.   Wait.  So I understand what you're
19 saying about what she knew or what she should have
20 known.  But I want to know what you told her.  Did
21 you ever use words to the effect of "fired," "let
22 go," or any euphemism for terminated to say,

Transcript of Henry Cuellar
Conducted on March 26, 2020

201

1  all of that experience that she would be able to
2  handle her work.  She was just pretty much out of
3  college at that time.  So with working, I think,
4  in a couple other members' offices, working in
5  Dallas at a financial services, I thought that she
6  now had experience to come in and work again.
7      Q.  Did Nina come visit you the evening
8  before you rehired her?
9      A.  No, ma'am.
10     Q.  All right.  If we could just go off the
11 record for about five minutes, but I think I'm
12 just about done.  And I know that Mr. Hayes may
13 have some follow-up questions for you.  But, yeah,
14 I'd like to take just about a five-minute break?
15     A.  Okay.
16         MR. HAYES:  Okay.  That's fine.  Thanks.
17         MS. McDONOUGH:  Okay.  Thanks.
18         (A recess ensued from 12:19 p.m. to
19 12:25 p.m.)
20         (Ms. Small is not present.)
21         MS. McDONOUGH:  Okay.  I actually don't
22 have any further questions.

202

1          So, Congressman, thank you so much for
2  taking the time to -- to answer these.  And I'll
3  just hand it over to Mr. Hayes, if he has
4  anything.
5          THE WITNESS:  Thank you.  And under all
6  this current circumstances with this pandemic, I
7  just wish everybody to be safe.  It's very
8  interesting times that we're in right now, so I --
9  I wish everybody the best.  It's -- it's -- never
10 seen anything like this before.  But, anyway,
11 thank you -- thank you, ma'am.  Thank you so much.
12         MS. McDONOUGH:  Thank you.  Same to you
13 and your family.
14         THE WITNESS:  Same to you and your
15 family.
16         MR. HAYES:  And -- and, Sara, can we
17 just take another break here, maybe five minutes,
18 just so that I can confer with my co-counsel?
19         MS. McDONOUGH:  Of course.
20         MR. HAYES:  Okay.  So I'm going to log
21 off this call and so I can -- then I'll just log
22 back in in about five minutes.  If it's going to

203

1  be longer, we'll log in and tell you.  So...
2          MS. McDONOUGH:  Sure.  Okay.
3          MR. HAYES:  Okay.  Great.  Thanks.
4          (A recess ensued from 12:26 p.m. to
5  12:38 p.m.)
6          MR. HAYES:  Okay.  Are we on the record?
7          THE REPORTER:  Yes.
8              EXAMINATION
9  BY MR. HAYES:
10     Q.  Okay.  Congressman, I just have a couple
11 follow-up questions.  Earlier, you testified about
12 some handwritten notes you reviewed prior to this
13 deposition; is that correct?
14     A.  That is correct.
15     Q.  And were those handwritten notes
16 prepared at the direction of counsel?
17     A.  That is correct.
18     Q.  Okay.  Thank you.
19         You also testified that on several
20 occasions Kristie Small requested raises; is that
21 correct?
22     A.  That is correct.

204

1      Q.  Did those requests for raises factor
2  into your decision to terminate her employment?
3      A.  I got the impression from her that she
4  was more interested in money.  You know, when I
5  first talked to her about her job, you know, and
6  she -- she kept asking for more money.  And I
7  said, "No.  This is -- we'll talk about this at
8  the 90-day probation."
9          In between her and Dean Lester and
10 myself would go over the budget.  And every budget
11 meeting that the three of us had, it was always
12 about, "Hey, we need to put more money for staff,
13 for myself."  And it got to a point where even
14 Dean would say, "Boy, you sure don't look happy
15 every time we have these staff meetings on that."
16         Because it was always -- her focus was
17 always to get more money.  When I had the 90-day
18 review, it was the same thing; it was she wanted a
19 pay raise.  Instead of focusing on the job
20 performance and what she needed to improve, she's
21 asking me for a $40,000 pay raise.  After, when we
22 did the final -- you know, that last week she was

205

1  with me, again, she was asking for a $20,000 pay
2  raise bonus for herself.
3         And it almost looked like at every
4  single time that we talked, it was about money.
5  In fact, on the 90-day probation, she gave me this
6  performance -- she called it a performance review,
7  but she didn't talk about how she did her
8  performance.  It was all about why she should be
9  getting a $40,000 pay raise.  So, yes, a factor
10 considered.
11        MR. HAYES:  Okay.  Thank you,
12 Congressman.  That's all we have.
13        THE WITNESS:  Thank you, guys.  I got to
14 get on a conference call.  So thank you to
15 everybody.  Everybody, stay safe.  It's -- it's a
16 very, very different circumstances and the numbers
17 keep going up.  So everybody please be safe with
18 your families.
19        MR. BLAKE:  Congressman, before you
20 leave.  Let's just let Sara confirm that we're
21 finished today.
22        MS. McDONOUGH:  Oh, yes.  We're

206

1  finished.
2         Thank you, Congressman.
3         THE WITNESS:  Thank you.  Be safe
4  everybody, please.
5         MR. BLAKE:  You too, sir.  Thank you
6  very much.
7         MR. HAYES:  Thanks.
8         MR. BLAKE:  Sara, did you want to -- did
9  you think we needed to have a call, or is the
10 notes issue cleared up?
11        MS. McDONOUGH:  No.  Yeah.  They were.
12 I didn't under -- I thought they -- it sounded to
13 me like they were notes he took for his own
14 purposes.  But, yeah, if it was something he was
15 providing to you all, that's fine.  Yeah.  No
16 issue.
17        But -- yeah.  Thanks to everybody.
18        Thank you, Charlotte and -- and Andrew.
19 I would like to order just an electronic copy and
20 standard delivery.
21        But thanks, everybody.
22        (The deposition concluded at 12:43 p.m.)

207

1              CERTIFICATE OF SHORTHAND REPORTER
2
3       I, Charlotte Lacey, the officer before whom the
4  foregoing deposition was taken, do hereby certify that
5  the foregoing transcript is a true and correct record of
6  the testimony given; that said testimony was taken by me
7  stenographically and thereafter reduced to typewriting
8  under my direction; that reading and signing was not
9  requested; and that I am neither counsel for, related
10 to, nor employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13
14      IN WITNESS WHEREOF, I have hereunto subscribed my
15 hand this 6th of April, 2020.
16
17
18
19              Charlotte Lacey, RPR, CSR #14224
20
21
22