Case No. 1:19-cv-01314-TNM

# **ATTACHMENT G**

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLUMBIA

3

       _____
4

       KRISTIE SMALL,              )Case No.

5                                  )1:19-cv-01314-TNM

          Plaintiff               )

6                                  )

       vs.                         )

7                                  )

       THE OFFICE OF CONGRESSMAN )

8      HENRY CUELLAR,              )

                                   )

9         Defendant               )

       _____

10

11

12

13              Deposition of Kristie Small

14                   Washington, D.C.

15                   March 13, 2020

16                     9:40 p.m.

17

18

19

20

21      Reported by:  Bonnie L. Russo

22      Job No. 4031159

Kristie Small                                                    March 13, 2020

Page 2

1    Deposition of Kristie Small held at:

2

3

4

5        Office of House Employment Counsel

6        U.S. House Of Representatives

7        4300 O'Neill House Office Building

8        Washington, D.C.

9

10

11

12

13

14    Pursuant to Notice, when were present on behalf

15    of the respective parties:

16

17

18

19

20

21

22

Page 3

1    APPEARANCES:

2    On behalf of the Plaintiff:

3        ALAN LESCHT AND ASSOCIATES, P.C.

4        SARA McDONOUGH, ESQ.

5        1825 K Street, N.W.

6        Washington, D.C. 20006

7        202-463-6036

8        sara.mcdonough@leschtlaw.com

9

10    On behalf of the Defendant:

11        TREVOR S. BLAKE, ESQ.

12        SENIOR ASSOCIATE COUNSEL

13        MARK HAYES, ESQ.

14        OFFICE OF HOUSE EMPLOYMENT COUNSEL

15        U.S. HOUSE OF REPRESENTATIVES

16        Office of the Clerk

17        4300 O'Neill House Office Building

18        Washington, D.C. 20515

19        202-225-7075

20        trevor.blake@mail.house.gov

21        mark.hayes@mail.house.gov

22

Page 4

1                C O N T E N T S

2    EXAMINATION OF KRISTIE SMALL          PAGE

3    BY MR. BLAKE                9

4

5

6

7                EXHIBITS

8    Exhibit 1  Resume of Kristie E. Small    16
          SMALL 00307-308

9

     Exhibit 2  Performance Review          44
10        HC001155

11   Exhibit 3  E-Mail Chain dated 9-28-18    54
          HC000399

12

     Exhibit 4  Letter dated 7-8-19      61
13        HC003582

14   Exhibit 5  Letter dated 6-25-19      61
          HC003586

15

     Exhibit 6  Letter dated 6-24-19      61
16        HC003595-3601

17   Exhibit 7  Memorandum dated 6-25-19      61
          HC003602-3603

18

     Exhibit 8  Handwritten Notes      61
19        HC003604-3614

20   Exhibit 9  Letter dated 7-8-19      61
          HC003615-3619

21

     Exhibit 10  Letter submitted 6-27-19      61
22        HC003621

Page 5

1    EXHIBITS (CONTINUED):

2    Exhibit 11  Letter submitted 6-27-19      61
          HC003626

3

     Exhibit 12  Letter submitted 6-21-19      61
4         HC003627

5    Exhibit 13  Letter submitted 7-3-19      62
          HC003628

6

     Exhibit 14  Acknowledgement of Receipt    93
7         of Employee Handbook for the
          Office of Henry Cuellar
8         HC000036

9    Exhibit 15  Confidentiality Agreement     108
          HC000038-39

10

     Exhibit 16  Protection of House Equipment  108
11        and Assets
          HC000041-42

12

     Exhibit 17  Amended Complaint          124

13

     Exhibit 18  Kristie Small vs. Office of    124
14        Congressman Henry Cuellar and
          Henry Cuellar Summary
15        SMALL 00003-4

16   Exhibit 19  Leave Request          141
          HC001148

17

     Exhibit 20  Leave Request          141
18        HC001149

19   Exhibit 21  E-Mail Chain dated 6-25-18    159
          HC000168-169

20

     Exhibit 22  E-Mail dated 6-3-18          159
21        HC000174-175

22   Exhibit 23  E-Mail Chain dated 7-31-18    159
          HC001484-1487

2 (Pages 2 - 5)

Page 6

EXHIBITS (CONTINUED:)

Exhibit 24  E-Mail Chain dated 7-16-18      159
        HC000194

Exhibit 25  E-Mail Chain dated 7-16-18      159
        HC000195-199
Exhibit 26  E-Mail dated 8-2-18            160
        HC000212-213

Exhibit 27  E-Mail Chain dated 7-16-18      160
        HC000674-678
Exhibit 28  E-Mail dated 8-8-18            160
        HC001132

Exhibit 29  E-Mail dated 8-9-18            160
        HC001133
Exhibit 30  E-Mail dated 8-15-18           160
        HC001134

Exhibit 31  E-Mail dated 8-17-18           160
        HC001136
Exhibit 32  E-Mail dated 7-31-18           160
        HC001150

Exhibit 33  E-Mail dated 10-12-18          160
        HC001154
Exhibit 34  E-Mail dated 7-31-18           160
        HC000201-202

Exhibit 35  E-Mail Chain dated 8-2-18       160
        HC000210-211
Exhibit 36  E-Mail Chain dated 10-1-18      175
        HC002570-2575

Exhibit 37  E-Mail Chain dated 10-16-18     175
        Attachment
        HC002803-2806

Page 7

EXHIBITS (CONTINUED):
Exhibit 38  E-Mail dated 9-4-18            175
        Attachment
        HC001847-1860
Exhibit 39  E-Mail Chain dated 9-10-18      175
        HC000373-375

Exhibit 40  E-Mail dated 8-3-18            225
        HC002408-2420
Exhibit 41  E-Mail Chain dated 8-8-18       225
        HC002439-2446

Exhibit 42  E-Mail Chain dated 9-5-18       225
        HC002470-2478
Exhibit 43  E-Mail dated 10-12-18          225
        HC000679

Exhibit 44  E-Mail dated 8-31-18           225
        Attachment
        HC002465-2469

Exhibit 45  E-Mail Chain dated 9-7-18       225
        Attachment
        HC000347-348

Exhibit 46  E-Mail Chain dated 10-11-18     225
        HC000405
Exhibit 47  E-Mail Chain dated 7-3-18       225
        HC000180-182

Exhibit 48  E-Mail Chain dated 10-15-18     239
        Attachment
        HC001158-1173

Exhibit 49  E-Mail dated 10-25-18          250
        HC001156-1157
Exhibit 50  E-Mail dated 7-19-18           252
        HC002311-2318

Page 8

EXHIBITS (CONTINUED):

Exhibit 51  E-Mail Chain dated 6-5-18       252
        HC002127-2130

Exhibit 52  E-Mail dated 7-3-18            252
        Attachment
        HC002255-2270

Exhibit 53  Plaintiff's Answers to          265
        Requests for Admission
Exhibit 54  E-Mail dated 3-3-20            270
        Attachment
        HC003631-3647
Exhibit 55  Plaintiff's Answers to          293
        Interrogatories

(Exhibits bound separately.)

Page 9

P R O C E E D I N G S

    KRISTIE SMALL,

was called for examination by counsel and,

after having been duly sworn by the Notary, was

examined and testified as follows:

    MR. BLAKE:  All right.  Good

morning.

        This is the deposition of Plaintiff

Kristie Small in the above-captioned case.  I

am Trevor Blake for the defendant, the office

of Congressman Henry Cuellar.  I'm here with

Mark Hayes, and Mrs. Small is here and

accompanied by her attorney, Sara McDonough.

        And are we ready to go?

        First of all, Counsel, I just want

to confirm that this is being taken pursuant to

the Federal Rules Of Civil Procedure, and that

as a result all objections except as to form

and privilege are preserved.

        Is that your understanding?

3 (Pages 6 - 9)

Kristie Small                                               March 13, 2020

Page 10

1        MS. McDONOUGH:  Yes.

2

3        EXAMINATION BY COUNSEL FOR DEFENDANT

4        BY MR. BLAKE:

5        Q.   All right.  Mrs. Small, will you,

6   please, state your name for the record.

7        A.   My name is Kristie Small.

8        Q.   Okay.  And did you ever go by any

9   other name?

10       A.   My maiden name was Kristie Muchnok.

11       Q.   Okay.  And could you spell that,

12   please?

13       A.   M-U-C-H-N-O-K.

14       Q.   And just to confirm, Ms. McDonough

15   is here today and she is your attorney; is that

16   right?

17       A.   Correct.

18       Q.   And are you married?

19       A.   I am.

20       Q.   And what is your spouse's name?

21       A.   Jeffrey Small.

22       Q.   And what is the date that you got

Page 11

1   married?

2        I won't tell him that it took a

3   little time.

4        A.   He knows.  He actually got me a sign

5   that has all of our important dates on it.  It

6   was September 25th -- no, that's my dad's

7   birthday.  September 19th, 2006 -- '7 -- 2015.

8   '16.

9        Q.   Okay.  So 2016.  That sounds about

10  right?

11       A.   Yes.

12       Q.   And you do know, Mrs. Small, that

13  you are under oath, and, as a result, subject

14  to the penalties of perjury just as if we were

15  in court in front of a judge, right?

16       A.   Yes.

17       Q.   Okay.  Have you ever been deposed

18  before?

19       A.   No.

20       Q.   Have you ever testified in court

21  before?

22       A.   No.

Page 12

1        Q.   So, in this deposition, your

2   attorney may object.  You should answer the

3   question anyway unless she instructs you not

4   to.  And, just to be clear, we are not seeking

5   any attorney-client communications, so don't

6   disclose any communications with your attorney.

7   If you're not sure, we can take a break for you

8   to confer with Sarah to determine whether or

9   not what you are inclined to say is privileged;

10  and, therefore, should not be said.  Okay?

11       A.   Okay.

12       Q.   If you don't understand a question,

13  please ask for clarification.  Otherwise, I

14  will assume you understand.  Is that okay?

15       A.   Okay.

16       Q.   And you're doing really well so far.

17  Verbal responses, please, just so that Bonnie

18  can take down your answers.  It's fine to do

19  gestures as long as you do gestures along with

20  some kind of verbalization.

21       Do you understand?

22       A.   I do.

Page 13

1        Q.   Okay.  And also, please, if you can,

2   say "yes" or "no" instead of "uh-huh" and

3   "uh-uh" just to be clear what you're saying for

4   the record.

5        Do you understand?

6        A.   I understand.

7        Q.   Breaks are okay, as we discussed.  I

8   would just ask that you not request a break

9   during when there's a pending question; but,

10  otherwise, just let me know if you have to take

11  a break and I'll let you know if I have to take

12  a break, and breaks are okay.

13       Do you understand?

14       A.   I do.

15       Q.   Is there any reason that you cannot

16  give truth -- truthful and full testimony

17  today?  For instance, any medication that

18  you're on, alcohol use, or anything else that

19  would impact your ability to testify today?

20       A.   There is no reason.

21       Q.   And can you hear me okay?

22       A.   I can.

4 (Pages 10 - 13)

Page 14

1    Q.   And can you see and read documents
2    that I'll be putting before you today?
3    A.   I can.
4    Q.   To prepare for this deposition, did
5    you review any documents?
6    A.   I did.
7    Q.   Okay.  And what documents did you
8    review?
9    A.   I reviewed the documents that we
10   provided to the House Of Representatives.
11   Q.   Okay.  So, just to be clear, your
12   counsel provided a number of documents to my
13   office in response to our discovery request, so
14   you did review those documents?
15   A.   Yes.
16   Q.   Okay.  And also just to be clear,
17   when I say "documents," do you understand that
18   I mean paper and also electronic documents like
19   e-mail, text messages, direct messages, chats,
20   et cetera?
21   A.   Yes.
22   Q.   Other than your counsel, did you

Page 15

1    communicate with anyone about your deposition?
2    A.   No.
3    Q.   And, just to be clear, "communicate"
4    means verbal communication as well as written
5    communication including electronic
6    communication like e-mail, text, direct
7    messages, and chat.
8        Do you understand that definition of
9    communication?
10   A.   I do.
11   Q.   And does that definition of
12   communication change your response to my
13   answer -- I'm sorry -- your response to my
14   question about whether you communicated with
15   anyone about your deposition?
16   A.   Yes.
17   Q.   Okay.  And what is -- did you
18   communicate with anyone about your deposition?
19   A.   Yes.
20   Q.   Okay.  And can you just describe
21   those communications?
22   A.   The communication that I had about

Page 16

1    my deposition was telling people that I have
2    one and that was it.
3    Q.   Okay.  And whom did you tell?
4    Like...
5    A.   My parents and a group of my best
6    friends.
7    Q.   Okay.  All right.  So, now, I'm
8    going to get into it and talk a little bit
9    about your time on the Hill.  First of all,
10   before you is what is marked as Defendant's
11   Exhibit 1, which is Bates labeled Small 00307.
12       (Deposition Exhibit 1 was marked for
13   identification.)
14       BY MR. BLAKE:
15   Q.   It is a two-page document.  It is
16   your resume that was provided during discovery.
17       Is this the most recent version of
18   your resume?
19   A.   No.
20   Q.   Okay.  And is there something that
21   you would add to this resume if you were to
22   give an updated resume to us today?

Page 17

1    A.   Yes.
2    Q.   Okay.  And what is that?
3    A.   I am currently in a position at the
4    AFL-CIO where my title is the director of the
5    United Way Worldwide Partnership.
6    Q.   And can you tell me when you started
7    that job?
8    A.   Started that job in mid-November.
9    Q.   To be clear, that's of 2019?
10   A.   Correct.
11   Q.   And besides that job -- and I also
12   understand that you and Ms. McDonough are going
13   to provide a supplemental discovery response
14   with an updated resume; is that correct?
15   A.   Correct.
16   Q.   And so besides the addition of the
17   AFL-CIO job and the description of your duties
18   there, is there anything else that you would
19   need to change to Defendant's Exhibit 1?
20   A.   No.
21   Q.   Okay.  All right.  Can you tell me
22   about your -- and this is going back a little

5 (Pages 14 - 17)

Kristie Small                                                    March 13, 2020

Page 34

1    A.   No.
2    Q.   Before Congressman Cuellar's office
3  on the Hill, did you have the ability to fire
4  or effectively recommend firing people?
5    A.   No.
6    Q.   Before Congressman Cuellar's office,
7  did you have the authority to promote or
8  effectively recommend promotions of people?
9    A.   No.
10   Q.   Before Congressman Cuellar's office,
11 while working on the Hill, did you have the
12 authority to discipline or effectively
13 recommend disciplining people who worked on the
14 Hill?
15   A.   No.
16   Q.   Before Congressman Cuellar's office,
17 did you have the ability to evaluate
18 performance in a formal way for anyone working
19 on the Hill?
20   A.   No.
21   Q.   Okay.  Before working for
22 Congressman Cuellar's office, did you have the

Page 35

1  ability to approve leave for anyone working on
2  the Hill?
3    A.   No.
4    Q.   And before working in Congressman
5  Cuellar's office, did you have the ability to
6  determine or effectively recommend compensation
7  such as salaries and bonus amounts?
8    A.   No.
9    Q.   Can you describe to ne the
10 application process with Congressman Cuellar's
11 office?  So how that job offer came about?
12   A.   As I was beginning the process of
13 finding a new position, I was reaching out to
14 colleagues to see where openings may be.  And a
15 colleague, Nina Andrews, notified me that her
16 chief of staff had just left and her deputy
17 chief had just quit, and that the office was a
18 mess, and he was probably looking to hire
19 someone.
20       And I said, oh, well, I'm looking.
21 So I believe she gave him my resume, and then I
22 had two or three interviews, and on my -- maybe

Page 36

1  it was just two.  On the -- no, it was two.
2  There was one in the members' dining room and
3  one where -- the second one where he hired me
4  was at a restaurant with Nina Andrews present,
5  and he offered me less money.  He offered me
6  what -- less money than I ended up making, and
7  he also offered me -- he -- he was thinking for
8  me to be legislative director, and I said to
9  him I think I would be better in a chief of
10 staff type position, is there anyone in your
11 office that you would trust to be your
12 legislative director?  And, at that point, he
13 and Nina discussed Juan Sanchez, and that's
14 what ended up happening.
15       So he took my recommendation to have
16 Juan become a legislative director, and hired
17 me as the deputy chief of staff, offering me
18 $80,000.  And I said that I would need to make
19 more, and so he ended up -- I ended up with
20 making $90,000.
21   Q.   Okay.  You said a lot.  So I just
22 want to make sure I understand everything.

Page 37

1        So you said that initially you were
2  in touch with Nina Andrews from Congressman
3  Cuellar's office; is that right?
4    A.   Uh-huh.
5    Q.   Okay.  So what was your relationship
6  with Nina Andrews before you spoke about
7  possibly joining Congressman Cuellar's office?
8    A.   Nina and I had been good friends for
9  approximately 10 years.  We were Washington
10 Wizard dancers together in 2008, and so that's
11 when our relationship began.  That's when we
12 met.
13   Q.   Did you have any professional
14 interaction with Nina on the Hill before you
15 started working in Congressman Cuellar's
16 office?
17   A.   As far as job duties, no.
18   Q.   So as a staffer on the Committee on
19 House Administration, which you were, and you
20 know as a staffer for Congressman Cuellar's
21 office, did you have any interaction between
22 the committee and the members' office?

10 (Pages 34 - 37)

Page 38

1   A.   No.
2   Q.   So was anyone present at your
3   interview with the congressman, the first one
4   that was in the members' dining room?
5   A.   No.
6   Q.   Okay.  And besides Nina Andrews and
7   the congressman, obviously, and yourself, was
8   anyone present at the interview that took place
9   at the restaurant?
10  A.   No.
11  Q.   Do you know why Nina was there?
12  A.   You would have to ask him.
13  Q.   All right.  What were you making
14  salary-wise at the Committee on House
15  Administration at the time that you interviewed
16  with Congressman Cuellar?
17  A.   80,000.
18  Q.   And so he offered you what you were
19  making --
20  A.   Yes.
21  Q.   -- at the Committee on House
22  Administration?

Page 39

1        Can you tell me a little bit more
2   about why he was recommending that you be the
3   legislative director?
4   A.   I have no -- you would have to ask
5   him.
6   Q.   Was being the legislative director
7   anything that you and Nina discussed about a
8   possibility when you joined the office?
9   A.   Not that I recall.
10  Q.   Was Nina present when you were
11  talking about salary?
12  A.   I don't recall.
13  Q.   Was Nina present for all of the --
14  was it the dinner, lunch?
15  A.   Dinner.
16        And, at the end, before he
17  officially offered me the job, he did have her
18  leave, but I don't remember if salary had been
19  discussed before or after she was -- she left.
20  Q.   So at some point Nina left and then
21  the congressman offered you the job; is that
22  right?

Page 40

1   A.   Yes.
2   Q.   And then you stayed a little bit
3   longer and talked about the job; is that right?
4   A.   I believe so.
5   Q.   So there was some conversation with
6   the congressman about the job on that occasion
7   when Nina was not present, right?
8   A.   Yes.
9   Q.   Did the congressman agree to pay
10  $90,000 in that same conversation or at a later
11  time?
12  A.   I believe it was at a later time.
13  Q.   And do you know if it was a verbal
14  communication, like a phone call or meeting, or
15  a written communication like an e-mail or a
16  text?
17  A.   I don't recall.
18  Q.   Did you -- at the time of this
19  conversation when the congressman offered you
20  the position of deputy chief of staff, did the
21  congressman's office have a chief of staff?
22  A.   No.

Page 41

1   Q.   Okay.  And was there any talk about
2   filling the vacant chief of staff position?
3   A.   He told me that he was not filling
4   it.  That the woman who had left and taken
5   another job, he was going to give it a year to
6   make sure that she was happy and didn't want to
7   come back.
8   Q.   So was your understanding, then,
9   that you would be deputy chief of staff on a --
10  for at least a year?
11  A.   Yes.
12  Q.   There is no discussion about the
13  possibility of a promotion to chief of staff?
14  A.   There was.  He told me that that
15  could be a possibility.
16  Q.   Okay.  Did you talk about a timeline
17  for that at all?
18  A.   No, not -- not past the one year
19  that he had mentioned.
20  Q.   Do you know Patrick Malloy?
21  A.   Yes, that name sounds familiar.
22        Can you give me more information?

11 (Pages 38 - 41)

Kristie Small                                                                March 13, 2020

Page 46

1        Do you know when that general
2    discussion that you were referring to in
3    Exhibit 2 happened?
4        A.   I don't recall, but I do know that
5    we had to switch daycares, and it became
6    significantly more cost-wise because I was
7    switching -- we were switching her daycare to
8    accommodate what my new office hours would be,
9    which were very long.
10       Q.   Do you know about when you switched
11   daycares?
12       A.   Probably -- I have to think about
13   that.
14            What was my start day with
15   Congressman Cuellar?
16       Q.   June 1st, 2018.
17       A.   So around then.  It would be around
18   that time.  Maybe a month after, but it was
19   really close to that time frame of getting the
20   new job.
21       Q.   So would you then, based on that,
22   think that this general conversation referenced

Page 47

1    in Bullet 2 about salary and daycare costs
2    happened in June of 2018?
3        A.   I can't say.
4        Q.   Do you think it would have been any
5    later than June of 2018?
6        A.   I don't know.
7        Q.   Okay.  So if we can pinpoint when --
8    Kadence, right?
9        A.   Uh-huh.
10       Q.   When Cadence started at the new
11   daycare, that would give us a sense of when you
12   had this conversation, right?
13       A.   I don't know.
14       Q.   Do you know when, going back to
15   Exhibit 2 here, you talk about wanting to
16   refresh what -- when -- what we went over?  Do
17   you remember when that later conversation, the
18   refreshed conversation happened?
19       A.   It was later in my employment and
20   that's what brought this about.
21       Q.   So when you were hired by the
22   congressman, did he know that you had Cadence?

Page 48

1        A.   Yes.
2        Q.   Okay.  And he knew that you were
3    married?
4        A.   Yes.
5        Q.   Okay.  At the time, he did not know
6    that you were pregnant --
7        A.   I did not --
8        Q.   -- or did you --
9        A.   -- know I was pregnant.
10       Q.   Okay.  So he -- so he didn't know
11   that you were pregnant?
12       A.   Correct.
13       Q.   Okay.
14       A.   And dur- -- during our interviews, I
15   expressed to him that the one thing that was
16   extremely important to me was that if I needed
17   to take care of Cadence if she was sick, like,
18   that would be my first priority.  So just so,
19   you know, he was clear before he hired me that
20   I did have this beautiful daughter and that I
21   would have to take care of her if, you know,
22   circumstances where -- where she was not

Page 49

1    healthy.
2        Q.   Right.
3            Did you talk to the congressman
4    about the prospect of having a second child
5    somewhat imminently?
6        A.   I have never spoke to him about
7    that.
8        Q.   So when you were talking about -- if
9    you look at the third bullet, the second to
10   last sentence says "Eventually, we will have a
11   second child in daycare where another
12   approximately $2,000 will be spent."
13       A.   Yes.
14       Q.   This estimates approximately --
15       A.   Yes.
16       Q.   -- $15,000 a year in daycare?
17       A.   Well, it wasn't a prospect at that
18   point.  I was pregnant.
19       Q.   Okay.  Well, you were pregnant when
20   you prepared Defendant's Exhibit 2, right?
21       A.   Yes.
22       Q.   But did you talk about this

13 (Pages 46 - 49)

Kristie Small                                                    March 13, 2020

Page 50

1    possibility --
2        A.   No.
3        Q.   -- in your initial conversation
4    that's referenced in Bullet 2?
5        A.   No.
6        Q.   But, just to be clear, you denote
7    that you had one child and he knew that you
8    were married at the time that he hired you,
9    right?
10       A.   Yes.
11            And before you ask, I will need to
12   take a bathroom break --
13       Q.   Sure?
14       A.   -- whenever --
15            MR. BLAKE:  Why don't we take a
16   break now.  So let's go off the record.
17            (A short recess was taken.)
18            BY MR. BLAKE:
19       Q.   I just want to ask you quickly about
20   your resume, Defendant's Exhibit 1.
21            So based on this resume, it looks
22   like your duties for the congressman were very

Page 51

1    different from your duties for the Committee on
2    House Administration.
3            Would you say that that's an
4    accurate assessment?
5        A.   Yes.
6        Q.   Also, just briefly going back to
7    your salary conversation with the congressman
8    around the time that you started a little bit
9    before, just to be clear, he offered $80,000,
10   right?
11       A.   Yes.
12       Q.   You countered with 90,000; is that
13   right?
14       A.   I don't recall.
15       Q.   You countered with some amount; is
16   that right?
17       A.   Correct.
18       Q.   And you agreed to 90,000; is that
19   right?
20       A.   Correct.
21       Q.   And did you talk about, you know, if
22   and when a future raise might happen?

