Case No. 1:19-cv-01314-TNM

# ATTACHMENT Q



# Transcript of Nina Andrews

**Date:** March 25, 2020
**Case:** Small -v- Office of Congressman

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## Page 1

```
        UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - -x
KRISTIE SMALL,                    : Case No.
    Plaintiff,                    : 1:19-cv-1314-TNM
v.                                :
OFFICE OF CONGRESSMAN HENRY       :
CUELLAR,                          :
    Defendant.                    :
- - - - - - - - - - - - - - - - - -x

              DEPOSITION OF NINA ANDREWS
                  CONDUCTED VIRTUALLY
                Wednesday, March 25, 2020
                    11:24 a.m. PST




Job No.:  293143
Pages:  1 - 117
Reported By:  Charlotte Lacey, RPR, CSR No. 14224
```

## Page 2

    DEPOSITION OF NINA ANDREWS, CONDUCTED VIRTUALLY




    Pursuant to subpoena, before Charlotte Lacey,
    Certified Shorthand Reporter, in and for the State of
    California.

## Page 3

```
                    A P P E A R A N C E S

ON BEHALF OF PLAINTIFF KRISTIE SMALL:
    TAMARA SLATER, ESQUIRE
    SARA McDONOUGH, ESQUIRE
    ALAN LESCHT AND ASSOCIATES, PC
    1825 K Street, Northwest, Suite 750
    Washington, D.C.  20006
    (202) 463-6036


ON BEHALF OF DEFENDANT OFFICE OF CONGRESSMAN HENRY
CUELLAR:
    TREVOR ST. GEORGE BLAKE, II, ESQUIRE
    MARK STEWART HAYES, ESQUIRE
    U.S. HOUSE OF REPRESENTATIVES
    OFFICE OF HOUSE EMPLOYMENT COUNSEL
    4300 O'Neill House Office Building
    Washington, D.C.  20515
    (202) 225-7075


ALSO PRESENT:
    Kristie Small
```

## Page 4

```
                      I N D E X
WITNESS                                            PAGE
NINA ANDREWS
Examination by            Ms. Slater                 6
Examination by            Mr. Blake                110


              I N D E X  O F  E X H I B I T S
EXHIBITS        DESCRIPTION                        PAGE
Exhibit 1    Subpoena to Produce Documents,          8
             Information, or Objects or to Permit
             Inspection of Premises in a Civil
             Action
Exhibit 2    Copy of handwritten statement, Bates   39
             number HC003604 through 614
```

**Page 9**

1  Q. Do you see that document?
2  A. If you'll give me one second. I'm
3  pulling that up.
4  Q. No problem.
5  A. And just to clarify which one you're
6  referencing, it's the handwritten statement; is
7  that correct?
8  Q. The other document.
9  A. Is that —
10 Q. Does that look like the subpoena that
11 you received?
12 A. Yes. Yes, I see that one.
13 Q. Okay. So the subpoena will be marked as
14 Exhibit 1. And do you understand that under that
15 subpoena, you must -- you were asked -- you were
16 asked and required to produce all documents from
17 the specified time period and relating to the
18 specified topics, even if those documents are from
19 or on a personal phone, e-mail, computer, media
20 account, or other personal device or system?
21 A. Yes, I do understand that. And I did
22 the best I could to provide what was requested.

**Page 10**

1  Q. Are or were there any other responsive
2  documents that you no longer have access to?
3  A. Not that I know of, no.
4  Q. Okay. And are there any additional
5  documents that you did not provide to -- to the
6  House attorneys that you -- that you can think of
7  that would be responsive?
8  A. No. Not to my knowledge, no.
9  Q. Okay. Great.
10    All right. Who is your current
11 employer?
12 A. Congressman Henry Cuellar.
13 Q. And when did you start working for
14 Congressman Cuellar?
15 A. With my current term of employment with
16 him, it was December of 2017.
17 Q. And you had a prior term of employment
18 with him; is that correct?
19 A. Correct.
20 Q. And what was that -- what was that term?
21 When did that start and end?
22 A. Twice. I worked for him directly out of

**Page 11**

1  college from April of 2007 to February 2008. And
2  then I also worked for him from August of 2016 to
3  December of 2016.
4  Q. Okay. Okay. What was your -- what was
5  your job title during that first period, the
6  April 2007 to February 2008?
7  A. I was executive assistant.
8  Q. And then, the second, what was your job
9  title August 2016 through December 2016?
10 A. My title was office manager.
11 Q. Okay. And then what was your job
12 title -- or what is your job title currently?
13 A. My title currently is special assistant.
14 Q. And is that -- was that your position as
15 of December 2017 when you -- when this current
16 term parted?
17 A. Yes, ma'am.
18 Q. Okay. As special assistant, what --
19 what are your job duties?
20 A. You name it. I am essentially a
21 catchall. I can do any and all. Basically, any
22 required duties that are falling through the