Page 52

1        A.   Not that I recall.
2        Q.   Okay.  So there was no discussion
3    about we'll revisit this in, you know, six
4    months?
5        A.   Not that I recall.
6        Q.   Did you talk at all about the
7    possibility of getting a bonus, you know, not
8    just salary but also getting a bonus?
9        A.   Not that I remember.
10       Q.   All right.  So one of our
11   million-dollar questions in this case is the
12   probationary period.
13            When did you first learn about the
14   probationary period in the congressman's
15   office?
16       A.   When he responded to my e-mail
17   asking for maternity leave.
18       Q.   Okay.  And so that was in August of
19   2018 -- around August -- I think it was August
20   8th of 2018; is that right?
21       A.   That sounds approximate.  I don't
22   remember.

Page 53

1        Q.   Okay.  So your contention, then, is
2    that before this response to this e-mail in
3    20 -- in August of 2018 that you were unaware
4    of your probationary period; is that right?
5        A.   100 percent.
6        Q.   Did you -- let me back up.
7            When you learned about your
8    probationary period, then, from this e-mail,
9    did you -- how did you respond to the
10   congressman?
11       A.   I believe the way I responded to him
12   was just as an employee just saying okay, I
13   understand.  I don't -- I don't believe that I
14   pushed back.  You know, he was my boss.  So if
15   he wanted to say that there was a 90-day
16   probationary period at that point, I -- I
17   questioned my coworkers.  I said, what is this?
18   What -- have you -- were you on a probationary
19   period?  And no one that had currently -- that
20   was currently working in the office had ever
21   been on a probationary period, and I helped
22   hire two of those people, and I was with him

14 (Pages 50 - 53)

Kristie Small                                                    March 13, 2020

Page 90

1  probationary status was mentioned often among
2  staff. I considered it to be well-known by all
3  staff either at the time of their hiring or
4  soon after onboarding.
5        So, once again, do you have any
6  basis to believe that this statement is a lie
7  about Travis?
8     A.   I know that the sentence I was not
9  made aware of any probationary policy at the
10  time of my hiring is true because I helped hire
11  him --
12     Q.   Okay.
13     A.   -- and so I think that speaks
14  volumes.
15     Q.   So it -- so it speaks volumes about
16  the veracity of Travis's statements?
17     A.   It speaks volumes about there not
18  being a probationary policy.
19        If the congressman did not tell him
20  there was one, I don't know why the special
21  assistants -- you know, that's not -- that's
22  not appropriate.

Page 91

1     Q.   So, hypothetically, if you had an
2  offer letter from the congressman from June
3  1st, 2018, that said that you were on a 90-day
4  probationary period in black and white clear as
5  day, and then you were fired when you were
6  fired in October, would you think that the
7  reason that you were fired was because you were
8  pregnant at the time?
9     A.   With all due respect, sir, this
10  isn't a hypothetical situation, and I won't be
11  speaking to anything hypothetical.
12     Q.   Okay. Well, I mean, we have to ask
13  the question if it's not going to reveal
14  privileged information.
15     A.   Okay. Well, then, give me an exact
16  situation that actually happened and I'll
17  answer the question.
18     Q.   I mean, the question is, like, what
19  makes you think that you were discriminated
20  against here?
21     A.   Okay. The reason that I know I was
22  discriminated against here is because I was

Page 92

1  doing a very good job at my job. I had done
2  multiple trainings. I had cleaned up a lot of
3  different administrative things in the office
4  that had not been tended to since there had
5  been no one in that position.
6        I had no issues until I sent the
7  e-mail that said -- that asked for the
8  maternity leave, and then magically all of a
9  sudden he put it in writing that there was -- I
10  was on -- at the end of my 90-day probationary
11  period, or however he stated it. And it just
12  is very clear to me that as soon as that e-mail
13  came, he also started following up with
14  e-mails, Kristie, can you help me, can you do
15  this, can you do that. Like, it was pretty
16  obvious that he was being harder on me or hard
17  on me at all to begin with after I requested
18  maternity leave.
19     Q.   Moving to something a little bit
20  different. So did the congressman ever
21  affirmatively tell you that you were not on a
22  probationary period?

Page 93

1     A.   No.
2     Q.   Did he ever tell you that you were
3  not at-will?
4     A.   I don't know what that means.
5     Q.   So do you know what at-will means?
6     A.   No.
7     Q.   Okay. So an at-will employee is
8  somebody who can be fired for any or no reason
9  as long as it's not discriminatory?
10     A.   I don't recall.
11     Q.   So you don't recall if the
12  congressman told you that you were --
13     A.   I don't believe so, but I -- I can't
14  be sure. I don't recall the exact, if that was
15  a conversation or not.
16     Q.   Okay.
17        (Deposition Exhibit 14 was marked
18  for identification.)
19        BY MR. BLAKE:
20     Q.   All right. So, Exhibit 14, HC 36,
21  is an acknowledgement of receipt of employee
22  handbook from the office of Henry Cuellar.

24 (Pages 90 - 93)

Kristie Small                                                    March 13, 2020

Page 98

1    House Administration, you didn't do any
2    legislative work, right?
3        A.    Correct.
4        Q.    You did some legislative work when
5    you worked for Congressman Brady in his
6    personal office, though?
7        A.    Correct.
8        Q.    Okay.  And that is 2005 to 2007,
9    roughly?
10       A.    Yeah.  Yes.
11       Q.    All right.  Did you -- do you know
12   who Cynthia LaFuente is?
13       A.    I believe that was his old chief of
14   staff.
15       Q.    Did you ever communicate with
16   Cynthia?
17       A.    No.
18       Q.    And we talked a little bit about
19   Patrick Malloy, but just to make it clear for
20   the record, you did not speak to Patrick Malloy
21   about his time working for the congressman,
22   right?

Page 99

1        A.    I -- I don't believe so.
2              And if I'm thinking correctly --
3    now, I could be wrong, so -- but he was one of
4    the people we were told not to speak to --
5        Q.    Patrick Malloy?
6        A.    -- because I think he left on bad
7    terms.  I could confirm that at some point if,
8    you know, I needed to, but I believe -- and
9    there were several staffers that were told --
10   like, we were -- we were told not to speak to
11   former staffers.
12       Q.    Okay.
13       A.    So --
14       Q.    Did -- well --
15       A.    And if we wanted to, we had to ask
16   him permission.  So, like, when I had lunch
17   with his old deputy chief, Amy, like, I had to,
18   you know, like, ask his permission and make
19   sure that I was allowed to speak to her, and
20   there was another employee that was a former
21   employee that I had to ask to speak to and I
22   don't recall who it was.  But there was --

Page 100

1    there were two different times where I had to
2    ask his permission to speak to someone.
3        Q.    You gave me a lot there.  I want to
4    follow-up on just to make clear for the record.
5              So when you talk about asking
6    somebody for permission, you meant -- you're
7    referring to Congressman Cuellar, right?
8        A.    Yes.
9        Q.    Okay.  And you said that you were
10   told not to talk to certain former staffers
11   without the congressman's per- -- permission.
12             Who told you that?
13       A.    Henry Cuellar told the entire staff
14   that.
15       Q.    And did you -- did the congressman
16   tell you why you weren't to talk to former
17   staffers without his permission?
18       A.    I don't recall.
19       Q.    Okay.  Do you know why you were told
20   not to communicate with former staffers without
21   his permission?
22       A.    I don't.

Page 101

1        Q.    Do you have any thought about why
2    you were told not to communicate with former
3    staffers?
4        A.    I think they were the ones that left
5    on bad terms, but I cannot be sure.
6        Q.    What is the congressman's reputation
7    as a boss, like -- as a boss on the Hill?
8              And you're under oath.
9        A.    If you refer to the last ten years
10   of articles coming from the Congressional
11   Research Service, then picked up by the
12   newspapers, he has one of the highest turnovers
13   every year of staff.  He's known to be very
14   tough.  And, I mean, he's not one of the most
15   sought after members to work for.
16       Q.    So turnover is high?
17       A.    Uh-huh.
18       Q.    I have noticed in e-mails --
19   obviously, I've looked at a lot of e-mails in
20   connection with this case -- that his e-mails
21   are not very long.
22             Is that typical for him?  His

26 (Pages 98 - 101)

Page 106

1    done, right?
2        A.   No.
3        I do have basis from his end.  When
4    I told him I was pregnant he was not -- he did
5    not really show any emotion.  He might have
6    said congratulations; but, again, it wasn't,
7    like, yay, congratulations.
8        And then we were having a staff
9    meeting right after, and I was like, hey, I was
10   referring to him, should I share the good news?
11       And he was, like, what news?
12       And I was, like, I'm pregnant.
13       He was, like, oh, oh, that's up to
14   you.  Just kind of just, like, shoved it off,
15   and we really never talked about it again.
16   Never asked me, like, how I was doing, you
17   know.  It was kind of just, like, I don't know.
18   It -- it wasn't a welcoming response.
19       Q.   We will do a few more exhibits.
20       So I have the congressman's
21   handbook, but I think you might know the answer
22   to this without having to go through --

Page 107

1        A.   I'm sure I do.
2        Q.   -- the whole rigamarole.
3        So you did receive a handbook from
4    the congressman, correct?
5        A.   I did.
6        Q.   And you did look at the FMLA policy
7    in the handbook; is that right?
8        A.   I did.
9        Q.   And the congressman's policy, when
10   you were working there, was to provide paid
11   FMLA leave; is that right?
12       A.   Yes.
13       Q.   And you know that the law does not
14   require employers to provide paid leave --
15       A.   I do.
16       Q.   -- maternity leave; is that right?
17       A.   Uh-huh.
18       Q.   Okay.  So the congressman was
19   providing paid leave, but was not legally
20   required to do that, right?
21       A.   That's what the handbook said.  He
22   never approved my leave.

Page 108

1        (Deposition Exhibit 15 was marked
2    for identification.)
3        (Deposition Exhibit 16 was marked
4    for identification.)
5        BY MR. BLAKE:
6        Q.   So I passed around two exhibits, 15
7    and 16.  15 is Bates labeled HC 38 and 39.  16
8    is Bates labeled HC 41 and 42.
9        Looking at Exhibit 15, Mrs. Small,
10   this is -- the title of this is
11   "Confidentiality Agreement."
12       Do you recall signing this
13   confidentiality agreement when you started
14   working for the congressman?
15       A.   Yes.
16       Q.   Okay.  And it says that you signed
17   this June 1st, 2018.
18       Does that seem accurate?
19       A.   Yes.
20       Q.   Did you read and understand this
21   confidentiality agreement?
22       A.   Yes.

Page 109

1        Q.   Okay.  So just I want to say for the
2    record -- so Paragraph 3 says, "Staff shall
3    maintain in the strictest confidentiality all
4    written or oral information learned or
5    discussed with staffing member and/or his
6    employing office.  Staff will not directly or
7    indirectly communicate or divulge to or for the
8    benefit of any person or other legal entity any
9    of the members and/or employing office's files,
10   documents, correspondence, practices,
11   procedures or other confidential information."
12       Do you -- did I read that
13   accurately?
14       A.   Yes.
15       Q.   Paragraph 5 also says that employee
16   reads and under -- read and understand, and you
17   indicated that you read and understood that,
18   right?
19       A.   Yes.
20       Q.   And Paragraph 6 says, "Staff
21   understands and agrees that any violation of
22   this agreement may result in immediate

28 (Pages 106 - 109)

Kristie Small                                                    March 13, 2020

Page 110

1  termination of the staff relationship;" is that
2  right?
3      A.   Yes.
4      Q.   And para- --- Exhibit 16, "Protection
5  Of House Equipment And Assets," looks like you
6  signed this on June 5th, 2018; is that right?
7      A.   Yes.
8      Q.   And you read and understood it?
9      A.   Yes.
10     Q.   Paragraph 1 says "I will use the
11  equipment and assets of the employing office
12  for the United States House of Representatives
13  house for the sole benefit of the employing
14  office;" is that right?
15     A.   Correct.
16     Q.   Okay.
17     A.   That actually just reminds me of the
18  three laptops.  So that -- those being sent to
19  an off-site address, that person should have
20  been fired, according to these documents.
21     Q.   Yeah.
22         So just --

Page 111

1      A.   Could have been.
2      Q.   So, for the record, yeah.  So
3  Paragraph 5, the last sentence says, "I further
4  understand the violation of this agreement may
5  result in discipline up to and including
6  termination;" is that right?
7      A.   Correct.
8      Q.   And Paragraph 2, again, just for the
9  record, says, "I will not use property of the
10  employing office or house for my personal use
11  without advanced written permission from
12  Congressman Cuellar or his designated
13  representative; is that right?
14     A.   Correct.
15     Q.   And, then, Paragraph 4, last
16  question about this indicates "I understand
17  that if I misuse or misappropriate any of the
18  equipment and assets of the employing office or
19  house, that the employing office may refer the
20  matter to appropriate law enforcement for
21  investigation and/or prosecution," right?
22     A.   Sure.

Page 112

1      Q.   Before you started working for the
2  congressman, did you have any impressions --
3  and I -- I know we talked about this a little
4  bit, so I'm just trying to talk about a
5  specific period of time.
6         So before you started working for
7  the congressman, did you have any impressions
8  about him as a boss or a potential boss?
9      A.   Yes.
10     Q.   Okay.  And what, at that time, were
11  your impressions?
12     A.   My impressions were that he was a
13  very high maintenance difficult person to work
14  for.
15     Q.   And what was the basis for that
16  impression?
17     A.   The news articles and things that
18  Nina had told me over the years, things that
19  Amy Travieso told me and that lunch
20  conversation about, like, he prefers for you to
21  cut up his apples and he prefers eight pumps of
22  creamer in his coffee.  Like, whatever.  And

Page 113

1  those are weird quirks, but I don't have a
2  problem working hard for a difficult person.
3  I -- so I still took the job and didn't realize
4  how deep that that -- those actual impressions
5  went.
6      Q.   So, just to be clear, before you
7  started working for the congressman, you had an
8  understanding that he was a difficult person to
9  work for?
10     A.   Yes.
11     Q.   That understanding was based on some
12  media reports as well as conversations with
13  people who had actually worked for the
14  congressman, correct?
15     A.   Correct.
16     Q.   Any other bases for that belief that
17  he was a difficult person to work for?
18     A.   Not that I can think of.
19     Q.   So did you have any reservations at
20  the time when you were interviewing with him
21  and when you got the offer and you were
22  thinking about starting a job, did you have any

29 (Pages 110 - 113)

Kristie Small                                                          March 13, 2020

Page 114

1    reservations based on your impression of his
2    reputation?
3        A.   No.
4        Q.   Okay.  Why not?
5        A.   Because I'm tough, and I don't mind
6    working for someone that's high maintenance.  I
7    still thought that the job opportunity
8    outweighed what I thought was just a difficult
9    boss, and I thought it was a good opportunity.
10       Q.   Before you started working for the
11   congressman, did you know anything about his
12   management style?
13       A.   Not specifically, just that he
14   wasn't nice.
15       Q.   Not nice to people who worked for
16   him?
17       A.   Correct.
18       Q.   Did you know anything about his
19   preferred interactions with his staff?
20           And, again, we're talking about
21   before you started.
22       A.   What kind of preferred interactions

Page 115

1    are you speaking of?
2        Q.   Well -- so -- so, for instance, you talked
3    about -- I'm going to use the example you gave,
4    cutting up the apple, the eight pumps of cream.
5    So any, you know, quirks about I don't want to
6    have meetings, I want to have e-mails; or I
7    don't want to have e-mails, I want to have
8    meetings; or I want to -- when I call you --
9        A.   I did not.
10       Q.   Okay.  Now, talking about after you
11   started working for the congressman and even
12   through today, did your impressions about the
13   congressman, as a difficult boss, change?
14       A.   They remained.
15       Q.   So you still think that he is a
16   difficult boss or was a difficult boss for you?
17       A.   I don't think he was a difficult
18   boss for me.  I think he was a difficult boss
19   in general.
20       Q.   So, just to be clear, so when I say
21   -- so what I was asking about is, at the time
22   that you worked in his office, he was a

Page 116

1    difficult boss, right?
2        A.   Correct.
3        Q.   Okay.  And are there things that you
4    can point to, like specific examples from
5    during your employment that --
6        A.   Yes.
7        Q.   -- can back up that contention?
8        A.   Yes.
9        Q.   And what are some of those things?
10       A.   The most concrete one would be that
11   he would tell us for the appropriations press
12   releases not to reinvent the wheel, to go back
13   to the press releases from the year before and
14   update the numbers, which made total sense, and
15   I agreed with that.  And then when we would
16   have -- go to him to approve them, he had
17   forgotten at some points that he had already
18   approved them a few months prior, and then he
19   would pick them apart and be, like, these are
20   terrible.  Like, I can't believe that you would
21   send this to me.  When, in reality, they had
22   been used last year, and so they were already

Page 117

1    out and in the press with last year's numbers.
2        Q.   And he had approved them last year?
3        A.   Last year.
4            And then also there was a -- there
5    was one instance where it was something that
6    Zack did, I believe, and I believe that we
7    had -- you have an e-mail that says, like, Zack
8    was, like, oh, what he doesn't remember is he
9    approved this, like, a couple months ago
10   already.  And so he was just very inconsistent,
11   and there was never -- nothing was ever really
12   right.  Every single thing had a problem with
13   it.  Every single, you know, project or plan
14   or -- and -- and -- none of that's -- like, 98
15   percent of the staff wasn't true.  Like, it was
16   just him being difficult.
17       Q.   So do you think if we were to -- and
18   your lawyers, Sara, is going to depose some
19   people who worked for the congressman or who
20   work for him now.  I mean, do you think if
21   those people were to be asked under oath about
22   whether the congressman is an easy person to

30 (Pages 114 - 117)

Page 118

1    work for that they would say under oath that he
2    is not?
3        A.   That is the truth, so I hope under
4    oath they would tell the truth.
5        Q.   So do you think that other people --
6    fair enough.  Do you think that -- sorry.
7            Do you think that other people in
8    the office, then, experienced the kinds of
9    things that you experienced with respect to how
10   difficult the congressman --
11       A.   Yes.
12       Q.   -- can be?
13       A.   We had daily conversations about his
14   difficulty.
15       Q.   So you were not alone?
16       A.   I was not alone.
17       Q.   And was he difficult to people
18   regardless of gender?
19           Was he difficult to Zack and Juan
20   and others?
21       A.   He was not as difficult to the men
22   as he was to the women.  And I noticed in Colin

Page 119

1    Strother's letter that he was noting the
2    treatment of women and how they hire women and
3    how they're great to women.  At -- it looks
4    great from the outside, but when I saw it from
5    the inside I could tell that he was hiring very
6    young women, for the most part.  I feel like
7    women that didn't have experience in other
8    offices that were able to push back without
9    fearing losing their job, it was kind of -- I
10   -- now this is just a feeling, and I know that
11   court is not about -- a court case is not about
12   feelings, but my feeling was that he was hiring
13   these young women because he felt they were
14   inferior and he could control them.
15       Q.   So, in your experience, the
16   congressman doesn't like when his employees
17   push back?
18       A.   You were not allowed to push back.
19       Q.   You don't challenge him?
20       A.   You do not challenge him.
21           That actually came up in my
22   interview at the dinner meeting with him

Page 120

1    because I was trying to gauge his personality,
2    and, like, how we would work together, and I
3    said -- he was, like, you know, Nina was
4    present at this point, you know, I -- I -- I'm
5    stern.  These aren't exact words.  I'm stern
6    and I -- you know, something, something.  And I
7    was, like, well, that's okay, sir, you know, as
8    long as you're okay with me yelling back at
9    you.  Because, you know, staffers do that --
10       Q.   Right.
11       A.   -- and I was joking, but not -- and
12   he was, like, oh, no, that will never happen.
13   Like, dead serious.  So I put in my place.  I
14   understood what that meant.  It was said very
15   clearly and that's fine.
16       Q.   And so the people who work in his
17   office who tend to stay in his office were not
18   inclined to -- based on your time in the
19   office, were not the kinds of people who would
20   push back or would often push back?
21       A.   Never.
22       Q.   So, then, based on your personal

Page 121

1    experience when you say that your initial
2    impressions of the congressman as a boss
3    remains the same, intensified, how did they
4    evolve, if at all?
5        A.   Can you repeat the question?
6        Q.   Okay.  So you had impressions of the
7    congressman before you started working for him,
8    right?
9        A.   (Witness nodding head.)
10       Q.   So -- I'm sorry.  For the -- for
11   Bonnie.
12       A.   Yes.
13       Q.   Okay.  And, then, obviously, you
14   worked for him and so you had firsthand
15   experience with him as a boss, and so I'm
16   asking:  At the end of your employment there,
17   what was your impression about him as a boss?
18       A.   I know that there is a difference
19   between a difficult boss and someone who is
20   actually taking it to a level where things are
21   not ethically, under the house ethics rules,
22   allowed to treat staff, and up to another level

Page 122

1  where it wasn't just being a tough boss.  It
2  was being just a truthfully not nice person.
3  There's a difference between a mean boss and a
4  person that's genuinely not nice.
5      Q.   So taking out, like, discrimination,
6  your claim, I just want to focus on.  So what,
7  besides that, made him, like, not a nice boss,
8  including anything that you think was unethical
9  under house rules?
10     A.   I mean, just everything I've already
11  stated about his demands and his fickleness of
12  knowing whether he approved things or not, and
13  whether had they been approved in the past and
14  he still -- he's acting like they still need
15  changed, and it's never really pleasant in
16  general.  He's always a crab around the office.
17  Cutting up the apples, eight pumps of creamer
18  in the coffee.  It was just difficult.
19     Q.   So if you had not been let go in
20  October of 2018, do you think you would have
21  stayed there longer -- much longer?
22     A.   I had no plans of leaving.  I don't

Page 123

1  know.  I can't say how long I would have
2  stayed.
3      Q.   I just want to go back.  So we
4  talked about ethics again.  So, for the record,
5  you never formally made an ethics complaint
6  against the congressman, right?
7      A.   It was informal.
8      Q.   Okay.  And you -- and -- and you
9  never made a formal anonymous complaint against
10  the congressman --
11     A.   It was not anonymous.
12     Q.   Okay.  So you made an inquiry?
13     A.   Informal inquiry.
14     Q.   Okay.  And it was not anonymous?
15     A.   No.
16     Q.   To ethics?
17     A.   I did.
18     Q.   While you were employed by the
19  congressman?
20     A.   No.
21     Q.   Okay.  After you left or before you
22  started?

Page 124

1      A.   After I left.
2      Q.   All right.  So during your
3  employment with the congressman, you made no
4  formal or informal ethics complaint against the
5  congressman; is that right?
6      A.   Correct.
7      Q.   So we started talking about this.
8          Actually, do you mind if we take a
9  break?
10     A.   I don't mind.
11         (A short recess was taken.)
12         (Deposition Exhibit 17 was marked
13  for identification.)
14         (Deposition Exhibit 18 was marked
15  for identification.)
16     BY MR. BLAKE:
17     Q.   We have a couple new exhibits.  One
18  is 17, which is your amended complaint, Mrs.
19  Small, and then the second new exhibit is 18,
20  and that's Bates labeled Small 3 and 4.
21         In Paragraph 32 of your amended
22  complaint, you allege that "Plaintiff

Page 125

1  immediately encountered significant challenges.
2  Cuellar's office was disorganized and lacked
3  policies and procedures."
4          So can you tell us a little about --
5  well, first of all, does that accurately
6  reflect your impression of the congressman's
7  office at the time that you started working
8  there?
9      A.   Yes.
10     Q.   Okay.  And can you explain a little
11  bit about what made you think that -- what
12  challenges you encountered and what made you
13  think that the office was disorganized and
14  lacked policies and procedures?
15     A.   The office was disorganized and
16  lacked policies and procedures due to the fact
17  that the position had been vacant, and so the
18  staff had no direction.  They really had nobody
19  to report to, and so they were actually
20  thankful and said so to me, that I was there,
21  and that things could quote/unquote, like,
22  come -- get back together.  Because, I guess,

32 (Pages 122 - 125)

Kristie Small                                                    March 13, 2020

Page 130

1    Q.   Okay.  And do you remember
2    specifically anything that you-all talked about
3    needing to improve or fix or otherwise develop?
4    A.   I don't recall.
5    Q.   When you left the office in October
6    of 2018, how did your impressions about the
7    state of the office change, if at all, from
8    when you started in June?
9    A.   The office was much more well
10   organized.  The staffers were trained much more
11   appropriately to be able to use resources that
12   they had not known about, and just a general
13   sense of planning and organization coming from
14   my end saying, you know, here's the timelines,
15   here's a deadline, here's a this, here's a
16   that, here's a this.  That definitely improved.
17   Q.   I just want to call your attention
18   to Exhibit 18.  Exhibit 18 is a letter, I
19   believe, from your former attorney, and it
20   indicates that the press team doing a bad job
21   was the direct result of their work product,
22   helping the press team was not something for

Page 131

1    which Mrs. Small was deficient or failed to do.
2         Do you agree with that statement?
3    A.   Yes.
4    Q.   And can you just explain a little
5    bit about why you believe that to be the case?
6    A.   I believe the case is that they were
7    learning.  I do think that they were doing the
8    job that they were supposed to be doing.  I
9    think that the difficulty wherein he would
10   approve things and then disapprove them, and
11   then not remember that things, you know, had
12   been approved.  Am I answering your question.
13        What was the question?
14   Q.   Yes.
15        That in a nutshell -- I mean, and
16   it's in the document, so if I'm not
17   representing it accurately in your view you can
18   look at what's in the document.  But,
19   basically, I think your attorney wrote that the
20   press team was not necessarily doing a great
21   job, but that that wasn't your fault, and so I
22   was asking for your thoughts about that?