**Page 12**

1  cracks and that haven't been followed up on.
2  Q. Okay. So is that any duties relating
3  to -- to anything happening with -- within the
4  congressman's office?
5  A. Within defining — how would that be
6  defined?
7  Q. Let's see. Would any -- would those
8  tasks include things relating to, for example,
9  campaign -- campaign-related projects?
10 A. That wouldn't necessarily be a
11 responsibility. That would be more of a volunteer
12 effort. Yes, I have engaged in campaign
13 activities for him on my own time, yes.
14 Q. Okay. But that would be on your own
15 time, so --
16 A. Yes.
17 Q. Okay. Okay. Let me bounce back to when
18 you left in December 2016. Did you voluntarily
19 leave the office in -- at that time?
20 A. I would — I would say it was a mutual
21 agreement to dissolve.
22 Q. Okay. And what was the reason?

**Page 37**

1  helpful."
2      That's all.
3  Q. Okay.
4  A. It wasn't a directive.
5  Q. Go ahead. Sorry.
6  A. I apologize. It wasn't a directive.
7  Q. So just -- just to be clear. I
8  understand it sounds like some of these
9  conversations were -- were informal. So did --
10 was this collecting of statements on your own --
11 entirely on your own initiative?
12 A. It came about because there were so many
13 conversations and so many instances, like one that
14 I had never heard about until after she was gone.
15 And so it was -- it was kind of just a -- I guess
16 a team effort of like -- like, "Hey, just while
17 you're -- while you're thinking about this and
18 while it is current and fresh in your mind, just
19 write it down." And it wasn't -- it wasn't
20 demanded. It was just offered.
21 Q. Okay. So you say it's a team effort.
22 Who -- amongst who? Who was the -- the team?

**Page 38**

1  A. The entire team.
2  Q. So all of the staff? All of the
3  congressman's employees?
4  A. In passing. Also, again, to remind you,
5  it's a cage of ten people, like --
6  Q. Okay.
7  A. There's a lot of overlapping
8  conversations day to day.
9  Q. Was -- did Colin Strother ever ask you
10 to provide a statement or -- or to see if other
11 staff members wanted to provide statements about
12 Kristie?
13 A. I'm sorry. Did who?
14 Q. Colin Strother?
15 A. I -- I know I -- I don't recall him
16 asking me specifically.
17 Q. Do you recall having a conversation with
18 him about -- about these statements, either your
19 own statement or other -- other staff members'
20 statements about Kristie following her
21 termination?
22 A. No. Colin is a little bit of a -- I

**Page 39**

1  don't know what to call it. Like, no, that would
2  not have been something that he would have asked
3  me.
4  Q. So did -- so, just to be clear, did he
5  ask you?
6  A. No, he did not. And that is not
7  something that he would have done. Like, it's not
8  his place.
9  Q. Okay. So I would like to turn your
10 attention to your statement, which I want to mark
11 as Exhibit 2.
12     (Deposition Exhibit 2 was marked for
13 identification.)
14 Q. Do you have that document in front of
15 you?
16 A. Yes, ma'am. Give me one second.
17     Yes, I have it here.
18 Q. Okay. Great.
19     Is this -- so is this the statement that
20 you -- that you wrote?
21 A. Yes, ma'am.
22 Q. Was this a statement -- when did you

**Page 40**

1  write it?
2  A. I couldn't -- I couldn't give you a
3  specific date. I would -- I would maybe
4  pinpoint -- actually, I think it was late -- late
5  November.
6  Q. Okay. And did you write this statement
7  by yourself?
8  A. Yes, ma'am.
9  Q. Did you talk to anybody about what you
10 planned to write?
11 A. No. They were just simply recollections
12 of incidents.
13 Q. Okay. And did anyone make any edits or
14 suggestions about the content of the statement?
15 A. No. That's why I did it in handwriting.
16 Q. Okay. And then who did you give the
17 statement to?
18 A. I -- I did provide it to the
19 congressman. I provided it to...
20     I think that's...
21     I honestly think that's the only person
22 I provided it to directly.