Page 132

1    A.   So I don't think that she -- it's
2    saying that they weren't doing a good job.  I
3    think she's saying that I wasn't the press
4    people.  So as far as I could guide them and
5    help them and review things, if Congressman
6    Cuellar had a problem with the press team and
7    how they were doing, then that should have been
8    addressed with them, and it wasn't.
9    Q.   So what was your role, then, like --
10   A.   To oversee --
11   Q.   -- with respect to the press team?
12   A.   -- to proofread.  And if I'm being
13   terminated because of one of the reasons he's
14   saying is that the press was bad, I -- I don't
15   understand how I could be held responsible for
16   the direct actions and work of other
17   individuals.
18   Q.   Okay.  But were you the supervisor
19   of the press team?
20   A.   Yes.
21   Q.   And who's the -- who's the head of
22   the press team at that time?  What was -- what

Page 133

1    position, the comms director?
2    A.   There was no comms director, but I
3    would say that Olya was the one that had the
4    most tenure.
5    Q.   And what was her position when you
6    were there?  Was she press secretary?
7    A.   Yeah, something like -- something to
8    that effect.
9         She wanted to be the director, but
10   he would -- did not -- he didn't give her that
11   title.
12   Q.   Did you have any problems with
13   staffers in your office, like personally or
14   professionally when you were in Congressman
15   Cuellar's office?
16   A.   The only problem I had with -- with
17   staff was really just trying to have Nina be
18   accountable for her whereabouts.  Everyone else
19   I really got along with.
20   Q.   Did you have any issues with Jessica
21   Hernandez?
22   A.   So at the very beginning, Jessica

34 (Pages 130 - 133)

Page 142

1    A.    I don't recall what this was for.  I
2  believe I had a trip planned prior to being
3  hired.
4    Q.    It might have been for your
5  sister-in-law's wedding.  Colorado?
6    A.    Yes.
7    Q.    I know I know too much about your
8  life.  I'm sorry.
9    A.    No, that's good.  I appreciate the
10  reminder.
11    Q.    So -- okay.  So at the time that you
12  requested this leave a couple of weeks into
13  starting with the congressman, you did not yet
14  have four days of annual leave; is that right?
15    A.    I don't recall, but that sounds
16  right.
17    Q.    Okay.  But he did approve --
18    A.    He did.
19    Q.    -- the leave request?
20          And, then, looking at Exhibit 20,
21  this was a request made on or about -- I'm
22  sorry, not Canadian.

Page 143

1          On or about July 5th, 2018, and it
2  is for sick leave pregnancy, is what's
3  indicated, for 1.5 hours of leave; is that
4  right?
5    A.    Correct.
6    Q.    Okay.  And so you made this request
7  on or about July 5th, 2018, and it looks like
8  the congressman approved it on or about July
9  8th, 2018.
10          Does that sound right?
11    A.    Correct.
12    Q.    All right.  So did the congressman
13  ever deny any sick leave request that you made
14  related to pregnancy?
15          So not FMLA.  For, you know,
16  delivery and post delivery, but did he deny any
17  request for prenatal care or anything like
18  that?
19    A.    He never responded to my document
20  that listed all of my doctors' appointments, so
21  he did not approve nor deny that.  But,
22  specifically, for Document 20, yes, he approved

Page 144

1  it.
2    Q.    Do you know was there ever a
3  neonatal appointment that you had during the
4  time -- that you had scheduled during the time
5  that you were working for the congressman that
6  he didn't allow you to attend?
7    A.    Okay.  He allowed me attend my
8  appointments.
9    Q.    Are you aware of the congressman
10  ever denying anyone else in the office, anyone
11  besides you, an FMLA leave request?
12    A.    I don't have knowledge to that.
13    Q.    Okay.  So while you were there, did
14  anyone make an FMLA leave request that you're
15  aware of?
16    A.    No.
17    Q.    Do you think the congressman treated
18  you differently than he treated other people?
19          And, I mean, in any way, just
20  day-to-day, did he treat you differently?
21    A.    I think after I told him I was
22  pregnant he treated me differently.  He was

Page 145

1  coming up with much more criticism.
2    Q.    Whom do you think he treated more
3  favorably than you in the office?
4    A.    The guys.
5    Q.    Do you think he was also treated --
6  also treated other women decides you
7  unfavorably?
8    A.    I do.
9    Q.    Compared to the men in the office?
10    A.    I do.
11    Q.    And do you have any examples showing
12  differential treatment based on gender by the
13  congressman?
14    A.    I saw harsher criticism on the young
15  women than I did on the young men.
16    Q.    Were there any -- when you say
17  "young," what age are you talking about?
18    A.    The young staffers were probably
19  anywhere from 22 to 25, 26, and that was the
20  majority of the staff.  The other people were
21  the military fellows who were more tenured in
22  age.

37 (Pages 142 - 145)

Kristie Small                                        March 13, 2020

Page 146

1    Q.   Okay.  So both male and female
2    staffers were in that kind of early to mid-20s
3    range, for the most part?
4    A.   For the most part.
5    Q.   Okay.  And you believe that the
6    congressman treated the male employees more
7    favorably than the female employees?
8    A.   Yes.
9    Q.   Okay.  And so in one way it was more
10   harsh criticism directly toward women.
11        Anything else?
12   A.   Not at this time.  I would have to
13   think about it more.
14   Q.   So at any time are you aware of any
15   other discrimination complaints besides yours
16   that has been made against the office?
17   A.   I'm unaware.
18   Q.   Okay.  So --
19   A.   I would -- I wouldn't know.
20   Q.   So while you were deputy, you
21   weren't looped in about any claims of
22   discrimination, formal or informal?

Page 147

1    A.   No.
2    Q.   And, again, I'm not asking about
3    your communications with your attorney, so
4    don't tell me about those communications.
5        But when did you first decide to
6    make a discrimination complaint against the
7    office?
8    A.   The evening that he fired me.
9    Q.   So at any time before October 16th,
10   2018, did you think about initiating any kind
11   of discrimination complaint against the office?
12   A.   No.
13        But I had thought about the fact
14   that this was all really strange, and so it was
15   a red flag to me, but I had not specifically
16   thought about filing anything.
17   Q.   And, just to be clear for the
18   record, what do you mean by "this" -- "this" --
19   "this whole thing is strange"?
20   A.   The escalation of discourse that
21   happened after I asked him for maternity leave
22   and told him I was pregnant.

Page 148

1    Q.   Right.
2        So this -- your e-mail to the
3    congressman about needing maternity leave was
4    August 8th, 2018.
5        Before August 8th, 2018, can you
6    describe feedback that you received from the
7    congressman about your work?
8    A.   Not specifically.  There's nothing
9    that jumps out at me.  There was nothing that
10   was tagged as an infraction or something I was
11   doing wrong.  We had a good rapport.  I believe
12   even after the maternity leave e-mail was sent
13   and he said I was on 90 days probation, it
14   changed a little, but there still wasn't --
15   there was no, like, outstanding conflict or
16   anything -- there wasn't really a change in
17   attitude, I don't believe.  I mean, the
18   attitude was poor on his part, naturally, how
19   he was to everybody.  So, like, there was no
20   change.  But, I mean, we would have
21   conversations where once in a while we might
22   laugh or crack a smile.  Like, it was -- there

Page 149

1    was nothing -- you know, the -- I didn't feel
2    the relationship was not normal.  The normal
3    that it had been.
4    Q.   Like his normal?
5    A.   His normal.
6    Q.   So would you say, then, from the
7    start of your time in his office -- in the
8    congressman's office, until the end, that your
9    relationship was flat, like pretty consistent?
10   A.   I would say that after the maternity
11   leave e-mail, those complaints about my work
12   ramped up; but, yes, I would say that it was --
13   it was pretty flat.  And not flat, but just,
14   like, normal.
15   Q.   So in your complaints, Paragraph 36,
16   you said that Cuellar and his staff gave
17   Plaintiff positive feedback about her
18   performance and the changes she was
19   implementing in the office.
20        Do you recall any kind of
21   specifically positive feedback that you were
22   referencing?

38 (Pages 146 - 149)

Kristie Small                                    March 13, 2020

Page 158

1  coaching.  Like, just come -- coming in late
2  and, like, multiple times, but I knew he had
3  confided in me that his mother had a health
4  problem, which I don't believe the congressman
5  knew, and so sometimes he would be home, like,
6  taking care of his mom late at night.  And so I
7  told him, like, listen, this is the last time
8  I'm going to tell you, maybe like the third
9  time that he was late, and significantly late
10  once, I'm here for you, I'm going to support
11  you, but you have got to get it together.  I
12  understand it's hard to be fresh out of college
13  in your first job and get adjusted to a work
14  life balance, but you're going to have to,
15  like, step it up.
16      So he and I, I felt, like, had a
17  good relationship and I was kind of mentoring
18  him.  And, again, like I said, he confided in
19  me about his mother, which nobody else, I don't
20  think, knew.  So I feel like he -- I bet he has
21  a heavy heart about having to write that,
22  honestly.

Page 159

1      Q.  But do you think he lied in his
2  statement?
3      A.  I didn't read the whole thing.  I
4  would have to reread it.
5      Q.  But based on your prior working
6  relationship with him, did you find him to be
7  dishonest in any ways?
8      A.  I don't think so.
9          MR. BLAKE:  I think we have a number
10  of exhibits.  Can we go off the record for a
11  second?
12      (A short recess was taken.)
13      (Deposition Exhibit 21 was marked
14  for identification.)
15      (Deposition Exhibit 22 was marked
16  for identification.)
17      (Deposition Exhibit 23 was marked
18  for identification.)
19      (Deposition Exhibit 24 was marked
20  for identification.)
21      (Deposition Exhibit 25 was marked
22  for identification.)

Page 160

1      (Deposition Exhibit 26 was marked
2  for identification.)
3      (Deposition Exhibit 27 was marked
4  for identification.)
5      (Deposition Exhibit 28 was marked
6  for identification.)
7      (Deposition Exhibit 29 was marked
8  for identification.)
9      (Deposition Exhibit 30 was marked
10  for identification.)
11      (Deposition Exhibit 31 was marked
12  for identification.)
13      (Deposition Exhibit 32 was marked
14  for identification.)
15      (Deposition Exhibit 33 was marked
16  for identification.)
17      (Deposition Exhibit 34 was marked
18  for identification.)
19      (Deposition Exhibit 35 was marked
20  for identification.)
21      BY MR. BLAKE:
22      Q.  Mrs. Small, you have in front of you

Page 161

1  Exhibit 21, which is a 168.  It's an e-mail
2  chain from on or about June 25th, 2018.  In
3  this the congressman writes to you and others
4  "Please keep me updated on any matter I refer
5  to you.  I cannot be chasing around for answers
6  when you have them already," et cetera, et
7  cetera.
8      Is this an example of some negative
9  feedback that the congressman was giving to
10  you, you and other staffers in June of 2018?
11      A.  Yes.
12      Q.  All right.  Exhibit 22, HC 174, this
13  is a June 30th, 2018, e-mail from the
14  congressman.  And, again, he's saying "I cannot
15  chase you-all for your work," and that is
16  negative feedback that he's directing to you
17  and other staffers; is that right?
18      A.  Yes.
19      Q.  All right.  Exhibit 23, HC 1484
20  through 1487, this is an e-mail chain from July
21  31st, 2018, between you and the congressman; is
22  that right?

41 (Pages 158 - 161)

Kristie Small                                                    March 13, 2020

Page 162

1    A.   Correct.

2    Q.   All right.  In this e-mail chain,

3  you are asking the congressman for permission

4  to attend some kind of training; is that right?

5    A.   Correct.

6    Q.   And the congressman says, on July

7  31st, 2018, at 4:45 p.m.:  "Please wait for

8  this training on another date.  There are too

9  many press releases.  We have to review PR and

10  calls to the district that have to be made.

11  Please manage.  Thanks."

12       Is that correct?

13    A.   Correct.

14    Q.   Okay.  And in response at 11:43

15  p.m., on that same day, you wrote: "Sir, I

16  assure you I can manage the staff, review press

17  releases, complete phone calls, and take the

18  training.  I wouldn't let you down.  I realize

19  I should be providing you with more updates so

20  you know what's going on and will do so moving

21  forward.  If you still don't want me to go to

22  the training, that is fine.  Again, I assure

Page 163

1  you I am on top of things here."

2       You did write that, right?

3    A.   Yes.

4    Q.   And the congressman, in response,

5  says:  "Let's do training another date" or

6  "let's do training other date;" is that right?

7    A.   Correct.

8    Q.   So, in this e-mail chain, the

9  congressman is denying your request to attend a

10  training and citing some things that he feels

11  are not being managed in the office that he

12  wants you to focus on instead; is that right?

13    A.   Correct.

14    Q.   On Exhibit --

15    A.   Well, let me say the statement is

16  not correct.  Those things were being taken

17  care of.

18    Q.   But that's what the e-mail says,

19  right?

20    A.   Correct.

21    Q.   Okay.  In -- on July 31st, 2018,

22  right?

Page 164

1    A.   Correct.

2    Q.   Okay.  On July -- I'm sorry.

3       Exhibit 24, HC 194, this is Exhibit

4  24.  It is an e-mail chain involving the

5  congressman staff, including you, from Monday,

6  July 16th, 2018.  The congressman in the top

7  e-mail is Kristie -- "Kristie?;" is that right?

8    A.   Correct.

9    Q.   And that's something he has -- he

10  had e-mailed you a number of times during your

11  employment with him; is that right?

12    A.   Correct.

13    Q.   So that seems to be in response to

14  he was asking for something to be done asap and

15  Colin wrote:  "I sent Kristie a draft about 30

16  minutes ago, I think."  And that e-mail was

17  from Colin at 3:38 on July 16, 2018; is that

18  right?

19    A.   Correct.

20       And also to note that Colin is not a

21  house staffer, so this information should not

22  have been going through him.  He was not a

Page 165

1  staffer at all at that point.  He was not being

2  paid.

3    Q.   Okay.  So -- but just this e-mail

4  shows that Colin sent something to you 30

5  minutes ago, and he had not heard back from

6  you; is that right?

7    A.   He thought he did.  He wasn't sure,

8  but correct.

9    Q.   Okay.  And do you specifically

10  remember this statement?

11    A.   No.

12    Q.   Okay.  So you don't know whether or

13  not you had responded to Colin; is that right?

14    A.   I don't know.

15    Q.   Exhibit 25 is HC 195 through 199,

16  and this is an e-mail chain from on or about

17  July 16th, 2018, between the congressman and

18  his staff, including you; is that right, Mrs.

19  Small?

20    A.   Correct.

21    Q.   And he writes at around 6:07 that

22  day:  "Kristie, I need help.  There are too

42 (Pages 162 - 165)

Kristie Small                                         March 13, 2020

Page 166

1  many corrections" and five exclamation points;
2  is that right?
3      A.   Correct.
4      Q.   All right.  Exhibit 26, HC 212, this
5  is an e-mail chain from August 2nd, 2008,
6  between the congressman, you and other
7  staffers; is that right?
8      A.   Correct.
9      Q.   The congressman is asking for a
10  clean draft and saying, "Can we all focus?;" is
11  that right?
12      A.   Correct.
13      Q.   In his -- in the e-mail chain in his
14  4:43 e-mail, August 2nd, he says, "Crossing is
15  not capitalized.  Who is reading this, guys.
16  Kristie?;" is that right?
17      A.   Correct.
18      Q.   And did you respond that same day at
19  11:45 p.m. saying: "I'm sorry, sir, that
20  particular one was not sent to me before you."
21      A.   Correct.
22      Q.   Okay.  Do you know why it wasn't

Page 167

1  sent to you?
2      A.   No.
3      Q.   Was it the ordinary practice for
4  things to be sent to you before they were sent
5  to the congressman?
6      A.   Yes.
7      Q.   Was that expected of the staffers,
8  to send it to you before sending it to the
9  congressman?
10      A.   Yes.
11      Q.   And you would have to approve it
12  before it went to the congressman; is that
13  right?
14      A.   Yes.
15      Q.   So, here, that did not happen?
16      A.   Correct.
17      Q.   But you don't know why?
18      A.   I don't recall.
19      Q.   All right.  27 is HC 674.  This --
20  actually -- so 27 is in the record, but I
21  think it's a repeat.  So I don't think we need
22  go through that, but we'll just leave it so we

Page 168

1  don't affect the numbers.
2      Q.   Okay.  During communications you had
3  with the congressman throughout your
4  employment, did he multiple times ask you to
5  walk the floor?
6      A.   Yes.
7      Q.   And what did he mean by "walk the
8  floor"?
9      A.   Every morning and multiple times
10  throughout the day I would go back to the
11  legislative office and talk to everyone and see
12  where they were on their projects and what they
13  were working on.
14      Q.   So that's what the congressman meant
15  by walk the floor?
16      A.   Yes.
17      Q.   And is that something he told you he
18  wanted you to do, like, throughout your
19  employment?
20      A.   Yes.
21      Q.   Okay.  And is that something that
22  you did?

Page 169

1      A.   Yes.
2      Q.   Every day?
3      A.   Every day multiple times.
4      Q.   Okay.  So, Exhibit 28, HC 1132,
5  seems to be an e-mail from you to the staff
6  asking for daily tasks to send to the boss; is
7  that right?
8      A.   Uh-huh.
9      Q.   Okay.  So what is the point of an
10  e-mail like this?
11      A.   Firstly, it serves as a reminder.  I
12  had already walked the floor.  And, secondly,
13  he and I had discussed and -- about walking the
14  floor, and I told him that I did do that and it
15  was a good practice and I would continue to do
16  that, but I also like to have their items in
17  writing.
18      Q.   Okay.
19      A.   Because for me, having it in writing
20  from their desk is a good practice, and also
21  then I could copy and paste and there would be
22  no room for error of me, you know, having an

43 (Pages 166 - 169)

Kristie Small                                                    March 13, 2020

Page 170

1    error in those tasks.
2        Q.    So -- I'm sorry.
3        A.    So I did both.
4        Q.    Did you --
5        A.    And I told him that that's what I
6    was doing.
7        Q.    Did you tell him in writing or
8    verbally?
9        A.    Verbally.
10       Q.    Okay.  So you don't have an e-mail
11   that you sent to him telling him that this was
12   your practice or any other writing?
13       A.    Not that I recall.
14       Q.    Okay.  So we're going to talk about
15   28 again, but -- so 29 is HC 1133, a similar
16   e-mail.  This one from --
17       A.    Uh-huh.
18       Q.    -- August 9th --
19       A.    Yeah.
20       Q.    -- 2018; is that right?
21       A.    Uh-huh.
22       Q.    The lead into that, Exhibit 30, HC

Page 171

1    1134, from August 15th a similar e-mail asking
2    for bullets; is that right?
3        A.    Uh-huh.
4        Q.    Exhibit 31, HC 1136, to quote you
5    "Hey, all, same drill, new day, send me task
6    please and thanks."  And that is from August
7    17th, 2018; is that right?
8        A.    Correct.
9        Q.    All right.  Exhibit 32, HC 1150,
10   looks like a similar e-mail from you to the
11   staff from July 31st, 2018, asking for a list
12   of things you're working on; is that right?
13       A.    That is correct.
14       Q.    And then there's one from October
15   12th, 2018, Exhibit 33, HC 1154, where you're
16   indicating that you're out of the office and
17   asking for bullets; is that right?
18       A.    That is correct.
19       Q.    So if the congressman is asking you
20   to walk the floor and he is seeing e-mails like
21   this, can you understand why he may think that
22   you are not walking the floor?

Page 172

1        A.    No, because I specifically told him
2    that I am walking the floor, but I also follow
3    up asking for it in writing.  So, to me, these
4    look like good practice, good management skills
5    and attention to detail to make sure that
6    nothing gets miswritten when I would send him
7    the bullet points.
8        Q.    So -- and we're going to talk a
9    little bit more about this in a minute, but --
10   or after lunch, but you did have a 90-day
11   probation -- probation meeting with the
12   congressman; is that right?
13       A.    I did.
14       Q.    And during that meeting he talked
15   about wanting you to walk the floor; is that
16   right?
17       A.    I don't recall.
18       Q.    Okay.  Exhibit 34, HC 201 is an
19   e-mail from you to the congressman.  I'm sorry.
20   It's a chain between you and the congressman
21   from July 31st, 2018; is that right?
22       A.    Correct.

Page 173

1        Q.    And the congressman is asking:
2    "What are you working on?  Where are more
3    drafts for press releases?  What has been sent
4    off?  Need details;" is that right?
5        A.    Yes.
6        Q.    So is that negative feedback from
7    the congressman in July of 2018?
8        A.    I would say they're questions, not
9    negative feedback.
10       Q.    But this e-mail does give the
11   impression that he doesn't know what you're
12   working on, does not know the status of the
13   drafts, does not know what has been sent off,
14   and does not have details that he wants, right?
15       A.    Correct.
16       Q.    Exhibit 35, HC 210, again, e-mails
17   between you and the congressman from on or
18   about August 2nd, 2018.  Toward the top about
19   maybe a quarter of the way down looks like you
20   wrote at 4:07 p.m. that's an "Okay, thank you.
21   I just want to make sure you know I'm working."
22        The congressman responded:  "Dailies

44 (Pages 170 - 173)

Kristie Small                                          March 13, 2020

Page 174

1    are dailies.  Talk to me or e-mail me if you
2    want me to know;" is that right?
3        A.   Yes.
4        Q.   Okay.  And you said "Yes, sir,"
5    right?
6        A.   Yes.
7            And I would like to point out that I
8    believe -- whether it gets mentioned again or
9    not, I don't know, but I believe there is a
10   comment made about these not being specific,
11   but I would like to point out right here is
12   where he tells me don't be specific.  Like,
13   those things are things we talk about.  We
14   don't put in our dailies.  If that comes up
15   later, that's the --
16       Q.   Okay.
17       A.   -- proof that I was doing what he
18   asked me to do by being brief.
19       Q.   I understand.
20           MR. BLAKE:  Can we go off the
21   record?
22           (A short recess was taken.)

Page 175

1            (Deposition Exhibit 36 was marked
2    for identification.)
3            (Deposition Exhibit 37 was marked
4    for identification.)
5            (Deposition Exhibit 38 was marked
6    for identification.)
7            (Deposition Exhibit 39 was marked
8    for identification.)
9            BY MR. BLAKE:
10       Q.   So Exhibit 36, HC 2570, this is an
11   e-mail chain involving you, Mrs. Small, and the
12   member and the member staff at the time, dated
13   on or about October 1st, 2018, to Congressman
14   Rhodes at 6:20 p.m., "Can we redo the press
15   releases on the approps?  Use the format I
16   like.  Kristie, please take the lead on all of
17   them;" is that right?
18       A.   Correct.
19       Q.   Exhibit 37, HC 2803, is an e-mail
20   between -- at the top is between you and Olya.
21   This is from October 16th, 2018.  Below that,
22   similar chain of e-mails between the member and

Page 176

1    the staff including you.  The member says
2    around 10:44 a.m. that he changed the titles in
3    this press release to past tense, and it looks
4    like you wrote to Olya "How did I miss that?;"
5    is that right?
6        A.   Correct.  I made a mistake.
7        Q.   Exhibit 38, HC 1847, this is an
8    e-mail chain from on or about September 4th,
9    2018, between the congressman and staffers,
10   including yourself.  He writes:  "Where is FBI
11   director testimony in the senate?  You are
12   missing things, Kristie?;" is that right?
13       A.   Correct.
14       Q.   And just below that Leslie had
15   written to the congressman:  "Please see blow.
16   Attached talking points for this interview.
17   They were reviewed and approved by Stacy and
18   Kristie;" is that right?
19       A.   Correct.
20       Q.   And then Exhibit 39, HC 373, this is
21   an e-mail at the very top from you to the
22   congressman, sent on September 10th, 2018.  The

Page 177

1    congressman has expressed some dissatis- --
2    dissatisfaction about an issue.  You explained
3    in your e-mail and indicated this wasn't a
4    part.  A little falls on everyone.  We will be
5    more diligent in the future and make sure this
6    doesn't happen in the future."  Is that right?
7        A.   Correct.
8            MR. BLAKE:  All right.  Let's go to
9    lunch.
10           (A short recess was taken.)
11           BY MR. BLAKE:
12       Q.   Welcome back, everyone.
13           For the record, I'm going to be
14   playing a recording that the congressman, I
15   believe, made of the 90-day probationary
16   meeting between Mrs. Small and the congressman,
17   and Bonnie is going to do her best to
18   transcribe it, and then I'm going to ask you
19   some questions about that.
20           (Whereupon, the audiotape was
21   played.)
22

45 (Pages 174 - 177)

Page 178

1    MR. CUELLAR: I wanted to do your
2  90-day performance. A few things. Again,
3  you've been doing a -- a very good job on the
4  90-day performance. You've been doing a good
5  job. You've got the right attitude. I
6  appreciate everything you're doing.
7    A couple of things I need for you to
8  work on to improve. One, if you remember when
9  I hired you I said, hey, I need for you to take
10  things off -- you know, help me with the
11  overload that we have here and that's one thing
12  that I think you need to improve on -- you need
13  to work on. Let me give you a couple of
14  examples. You know, there's a couple times
15  when I'll say, Kristie, Kristie, that means
16  help me out, help me out.
17    Main thing is -- is the -- for
18  example, there's a series of them, but the main
19  one is the press releases. There has been
20  times where I -- it's, like, four or five
21  times, like, front, back, front, back, front,
22  back, front, back. You had to sit down with

Page 179

1  them. There is a format that -- you know,
2  that -- that I like is very outline, you know,
3  explain it instead of just putting one large
4  paragraph. You have to sit down with them --
5  with them and -- and -- and that's one example
6  that I need for you to work on.
7    I mean, the other thing is, you
8  know, remember that time there was an e-mail
9  sent out by mistake where you say, hey, give me
10  a TP. You can't do that. You have to go back
11  there. You have to sit down with them. You
12  have to know what everybody is working on and
13  the only way you can do that is not by asking
14  them to send you a TP, what they're working on,
15  you know, the target points, you need to sit
16  down with them and say, okay, what are you
17  working, how is this, all that.
18    From the legislative team to
19  Patrick, you know, everybody, you've got to
20  know, hey, Patrick, how are the letters coming
21  along? Are they going out? Where are they
22  going to? Not just say, are the letters there?