**69**

1  when persons asked me, like, "What -- what did she
2  actually do?"
3　　　　I'm like, "I saw her edit one thing one
4  time. That's it. That's all I can speak to."
5　　Q.　But you wouldn't have seen every
6  document that Kristie would have been asked to
7  edit; is that correct?
8　　A.　No, I haven't seen every one, but I have
9  a good relationship enough with my staff that they
10 pointed it out.
11　　Q.　Are there specific -- are there specific
12 products that -- that Kristie failed to edit? Or
13 what were specific products that she failed to
14 edit?
15　　A.　Multiple.
16　　Q.　What's -- what's the first one you
17 recall knowing of?
18　　A.　The first...
19　　　　It just became a trend the whole summer.
20 The first one, I would say -- I would say a lot
21 of -- a lot of scheduling, a lot of grants,
22 notifications, a lot of district scheduling, a lot

**70**

1  of press releases and check-offs, like last
2  sign-off. Like, she should be — she should have
3  been the last sign-off on anything before it went
4  to the congressman at that point. And that rarely
5  happened, because she didn't actually review the
6  document.
7　　Q.　So how did you know that she wasn't
8  reviewing the documents?
9　　A.　Because rudimentary mistakes were not
10 caught. So, clearly, it was not read before it
11 was handed over to the boss.
12　　Q.　Okay. Did you -- did you ever tell --
13 did you tell the congressman that you didn't think
14 Kristie was editing media materials?
15　　A.　No, I didn't have to tell him. He was
16 aware.
17　　Q.　How do you know that he was aware?
18　　A.　He — he could tell, I think, by
19 complaints by other staffers.
20　　Q.　Did you know that other staffers
21 complained? To the congressman.
22　　A.　Yes, because they would have to directly

**71**

1  submit -- via e-mail, directly submit and say,
2  "Kristie had not signed off yet. Here is
3  Exhibit A." Or, you know, whatever document he's
4  requesting.
5　　Q.　Okay. And just to be clear, the -- the
6  documents that were being sent to the congressman
7  with mistakes were not drafted by Kristie; is that
8  right?
9　　A.　No, no. I don't think she ever drafted
10 anything.
11　　Q.　Okay. So there were other -- other
12 staff that had made the initial mistakes, right?
13　　A.　Correct. But because of her not leaning
14 in, it was -- they weren't caught. And then they
15 got sent to the boss without catching. And then,
16 of course, he catches it. And then we all get in
17 trouble.
18　　Q.　In a -- so you mentioned that there was
19 the three-eyes rule where Kristie would have been
20 one set of eyes. What about the other -- what
21 about the other people in the office who -- you
22 know, there would have been at least one other

**72**

1  person that was expected to review any document;
2  is that right?
3　　A.　She should have been the final and
4  foremost. At the time, she should have been the
5  final and foremost set of eyes on anything. But
6  just — just being professional, you don't send
7  something to your boss without making sure it's
8  perfect. You know, like, you don't —
9　　Q.　No, I understand.
10　　A.　Okay.
11　　Q.　But she wasn't the only person that was
12 reviewing -- that was supposed to review
13 documents; is that correct?
14　　A.　No, we — we can all review each other's
15 documents. Like, we're a team. But, that being
16 said, she's the final — or, at the time, she was.
17 And she did not.
18　　Q.　Okay. So just -- just so I understand
19 what the three-eyes rule is, so by the time a
20 document got to Kristie, it should have been
21 reviewed by two other people; is that right?
22　　A.　Correct.

89

1  A.  My access to being an administrator.
2  Q.  Okay. I understand. So it wasn't just
3  Juan's e-mails. It was -- it was your status as
4  the administrator that had been revoked; is that
5  correct?
6  A.  Yes.
7  Q.  Okay. And did you ever talk to the
8  congressman about your -- about either of these
9  things, about your access to Juan's e-mails being
10 blocked or your -- or your administrator status
11 being revoked?
12 A.  He addressed it with me. I gave him
13 clarification as to what the situation was,
14 reminded him of the facts, and — and that — he
15 elected to let Kristie make her decision.
16 Q.  Okay. So he let her decision stand; is
17 that correct?
18 A.  Yes, he did.
19 Q.  Okay. So more -- more, generally, I
20 know I've asked you a number of times about
21 specific incidents, but more generally during
22 Kristie's employment, did you ever complain to the

90

1  congressman about -- about Kristie?
2  A.  Not that I specifically recall. I — it
3  was notable enough that I didn't necessarily need
4  to complain.
5  Q.  Okay. So your impression was that you
6  didn't need to complain. Did -- did -- why was
7  that?
8  A.  Because her actions were highly
9  observable by everyone in the office and —
10 Q.  Okay.
11 A.  — as well him.
12 Q.  Okay. But the congressman never
13 mentioned anything to you about -- about the
14 conduct that concerned you, about Kristie's --
15 about Kristie's performance?
16 A.  The only incident that he directly
17 mentioned to me was her pulling Travis into the
18 hallway for about three minutes before pulling him
19 into the office as was requested.
20 Q.  Okay.
21 A.  That's the only time he ever addressed
22 her performance with me.