Page 180

1  Yeah, they're going out. No. Break it down.
2  Break it down. So I need for you to help me
3  take some of that load off me, and that's, you
4  know, what your job is supposed to be, number
5  one.
6    Number two, you know, I don't know
7  how you work on this, but, you know, my -- my
8  expectations when you came was that you were
9  training people. So I said, this is something
10  that I need is for her to come in and train
11  staff. I think I brought it up to you and you
12  said, well, I was training members, not staff.
13  I said, well, that's even easier to train
14  staff. If you are training members, new
15  members and you should be able to -- I mean, I
16  need for you to be able to sit down and --
17  and -- and help train, you know, bring the
18  staff up to a different level on that.
19    The third thing is just simply I
20  don't like when somebody goes against an
21  instruction that I left. Example, the agenda
22  or when I was -- or I was I -- I don't know

Page 181

1  what -- I think I was in a Codel, and you asked
2  her -- and you asked Madeline, hey, I want
3  this, and she kept saying no, you know,
4  describe those in one [inaudible], you know
5  unless you ask me and you overwrote my
6  instructions. You just never do that, you
7  know. If I have certain instructions, then
8  that's it. You ask me and I can say, okay,
9  let's do that, but you cannot override and put
10  her in a very difficult situation. Okay?
11    I believe in you. Okay? I want to
12  extend this for another 30 days. I want you to
13  work hard the next 30 days. I know you can do
14  it. I know you can do it. So let's talk again
15  in 30 days and see where we're at at that time
16  with the evaluations and improvement at that
17  time.
18    MS. SMALL: Okay.
19    MR. CUELLAR: Ask me whatever
20  questions you might want to ask me.
21    MS. SMALL: So I will.
22    So with the staff more, I have been

46 (Pages 178 - 181)

Page 182

1  doing that. I don't want you to think that I
2  just sent out an e-mail. I do both. I like to
3  have it in writing as well just for reference
4  and so I can make sure I have it, but I do sit
5  down with them first. So I just don't want you
6  to think that that's all I'm doing, but I will
7  do it more.
8         MR. CUELLAR: You have to walk the
9  floor.
10        MS. SMALL: Yeah.
11        MR. CUELLAR: You go back there and
12  go one -- go one -- one -- one booth, go
13  another one.
14        MS. SMALL: Absolutely.
15        MR. CUELLAR: You have to know --
16  you know, when we have the meetings, you know,
17  I hope you know what everybody is talking
18  about.
19        The other thing is I used to have --
20  and there is forms that are charts. Every week
21  I used to have a chart of, you know, hey, guys,
22  whatever projects you're working on, give me

Page 183

1  your project before I leave, you know. Due on
2  Thursday, due on Friday, depending on what my
3  last day is, and then that would tell you and
4  then they -- they'll say what they're working
5  on.
6         I don't know if anybody there has
7  done it before, but there's a lot of examples.
8  We can ask Juan and he can give us a copy of
9  that. But it was -- you know, that way, you
10  know, when I'm flying for you and I to look at
11  it, plus the district office so they know what
12  everybody is working on.
13        MS. SMALL: Okay.
14        MR. CUELLAR: By that, I'm talking
15  about everybody has a whole bunch of projects
16  and -- and I'll tell them this is important,
17  this is -- everything is important, but I'll
18  prioritize the -- the things on that. But you
19  just have to just go and spend time with them.
20        MS. SMALL: Yes.
21        So I think that that's my number one
22  priority moving forward is to make sure that

Page 184

1  I'm getting everyone's tasks and knowing them
2  myself. I think for the first three months I
3  was just trying to figure everything out, and
4  the administrative side now is smooth. I've
5  got -- that's easy. That's down. So now I
6  want to definitely -- you know, not that I
7  haven't been learning the legislation, but
8  really dive into knowing -- yeah, actually,
9  with Juan gone, I mean, you're going to -- I
10  want you to be able to lean on me and be able
11  just to take that -- that void away for you.
12        MR. CUELLAR: Because Sag is good,
13  but he's only been here a year or less than a
14  year -- in that position a year. So, I mean,
15  that's why you got to dive into it a lot more.
16        MS. SMALL: Yes, and I want to.
17        MR. CUELLAR: Okay.
18        MS. SMALL: I don't even --
19        MR. CUELLAR: And most of it is just
20  spending time with them.
21        MS. SMALL: Right.
22        MR. CUELLAR: You know, like, with

Page 185

1  David -- David, tell me what you're working on,
2  what can I help you with and --
3         MS. SMALL: I may not be standing
4  there every minute now. I'll probably be back
5  there more, so just yell for me or Madeline
6  yell for me.
7         MR. CUELLAR: Okay. One is the, you
8  know, take things off me.
9         MS. SMALL: Yes.
10        MR. CUELLAR: You got to spend time
11  with Olya.
12        MS. SMALL: Yes.
13        MR. CUELLAR: Olya -- Olya is good,
14  but, you know, you have to -- when something
15  gets to me, you know, you just can't say, looks
16  good, and then that's it. You have to really
17  look into it on that.
18        MS. SMALL: So this is what I wrote
19  down. I do want to revisit this with you.
20        MR. CUELLAR: Okay.
21        MS. SMALL: Pending that everything
22  moves forward and everything goes well. So I

47 (Pages 182 - 185)

Page 186

1    do intend to stay here as long as you will have
2    me.
3           MR. CUELLAR:  Okay.
4           MS. SMALL:  I'm very loyal.  I'm
5    looking out for the best for you.  I'm not
6    looking to run off.  So if you want me here for
7    the long run, I'll be here.  I don't want you
8    to be afraid that I'm leaving or looking for
9    something, I'm not.
10          So this is hard for me to talk
11   about, but I did want to discuss the future of
12   my salary.  So this is not because I'm being
13   greedy or being -- you know, this is just
14   financially for my family.  We had a general
15   discussion about salary and daycare when I took
16   the job, so I just wanted to refresh what we
17   went over.  A raise of $10,000 is approximately
18   $500 a pay period.  I have -- if you want
19   the --
20          MR. CUELLAR:  Okay.  Can we -- and
21   I'll be happy to discuss, but --
22          MS. SMALL:  It doesn't have to be --

Page 187

1           MR. CUELLAR:  -- can we -- on the
2    performance review, can we just stick to the
3    performance and then, you know, in 30 days
4    let's talk about salaries, let's talk about
5    everything?
6           MS. SMALL:  Okay.  And it's -- I'm
7    not asking for right now --
8           MR. CUELLAR:  Okay.
9           MS. SMALL:  -- but I just wanted
10   to --
11          MR. CUELLAR:  Go ahead.  But, I
12   mean, I -- I -- I -- I --
13          MS. SMALL:  Yeah.
14          MR. CUELLAR:  I -- the way this
15   thing -- you know how it is --
16          MS. SMALL:  Uh-huh.
17          MR. CUELLAR:  I mean, first, you've
18   got to get past an extra 30 days.  And the
19   reason I'm giving you 30 days is I want you to
20   succeed.  I mean, you've got the attitude.
21   You've got everything.  You've got the smarts,
22   everything.  I just need for you to work on

Page 188

1    those --
2           MS. SMALL:  Is this more of a review
3    after 30 days, or is my job on the line?
4           MR. CUELLAR:  We'll talk in 30 days.
5           MS. SMALL:  Okay.  So when I took
6    the job we had discussed that daycare would be
7    $500 a week at this point, which is $2,000 a
8    month, or as August was, $2,500 a month because
9    there was five weeks.  So eventually we will
10   have this, you know, second baby, and it's
11   approximately $50,000 a year in daycare.
12          MR. CUELLAR:  50, 5-0?
13          MS. SMALL:  And the reason I'm
14   getting emotional is because it's such a heavy
15   burden, and I -- I don't want to necessarily,
16   you know, be a stay-at-home mom, but I have to
17   be able to afford the daycare in order to work.
18   So that's why I'm bringing this to your
19   attention.  And so a consideration of money in
20   the future will depend on if I'm able to work
21   or if I have to stay home, and that's why I'm
22   telling you about it.  I'm sorry.  I just get

Page 189

1    emotional about my family.
2           MR. CUELLAR:  I mean, we'll talk
3    about this; but, basically, you're asking for
4    it to go $40,000 increase?
5           MS. SMALL:  Not at this time, but
6    over time that's what I would need to sustain
7    two children in daycare.
8           MR. CUELLAR:  Yeah.
9           MS. SMALL:  And I -- you know, I
10   won't have a baby in daycare maybe for another
11   eight months.
12          MR. CUELLAR:  Yeah.
13          MS. SMALL:  But that's just why I
14   just don't want to -- I want to bring it out
15   now and be professional about it.
16          MR. CUELLAR:  All right.  I
17   appreciate it.  But we'll -- we'll talk about
18   that.  I mean, let's get past your next 30
19   days.  At the end of 30 days, I mean, I want
20   you to improve.  I mean, I'll be very honest,
21   at that time we'll decide whether you stay or
22   go, so that's why I want to leave everything

48 (Pages 186 - 189)

Kristie Small                                                    March 13, 2020

Page 190

1    until you stay here.
2          I just need somebody -- you know, I
3    mentioned the three reasons.  Same things, I
4    just want things off my back because next year
5    is going to be -- well, you know, how it is.
6    It's -- you've seen -- I think you came in at
7    the end, but at the beginning it's like the
8    busiest on that, so we need to -- but we'll
9    talk about, you know, the 40,000.  We can talk
10   about that, but let's first get past that.
11   It's a little premature to talk about this.
12   Let's get past the -- the next 30 days.
13         MS. SMALL:  Okay.  I wasn't
14   expecting that extension, so that's why I have
15   this, but I'm able just to -- it stresses me
16   out, so I'd rather just you have that.
17         MR. CUELLAR:  Yeah.  I know.
18         MS. SMALL:  And also -- I mean, I
19   know it's -- 30 days isn't intended to put
20   pressure on me.
21         MR. CUELLAR:  I'm not trying to put
22   pressure on you.  I'm trying to get you to

Page 191

1    elevate things.
2          MS. SMALL:  And I can do that and
3    I'm fully willing to work on everything, but if
4    you truly think in 30 days you might fire me, I
5    don't want to have to worry about that for 30
6    days.  So maybe it would be better if you made
7    some sort of decision if you don't want me
8    here.
9          MR. CUELLAR:  No, I want you -- if I
10   didn't have faith in you, I would not be giving
11   you the 30 days on that.  I mean, I -- I have
12   faith that you can elevate it and I want you to
13   do that.  I want you to do that.  I mean, I
14   want you to do your best.  We'll talk in 30
15   days and see where we are at that time.
16         MS. SMALL:  Okay.  Is there anything
17   else performance review wise?
18         MR. CUELLAR:  Well, I want you to
19   ask me questions.  I mean, it's just basically,
20   you know, the three things I -- you know,
21   the -- the -- the first two are the -- are the
22   key ones.  You have to take things off my --

Page 192

1    my, you know --
2          MS. SMALL:  Yes.
3          MR. CUELLAR:  Help me with more
4    things because I am doing a lot with the staff.
5          MS. SMALL:  And I completely agree
6    with that and that's all on me.
7          MR. CUELLAR:  I mean, it's -- you
8    know, I mean, by the time they bring something
9    to me, you have to scrub it and make sure
10   because otherwise I'm editing.  I'm editing
11   most of the work for you.  I mean, I really
12   really am, and I need -- before it gets to me,
13   you have the sit down and say, no, change this,
14   change this.
15         I mean, sometimes I think you just
16   put, okay, thanks, but it's a little bit more
17   because, I mean, you know, they're -- they're
18   smart, they're hardworking individuals, but
19   they need --
20         MS. SMALL:  Yes.
21         MR. CUELLAR:  -- you know, a little
22   assistance also with themselves, and that's

Page 193

1    where you come in.
2          MS. SMALL:  I know.  I will dive
3    deeper into that and I promise you I never just
4    put "okay."  I do read everything.  And, yeah,
5    I mean, I agree with all that, and that's all
6    stuff I was aware of and want to work on, so...
7          MR. CUELLAR:  I mean, tell them you
8    have to have a look before someone gives it to
9    Mr. Cuellar.
10         MS. SMALL:  I 100 percent agree.
11         That's all.  I don't really have any
12   questions because I agree with everything you
13   said, so I'll just keep --
14         MR. CUELLAR:  And that says if
15   any -- you have any questions as we go on
16   during this week and next week, I don't know
17   what's going to happen.  Like I said, the
18   fourth week of September we're going to be on
19   and off.  I mean, I don't know if we're going
20   to be here.  I mean, I assume we're going to be
21   here.  October, I don't know if we're going to
22   be here, you know, so...

49 (Pages 190 - 193)

Page 194

1    MS. SMALL: Okay. Sounds good.
2    MR. CUELLAR: Let me know.
3    MS. SMALL: I totally agree with all
4  of that, so that's all I have for a performance
5  review wise. I do have, like, 10,000 things to
6  go over with you --
7    MR. CUELLAR: Okay.
8    MS. SMALL: -- if you'd like to go
9  over them.
10    MR. CUELLAR: Let's go over first
11  the -- I think the media interview. There's a
12  deadline before 11:30, so why don't we --
13    MS. SMALL: Okay.
14    MR. CUELLAR: -- have you sit down
15  with Olya and make sure that -- how long is the
16  interview, et cetera, et cetera, et cetera.
17  You know, just package everything by the time
18  it gets to me.
19    MS. SMALL: Okay.
20    MR. CUELLAR: Okay.
21    MS. SMALL: All right. Thank you.
22    MR. CUELLAR: All right.

Page 195

1    (Whereupon, the audiotape
2  concluded.)
3    MR. BLAKE: Can we go off the
4  record.
5    (A short recess was taken.)
6    BY MR. BLAKE:
7    Q.   Mrs. Small, we just played a
8  recording of your 90-day probationary meeting
9  with the congressman.
10    To your recollection, was that
11  recording a complete recording of the
12  conversation that you had about your
13  performance with the congressman at that time?
14    A.   Yes.
15    Q.   You did say in -- backing up, in
16  that meeting the congressman identified a
17  number of performance concerns, things that he
18  didn't like, and things that he wanted you to
19  work on, right?
20    A.   Correct.
21    Q.   And you said several times in
22  response to the congressman when he was telling

Page 196

1  you about things that he wanted to see
2  improvement on that you completely agree, you
3  agree a hundred percent, and words you totally
4  agree, and words to that effect; is that right?
5    A.   Correct.
6    Q.   What is your understanding about, at
7  that time, what your employment status was
8  following that meeting with the congressman?
9    A.   I truthfully didn't think that I was
10  going to get fired. I thought that he was just
11  being tough on me, and although I did say that
12  I agreed, I did agree, but I thought these were
13  all reasonable things for the short time frame
14  that I had been there to keep learning. That
15  wasn't anything that was majorly [sic] lacking
16  or any huge issues that would self-correct by
17  just being there longer.
18    So I heard him say that he didn't
19  know what would happen in 30 days, but I
20  just -- in my mind, I just never fathomed
21  that -- because I knew I was doing a good job.
22  I knew that everyone in the office -- we all --

Page 197

1  you know, we were having a good rapport, and I
2  just never just really thought honestly that it
3  would -- I would be fired.
4    Q.   So at some point, at least as of
5  August 8th, 2018, I believe, the congressman
6  indicated that you were subject to a 90-day
7  probationary period, right?
8    A.   Can you repeat the question?
9    Q.   So at some point at least as of --
10  or at latest as of August 8th, 2018, the
11  congressman indicated to you that you were on a
12  90-day probationary period, right?
13    A.   Correct.
14    Q.   But in this meeting that we just
15  heard a transcript of or just listened to you,
16  rather, the congressman did indicate that he
17  was going to extend that probational period by
18  30 days; is that right?
19    A.   Correct.
20    Q.   In this meeting of yours, this
21  90-day probationary meeting -- probationary
22  period meeting, you started to talk about a

Kristie Small                                                    March 13, 2020

Page 198

1   request for a raise; is that right?
2      A.   Correct.
3      Q.   And you talked about a request, not
4   necessarily all at once, but over time a raise
5   of about $40,000; is that right?
6      A.   Correct.
7      Q.   Did you think that that was an odd
8   time to bring that issue up with the
9   congressman?
10     A.   No, I did not.
11     Q.   Okay.  And why did you not think it
12  was not an odd time to bring it up with the
13  congressman?
14     A.   Because I was making sure that I was
15  going to provide for my family, and I didn't
16  want to catch him off guard.  And as I'm saying
17  in that meeting, I wanted to be professional
18  about it and just, you know, put it out there
19  as early as I could.
20          I was also grossly underpaid for the
21  average of what a deputy chief of staff
22  position is paid, as was -- as were the other

Page 199

1   employees in the office.  He had a very low pay
2   rate.  From the Congressional Research
3   Services, they do a report every year, which I
4   had.  And so asking for that $40,000 was still
5   under the median salary of a person in the same
6   position that I was in.
7      Q.   Did you think that everyone in the
8   office was underpaid?
9      A.   I think that the majority were
10  underpaid, not everyone.
11     Q.   Did you think that both men and
12  women in the office were underpaid?
13     A.   Yes.
14     Q.   And we'll talk about this a little
15  bit later; but, ultimately, you made
16  recommendations for raises and you made
17  recommendations to raise the salaries of both
18  men and women; is that right?
19     A.   Yes.
20          And bonuses for the entire staff.
21     Q.   Right.
22     A.   Which was a practice that he had

Page 200

1   done.
2      Q.   Do you think that your request for a
3   raise in that meeting says anything about your
4   judgment?
5      A.   Yes.
6      Q.   What do you think it says?
7      A.   I think it says that I have good
8   judgment.  That I was looking out for the
9   well-being of my family.  That I researched the
10  salary medians.  That I came in prepared with a
11  document and shows my organization and work
12  ethic skills also.
13     Q.   But you -- you think it was not an
14  inappropriate time or questionable time to talk
15  about a raise when you were meeting to talk
16  about performance issues that the congressman
17  was identifying?
18     A.   As a newly pregnant woman worried
19  about her unborn child and her current child,
20  absolutely not.  It was not bad judgment.
21     Q.   Now, is it your position that the
22  congressman thought that you were performing

Page 201

1   well as his deputy chief of staff?
2      A.   Yes.
3      Q.   Okay.  And what is the basis for
4   that opinion?
5      A.   That he says it in the phone call
6   that's recorded.
7      Q.   He also says some things that he
8   wants you to work on; is that right?
9      A.   To improve upon, yes.
10     Q.   Okay.  And when you asked him if
11  your job is on the line, he suggests that it
12  very well could be; is that right?
13     A.   Yes.
14     Q.   And so he also did not end your
15  probationary period.  He extended it, right?
16     A.   Correct.
17     Q.   Okay.  He could have ended it if he
18  felt that you were performing well; is that
19  right?
20     A.   I don't have knowledge of that
21  because there was no probationary period ever
22  expressed or explained to me before the e-mail

51 (Pages 198 - 201)

Kristie Small                                                    March 13, 2020

Page 238

1        She also says:  "Kristie, they are
2  bringing you down here for a reason which is to
3  training the staff, including me, to better
4  ourselves and the office."
5        So do you have any reason to believe
6  that Jessica did not express her views to the
7  congressman beyond this e-mail about your
8  performance as it relates to putting together
9  this training?
10        A.   This doesn't speak to my
11  performance.  It speaks to hers not knowing the
12  district.  So I don't know what she -- her
13  angle was.  I have no idea.
14        Q.   Okay.  On HC 181 it looks like you
15  sent an e-mail, it's at the top, where you say,
16  "Jessica, as we discussed, please share with me a brief
17  outline with me by COB of what you plan to go
18  over during the quote/unquote community
19  outreach practices section of training."
20        So does that refresh your
21  recollection about what you had asked her to
22  do?

Page 239

1        A.   That's an in addition.  Yes, she
2  needed to go over the community outreach
3  practices.  She was district director.  That's
4  her job.
5        Q.   So what were the community outreach
6  practices --
7        A.   I don't know.
8        Q.   -- that you felt she needed to go
9  over?
10        A.   That was her job.  I don't know.
11        Q.   All right.  And just to be clear for
12  the record, you have no basis to think that
13  Jessica did not speak disparagingly to the
14  congressman about you with respect to this
15  chain of e-mails about getting ready for the
16  training session --
17        A.   I have no way of knowing.
18        MR. BLAKE:  Can we go off the record
19  for a second?
20        (A short recess was taken.)
21        (Deposition Exhibit 48 was marked
22  for identification.)

Page 240

1        BY MR. BLAKE:
2        Q.   Exhibit 48 is the first page is HC
3  1158.  It goes through 1173.
4        Mrs. Small, this e-mail chain
5  includes an e-mail from you to the congressman
6  on October 12, 2018.  It's 3:41 p.m. where you
7  were e-mailing the congressman about your raise
8  and bonus recommendations for the staff; is
9  that right?
10        A.   Correct.
11        Q.   Okay.  And this was after your
12  90-day probationary period but before you and
13  the congressman had your final review
14  conversation; is that right?
15        A.   Correct.
16        Q.   So looking at Page 1163, does that
17  accurately reflect the raise and bonus
18  recommendations that you were making to the
19  congressman at that time?
20        A.   Yes.
21        Q.   Okay.  And so you were recommending
22  a $20,000 raise for yourself, right?

Page 241

1        A.   Yes.
2        Q.   The next highest raise after that
3  was 10,000?
4        A.   Yes.
5        Q.   And that was for Zack, Olya, and
6  Sylvia, correct?
7        A.   Yes.
8        Q.   And then the next highest after that
9  was for Travis and for Francis; is that right?
10        A.   Yes.
11        Q.   Okay.  And Francis Atwell, is that a
12  man or a woman?
13        A.   Man.
14        Q.   So these are the only raise
15  recommendations that you made; is that right?
16        A.   Correct.
17        Q.   Okay.  And this is not everyone in
18  the office at the time, right?
19        A.   Correct.
20        Q.   Okay.  So who in the office did you
21  not recommend receive a raise?
22        A.   Madeline and Nina.