91

1  Q.  Are you aware of anybody else
2  complaining to the congressman about Kristie's
3  performance? Prior to her termination.
4  A.  I'm sorry. Your last — your last
5  phrase?
6  Q.  Prior to her termination. Are you aware
7  of anybody else complaining to the congressman
8  about Kristie's performance prior to her
9  termination?
10 A.  I don't believe that her and
11 Ms. Hernandez had the best relationship.
12 Q.  Okay. But are you aware of
13 Ms. Hernandez saying anything to the congressman
14 about Kristie?
15 A.  I overheard statements, sure, but no
16 firsthand information.
17 Q.  Okay. Did the congressman ever ask you
18 about -- about Kristie's performance?
19 A.  No. It was notable enough that there
20 was no need to ask.
21 Q.  But, again, you're just saying that
22 based on your perception. The congressman never

92

1  said something to you indicating that he shared
2  your concerns about her performance; is that
3  correct?
4  A.  These are not my concerns. They were my
5  observations.
6  Q.  Okay. But he never said anything to you
7  explicitly that indicated that he shared your
8  observations; is that accurate?
9  A.  With all due respect, I — my personal
10 opinion is that Congressman, knowing that her and
11 I had previously been very close friends, was
12 attempting to protect me from attempting to be a
13 part of this process, knowing that he had no
14 intention of continuing along with her employment
15 but not wanting to put me in an uncomfortable
16 situation. That's — that's my perspective and my
17 opinion. So I think he went out of his way to not
18 mention his challenges with her. But they were
19 very evident.
20 Q.  Did he say anything to you to indicate
21 that he was trying to shield you from some of
22 those comments, those conversations?

**101**

1 A. No. No. That was — that was very
2 unusual and very specific.
3 Q. And when you say it's unusual, but --
4 A. Unusual as in — yes. So Taste of
5 Laredo, like, that was an extraordinary day. I
6 did volunteer, like, two to three hours of my time
7 to help re-facilitate the event. And I did do a
8 walk-through. And I have receipts for lunch,
9 buying the team lunch — not the team, but, like,
10 just a helper and Vanessa, all three of us lunch
11 that day to do a walk-through. And that is it.
12 Q. Okay. Well, you know, even if it's an
13 unusual circumstance, would that -- would that be
14 included in -- in this sort of expectation that
15 people -- that staff fully participate in what the
16 congressman needs from them?
17 A. It's not demanded in no way, no.
18 Q. Okay. Do you think he -- do you think
19 he ever makes unreasonable demands on his
20 employees?
21 A. I think he's challenging, but I don't
22 think it's unrealistic.

**102**

1 Q. I guess the question was unreasonable.
2 Are the demands ever unreasonable?
3 A. That's up to the individual's
4 perspective at the definition of unreasonable.
5 Q. Okay. So under your -- you know, your
6 perspective is what I'm asking for.
7 A. No.
8 Q. Okay. Do you think -- do you have
9 colleagues that think that his demands are
10 unreasonable?
11 A. I wouldn't say that they believe they're
12 unreasonable. My — my perspective is that they
13 would perceive them as taxing, but, yet,
14 understandable.
15 Q. Okay. Okay. Did you ever hear any
16 rumors about the congressman having romantic or
17 sexual relationships with employees?
18 A. I — I have not, no.
19 Q. Okay. Do you know of the congressman
20 ever having romantic or sexual relationships with
21 employees?
22 A. I — I do not know and can't speak to

**103**

1 that.
2 Q. What do you mean you can't speak to
3 that?
4 A. I -- I have no firsthand knowledge or
5 any awareness of -- of that being the situation.
6 Q. Okay. Bouncing back a little bit to
7 your work experience in between your -- your terms
8 with the congressman, who did you -- who did you
9 work for immediately before your current
10 employment with -- with Congressman Cuellar?
11 A. I worked for an interim period of time
12 for Joel White with Horizon Government Affairs.
13 Q. And then who else -- was there anyone
14 before that? Who else did you -- have you worked
15 for other than Congressman Cuellar -- well, let me
16 start that over.
17 Is there another congressperson that you
18 have worked for?
19 A. Yes. I've worked for Congressman
20 Marchant, Kenny Marchant from Southlake, Texas.
21 I've worked for Congressman Ted Poe of Houston,
22 Texas, too. And I've worked for Rubén Hinojosa,

**104**

1 Texas 15.
2 Q. Okay. And when did you -- what time
3 periods did you work for each of those three
4 congresspeople?
5 A. I am a happy to send you my resume. I
6 began with Congressman Marchant. He was —
7 kindly, willingly, and gracious to accept me as an
8 intern. I worked for him for four months.
9 Congressman hired me in April of 2007, and I
10 worked for Congressman from April of 2007 to, I
11 believe — I believe February of 2008.
12 I was employed by Congressman Ted Poe
13 from February of 2008 to, give or take, April or
14 May of 2009.
15 I began work with Congressman Hinojosa
16 in June of 2009. And I was released from his
17 employment in November or December of 2009.
18 Q. Okay. Thank you.
19 Did you -- have you ever signed a
20 settlement or a severance agreement in connection
21 with leaving a job?
22 A. Could you define "severance"?