61 (Pages 238 - 241)

Kristie Small                                                    March 13, 2020

Page 242

1    Q.   And why did you not recommend raises
2    for Madeline and Nina?
3    A.   Madeline had not been there long
4    enough, and I didn't know Nina's salary because
5    Nina told me that she was half paid by campaign
6    staff, which I'm not sure if that's true or
7    not.  So I didn't recommend her for a raise
8    because I didn't have complete information of
9    her salary at the time.  However, both Madeline
10   and Nina were recommended for bonuses.
11   Q.   So what about the district staff?
12   A.   What about them?
13   Q.   So are any district staffers listed?
14   A.   Yes.
15   Q.   Okay.  Jessica Hernandez is not
16   listed, right?
17   A.   Correct.
18   Q.   So you did not -- you did not
19   recommend a raise for Jessica?
20   A.   Correct.
21   Q.   Why not?
22   A.   I believe during my research in the

Page 243

1    CRS documents that she was at that median level
2    and she was new as well, but so was I.
3    Q.   So -- an dhow new was Madeline?  Did
4    she start before you or after you?
5    A.   After me.
6    Q.   Okay.  You started in June.
7    Did she start in July?
8    A.   I don't recall.
9    Q.   Is there anyone else in the district
10   who is not on this sheet?
11   A.   Yes.
12   Most of the district members are not
13   because the median salary that they would --
14   were receiving was close to -- the salary they
15   were receiving was close to the median, and I
16   also calculated, by doing research, the cost of
17   living as compared to Laredo, Texas and
18   Washington, D.C., and the comparisons that I --
19   comparisons and the research that I had from
20   both CRS, and learning the median salaries
21   were -- the ones in Laredo were way closer than
22   the ones in D.C..

Page 244

1    Basically, the Laredo people were
2    getting paid similar to the D.C. people, I
3    think.  And so with the cost of living
4    adjustment, it was just like very
5    disproportionate.
6    Q.   Right.
7    So what was the basis for these
8    raise amounts or these specific numbers?
9    A.   The basis amount for the raise
10   amounts were the research I did with CRS
11   documents and the research that I did based on
12   the median salaries, and the research that I
13   did on cost of living.
14   Q.   So are these numbers then aimed at
15   bringing people from their then levels to the
16   median level?
17   A.   Yes.
18   Q.   All right.  And for bonuses it says
19   "17 people for bonuses, $4,000 each."
20   Was there anyone you didn't
21   recommend receive a bonus?
22   A.   No.

Page 245

1    Q.   So did you only have 17 people in
2    the office at that time?
3    A.   I believe with the military fellows
4    and part-time interns it ended up to be 21 or
5    22, but these were full-time.  These were all
6    the full-time.
7    Q.   So of your, like -- the 18 that
8    people always talk about?
9    A.   Right.
10   Q.   So all of those 18 -- you only had
11   17.  All of those people got --
12   A.   I didn't.
13   Q.   You were recommending that they get
14   bonuses?
15   A.   Uh-huh.
16   Q.   And everyone got the same amount.
17   It wasn't based on performance or anything?
18   A.   Right.
19   Q.   Just split it up evenly?
20   A.   Yes.
21   Q.   Did the congressman ask you to
22   prepare to make these recommendations for

62 (Pages 242 - 245)

Kristie Small                                    March 13, 2020

Page 246

1    salary and bonuses?
2        A.   Yes.
3            He told me that I was in charge of
4    being -- doing the budget oversight.
5        Q.   Okay.  Did he specifically ask you
6    to make these recommendations?
7        A.   I don't recall.
8        Q.   And do you know when he communicated
9    to you about doing budget and oversight, which
10   would include salaries and bonuses, presumably,
11   whether he communicated with you verbally or in
12   writing?
13       A.   I don't know.
14       Q.   Did you think it was odd to make a
15   recommendation for your own salary increase?
16       A.   No.
17       Q.   Did you talk to the congressman
18   about, you know, whether you would do that or
19   whether he would do that?
20       A.   There was never a discussion.
21       Q.   Did you think in light of your
22   90-day performance conversation with the

Page 247

1    congressman that it was odd to make this salary
2    recommendation to the congressman at this time?
3        A.   Saw it as performing the duties that
4    I needed to perform moving forward as I
5    normally would.  I wasn't holding any work back
6    because I thought that there was potentially
7    that I wouldn't be there, so I was still moving
8    forward with everything I normally would have.
9        Q.   But you knew on the 12th, when you
10   sent this e-mail, that your meeting with the
11   congressman was coming up on the 16th, right?
12       A.   Yes.
13       Q.   But you still decided to send this
14   to the congressman before --
15       A.   Yes, I wasn't going to punish the
16   work of the office and not do things that
17   needed to be done that normally would have been
18   done outside of the circumstances.
19       Q.   So, I mean, would waiting four or
20   five days have affected the timing of when
21   these raises and bonuses took effect?
22       A.   I think I thought so at the time,

Page 248

1    and I think I was a month off.  I think Dean
2    and I had that conversation, and then the
3    congressman was involved, and so I did make a
4    mistake.  I think that there was a month -- I
5    had a month, and I thought I only had, like,
6    four or five days.  And that was a
7    clarification that Dean made to me since he's
8    the actual payroll person.
9        Q.   Right.
10           So on Page 1159, in the second
11   paragraph, you wrote to the congressman "I have
12   spoken to Dean about the raise levels being
13   maintainable for next year and he is on board
14   that we will have the funds including hiring an
15   LD or LA;" Is that accurate?
16       A.   Yes.
17       Q.   Okay.  So you wrote that to the
18   congressman on October 12th, 2018?
19       A.   Okay.
20       Q.   Do you disagree or you --
21       A.   No, I agree.
22       Q.   But you didn't provide the numbers

Page 249

1    to Dean until October 15th, 2018, right?
2        A.   Dean and I had had three
3    conversations at least, potentially four
4    conversations about this, and I was assured by
5    him that yes, we have it, yes, we have it, yes,
6    we have it.  I'll have to move some things
7    around, he said.  I have to -- I don't know,
8    you know, the logistics of that, but I told him
9    in conversation, like, okay, I'm going to put
10   this to the congressman.
11           So, yes, he had not run the actual
12   numbers yet because that was premature.  I
13   wasn't going to make him run all the numbers if
14   the congressman was going to say no.  So
15   these -- I mean, it was -- you know, it was an
16   estimate and it was the truth that I had spoken
17   to him at least three times about it prior.
18       Q.   Okay.  So when Dean wrote on Monday,
19   October 15th, to you, and this is on Page 1159
20   at the bottom, "I'm not sure of the raises you
21   are proposing so I cannot technically state
22   that they are maintainable until I run the

63 (Pages 246 - 249)

Page 250

1    numbers."
2        A.   That's fair.
3        Q.   Okay.
4            (Deposition Exhibit 49 was marked
5    for identification.)
6            BY MR. BLAKE:
7        Q.   And can I just clarify for the
8    record, I don't -- it's kind of hard to read
9    the writing on this.  So Exhibit 48 starts at
10   Page 1158.  I don't remember if I said that or
11   something else, but it's 1158 to 1173.
12           Now, Exhibit 49 is 1156 and 1157.
13           So Exhibit 49 is an e-mail that
14   Colin sent to the congressman on Thursday,
15   October 25th, 2018, forwarding an e-mail that
16   Dean had sent to Colin and to Jessica a little
17   bit earlier that same night.
18       A.   Sunday night to call is a huge
19   ethics violation.
20       Q.   So he -- so toward the bottom of the
21   page, third-ish paragraph up, it says:  "During
22   the times that Kristie mentioned she was

Page 251

1    working on bonuses/salary raises for people,
2    she never had shared the numbers with me.  I
3    was under the impression the bonuses were
4    modest ones and that the raises might be 3 to
5    5K per person.  The only thing she did say was
6    she was hopeful she would receive a good bump
7    since her work was excellent."
8            So do you agree or disagree with
9    that statement?
10       A.   I can agree with that.
11       Q.   Okay.  So you did not share the
12   numbers with Dean and so he didn't have a sense
13   from you what you were thinking about in terms
14   of the levels of the raises and the bonus?
15       A.   I believe that we had talked about
16   that it was going by the CRS report.  So not
17   specifically, but -- and I intended to send him
18   the numbers.  It just wasn't time yet.  And
19   then if he had come back and said, oh, my gosh,
20   no, we can't do this, then we would revisit.
21   It wasn't a life or death situation.
22       Q.   I understand.

Page 252

1        So, just to be clear, though, you
2    didn't actually give him numbers even though
3    you had spoken about, you know, the fact that
4    you're working on this proposal, right?
5        A.   Correct, I had not yet given him
6    numbers.
7            MR. BLAKE:  Can we go off the record
8    for a second.
9            (A short recess was taken.)
10           (Deposition Exhibit 50 was marked
11   for identification.)
12           (Deposition Exhibit 51 was marked
13   for identification.)
14           (Deposition Exhibit 52 was marked
15   for identification.)
16           BY MR. BLAKE:
17       Q.   Okay.  So back on.
18           Mrs. Small, did you -- you
19   communicated with your husband, Jeff, about
20   your work for the congressman; is that right?
21       A.   Correct.
22       Q.   Okay.  And what kinds of things did

Page 253

1    you communicate about your work?
2        A.   I'm not sure.  Whatever are in these
3    documents.
4        Q.   Okay.
5        A.   I don't remember.
6        Q.   Okay.  So Exhibit 50, HC 2311
7    through 2318, this is from July 19th, 2018.
8    Looks like you sent an e-mail to yourself,
9    forwarding an e-mail that's sent to the staff
10   with some vote recommendations for the
11   congressman.  So in this e-mail you say,
12   "Questions for Jeff."
13       A.   Correct.
14       Q.   So what were you asking Jeff about
15   in this e-mail?
16       A.   My husband was also a congressional
17   staffer, so I was -- I don't remember exactly,
18   but I would think that my thinking would be
19   just to ask him about some of this legislation
20   because he was -- he was a legislative
21   director.  I believe at this time he was
22   already promoted, but he just had really good

64 (Pages 250 - 253)

Page 262

1    Q.   And did you provide the information
2    that is in that complaint?
3    A.   Yes.
4    Q.   Did you review the complaint?
5    A.   Yes.
6    Q.   Did you understand the complaint?
7    A.   Yes.
8    Q.   Did you approve the complaint?
9    A.   Yes.
10   Q.   Is there anything missing from that
11   complaint related to your claims?
12   A.   No.
13   Q.   Is there anything else that you
14   think should be included in your amended
15   complaint -- your First Amended Complaint
16   that's not there?
17   A.   No.
18   Q.   Okay.  For the claims in your
19   complaint, basically all relate to your
20   termination from the congressman's office, what
21   are your specific reasons for thinking that the
22   congressman has terminated your employment

Page 263

1    because of your pregnancy and/or desire to use
2    FMLA leave to take parental leave after Kendall
3    was born?
4    A.   His response to my e-mail requesting
5    leave in writing was the 90-day probationary
6    period sentence, which I had never been aware
7    of or never been told of or it was not in the
8    employee handbook.  It was never mentioned to
9    me, so that is the first reason.
10         The second reason is that after he
11   mentioned in the e-mail the 90-day probationary
12   period, the complaints from him became much
13   more frequent, and it was evident to me that
14   things were just being said to be documented
15   and -- because some of the stuff wasn't even
16   true.  It was just -- it was excelled after I
17   made my -- after I told him I was pregnant.
18   Q.   Anything else?
19   A.   Repeat the question.
20   Q.   What are your specific reasons for
21   believing that the congressman terminated your
22   employment because of your pregnancy and/or

Page 264

1    your desire to use FMLA leave for maternity
2    leave?
3    A.   Okay.  So I stated the e-mail.  I
4    stated the uptick in corrections.  Those are my
5    main reasons.
6    Q.   So both of those are in your
7    complaint.  So there is nothing that is not in
8    your complaint that makes you think that you
9    were discriminated against based on pregnancy
10   for FMLA?
11   A.   Rephrase without the double
12   negative.  I don't want to answer it
13   improperly.
14   Q.   I went to law school to confuse
15   people.
16   A.   I'm very detailed oriented.
17   Q.   What do you think -- in the -- in
18   the affirmative as opposed to the negative,
19   every basis that you have for believing that
20   the congressman discriminated against you based
21   on pregnancy or the FMLA is in your complaint;
22   is that correct?

Page 265

1    A.   Correct.
2    Q.   Okay.  So your complaint does not
3    have anything in it about the congressman
4    saying anything disparaging about pregnancy or
5    women or children or medical leave or FMLA
6    leave?
7    A.   Correct.
8    Q.   Okay.  So -- and that is because he
9    did not say those things, right?
10   A.   Correct.
11   Q.   Okay.  So --
12         MR. BLAKE:  Can we go off the
13   record?
14         (A short recess was taken.)
15         (Deposition Exhibit 53 was marked
16   for identification.)
17         BY MR. BLAKE:
18   Q.   Exhibit 53 are Plaintiff's answers
19   to request for admission.
20         Mrs. Small, do you recognize Exhibit
21   53?
22   A.   I do.

67 (Pages 262 - 265)

# KRISTIE E. SMALL

**Phone:** 571-335-3869
**Email:** Ksmall2017@gmail.com

## SUMMARY OF QUALIFICATIONS

Strong written and verbal communication skills utilized daily to interact with clients, key players, senior-level congressional staff and Members of Congress. Former congressional staffer with 14 years of experience. Master of all working parts of Congress. Strong analytical skills and knowledge of the legislative and appropriations process. Team player. Self-motivator. High energy.

## EMPLOYMENT HISTORY

**The Ford Agency – Temporary Recruiting Coordinator**                    **June 2019 - September 2019**
- Responsible for assistance of recruiting and talent acquisition.
- Assisted with the full cycle of finding, attracting, and hiring new employees to fill open positions.
- Wrote advertisements for the company website.
- Created job descriptions and pitches for candidate outreach.

**Lippes, Mathias, Wexler, Friedman LLP - Senior Policy Advisor**                    **March 2019 - June 2019**
- Brought clients in touch with principle players in Congress, federal agencies, and outside organizations to meet a common goal.
- Policy analytics and work related to the clients' needs included but not limited to women's rights, labor, immigration, and appropriations.

**Congressman Henry Cuellar (TX-28) - Acting Chief of Staff**                    **June 2018 - October 2018**
- Acted as the Member's principal liaison.
- Managed 22 employees in Washington, DC, and district office. Sets office goals, policies and procedures, and oversaw hiring and salary decisions.
- Strong focus on the Appropriations process.
- Managed legislative plan of the Member.
- Managed the media team and approved all press releases and media strategies.
- Developed and approved recommendations of the Legislative Director and Legislative Assistants.
- Oversaw the office budget and all office operations.

**Committee on House Administration - Professional Staff**                    **May 2007 – May 2018**
- Served as a key professional staff member for one of the standing Committees in the House of Representatives.
- New Member Orientation (NMO) 5 cycles.
  - Member Services.
  - Facilitated all aspects of NMO including management of programing, security, seminars, and receptions. Built lasting relationships with Members and their staff.
- Oversight of the CAO
  - Workplace Rights and Responsibilities (sexual harassment) legislative development.
  - Management of the food services vendor (Sodexo and Restaurant Associates).
    - Procurement of vendors.
    - Attended weekly meetings and approved all vendor and management decisions.
    - Enforced compliance with contractual obligations of the House of Representatives.
- Oversight of the Capitol Visitor Center (CVC).
  - Worked with CVC executives, House Republicans, and Senate Rules Committee to ensure use of the CVC complied with all Congressional rules and regulations.
  - Molded the CVC mission.
  - Helped ensure more than 20 million visitors to the Capitol had a world-class experience.
  - Key role in the Exhibition Hall refresh and Capitol Dome restoration projects.
  - Approved historical rotations.
  - Collaborated with the Capitol Police (USCP) to update evacuation and safety procedures.

- Implementation, in collaboration with Speaker Nancy Pelosi's office, of the "Greening of the Capitol" initiative.
  - Oversaw $25 million dollar in spending on numerous CAO projects.
  - Developed sustainability and energy efficiency projects for more than fifty Members.
  - Key role in the U.S. Capitol Dome re-lighting project.



**DEFENDANT'S EXHIBIT**
1
3-13-20

SMALL 00307

**Kristie E. Small**                                                                                              **Page 2**
**Professional Resume**

- Oversight of the Architect of the Capitol.
  - ❖ Capitol Power Plant cogeneration efforts.
- Development and implementation of education programs for senior level staff.
  - ❖ Classes provided Chief of Staff level employees with the opportunity to learn how to manage a staff and run a congressional office.
  - ❖ Provided education on the process of proper disciplinary procedures.
- Congressional Member Organizations (CMO) and Congressional Staff Organizations (CSO).
  - ❖ Approval and management.
    - ❖ Created an online alternative to paper files, making the process a live, online submission.

**Congressman Robert A. Brady (PA-01) - Legislative Assistant**                          **November 2006 – May 2007**
- Legislative issues included Government Reform, Agriculture, Postal, and Labor Relations.
- Authored numerous pieces of legislation and letters for the Congressman.
- Provided vote recommendations and other information on the relevant bills of the day.
- Coalition building with outside organizations and other Member offices for various initiatives.
- Foremost expert in the office for constituent and other meetings on the above issues.

**Congressman Robert A. Brady (PA-01) - Scheduler/ Staff Assistant**                    **February 2005 – Oct 2006**
- Maintained highly-active Member's schedule of events, meetings, and travel.
- Successfully completed high volumes of constituent correspondence responses.
- Responsible for identifying, hiring, and supervising office interns.
- Created the first PA-01 National Art Competition Contest.
- Wrote Congressional Record entries for hundreds of constituents on subjects including tributes in honor of fallen soldiers.

SKILLS

Microsoft Office Suite, Outlook, Bullhorn, Website Content Input, Typing, Writing, Management, Customer Service

EDUCATION

**Bachelor of Political Science**                                                       **September 2000 – December 2004**
Concentration in English
West Virginia University, Morgantown West Virginia

OTHER RELEVANT EXPERIENCE

Women's Congressional Staff Association                                                 **2007, 2013 – Present**
Don Beyer for Congress – Campaign Volunteer                                             **April 2014 – June 2014**
Student Board of Governors – West Virginia University                                   **2003 – 2004**
Senator John D. Rockefeller – Intern                                                    **July 2003 – August 2003**

ORGANIZATIONS

- Washington Redskins Alumni Association – Decade Representative                         **2013 - Present**
- Washington Redskins                                                                   **2011 – 2013**
  - ❖ In game entertainment.
- Everybody Wins!DC                                                                     **2006 – 2011**
  - ❖ Reading program for "at risk" youth from DC public school system.
- WVU Recruitment                                                                       **2006 – 2011**
- Washington Capitals                                                                   **2009 – 2011**
  - ❖ Frontline outreach for Game Entertainment Operations.
- Washington Wizards                                                                    **2008 – 2009**
  - ❖ Frontline outreach for Game Entertainment Operations.
- Capitol Movement Inc.                                                                 **2007 – 2009**
  - ❖ Building better lives through dance by fundraising to provide scholarships for underserved youth.

SMALL 00308

# U.S. HOUSE OF REPRESENTATIVES EMPLOYEE HANDBOOK FOR THE OFFICE OF

## CONGRESSMAN HENRY CUELLAR

ACKNOWLEDGMENT OF RECEIPT OF EMPLOYEE HANDBOOK
FOR THE OFFICE OF HENRY CUELLAR

I acknowledge that I have received a copy of the Employee Handbook for the Office of Congressman Henry Cuellar, and that I have read and understand the contents of the handbook. I understand the handbook is intended to provide me with general information about policies and procedures of the Office that govern my employment. This Employee Handbook will be kept at the Office of Congressman Henry Cuellar.

I acknowledge and understand that employment with the Office is at-will and that all employees serve at the pleasure of the Office. Accordingly, I have the right to resign from my position, at any time, and the Office can terminate my employment relationship, with or without cause, or with or without notice, at any time, except, of course, the Office cannot terminate my employment for discriminatory reasons in violation of applicable federal law or Rules of the House of Representatives. I understand that by signing this Acknowledgment I do not waive my rights under applicable federal law or the Rules of the House of Representatives.

I also understand and acknowledge that the office may unilaterally change or revise, with or without notice, its policies and practices, and such changes may affect the benefits provided therein. Moreover, I understand and acknowledge that the contents of employee handbooks, personnel manuals, benefit plans, policy statements, and the like as they may exist from time-to-time, or other employment practices, shall not serve to create an actual or implied contract of employment, or to confer any right to remain an employee of the office, or otherwise to change in any respect the employment-at-will relationship between the office and myself.

I acknowledge that no one in the Office is authorized to make exception to this understanding, except, who must do so in writing.

_Kristie Small_
(Signature of Employee)

_June 1 2018_
(Date)

_Henley_
(Member or Designee)

1

*(January 29, 2018)*



HC000036

# OFFICE OF CONGRESSMAN HENRY CUELLAR
# LEAVE REQUEST

**EMPLOYEE'S NAME:** Kristie Small

**LOCATION:** DC

Please check the appropriate category/categories below:

( ) Annual Leave

(X) Sick Leave  (Purpose)

_____X___ illness, injury, (pregnancy) or medical confinement

_____ medical/dental/other healthcare appointment

_____ to care for a family member as a result of illness, injury or medical
examination

( ) Leave Without Pay (LWOP)

( ) Other (please specify) _____

Beginning: __ AM (X) PM ( ) __7/5__, 2018
                                    Month, Day

Ending: __ AM (X) PM ( ) __7/5__, 2018
                                 Month, Day

TOTAL Number of (Hours)/Days Requested: 1.5 hours

TOTAL Number of Hours/Days Remaining: _____ (FOR OFFICE USE ONLY)

**EMPLOYEE SIGNATURE:** K Small          **DATE:** 7/5/2018

**SUPERVISOR SIGNATURE:** _____  **DATE:** _____

**CHIEF OF STAFF SIGNATURE:** K Small    **DATE:** 7/5/2018

**CONGRESSMAN SIGNATURE:** _____  **DATE:** 7/8/18



DEFENDANT'S
EXHIBIT
20
3·13·20

HC001149

**To:**     HRC[Cuellar28@mail.house.gov]; Hernandez, Jessica[Jessica.Hernandez@mail.house.gov]; TX28 All Staff[TX28AllStaff@mail.house.gov]
**From:**   Small, Kristie
**Sent:**   Mon 6/25/2018 11:43:07 AM (UTC-04:00)
**Subject:** RE: Congressional Inquiry FINAL response for Kris Waterman (79909) - TX

Yes, Sir.

**From:** HRC
**Sent:** Monday, June 25, 2018 11:34 AM
**To:** Hernandez, Jessica <Jessica.Hernandez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>; TX28 All Staff <TX28AllStaff@mail.house.gov>
**Subject:** Re: Congressional Inquiry FINAL response for Kris Waterman (79909) - TX

Please keep me updated on any matter I refer to you. I cannot be chasing around for answers (when you have them already) when the person that called me  ( a federal judge in this case)is asking. I have explained this policy so many times over the years. Please FOLLOW INSTRUCTIONS.

Sent by HRC
On Jun 25, 2018, at 8:24 AM, Hernandez, Jessica <Jessica.Hernandez@mail.house.gov> wrote:


Jessica Hernandez
**District Director**
U.S. Congressman Henry Cuellar | 28th District of Texas
602 E. Calton Rd, Suite# 2 | Laredo, TX 78041
Office: (956)725-0639 | Fax: (956)725-2647 | Jessica.Hernandez@mail.house.gov
*Sign up for Congressman Cuellar's e-newsletter here.*
<image001.png><image002.png><image003.png><image004.png>
www.cuellar.house.gov

**From:** Travel2, Cuellar
**Sent:** Saturday, June 23, 2018 8:53 PM
**To:** Hernandez, Jessica; Small, Kristie
**Subject:** Fwd: Congressional Inquiry FINAL response for Kris Waterman (79909) - TX

Hi - I've left the country for my leave. This response was for Kris Waterman, the update has already been sent to him. This is to let you guys know. - Nadia



This email concerns the congressional inquiry you submitted on behalf of the constituent listed below. Review of this matter has been completed and the final response is attached.

We hope the information provided is helpful in you responding to your member's constituent and thank you for the opportunity to be of assistance.

Should you have any questions, please contact the Constituent Services office 202.225.4955.

**Item ID (Tracking #):** 79909
**Date/Time Received:** 06/13/2018 05:43:25 PM
**Constituent Issue(s):**
**Constituent:** Waterman, Kris R
**Member:** Representative Henry Cuellar
**POC:** Nadia Islam
**POC eMail:** nadia.islam@mail.house.gov



DEFENDANT'S
EXHIBIT
21
3·13·20



H 000168

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**POC Phone:** 2102712851
<BDS_-_FERS_Approved_-_Annuitant_-_Not_Separated_WATERMAN_0621.pdf>

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**To:** Voytovich, Olya[Olya.Voytovich@mail.house.gov]; Martinez, Leslie[Leslie.Martinez@mail.house.gov]; Colin Strother[colinstrother@gmail.com]; O'Connor, Patrick[Patrick.OConnor2@mail.house.gov]; Small, Kristie[Kristie.Small@mail.house.gov]
**From:** HRC
**Sent:** Sat 6/30/2018 7:38:40 PM (UTC-04:00)
**Subject:** Qatar, US discuss energy ties

Where is our photo to post and hard copy? I can not chase you all for your work.
http://www.gulf-times.com/story/598016/Qatar-US-discuss-energy-ties

# Qatar, US discuss energy ties

Bilateral energy co-operation between Qatar and the US was at the centrestage of the discussions between Qatar Petroleum president and CEO Saad Sherida al-Kaabi and US Secretary of Energy Rick Perry in Washington, DC recently.

Al-Kaabi and the accompanying delegation also held talks with the assistant secretary of state for the Bureau of Energy Resources, Francis R Fannon, which tackled energy co-operation between Qatar and the US.

The QP CEO held similar talks, on the sidelines of his participation in the World Gas Conference in the US capital, with a number of representatives in the US Congress and their assistants, who included member of the House Energy and Commerce Committee Joe Barton; member of the House Ways and Means Committee John Larson; member of the House Armed Services Committee and House Transportation and Infrastructure Committee Rick Larsen; member of the House Agriculture Committee and House Education and the Workforce Committee Rick Allen, and member of the House Energy and Commerce Committee and House Veterans' Affairs Committee Gus Bilirakis.

Similar meetings were held with the chairman of the House Energy and Commerce Committee Greg Walden, and member of the House Energy and Commerce Committee Richard Hudson.

Al-Kaabi also met with member of the House Appropriations Committee and its subcommittees on Defense and Homeland Security Henry Cuellar, and member of the House Energy and Commerce Committee and its subcommittees on Energy and Health Kurt Schrader.

Discussions during the meetings centred on issues of mutual concern, foremost of which was the energy industry and Qatar's partnerships with American companies in the fields of exploration and natural gas production.

Al-Kaabi also met in Washington with Paik Ungyu, the Minister of Trade, Industry and Energy in the Republic of Korea and senior officials at the ministry for a wide-ranging discussion of bilateral co-operation in the field of energy.

Al-Kaabi's meetings in Washington, DC also included a number of discussions with presidents and CEOs of leading American energy companies, including ExxonMobil, ConocoPhillips, and Occidental Petroleum.



DEFENDANT'S
EXHIBIT
_22_
3-13-20

HC000174

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Sent from HRC

**From:** Small, Kristie
**Sent:** Tuesday, July 31, 2018 5:45 PM
**To:** HRC
**Subject:** RE: Please Register for the Advanced Legislative Process Institute to be held August 2-3, 2018

Yes Sir.

**From:** HRC
**Sent:** Tuesday, July 31, 2018 5:44 PM
**To:** Small, Kristie <Kristie.Small@mail.house.gov>
**Subject:** Re: Please Register for the Advanced Legislative Process Institute to be held August 2-3, 2018

Let's do training other date

Sent from HRC

On Jul 31, 2018, at 11:43 PM, Small, Kristie <Kristie.Small@mail.house.gov> wrote:

> Sir, I assure you I can manage the staff, review press releases, complete phone calls and take the training. I wouldn't let you down.
> I realize I should be providing you with more updates so you know what's going on and will do so moving forward. If you still don't want me to go to training that is fine but again I assure you I am on top of things here.
>
> **From:** HRC
> **Sent:** Tuesday, July 31, 2018 4:45 PM
> **To:** Small, Kristie <Kristie.Small@mail.house.gov>
> **Subject:** Re: Please Register for the Advanced Legislative Process Institute to be held August 2-3, 2018
>
> Please wait for this training on another date. There are two many press releases( you have to review pr)and calls to district that have to made. Please manage.  Thanks
>
> Sent from HRC
>
> On Jul 31, 2018, at 10:08 PM, Small, Kristie <Kristie.Small@mail.house.gov> wrote:
>
>> I am managing, Sir. The opportunity for this course was just presented to us when CRS did their presentation at 1:30 today. I will ask staff about this but unless they completed the pre requisite they cannot do this course.
>>
>> **From:** HRC
>> **Sent:** Tuesday, July 31, 2018 3:56 PM
>> **To:** Small, Kristie <Kristie.Small@mail.house.gov>
>> **Subject:** Re: Please Register for the Advanced Legislative Process Institute to be held August 2-3, 2018

1





DEFENDANT'S EXHIBIT 23

HC001484

Btw this two day training.  Next time give me more notice  and catch up with work because u have miss several days in the last week. Als get me daily reports on office.  I need you to manage the office

Sent from HRC

On Jul 31, 2018, at 9:34 PM, Small, Kristie <Kristie.Small@mail.house.gov> wrote:

Hello Sir,
I was wondering if I could take this course Thurs and Friday?
There is a $60 reimbursable fee that I will pay and submit with Dean if you approve. Thanks!

**From:** Choi, Seh Hee <SCHOI@crs.loc.gov>
**Sent:** Tuesday, July 31, 2018 3:29 PM
**To:** Small, Kristie <Kristie.Small@mail.house.gov>
**Subject:** FW: Please Register for the Advanced Legislative Process Institute to be held August 2-3, 2018

Hello!

Thanks for your email. Thank you for your interest. Please register using the link provide below.

All my best,
Sehhee



2

Dear Congressional Staff Member:

You are invited to attend the **Advanced Legislative Process Institute**. This program builds on th
*Congress: An Introduction to Process and Resources* in complexity and depth, and is designed fo
to pursue deeper knowledge in all aspects of the legislative process. It also offers an opportunit
with other legislative staff and CRS legislative procedure experts.

| | |
|---|---|
| **DATE:** | **Thursday, August 2, 2018** from 8:45 am to 4:15 pm and<br>*(Raising and Considering Measures and Amending Measures)* |
| | **Friday, August 3, 2018** from 8:45 am to 4:00 pm<br>*(Committee Procedures and Resolving Differences Between the Chambers)* |
| | Lunch is included in the program on each day |
| **LOCATION:** | LM-222, Collaborative Work Center, James Madison Building |
| **ELIGIBILITY:** | Attendance at *Congress: An Introduction to Process and Resources* qualifies<br>Advanced Legislative Process Institute |
| **FEE:** | $60.00 - May be treated as an official expense.  For program reimbursemer<br>receive a receipt and certificate of attendance at the end of the program |
| **REGISTRATION:** | <image005.jpg> |
| **REGISTRATION DEADLINE:** | The facility can accommodate 55 participants.  Registration will be on a first<br>serve basis and will close at **noon on Monday, July 30** unless the program f<br>then. |
| **CANCELLATION** | To cancel your registration, please call the CRS Program Office at 7.7904, nc<br>**noon, Monday, July 30, 2018. *Fees cannot be returned after this date.** |

For additional questions, please call or email Seh Hee Choi.

**Seh Hee Choi**
**Congressional Programs and Communications Office**
Library of Congress
schoi@crs.loc.gov
202-707-1974 office

3

HC001486

202-707-7904 | www.CRS.gov

**Seh Hee Choi**
**Public Affairs Specialist**
Congressional Programs and Communications Office, DIR
Congressional Research Service
Library of Congress
Main: (202) 707-7904
Office: (202)707-1974
Mobile: (202) 768-2519
<image003.gif>

4

HC001487

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**To:**      Colin Strother[colinstrother@gmail.com]
**Cc:**      Voytovich, Olya[Olya.Voytovich@mail.house.gov]; Small, Kristie[Kristie.Small@mail.house.gov]; Martinez,
Leslie[Leslie.Martinez@mail.house.gov]; Knight, Travis[Travis.Knight@mail.house.gov]; Sanchez,
Juan[Juan.Sanchez@mail.house.gov]
**From:**    HRC
**Sent:**    Mon 7/16/2018 3:45:47 PM (UTC-04:00)
**Subject:** Re: Statement Request

Kristie?

Sent from HRC

On Jul 16, 2018, at 3:38 PM, Colin Strother <colinstrother@gmail.com> wrote:

> I said Kristie a draft about 30 minutes ago I think.
>
> On Mon, Jul 16, 2018, 2:37 PM HRC <Cuellar28@mail.house.gov> wrote:
>
> Yes get it done ASAP
>
> Sent from HRC
>
> On Jul 16, 2018, at 3:36 PM, Voytovich, Olya <Olya.Voytovich@mail.house.gov> wrote:
>
>> Sir,
>>
>> Camille Caldera from Dallas Morning News is looking for your reaction to the Trump/Putin
>> meeting and press conference. She will be updating the story as she gets more reactions from
>> the Texas Delegation. We are currently working on the statement, would you like to send it to
>> her once it is edited?
>>
>> **Name:** Camille Caldera
>>
>> **Publication:** Dallas Morning News (online)
>>
>> **Contact:** 202-661-8407 (Work)
>>
>> 301-454-9992 (Cell)
>>
>> **Request:** Statement on Trump/Putin Summit
>>
>> **Deadline:** asap

24

DEFENDANT'S
EXHIBIT
24
3·13·20

HC000194

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEFENDANT'S EXHIBIT
tabbies
3-19-2  25

To:        HRC[Cuellar28@mail.house.gov]; Voytovich, Olya[Olya.Voytovich@mail.house.gov]; Linick,
Zack[Zack.Linick@mail.house.gov]; Martinez, Leslie[Leslie.Martinez@mail.house.gov]; Sanchez,
Juan[Juan.Sanchez@mail.house.gov]; Colin Strother[colinstrother@gmail.com]
Cc:        Martinez, Leslie[Leslie.Martinez@mail.house.gov]
From:      Small, Kristie
Sent:      Mon 7/16/2018 6:07:15 PM (UTC-04:00)
Subject:   RE: Final Approval

Yes Sir.

From: HRC
Sent: Monday, July 16, 2018 6:07 PM
To: Voytovich, Olya <Olya.Voytovich@mail.house.gov>; Linick, Zack <Zack.Linick@mail.house.gov>; Martinez, Leslie
<Leslie.Martinez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>; Sanchez, Juan <Juan.Sanchez@mail.house.gov>;
Colin Strother <colinstrother@gmail.com>
Cc: Martinez, Leslie <Leslie.Martinez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>
Subject: Re: Final Approval

Take out Notzon language from the first paragraph.  Kristie I need help. There are too many corrections!!!!!

Sent by HRC
On Jul 16, 2018, at 6:01 PM, Voytovich, Olya <Olya.Voytovich@mail.house.gov> wrote:

As in TPs.

<image001.png>
FOR IMMEDIATE RELEASE
Monday, July 16, 2018
Olya Voytovich, DC Press Secretary
Olya.Voytovich@mail.house.gov
Office: (202) 225-1640
Cell: (202) 340-9148

Leslie Martinez, District Press Secretary
Leslie.Martinez@mail.house.gov
Office: (956) 725-0639
Cell: (956) 286-6007

# Rep. Cuellar Passes Bill to Name Laredo Federal Courthouse after Judge George P. Kazen

*Central Jury Assembly Room will be known as Judge Marcel C. Notzon II Jury Room*

**WASHINGTON** – Today, Congressman Henry Cuellar (TX-28) announced the successful passage of S. 2734, a bill which designates the federal courthouse located at 1300 Victoria Street, Laredo, TX as the "George P. Kazen Building and United States Courthouse." Congressman Cuellar sponsored this bill with Senators Cornyn (R-TX) and Cruz (R-TX) to rename the courthouse. Congressman Cuellar also stated that the Central Jury Assembly Room, located on the first floor of the Courthouse, will be known as the "Marcel C. Notzon II Jury Room." The bill has already passed the Senate and will be sent to the President's desk to be signed into law.

Speaking today on the floor of the U.S. House of Representatives, Congressman Cuellar stressed the importance of naming this courthouse after Judge George P. Kazen. He additionally recognized Judge Marcel C. Notzon.

"I am pleased to have this opportunity to honor such a noble individual," Congressman Cuellar said. "Judge Kazen was known as an honest, humble, and dedicated man. He was among the most respected judges in the state, and consistently ruled with class and fairness, all the while still making time to serve in numerous civic organizations throughout South Texas. The dedicating of this federal building and U.S. Court House will serve as a reminder to us

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

all of this great man of character who dutifully served his community."

Congressman Cuellar continued, "I also want to convey my legislative intent for this bill that the jury room in this Courthouse be known as the 'Marcel C. Notzon II Jury Room.' Judge Marcel C. Notzon, II, was an outstanding individual, family man and public servant who dedicated his life to serving the southern Texas region. I recognize him for his years of service, accomplishments in the community and career."

"I would like to thank Senators Cornyn and Cruz for introducing this bill in the Senate and for helping solidify a lasting testament of Judge George P. Kazen, who has given so much to this country."

Judge Kazen was born in Laredo, TX and received his law degree with honors from the University of Texas School of Law. Shortly after graduation, he served a term as a briefing attorney for the Texas Supreme Court and entered the United States Air Force as a Judge Advocate officer, where he was awarded the Air Force Commendation Medal. He returned back to his hometown of Laredo, TX and practiced law until he was appointed by president Jimmy Carter to become District Judge for the Southern District of Texas. Judge Kazen retired after serving almost 40 years of service on the bench.

Judge Notzon was born in Laredo, TX. His dedication to law and justice spanned a legal career of over 39 years, with a near quarter century on the bench as the United States Magistrate Judge for the Southern District of Texas. After being awarded the Laredo Webb County Bar Association's Lifetime Achievement Award, Judge Kazen called Judge Notzon the "heart of the courthouse."

Read Congressman Cuellar's speech on the House floor here.

###
*Congressman Henry Cuellar is a member of the U.S. House Appropriations Committee. Previously, he served as a Texas State Representative and Texas Secretary of State.*
*Sign up to receive Congressman Cuellar's E-mail Newsletters*
*Click here for Congressman Cuellar's Facebook, Twitter Feed, or YouTube Channel*
<image002.png><image003.png><image004.png><image005.png>

---

**From:** HRC
**Sent:** Monday, July 16, 2018 5:57 PM
**To:** Voytovich, Olya <Olya.Voytovich@mail.house.gov>
**Cc:** Martinez, Leslie <Leslie.Martinez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>
**Subject:** Re: Final Approval

Follow jury room language in my tps!!!!

Sent by HRC
On Jul 16, 2018, at 5:42 PM, Voytovich, Olya <Olya.Voytovich@mail.house.gov> wrote:

Sir,

Provided lower in the quote:

<image001.png>
FOR IMMEDIATE RELEASE
Monday, July 16, 2018
Olya Voytovich, DC Press Secretary
Olya.Voytovich@mail.house.gov
Office: (202) 225-1640
Cell: (202) 340-9148

Leslie Martinez, District Press Secretary
Leslie.Martinez@mail.house.gov

HC000196

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Office: (956) 725-0639
Cell: (956) 286-6007

# Rep. Cuellar Passes Bill to Name Laredo Federal Courthouse after Judge George P. Kazen

*Central Jury Assembly Room will be known as Judge Marcel C. Notzon II Jury Room*

**WASHINGTON** – Today, Congressman Henry Cuellar (TX-28) announced the successful passage of S. 2734, a bill which designates the federal courthouse located at 1300 Victoria Street, Laredo, TX as the "George P. Kazen Building and United States Courthouse." Congressman Cuellar sponsored this bill with Senators Cornyn (R-TX) and Cruz (R-TX) to rename the courthouse. Congressman Cuellar also stated that the Central Jury Assembly Room, located on the first floor of the Courthouse, will be known as the "Marcel C. Notzon II Jury Room." The bill has already passed the Senate and will be sent to the President's desk to be signed into law.

Speaking today on the floor of the U.S. House of Representatives, Congressman Cuellar stressed the importance of naming this courthouse after Judge George P. Kazen. He additionally recognized Judge Marcel C. Notzon.

"I am pleased to have this opportunity to honor such a noble individual," Congressman Cuellar said. "Judge Kazen was known as an honest, humble, and dedicated man. He was among the most respected judges in the state, and consistently ruled with class and fairness, all the while still making time to serve in numerous civic organizations throughout South Texas. The dedicating of this federal building and U.S. Court House will serve as a reminder to us all of this great man of character who dutifully served his community."

Congressman Cuellar continued, "I also want to convey that my legislative intent is for the jury room in this Courthouse be known as the 'Marcel C. Notzon II Jury Room.' Judge Marcel C. Notzon, II, was an outstanding individual, family man and public servant who dedicated his life to serving the southern Texas region. I recognize him for his years of service, accomplishments in the community and career."

"I would like to thank Senators Cornyn and Cruz for introducing this bill in the Senate and for helping solidify a lasting testament of Judge George P. Kazen, who has given so much to this country."

Judge Kazen was born in Laredo, TX and received his law degree with honors from the University of Texas School of Law. Shortly after graduation, he served a term as a briefing attorney for the Texas Supreme Court and entered the United States Air Force as a Judge Advocate officer, where he was awarded the Air Force Commendation Medal. He returned back to his hometown of Laredo, TX and practiced law until he was appointed by president Jimmy Carter to become District Judge for the Southern District of Texas. Judge Kazen retired after serving almost 40 years of service on the bench.

Judge Notzon was born in Laredo, TX. His dedication to law and justice spanned a legal career of over 39 years, with a near quarter century on the bench as the United States Magistrate Judge for the Southern District of Texas. After being awarded the Laredo Webb County Bar Association's Lifetime Achievement Award, Judge Kazen called Judge Notzon the "heart of the courthouse."

See Congressman Cuellar's speech on the House floor here.

### 

*Congressman Henry Cuellar is a member of the U.S. House Appropriations Committee. Previously, he served as a Texas State Representative and Texas Secretary of State.*
*Sign up to receive Congressman Cuellar's E-mail Newsletters*
*Click here for Congressman Cuellar's Facebook, Twitter Feed, or YouTube Channel*

HC000197

<image002.png><image003.png><image004.png><image005.png>

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** HRC
**Sent:** Monday, July 16, 2018 5:34 PM
**To:** Voytovich, Olya <Olya.Voytovich@mail.house.gov>
**Cc:** Martinez, Leslie <Leslie.Martinez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>
**Subject:** Re: Final Approval

Put legislative intent lower in pr not in the first paragraph

Sent by HRC
On Jul 16, 2018, at 5:30 PM, Voytovich, Olya <Olya.Voytovich@mail.house.gov> wrote:

> Sir,
>
> Edited PR below with legislative intent. Do you give final approval so we can send out as
> soon as it passes to Webb, LeSalle, Zapata?
>
> <image001.png>
> **FOR IMMEDIATE RELEASE**
> **Monday, July 16, 2018**
> **Olya Voytovich, DC Press Secretary**
> Olya.Voytovich@mail.house.gov
> Office: (202) 225-1640
> Cell: (202) 340-9148
>
> **Leslie Martinez, District Press Secretary**
> Leslie.Martinez@mail.house.gov
> Office: (956) 725-0639
> Cell: (956) 286-6007

# Rep. Cuellar Passes Bill to Name Laredo Federal Courthouse after Judge George P. Kazen

*Central Jury Assembly Room will be known as Judge Marcel C. Notzon II Jury Room*

**WASHINGTON –** Today, Congressman Henry Cuellar (TX-28) announced the successful passage of S. 2734, a bill which designates the federal courthouse located at 1300 Victoria Street, Laredo, TX as the "George P. Kazen Building and United States Courthouse." Congressman Cuellar sponsored this bill with Senators Cornyn (R-TX) and Cruz (R-TX) to rename the courthouse. Congressman Cuellar also stated that his legislative intent for the Central Jury Assembly Room, located on the first floor of the Courthouse, is for it to be known as the "Marcel C. Notzon II Jury Room." The bill has already passed the Senate and will be sent to the President's desk to be signed into law.

Speaking today on the floor of the U.S. House of Representatives, Congressman Cuellar stressed the importance of naming this courthouse after Judge George P. Kazen. He additionally recognized Judge Marcel C. Notzon.

"I am pleased to have this opportunity to honor such a noble individual," Congressman Cuellar said. "Judge Kazen was known as an honest, humble, and dedicated man. He was among the most respected judges in the state, and consistently ruled with class and fairness, all the while still making time to serve in numerous civic organizations throughout South Texas. The dedicating of this federal building and U.S. Court House will serve as a reminder to us all of this great man of character who dutifully served his

HC000198

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

community."

Congressman Cuellar continued, "I also want to honor Judge Marcel C. Notzon, II, who was an outstanding individual, family man and public servant who dedicated his life to serving the southern Texas region. I recognize him for his years of service, accomplishments in the community and career."

"I would like to thank Senators Cornyn and Cruz for introducing this bill in the Senate and for helping solidify a lasting testament of Judge George P. Kazen, who has given so much to this country."

Judge Kazen was born in Laredo, TX and received his law degree with honors from the University of Texas School of Law. Shortly after graduation, he served a term as a briefing attorney for the Texas Supreme Court and entered the United States Air Force as a Judge Advocate officer, where he was awarded the Air Force Commendation Medal. He returned back to his hometown of Laredo, TX and practiced law until he was appointed by president Jimmy Carter to become District Judge for the Southern District of Texas. Judge Kazen retired after serving almost 40 years of service on the bench.

Judge Notzon was born in Laredo, TX. His dedication to law and justice spanned a legal career of over 39 years, with a near quarter century on the bench as the United States Magistrate Judge for the Southern District of Texas. After being awarded the Laredo Webb County Bar Association's Lifetime Achievement Award, Judge Kazen called Judge Notzon the "heart of the courthouse."

See Congressman Cuellar's speech on the House floor here.

### 

*Congressman Henry Cuellar is a member of the U.S. House Appropriations Committee.*
*Previously, he served as a Texas State Representative and Texas Secretary of State.*
*Sign up to receive Congressman Cuellar's E-mail Newsletters*
*Click here for Congressman Cuellar's Facebook, Twitter Feed, or YouTube Channel.*
<image002.png><image003.png><image004.png><image005.png>

HC000199

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **To:** | Small, Kristie[Kristie.Small@mail.house.gov]; Sanchez, Juan[Juan.Sanchez@mail.house.gov] |
| **Cc:** | Martinez, Leslie[Leslie.Martinez@mail.house.gov]; Colin Strother[colinstrother@gmail.com]; Voytovich, Olya[Olya.Voytovich@mail.house.gov]; Hernandez, Jessica[Jessica.Hernandez@mail.house.gov] |
| **From:** | HRC |
| **Sent:** | Thur 8/2/2018 4:48:34 PM (UTC-04:00) |
| **Subject:** | Re: Request: Telemundo |

Please include Juan!!!!  Don't exclude him. Can I get another clean draft?  Can we all focus?

Sent from HRC

On Aug 2, 2018, at 11:45 PM, Small, Kristie <Kristie.Small@mail.house.gov> wrote:

> I'm sorry Sir, that particular one was not sent to me before you.
>
> **From:** HRC
> **Sent:** Thursday, August 2, 2018 4:43 PM
> **To:** Martinez, Leslie <Leslie.Martinez@mail.house.gov>
> **Cc:** Colin Strother <colinstrother@gmail.com>; Voytovich, Olya <Olya.Voytovich@mail.house.gov>; Hernandez, Jessica <Jessica.Hernandez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>
> **Subject:** Re: Request: Telemundo
>
> Crossing is not capitalized.  Who is reading this guys? Kristie?
>
> Sent from HRC
> On Aug 2, 2018, at 11:36 PM, Martinez, Leslie <Leslie.Martinez@mail.house.gov> wrote:
>
>> *Sir, would you like to send the following to the reporter?*
>>
>> *"The Flores Amendment created a loophole that incentivized human traffickers to put children at tremendous risk. So we fixed that. As a father,  I feel very strongly that  we need to do more  to prevent  innocent children from being placed  in dangerous situations like Crossing our border illegally. Any policy that results in a single family being separated has my full opposition. I support the immediate reunification of families while there credible risk is assessed.*
>>
>> *Activists are going to paint it gloom and doom but the average time of an immigration detention for family units is less than 20 days. Each individual immigration case is unique; individuals can be held in custody for a few days or depending on their circumstances it could be longer. The talking point they use saying people are detained indefinitely is either ignorant of the reality or they're being purposely misleading."*


DEFENDANT'S
EXHIBIT
*tabbies*
26
3·13·20    *fc*

26

**Name:** Alicia Barrera
**Publication:** Telemundo 40 Rio Grande
**Number:** O: 956.331.2640 C: 956.358.1876
**Email:** Alicia.Barrera@telemundo.com
**Deadline:** Today 4pm,  but can include a follow up on newscast and website with any information

HC000212

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

provided after that
**Method** (call-in, Skype, phone, etc.): Written Statement
**Topic:** Flores Agreement, Zero Tolerance, private funding

**What is your goal for this piece?:** I'm seeking a written statement from Congressman Cuellar's office in reference to the adoption of the amendment to the Flores agreement that would indefinitely detain migrant children. This was done on Wednesday, July 11 with the House Appropriations Committee.

**Leslie D. Martinez**
District Press Secretary
**Office of Congressman Henry Cuellar (TX-28)**
602 E. Calton Road, Suite 2
Laredo, TX 78041
O: 956-725-0639| M: 956-286-6007 | F: 956-725-2647
*Sign up for Congressman Cuellar's e-newsletter here.*
<image001.png><image001.png><image003.png><image004.png>

HC000213

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** Small, Kristie
**Sent:** Tuesday, October 16, 2018 10:45 AM
**To:** Voytovich, Olya
**Subject:** FW: Social media for approval

How did I miss that... ugh.

*Kristie E. Small*
*Deputy Chief of Staff*
*Office of Congressman Henry Cuellar (TX-28)*
2209 Rayburn House Office Building
O: 202-225-1640 | F: 202-225-1641
*Sign up for Congressman Cuellar's e-newsletter here.*



**From:** HRC
**Sent:** Tuesday, October 16, 2018 10:44 AM
**To:** Voytovich, Olya <Olya.Voytovich@mail.house.gov>
**Cc:** Martinez, Leslie <Leslie.Martinez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>; Hernandez, Jessica <Jessica.Hernandez@mail.house.gov>
**Subject:** Re: Social media for approval

Changed titles to past tense

Sent by HRC

On Oct 16, 2018, at 9:41 AM, Voytovich, Olya <Olya.Voytovich@mail.house.gov> wrote:

> Sir,
>
> Do you approve of the following posts for social media? Has been approved by staff. Thank you.

### "Rep. Cuellar Will Speak at McMullen Community Health Center Grand Opening"

<image001.jpg>

Facebook
As a long standing supporter of community health centers, I spoke at McMullen Community Health Center's grand opening ceremony yesterday for their new behavioral health services clinic, the first of its kind for the county. The addition of this new behavioral health facility will be an invaluable resource to all of McMullen County. Pictured from left to right: Congressman Henry Cuellar, PA-C Angela R. Karsky, McMullen Community Health Center Practice Manager Brenda Salazar, Atascosa Health Center, Inc. CEO Monty Small, Camino Real Community Services Executive Director Emma Garcia, Camino Real Integrated

1


DEFENDANT'S EXHIBIT
37
3.13.20

37

HC002803

Health Program Manager John Koenig, Camino Real LPC Mary Rivera, Camino Real QMHP-CS Nancy Moreno, and McMullen County Judge James Teal.

**Twitter**
Yesterday, I spoke at McMullen Community Health Center's grand opening ceremony of their new #behavioral health services clinic, the first of its kind for the county.

## "Congressman Cuellar Will Announce $600,000 Grant for Atascosa Health Center Hurricane Response Service"

<image002.jpg>

**Facebook**
Yesterday, I announced the awarding of over $600,000 in federal funding directed to support the quality and scope of primary healthcare services at the Atascosa Health Center. These funds will also be directed to assist in current hurricane recovery efforts and prepare AHC to effectively respond to future natural disasters that affect our district. Pictured form left to right: Atascosa Health Center, Inc. CEO Monty Small, Mayor of Pleasanton Travis Hall, Director of Behavior Health LCSW Dr. Noel Laurel, Board Member Virginia Herring, Mayor of Karnes City Leroy Skloss Medical Director Dr. Rayford Mitchell, Board Member Dwayne Villanueva, Board Member Lillian Cashmer, CFO Maria Garcia, Board Member Luana Newman-Leus, and Congressman Henry Cuellar

**Twitter**
Yesterday, I announced over $600k in #federalfunding directed to support Atascosa Health Center's #healthcare services, along with hurricane preparedness and recovery efforts.

HC002804

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



HC002805

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | HRC |
| **Sent:** | Tuesday, September 4, 2018 2:51 PM |
| **To:** | Martinez, Leslie |
| **Cc:** | Abadie, Madeline; Small, Kristie; Linick, Zack; Voytovich, Olya; Knight, Travis; Colin Strother; Kolcun, David; Hernandez, Jessica; Forbes, Stacy |
| **Subject:** | Re: Sharyl Attkisson Update |

Where is FBI director testimony in senate? You are missing things. Kristie?

Sent by HRC

On Sep 4, 2018, at 1:46 PM, Martinez, Leslie <Leslie.Martinez@mail.house.gov> wrote:

> Sir, please see below and attached TPs for this interview. They were reviewed and approved by Stacy and Kristie. They'll be in your take-home as well.
>
> *Congressman Henry Cuellar*
> *Interview: Full Measure with Sharyl Attkisson*
> *Date: TBD*
> *Time: TBD*
> *Location: TBD*
> *Topic: Confucius Institutes*

# <u>Confucius Institutes</u>

- China is a powerful international actor as the world's most populous country and its second-largest economy.

- As China continues to position itself as a champion of globalization and economic integration, it must counter narratives from the West that China's emergence is a threat to the existing international order.

1



DEFENDANT'S EXHIBIT
38
3-13-20

*38*

HC001847

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- They have done this by increasing their soft power around the world.

- Soft power, a term coined by Harvard University scholar Joseph S. Nye Jr. in 1990, is the means by which a country gets other countries to do "want what it wants."

- Nye emphasized that a country's perceived legitimacy, attractiveness of ideology and culture, and societal norms play an important role in shaping international politics.

- Chinese soft power was explicitly referenced in former President Hu Jintao's report at Seventeenth National Congress of the Chinese Communist Party in 2007.

- The  Promoting Vigorous Development and Prosperity of Socialist Culture

- Chinese President Xi Jinping, said in 2014, "We should increase China's soft power, give a good Chinese narrative, and better

2

HC001848

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

communicate China's message to the world," calling for a stronger national effort to link China's popularity and likeability to its meteoric rise.

- U.S. sinologist David Shambaugh of George Washington University says that China spends approximately $10 billion a year toward its soft power campaign.

- Confucius Institutes are one of the soft power tools used by the Chinese Communist Party regime to infiltrate American higher education to silence criticism and sanitize education about China.

- American taxpayer dollars should not be subsidizing their propaganda.

- Recent information has shown that American universities signed contracts to include programs funded and directed by the Chinese government, which poses a threat to our national security.

HC001849

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- That is why on March 23, 2018 Congressman McCaul and I sent a letter to universities in Texas hosting Confucius Institutes, including Texas A&M University, University of Texas at Dallas, University of Texas at San Antonio, and Texas Southern University, urging them to terminate these programs.

- The United States has always made it a top priority to uphold values of free expression and counter any behavior that has posed a threat to our democracy.

- Confucius Institutes and other Chinese government supported academic organizations, such as the China-United States Exchange Foundation, are intended to spread China's political agenda, suppress academic debate, and steal vital academic research.

- Confucius Institutes were launched by the Chinese Communist Party's United Front Work Department. The United Front Work Department's goals are to "win support for China's political agenda, accumulate

4

HC001850

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

influence overseas and gather key information."

- Fortunately, the U.S. Intelligence Community and academic institutions are recognizing this threat.

- Implementing and executing these protective measures are the most assuring way to defend the integrity of our colleges and universities from external organizations that seek to undermine our nation's security.

- It is encouraging to see that Universities like Texas A&M have taken proactive steps towards protecting our educational institutions from foreign interference.

- I will continue to work with my fellow colleagues to implement policies and do everything we can in order to counter national security threats in our schools and across the country.

## **Additional Information**

5

HC001851

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- The 2019 U.S. National Defense Authorization Act, prohibits Pentagon funding for Department of Defense's National Security Language Initiative Chinese language programs hosted at or by any Confucius Institute in the U.S.

- This provision sends a clear message that the U.S. government now positions the institution as a threat to academic freedom and national security.

- By the end of 2017, there were 525 Confucius institutes and 1,113 Confucius classrooms established in 146 countries and regions, according to the 2017 Confucius Institute Annual Development Report.

- The number of Confucius institutes and classrooms in the US reached 629, or nearly 40 percent of Confucius institutes and courses in the world.

- The provision of the NDAA only affects **five** universities with a Confucius Institute

6

HC001852

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

and Chinese-language programs funded by the U.S. Department of Defense.

- Any university that has Pentagon-funded and Chinese government-funded Chinese language programs will have to secure a Pentagon waiver if they want to keep both.

- It creates a waiver process that allows funding to flow to Chinese-language programs if the Defense Department certifies to relevant congressional committees that "Confucius Institute employees and instructors will have no affiliation with," teach or "support" the programs.

- Colleges also must make public all agreements with the Confucius Institutes and any organization affiliated with the Chinese government.

SEC. 1091. PROHIBITION OF FUNDS FOR CHINESE LANGUAGE INSTRUCTION PROVIDED BY A CONFUCIUS INSTITUTE.

(a) PROHIBITION.—None of the funds authorized to be appropriated by this Act or otherwise made available for the Department of Defense may be obligated or expended for Chinese language instruction provided by a Confucius Institute.

7

HC001853

(b) LIMITATION.—None of the funds authorized to be appropriated by this Act or otherwise made available for the Department of Defense may be obligated or expended to support a Chinese language program at an institution of higher education that hosts a Confucius Institute.

(c) WAIVER.—The Under Secretary of Defense for Personnel and Readiness may waive the limitation in subsection (b) with respect to a Chinese language program at a specific institution of higher education if the Under Secretary of Defense for Personnel and Readiness—

(1) certifies to the congressional defense committees that—

(A) Confucius Institute employees and instructors will provide no instruction or educational support to the program;

(B) Confucius Institute employees and instructors will have no authority with regard to the curriculum and activities of the program; and

(C) the institution has made available to the Department of Defense all memoranda of understanding, contracts, and other agreements between the institution and the Confucius Institute, or between the institution and any agency of or organization affiliated with the government of the People's Republic of China; or

(2) certifies to the congressional defense committees that—

(A) the requirements described in subparagraphs (A) and (B) of paragraph (1) have been met; and

(B) the waiver of the limitation in subsection (b) is necessary for national security, and there is no reasonable alternative to issuing the waiver.

(d) DEFINITIONS.—

(1) CHINESE LANGUAGE PROGRAM.—The term "Chinese language program" means any Department of Defense program designed to provide or support Chinese language instruction, including the National Security Education Program, the Language Flagship program, Project Global Officer, and the Language Training Centers program.

(2) CONFUCIUS INSTITUTE.—The term "Confucius Institute" means a Confucius Institute that is operated by the Office of Chinese Languages Council International, also known as Hanban, which is affiliated with the Ministry of Education of the People's Republic of China.

(3) INSTITUTION OF HIGHER EDUCATION.—The term "institution of higher education" has the meaning given the term in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.).

(e) RULE OF CONSTRUCTION.—The prohibition under subsection

(a) and the limitation under subsection (b) shall not apply to an institution of higher education by reason that the institution funds or sponsors an event or activity, regardless of any affiliation of any individual who participates in the event or activity, and nothing shall be construed to prohibit funding for other programs, research or other activities at an institution that hosts a Confucius institute.

**From:** Small, Kristie
**Sent:** Tuesday, September 4, 2018 1:40 PM
**To:** HRC <Cuellar28@mail.house.gov>; Voytovich, Olya <Olya.Voytovich@mail.house.gov>; Linick, Zack <Zack.Linick@mail.house.gov>; Knight, Travis <Travis.Knight@mail.house.gov>; Abadie, Madeline <Madeline.Abadie@mail.house.gov>; Martinez, Leslie <Leslie.Martinez@mail.house.gov>; Hernandez, Jessica <Jessica.Hernandez@mail.house.gov>; Colin Strother <colinstrother@gmail.com>; Kolcun, David <David.Kolcun@mail.house.gov>
**Cc:** Abadie, Madeline <Madeline.Abadie@mail.house.gov>; Martinez, Leslie <Leslie.Martinez@mail.house.gov>
**Subject:** RE: Sharyl Attkisson Update

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Madeline?

*Kristie E. Small*
*Deputy Chief of Staff*
*Office of Congressman Henry Cuellar (TX-28)*
2209 Rayburn House Office Building
O: 202-225-1640 | F: 202-225-1641
*Sign up for Congressman Cuellar's e-newsletter here.*
<image001.png><image002.png><image003.png><image004.png>

**From:** HRC
**Sent:** Tuesday, September 4, 2018 2:39 PM
**To:** Voytovich, Olya <Olya.Voytovich@mail.house.gov>; Linick, Zack <Zack.Linick@mail.house.gov>;
Knight, Travis <Travis.Knight@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>; Abadie,
Madeline <Madeline.Abadie@mail.house.gov>; Martinez, Leslie <Leslie.Martinez@mail.house.gov>;
Hernandez, Jessica <Jessica.Hernandez@mail.house.gov>; Colin Strother <colinstrother@gmail.com>;
Kolcun, David <David.Kolcun@mail.house.gov>
**Cc:** Abadie, Madeline <Madeline.Abadie@mail.house.gov>; Martinez, Leslie
<Leslie.Martinez@mail.house.gov>; Small, Kristie <Kristie.Small@mail.house.gov>
**Subject:** Re: Sharyl Attkisson Update

Do we have info team? Kristie? Day ok, time?

Sent by HRC

On Sep 4, 2018, at 12:34 PM, Voytovich, Olya <Olya.Voytovich@mail.house.gov> wrote:

Starting a new thread to keep it more consistent.

Sharyl Attkisson is now saying they might have to change the interview to next week
with the Congressman. Madeline— Is there availability next week in the schedule?

**Name:** Joce Sterman, Correspondent, Full Measure with Sharyl Attkisson
**Show:** Full Measure with Sharyl Attkisson
**Phone:** 571-814-0501
**Preferred time for interview:** Beginning of September
**Location:** TBD
**Deadline:** Planning to air sometime in September
**Method:** In-person
**Topic:** Confucius Institutes
**What prompted you to call us?:** The Congressman has publicly spoken out against the
threat that these partnerships present.

**Olya Voytovich**
DC Press Secretary
**Office of Congressman Henry Cuellar (TX-28)**
2209 Rayburn House Office Building

9

HC001855

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

O: 202-225-1640 ¦ F: 202-225-1641
*Sign up for Congressman Cuellar's e-newsletter <u>here.</u>*
<image001.png><image002.png><image003.png><image004.png>

<Talking_Points_Confucius Institutes _8.9.18.docx>

HC001856

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



HC001857

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



HC001858

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



HC001859

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



HC001860

**To:**       HRC[Cuellar28@mail.house.gov]
**From:**     Hernandez, Jessica
**Sent:**     Tue 7/3/2018 10:35:59 PM (UTC-04:00)
**Subject:**  Fwd: Outstanding Items - Staff Training

Sent from my iPhone

Begin forwarded message:

**From:** "Hernandez, Jessica" <Jessica.Hernandez@mail.house.gov>
**Date:** July 3, 2018 at 9:33:23 PM CDT
**To:** "Small, Kristie" <Kristie.Small@mail.house.gov>
**Subject: Re: Outstanding Items - Staff Training**

Don't know if the congressman ever mentioned this but I was the campaign assistant finance director. If you were to need a campaign outline will prep one in a snap of a finger. I've never ever been on the official side so this is all new to me. So please understand I need to learn from you.
Sent from my iPhone

On Jul 3, 2018, at 9:18 PM, Hernandez, Jessica <Jessica.Hernandez@mail.house.gov> wrote:

And am not getting defensive at all. I look forward to meeting you and learning from you but you were brought aboard to help us better ever angle in the office and to help me also.

Sent from my iPhone

On Jul 3, 2018, at 9:15 PM, Hernandez, Jessica <Jessica.Hernandez@mail.house.gov> wrote:

In regards to outline, I read and re-read the office manual. I don't know what you want me to come up with. I don't have the knowledge that you have as a chief of staff trainer. You keep asking me for an outline and which offices to visit when you are here in the District and I don't know the district that well yet nor public official. My outline will be plain and simple and to the point such as make sure the staff, staffs HC the way it should be done and making sure things get done. Kristi they are bringing you done here for a reason which is to training the staff including me to better ourselves and the office.

Sent from my iPhone

On Jul 3, 2018, at 7:30 PM, Small, Kristie <Kristie.Small@mail.house.gov> wrote:

Outline and projector status? This is what we spoke about a couple of weeks ago.  When I ask for things and I get no follow up or response.

**Kristie E. Small**
**Deputy Chief of Staff**
**Office of Congressman Henry Cuellar (TX-28)**
2209 Rayburn House Office Building
O: 202-225-1640 | F: 202-225-1641
*Sign up for Congressman Cuellar's e-newsletter here.*



DEFENDANT'S
EXHIBIT
47
3·13·20

47

HC000180



On Jul 3, 2018, at 11:36 AM, Small, Kristie
<Kristie.Small@mail.house.gov> wrote:

Hi Jessica and Colin!

Jessica,
As we discussed, please share a brief outline with
me by COB of what you plan to go over during the
"Community Outreach Practices" section of
training.
Let me know by COB if the projector is up and
running and able to play PowerPoints.
We also need to have a call Thursday or Friday
with the Congressman to confirm the details of our
road trip through the district.


Colin, if you don't mind sharing a few things and
working with us that would be great. As you know,
you will be leading the second part of that section
"Staffing the Congressman" Also, Could I please
have the contact information of the gentleman
doing the lunchtime presentation?

I am working on my PowerPoint and staff handout.


Thanks all. Please let me know if you have any
questions.


**TX28 DISTRICT TRAINING TRIP**
**July 9-11, 2018**

**July 9th -** Mission District Office
    Fly in
    2pm-4pm – Meet with Staff/Observe Office
    Hours
    4pm-7pm – City Hall/Court House
    7pm – Drive to Laredo

**July 10th -** Laredo District Office- **All Staff**
    8:30am-9am- Core Responsibilities (Kristie)
    9am-10am- Constituent Services/Casework

HC000181

Responsibilities (Kristie)
10am-11am- Community Outreach
Practices/Staffing the Congressman (Jessica
& Colin)
11am-12pm- DC/District
Communication/Press (Polycom DC)
(Kristie & Jessica)
12pm- 1pm - Speaker/Working Lunch
(Polycom DC/Interns) (Speaker)
1pm-2pm - Role Improvisations/Best
Practices (Everyone)
2pm-4pm- Meet with Laredo Staff/Observe
Office hours
4pm- 7pm - District Tours- City
Hall/Courthouse

**July 11th** - Laredo
All City Tour
7pm - Drive to San Antonio

**July 12th -**
8:30-10:30am - Meet with Staff/Observe
Office Hours
10:30am - City Hall/Court House
Fly out


**Kristie E. Small**
**Deputy Chief of Staff**
**Office of Congressman Henry Cuellar (TX-
28)**
2209 Rayburn House Office Building
O: 202-225-1640 | F: 202-225-1641
*Sign up for Congressman Cuellar's e-newsletter
here.*
<image001.png><image002.png><image003.png><i
mage004.png>

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7/10/2019                                          Yahoo Mail - Fwd: FW: Bonus and Salary Information

**From:** Small, Kristie
**Sent:** Monday, October 15, 2018 11:26 AM
**To:** Lester, Dean <dean.lester@mail.house.gov>
**Subject:** FW: Bonus and Salary Information

## Kristie E. Small

## Deputy Chief of Staff

## Office of Congressman Henry Cuellar (TX-28)

2209 Rayburn House Office Building

O: 202-225-1640 | F: 202-225-1641

*Sign up for Congressman Cuellar's e-newsletter here.*



**From:** Small, Kristie
**Sent:** Friday, October 12, 2018 3:41 PM
**To:** HRC <Cuellar28@mail.house.gov>
**Subject:** FW: Bonus and Salary Information

**Document 1: Suggested Bonuses and Raises**

**Document 2: Current Salary Chart and CRS Report on Median Staff Salaries (relevant info highlighted in yellow)**

Sir,

My number one priority is to serve you by having the staff run as efficiently as possible. By maintaining employees with institutional knowledge we will maximize productivity and eliminate constant learning curves. (This will make your life much easier!) On a real level, the most important thing I want to note is the level of work and commitment the staff shows. I am very impressed by the dedication and hours they put in.

They are truly happy to serve you and the 28th district. I enjoy working with them so much. That being said, with my knowledge on staff management, I wanted to recommend that we try and get staff pay levels



HC001156

DEFENDANT'S
EXHIBIT
48
3·13·20

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

7/10/2019                                    Yahoo Mail - Fwd: FW: Bonus and Salary Information

up a bit to reflect the second document attached from CRS. Those are the median salaries for each position. It seems like we are a little under the bar and I'd hate to risk losing good people to another office only because of a paycheck. These are the same reason for my bonus suggestions. **After elections it will be extremely enticing for staff to look for other opportunities.** At the end of the day, keeping good staff with us is SUCH a benefit to you. If you trust me to help, I can assure you that within the next year the office will run so much more smoothly. I know you have done things very differently in the past but I wanted to make these suggestions because I truly know it will help you.

On a more statistics driven level I want to promise you that I've done my homework and I can answer any questions you may have. I have spoken to Dean about the raise levels being maintainable for next year and he is on board that we will have the funds including hiring an LD or LA. I can include him later if you have questions for him but I wanted to present this to you 1 on 1 first. I wanted to keep this short but if you'd like any more info or to talk please let me know. Thank you for reading and considering. I have really enjoyed my time here so far and am looking forward to hopefully severing a long tenure in your office.

Thanks Sir!  Have a good day.



**Kristie E. Small**

**Deputy Chief of Staff**

**Office of Congressman Henry Cuellar (TX-28)**

2209 Rayburn House Office Building

O: 202-225-1640 | F: 202-225-1641

*Sign up for Congressman Cuellar's e-newsletter here.*



---------- Forwarded message ----------
From: "Lester, Dean" <dean.lester@mail.house.gov>
To: "Small, Kristie" <Kristie.Small@mail.house.gov>
Cc:
Bcc:
Date: Mon, 15 Oct 2018 11:06:32 +0000
Subject: RE: Bonus and Raise clip

Kristie – I am not sure the raises you are proposing so I cannot technically state they are maintainable till I run the figures.  As far as hiring an LD or LA we are maxed out on staff right now.  It's a juggling issue I know.  We have 18 staff on full time.   Eddie Zavala and I are part of the 18 full time slots because we have so many needs for our 4 part

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

7/10/2019                                    Yahoo Mail - Fwd: FW: Bonus and Salary Information

times to be used by interns and caucus dues.   I am not sure how CHA is structuring the intern pot of funds (approx. 20K) for offices.   Hopefully whatever they do will allow us to move Eddie and me into the part time slots, free up 2 slots and go from there.   Hope that helps.

If you could share with me figures I can run some numbers, am preparing the 2019 budget today and want to send to the Congressman by tomorrow.

Thanks.

Dean

---

Dean Lester

Office & Financial Administrator
Rep. Bucshon, Cuellar, Labrador, Mooney, OK01, PA07, Roby & Rooney

202-425-9692 (mobile)

*"Noboby Likes Change but a wet baby!"* ☺

**From: Small, Kristie**
**Sent: Friday, October 12, 2018 3:49 PM**
**To: Lester, Dean <dean.lester@mail.house.gov>**
**Subject: Bonus and Raise clip**

Hey Dean! Wanted to share with you a portion of the email I sent HC about raises and bonuses. In case is mentions these things I wanted to be sure you knew what was said on my end☺

"On a more statistics driven level I want to promise you that I've done my homework and I can answer any questions you may have. I have spoken to Dean about the raise levels being maintainable for next year and he is on board that we will have the funds including hiring an LD or LA. I can include him later if you have questions for him but I wanted to present this to you 1 on 1 first. I wanted to keep this short but if you'd like any more info or to talk please let  me know. Thank you for reading and considering. I have really enjoyed my time here so far and am looking forward to hopefully severing a long tenure in your office."

**Kristie E. Small**

HC001160

7/10/2019                                    Yahoo Mail - Fwd: FW: Bonus and Salary Information

## Deputy Chief of Staff

## Office of Congressman Henry Cuellar (TX-28)

2209 Rayburn House Office Building

O: 202-225-1640 | F: 202-225-1641

*Sign up for Congressman Cuellar's e-newsletter here.*



---------- Forwarded message ----------
From: "Lester, Dean" <dean.lester@mail.house.gov>
To: "Small, Kristie" <Kristie.Small@mail.house.gov>
Cc:
Bcc:
Date: Mon, 15 Oct 2018 11:02:24 +0000
Subject: RE: Payroll deadline Mon Oct 15th

No.  Normally the Cuellar office does bonuses in Nov not Oct.

Hope that helps.


D


---

Dean Lester

Office & Financial Administrator
Rep. Bucshon, Cuellar, Labrador, Mooney, OK01, PA07, Roby & Rooney

202-425-9692 (mobile)


*"Noboby Likes Change but a wet baby!"* ☺


From: Small, Kristie
Sent: Sunday, October 14, 2018 5:40 PM
To: Lester, Dean <dean.lester@mail.house.gov>
Subject: Re: Payroll deadline Mon Oct 15th


Hey Dean! Has the boss communicated anything with you about bonuses?

**Kristie E. Small**

HC001161

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7/10/2019                                Yahoo Mail - Fwd: FW: Bonus and Salary Information

**Deputy Chief of Staff**

## Congressman Henry Cuellar (TX-28)

2209 Rayburn House Office Building

O: 202-225-1640 | F: 202-225-1641

On Oct 12, 2018, at 8:26 AM, Lester, Dean <dean.lester@mail.house.gov> wrote:

> Morning – Hope your week has been good.
>
>
> Just a reminder that the 15th is Monday and that is the deadline day for payroll actions for the regular paychecks on Oct 31.
>
>
> Thanks.
>
> Dean

 Bonus - Salary.pdf
215.3kB

 Bonus-Salary Doc.pdf
5.5MB

 noname
43.9kB

 noname
56.3kB

 image001.png
2.4kB

 image002.png
1.6kB

 image003.png
3.4kB

 image004.png
2.6kB

 image004.png
2.6kB

HC001162

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Current Surplus $156,000

| | |
|---|---|
| Francis Atwell | $5k |
| Sylvia Segovia | $10k |
| Patrick O'Connor | $5k |
| Travis Knight | $5k |
| Olya Voytovich | $10k |
| Zack Linick | $10k |
| Kristie Small | $20k |

Total Raise Amount      $65K total

Surplus after Raises      $133k

17 People for bonuses   $4k = $68k

Surplus after bonuses = 65k - Office supplies/Subscrptions/Misc needs

*Extra money goes to the general fund controlled by the Speakers office and is disbursed at their discretion. There is no benefit for us to turn in monies left over.

HC001163

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# U.S. House of Representatives
## PAYROLL CERTIFICATION - DRAFT
09/01/2018 to 09/30/2018

Process Level:   TX28Y HON.HENRY CUELLAR

Accounting Organization:  TX28CUH

MEMBERS CLERK HIRE - PERMANENT PERSONNEL

| Employee and Job Title | Annual Salary | Gross Pay | Period | Remarks | Employee No. |
|---|---|---|---|---|---|
| ABADIE, MADELINE E<br>SCHEDULER | 44,000.00 | 3,666.67 | 09/01/2018 to 09/30/2018 | | 178567 |
| ANDREWS, NINAMARIE JOY<br>OFFICE MANAGER | 39,500.00 | 3,291.67 | 09/01/2018 to 09/30/2018 | | 147610 |
| ARGUELLO, PETE JACOB<br>CONSTITUENT SERVICES | 41,200.00 | 3,433.33 | 09/01/2018 to 09/30/2018 | | 157132 |
| ATWELL, FRANCIS MATTHEW<br>LAREDO OUTREACH COORDINATOR | 30,000.00 | 2,500.00 | 09/01/2018 to 09/30/2018 | | 172904 |
| GALLEGOS, ALEXIS DENNEA<br>CONSTITUENT SERVICES REPRESENT | 32,000.00 | 2,666.67 | 09/01/2018 to 09/30/2018 | | 159583 |
| HERNANDEZ, JESSICA<br>DISTRICT DIRECTOR | 75,000.00 | 6,250.00 | 09/01/2018 to 09/30/2018 | | 177617 |
| HERNANDEZ, VANESSA NICOLE<br>OUTREACH COORDINATOR | 34,196.00 | 2,849.67 | 09/01/2018 to 09/30/2018 | | 163322 |
| ISLAM, NADIA<br>CONSTITUENT SERVICE REP. | 32,960.00 | 2,746.67 | 09/01/2018 to 09/30/2018 | | 169355 |
| KNIGHT, TRAVIS COWLES<br>LEGISLATIVE ASSISTANT | 35,000.00 | 2,916.67 | 09/01/2018 to 09/30/2018 | | 178156 |
| LAFUENTE, GILBERT<br>OUTREACH COORDINATOR | 48,600.00 | 4,050.00 | 09/01/2018 to 09/30/2018 | | 146933 |
| LESTER, DEAN A<br>SHARED FINANCIAL ADMINISTRATOR | 21,000.00 | 1,750.00 | 09/01/2018 to 09/30/2018 | | 131032 |
| LINICK, ZACKARY BRIAN<br>LEGISLATIVE ASSISTANT | 40,000.00 | 3,333.33 | 09/01/2018 to 09/30/2018 | | 175888 |
| MARTINEZ, LESLIE DENISE<br>DISTRICT PRESS SECRETARY | 38,000.00 | 3,166.67 | 09/01/2018 to 09/30/2018 | | 177569 |
| O'CONNOR, PATRICK M<br>STAFF ASSISTANT | 33,000.00 | 2,750.00 | 09/01/2018 to 09/30/2018 | | 171532 |
| SEGOVIA, SYLVIA M<br>CONSTITUENT SERVICES REPRESENT | 30,900.00 | 2,575.00 | 09/01/2018 to 09/30/2018 | | 169116 |
| SMALL, KRISTIE E<br>DEPUTY CHEIF OF STAFF | 90,000.00 | 7,500.00 | 09/01/2018 to 09/30/2018 | | 141797 |
| VOYTOVICH, OLGA<br>PRESS SECRETARY | 50,000.00 | 4,166.67 | 09/01/2018 to 09/30/2018 | | 177053 |
| ZAVALA, LUIS EDUARDO<br>FIELD REPRESENTATIVE | 12,000.00 | 1,000.00 | 09/01/2018 to 09/30/2018 | | 141315 |

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

### U.S. House of Representatives
### PAYROLL CERTIFICATION - DRAFT
09/01/2018 to 09/30/2018

Process Level:  TX28Y HON.HENRY CUELLAR                     Accounting Organization:  TX28CUH

MEMBERS CLERK HIRE - NON PERMANENT PERSONNEL

| Employee and Job Title | Annual Salary | Gross Pay | Period | Remarks | Employee No. |
|---|---|---|---|---|---|
| BONILLA, SOFIA G<br>PAID INTERN | 12,000.00 | 1,000.00 | 09/01/2018 to 09/30/2018 | | 178394 |
| GAONA, ANDREW J<br>TEMPORARY EMPLOYEE | 27,700.00 | 1,000.28 | 09/01/2018 to 09/30/2018 | APPOINTMENT<br>09/18/18 | 178333 |
| ORTIZ, BRIANA G<br>PAID INTERN | 19,300.00 | 0.00 | 09/01/2018 to 09/30/2018 | TERMINATED<br>08/31/18 | 176010 |

HC001165

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

### U.S. House of Representatives
**PAYROLL CERTIFICATION - DRAFT**

09/01/2018 to 09/30/2018

Process Level:    TX28Y HON.HENRY CUELLAR

Accounting Organization:  TX28CUH

| Employee Group | Expenditure | Active | Paid |
|---|---|---|---|
| MEMBERS CLERK HIRE - PERMANENT PERSONNEL | 60,613.02 | 18 | 18 |
| MEMBERS CLERK HIRE - NON PERMANENT PERSONNEL | 2,000.28 | 2 | 2 |
| Total | 62,613.30 | 20 | 20 |

COMMENTS:  (EXCEPTIONS MUST BE LISTED WITHIN THIS BOX)

I CERTIFY THAT THE LISTED EMPLOYEES HAVE PERFORMED THEIR ASSIGNED OFFICIAL DUTIES
FOR THE OFFICES OF THE EMPLOYING AUTHORITY, AND THAT THEY HAVE CERTIFIED THAT THEY
HAVE NO RELATIONSHIP TO A CURRENT MEMBER OF CONGRESS, UNLESS OTHERWISE NOTED
HEREON.

HC001166

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



*Congressional*
*Research Service*
Informing the legislative debate since 1914

# Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015

**R. Eric Petersen, Coordinator**
Specialist in American National Government

November 9, 2016

Congressional Research Service
7-5700
www.crs.gov
R44323

CRS REPORT
Prepared for Members and
Committees of Congress

HC0Q1167

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015*

## Table 14. Staff Assistant

| Year | Observations | Nominal $ | | | | Constant $ | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Minimum | Average | Median | Maximum | Minimum | Average | Median | Maximum |
| 2001 | 45 | $21,667 | $33,302 | $31,000 | $79,516 | $29,213 | $44,900 | $41,797 | $107,210 |
| 2002 | 45 | $24,500 | $34,378 | $33,000 | $62,317 | $32,519 | $45,631 | $43,801 | $82,713 |
| 2003 | 45 | $20,000 | $37,518 | $35,917 | $74,394 | $25,955 | $48,688 | $46,610 | $96,544 |
| 2004 | 45 | $21,200 | $35,866 | $36,227 | $52,750 | $26,798 | $45,336 | $45,793 | $66,680 |
| 2005 | 45 | $22,000 | $38,296 | $34,375 | $105,950 | $26,898 | $46,822 | $42,028 | $129,539 |
| 2006 | 45 | $21,834 | $38,120 | $35,167 | $63,830 | $25,861 | $45,151 | $41,653 | $75,603 |
| 2007 | 45 | $24,486 | $39,808 | $38,400 | $60,790 | $28,199 | $45,844 | $44,223 | $70,008 |
| 2008 | 45 | $25,500 | $40,657 | $36,156 | $73,300 | $28,281 | $45,091 | $40,098 | $81,293 |
| 2009 | 45 | $20,175 | $37,829 | $37,504 | $67,333 | $22,455 | $42,105 | $41,742 | $74,943 |
| 2010 | 45 | $25,000 | $42,084 | $39,750 | $93,750 | $27,376 | $46,084 | $43,528 | $102,661 |
| 2011 | 45 | $26,250 | $38,681 | $34,833 | $87,500 | $27,865 | $41,061 | $36,977 | $92,885 |
| 2012 | 45 | $22,000 | $41,076 | $35,767 | $167,411 | $22,880 | $42,720 | $37,198 | $174,111 |
| 2013 | 45 | $21,095 | $37,726 | $34,986 | $67,167 | $21,623 | $38,669 | $35,861 | $68,846 |
| 2014 | 45 | $21,067 | $37,176 | $36,250 | $88,058 | $21,224 | $37,452 | $36,520 | $88,714 |
| 2015 | 45 | $25,950 | $37,958 | $34,857 | $69,500 | $25,950 | $37,958 | $34,857 | $69,500 |

|  | | |
|---|---|---|
| | 5 Years, 2011-2015 | -5.73% |
| Change | 10 Years, 2006-2015 | -16.31% |
| | 15 Years, 2001-2015 | -16.60% |







*Dollars in figures are in thousands.*

Source: *Statement of Disbursements of the House*, as collated by LegiStorm, various years, and CRS calculations. Tabular change is based on change in median pay for the periods noted. In the visualizations, position pay information based on constant 2016 dollars in thousands of dollars, or change in those levels, is presented in green. Detailed information about data sources is available above in "Data Tables and Visualizations."

HC001168

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015

### Table 10. Legislative Director

| Year | Observations | Nominal $ | | | | Constant $ | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Minimum | Average | Median | Maximum | Minimum | Average | Median | Maximum |
| 2001 | 45 | $47,000 | $66,932 | $66,250 | $91,412 | $63,370 | $90,243 | $89,324 | $123,249 |
| 2002 | 45 | $48,399 | $71,594 | $70,000 | $117,000 | $64,240 | $95,027 | $92,911 | $155,295 |
| 2003 | 45 | $51,048 | $72,020 | $70,500 | $105,000 | $66,246 | $93,462 | $91,490 | $136,261 |
| 2004 | 45 | $51,761 | $73,294 | $70,300 | $124,833 | $65,430 | $92,649 | $88,864 | $157,798 |
| 2005 | 45 | $58,963 | $75,692 | $72,068 | $133,833 | $72,090 | $92,545 | $88,113 | $163,630 |
| 2006 | 45 | $55,542 | $76,599 | $74,515 | $101,917 | $65,786 | $90,726 | $88,258 | $120,714 |
| 2007 | 45 | $58,000 | $81,721 | $81,667 | $102,683 | $66,795 | $94,112 | $94,050 | $118,254 |
| 2008 | 45 | $54,500 | $82,548 | $82,000 | $124,333 | $60,443 | $91,550 | $90,942 | $137,892 |
| 2009 | 45 | $51,500 | $85,883 | $84,417 | $127,411 | $57,320 | $95,588 | $93,957 | $141,810 |
| 2010 | 45 | $61,303 | $87,717 | $86,167 | $118,000 | $67,130 | $96,054 | $94,357 | $129,216 |
| 2011 | 45 | $47,075 | $85,639 | $86,750 | $117,500 | $49,972 | $90,909 | $92,089 | $124,731 |
| 2012 | 45 | $48,400 | $82,327 | $80,000 | $138,000 | $50,337 | $85,622 | $83,202 | $143,523 |
| 2013 | 45 | $50,736 | $79,804 | $80,000 | $106,000 | $52,005 | $81,800 | $82,000 | $108,650 |
| 2014 | 45 | $50,417 | $87,256 | $84,718 | $127,000 | $50,792 | $87,906 | $85,349 | $127,946 |
| 2015 | 45 | $55,133 | $84,862 | $86,500 | $132,800 | $55,133 | $84,862 | $86,500 | $132,800 |

| | | |
|---|---|---|
| | 5 Years, 2011-2015 | -6.07% |
| Change | 10 Years, 2006-2015 | -1.99% |
| | 15 Years, 2001-2015 | -3.16% |



Median Pay



Change in Pay



2015 Pay Distribution

Dollars in figures are in thousands.

Source: Statement of Disbursements of the House, as collated by LegiStorm, various years, and CRS calculations. Tabular change is based on change in median pay for the periods noted. In the visualizations, position pay information based on constant 2016 dollars in thousands of dollars, or change in those levels, is presented in green. Detailed information about data sources is available above, in "Data Tables and Visualizations."

HC001169

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015*

## Table 9. Legislative Correspondent

| Year | Observations | Nominal $ | | | | Constant $ | | | |
|------|-------------|-----------|---------|---------|---------|-----------|---------|---------|---------|
| | | Minimum | Average | Median | Maximum | Minimum | Average | Median | Maximum |
| 2001 | 31 | $24,500 | $33,552 | $31,313 | $84,267 | $33,033 | $45,238 | $42,218 | $113,616 |
| 2002 | 45 | $25,000 | $34,141 | $31,983 | $52,000 | $33,183 | $45,315 | $42,452 | $69,020 |
| 2003 | 45 | $23,958 | $36,698 | $35,614 | $64,077 | $31,091 | $47,624 | $46,217 | $83,155 |
| 2004 | 40 | $25,372 | $36,524 | $34,720 | $66,667 | $32,072 | $46,168 | $43,888 | $84,271 |
| 2005 | 37 | $26,000 | $37,095 | $35,250 | $60,750 | $31,789 | $45,353 | $43,098 | $74,276 |
| 2006 | 45 | $27,583 | $39,217 | $36,750 | $73,315 | $32,671 | $46,450 | $43,528 | $86,837 |
| 2007 | 45 | $28,544 | $40,299 | $39,617 | $56,333 | $32,872 | $46,410 | $45,624 | $64,875 |
| 2008 | 45 | $28,867 | $39,190 | $38,500 | $55,680 | $32,015 | $43,464 | $42,699 | $61,752 |
| 2009 | 45 | $29,085 | $41,173 | $38,875 | $75,917 | $32,372 | $45,826 | $43,268 | $84,496 |
| 2010 | 45 | $28,000 | $40,366 | $38,542 | $75,833 | $30,661 | $44,203 | $42,205 | $83,041 |
| 2011 | 45 | $28,833 | $42,489 | $39,600 | $86,250 | $30,608 | $45,104 | $42,037 | $91,558 |
| 2012 | 45 | $26,000 | $39,351 | $39,000 | $65,000 | $27,041 | $40,926 | $40,561 | $67,601 |
| 2013 | 45 | $28,900 | $38,589 | $37,500 | $65,000 | $29,623 | $39,554 | $38,438 | $66,625 |
| 2014 | 45 | $30,000 | $41,122 | $40,233 | $63,000 | $30,223 | $41,428 | $40,533 | $63,469 |
| 2015 | 45 | $25,000 | $41,290 | $40,000 | $77,000 | $25,000 | $41,290 | $40,000 | $77,000 |

| Change | | |
|--------|--|--|
| 5 Years, 2011-2015 | -4.85% |
| 10 Years, 2006-2015 | -8.11% |
| 15 Years, 2001-2015 | -5.25% |



Median Pay



Change in Pay



2015 Pay Distribution

*Dollars in figures are in thousands.*

**Source:** *Statement of Disbursements of the House*, as collated by LegiStorm, various years, and CRS calculations. Tabular change is based on change in median pay for the periods noted. In the visualizations, position pay information based on constant 2016 dollars in thousands of dollars, or change in those levels, is presented in green. Detailed information about data sources is available above in "Data Tables and Visualizations."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015

## Table 4. Chief of Staff

| Year | Observations | Nominal $ | | | | Constant $ | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Minimum | Average | Median | Maximum | Minimum | Average | Median | Maximum |
| 2001 | 45 | $76,361 | $106,313 | $104,250 | $137,020 | $102,957 | $143,341 | $140,559 | $184,742 |
| 2002 | 45 | $65,000 | $113,580 | $115,089 | $145,226 | $86,275 | $150,756 | $152,758 | $192,759 |
| 2003 | 45 | $81,000 | $114,406 | $110,750 | $148,978 | $105,116 | $148,468 | $143,723 | $193,332 |
| 2004 | 45 | $86,500 | $122,278 | $124,000 | $151,974 | $109,342 | $154,567 | $156,744 | $192,105 |
| 2005 | 45 | $70,196 | $129,013 | $130,000 | $156,827 | $85,825 | $157,736 | $158,944 | $191,743 |
| 2006 | 45 | $94,000 | $135,327 | $133,180 | $159,828 | $111,337 | $160,286 | $157,743 | $189,306 |
| 2007 | 45 | $96,833 | $138,937 | $141,652 | $159,828 | $111,517 | $160,005 | $163,132 | $184,063 |
| 2008 | 45 | $93,508 | $145,683 | $149,972 | $163,795 | $103,705 | $161,569 | $166,327 | $181,657 |
| 2009 | 45 | $42,708 | $133,877 | $134,344 | $168,411 | $47,535 | $149,007 | $149,527 | $187,443 |
| 2010 | 45 | $98,500 | $143,697 | $147,000 | $168,411 | $107,862 | $157,355 | $160,972 | $184,418 |
| 2011 | 45 | $103,124 | $146,853 | $150,833 | $168,411 | $109,470 | $155,890 | $160,116 | $178,775 |
| 2012 | 45 | $98,220 | $143,040 | $144,000 | $168,411 | $102,151 | $148,765 | $149,763 | $175,151 |
| 2013 | 45 | $90,501 | $142,480 | $143,800 | $168,411 | $92,764 | $146,043 | $147,395 | $172,622 |
| 2014 | 45 | $89,401 | $140,803 | $138,968 | $168,411 | $90,067 | $141,851 | $140,003 | $169,665 |
| 2015 | 45 | $114,173 | $147,650 | $146,561 | $168,411 | $114,173 | $147,650 | $146,561 | $168,411 |

| Change | 5 Years, 2011-2015 | -8.47% |
|---|---|---|
| | 10 Years, 2006-2015 | -7.09% |
| | 15 Years, 2001-2015 | 4.27% |



Median Pay



Change in Pay



2015 Pay Distribution

Dollars in figures are in thousands.

Source: Statement of Disbursements of the House, as collated by LegiStorm, various years, and CRS calculations. Tabular change is based on change in median pay for the periods noted. In the visualizations, position pay information based on constant 2016 dollars in thousands of dollars, or change in those levels, is presented in green. Detailed information about data sources is available above in "Data Tables and Visualizations."

HC001171

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015*

### Table 8. Legislative Assistant

| | | Nominal $ | | | | Constant $ | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Observations | Minimum | Average | Median | Maximum | Minimum | Average | Median | Maximum |
| 2001 | 45. | $30,154 | $43,493 | $41,092 | $70,000 | $40,656 | $58,641 | $55,403 | $94,380 |
| 2002 | 45 | $29,068 | $44,295 | $43,333 | $61,296 | $38,582 | $58,793 | $57,517 | $81,358 |
| 2003 | 45 | $29,025 | $45,828 | $42,542 | $121,750 | $37,667 | $59,472 | $55,208 | $157,998 |
| 2004 | 45 | $30,081 | $46,008 | $43,750 | $95,585 | $38,024 | $58,158 | $55,303 | $120,826 |
| 2005 | 45 | $29,542 | $50,609 | $45,208 | $104,290 | $36,119 | $61,877 | $55,274 | $127,509 |
| 2006 | 45 | $35,994 | $50,584 | $48,750 | $69,631 | $42,633 | $59,914 | $57,741 | $82,474 |
| 2007 | 45 | $32,750 | $50,261 | $45,600 | $120,136 | $37,716 | $57,882 | $52,515 | $138,353 |
| 2008 | 45 | $35,267 | $53,668 | $49,389 | $94,841 | $39,113 | $59,521 | $54,775 | $105,183 |
| 2009 | 45 | $34,000 | $49,982 | $50,500 | $63,500 | $37,842 | $55,630 | $56,207 | $70,676 |
| 2010 | 45 | $37,637 | $54,346 | $51,427 | $114,814 | $41,214 | $59,511 | $56,315 | $125,727 |
| 2011 | 45 | $32,500 | $50,506 | $48,863 | $96,400 | $34,500 | $53,614 | $51,870 | $102,333 |
| 2012 | 45 | $29,000 | $49,916 | $49,250 | $78,833 | $30,161 | $51,914 | $51,221 | $81,988 |
| 2013 | 45 | $29,500 | $48,395 | $47,917 | $72,802 | $30,238 | $49,605 | $49,115 | $74,623 |
| 2014 | 45 | $31,333 | $50,854 | $49,219 | $90,833 | $31,567 | $51,233 | $49,586 | $91,510 |
| 2015 | 45 | $30,000 | $49,860 | $48,760 | $83,336 | $30,000 | $49,860 | $48,760 | $83,336 |

| Change | | |
|---|---|---|
| 5 Years, 2011-2015 | -5.99% |
| 10 Years, 2006-2015 | -15.55% |
| 15 Years, 2001-2015 | -11.99% |



**Median Pay**



**Change in Pay**



**2015 Pay Distribution**

*Dollars in figures are in thousands.*

**Source:** *Statement of Disbursements of the House*, as collated by LegiStorm, various years, and CRS calculations. Tabular change is based on change in median pay for the periods noted. In the visualizations, position pay information based on constant 2016 dollars in thousands of dollars, or change in those levels, is presented in green. Detailed information about data sources is available above in "Data Tables and Visualizations."

HC001172

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Staff Pay Levels for Selected Positions in House Member Offices, 2001-2015*

### Table 12. Press Secretary/Communications Director

| Year | Observations | Nominal $ | | | | Constant $ | | | |
|------|--------------|-----------|---------|---------|----------|------------|---------|---------|----------|
| | | Minimum | Average | Median | Maximum | Minimum | Average | Median | Maximum |
| 2001 | 45 | $29,000 | $54,897 | $52,083 | $99,020 | $39,100 | $74,016 | $70,223 | $133,508 |
| 2002 | 45 | $37,226 | $58,411 | $57,625 | $95,527 | $49,410 | $77,530 | $76,486 | $126,793 |
| 2003 | 45 | $32,668 | $59,875 | $59,000 | $93,000 | $42,394 | $77,701 | $76,566 | $120,689 |
| 2004 | 45 | $32,378 | $59,282 | $56,000 | $93,500 | $40,928 | $74,936 | $70,788 | $118,190 |
| 2005 | 45 | $41,739 | $65,916 | $65,000 | $101,000 | $51,032 | $80,592 | $79,472 | $123,487 |
| 2006 | 45 | $29,010 | $62,757 | $62,500 | $111,188 | $34,360 | $74,332 | $74,027 | $131,695 |
| 2007 | 45 | $36,281 | $67,472 | $69,000 | $110,000 | $41,782 | $77,703 | $79,463 | $126,680 |
| 2008 | 45 | $40,000 | $70,609 | $69,948 | $112,860 | $44,362 | $78,309 | $77,576 | $125,168 |
| 2009 | 45 | $40,400 | $72,711 | $69,174 | $128,992 | $44,966 | $80,928 | $76,991 | $143,569 |
| 2010 | 45 | $46,000 | $72,512 | $67,250 | $132,596 | $50,372 | $79,404 | $73,642 | $145,199 |
| 2011 | 45 | $48,000 | $76,528 | $76,000 | $120,000 | $50,954 | $81,238 | $80,677 | $127,385 |
| 2012 | 45 | $29,959 | $74,514 | $73,167 | $121,805 | $31,157 | $77,496 | $76,095 | $126,680 |
| 2013 | 45 | $36,439 | $70,351 | $65,000 | $124,861 | $37,350 | $72,110 | $66,625 | $127,983 |
| 2014 | 45 | $42,500 | $73,199 | $72,000 | $124,233 | $42,816 | $73,744 | $72,536 | $125,158 |
| 2015 | 45 | $43,878 | $69,302 | $67,000 | $108,333 | $43,878 | $69,302 | $67,000 | $108,333 |

| Change | 5 Years, 2011-2015 | -16.95% |
|--------|--------------------|---------|
| | 10 Years, 2006-2015 | -9.49% |
| | 15 Years, 2001-2015 | -4.59% |



**Median Pay**



**Change In Pay**



**2015 Pay Distribution**

*Dollars in figures are in thousands.*

**Source:** *Statement of Disbursements of the House,* as collated by LegiStorm, various years, and CRS calculations. Tabular change is based on change in median pay for the periods noted. In the visualizations, position pay information based on constant 2016 dollars in thousands of dollars, or change in those levels, is presented in green. Detailed information about data sources is available above in "Data Tables and Visualizations."