Case No. 1:19-cv-01314-TNM

# **ATTACHMENT Z**



# Transcript of Travis Knight

**Date:** March 25, 2020
**Case:** Small -v- Office of Congressman

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

### Page 1

```
            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - -x
KRISTIE SMALL,                   : Case No.
     Plaintiff,                  : 1:19-cv-1314-TNM
v.                               :
OFFICE OF CONGRESSMAN HENRY      :
CUELLAR,                         :
     Defendant.                  :
- - - - - - - - - - - - - - - - -x

            DEPOSITION OF TRAVIS KNIGHT
                 CONDUCTED VIRTUALLY
               Wednesday, March 25, 2020
                     9:02 a.m. PST




Job No.: 293143
Pages: 1 - 96
Reported By: Charlotte Lacey, RPR, CSR No. 14224
```

### Page 2

```
      DEPOSITION OF TRAVIS KNIGHT, CONDUCTED VIRTUALLY



     Pursuant to subpoena, before Charlotte Lacey,
Certified Shorthand Reporter, in and for the State of
California.
```

### Page 3

```
                    A P P E A R A N C E S
ON BEHALF OF PLAINTIFF KRISTIE SMALL:
     SARA McDONOUGH, ESQUIRE
     TAMARA SLATER, ESQUIRE
     ALAN LESCHT AND ASSOCIATES, PC
     1825 K Street, Northwest, Suite 750
     Washington, D.C.  20006
     (202) 463-6036


ON BEHALF OF DEFENDANT OFFICE OF CONGRESSMAN HENRY
CUELLAR:
     TREVOR ST. GEORGE BLAKE, II, ESQUIRE
     MARK STEWART HAYES, ESQUIRE
     U.S. HOUSE OF REPRESENTATIVES
     OFFICE OF HOUSE EMPLOYMENT COUNSEL
     4300 O'Neill House Office Building
     Washington, D.C.  20515
     (202) 225-7075


ALSO PRESENT:
     Kristie Small
```

### Page 4

```
                    I N D E X
WITNESS                                         PAGE
TRAVIS KNIGHT
Examination by        Ms. McDonough              5
Examination by        Mr. Blake                  89
Further Examination by   Ms. McDonough           94


              I N D E X  O F  E X H I B I T S
EXHIBITS         DESCRIPTION                    PAGE
Exhibit 1     Subpoena to Produce Documents,      7
              Information, or Objects or to Permit
              Inspection of Premises in a Civil
              Action
Exhibit 2     Typewritten statement dated         35
              7/8/2019, Bates number HC003615
              through 619
```

---

**37**

1  you ever taken notes or put anything in writing
2  about Kristie?
3    A.  No.
4    Q.  Did anyone else ever ask you to provide
5  information or a statement about Kristie?
6    A.  Besides Colin in that phone call we were
7  talking about earlier, no.
8    Q.  Have you ever served as the
9  congressman's chief of staff?
10   A.  No.
11   Q.  Or his deputy chief of staff?
12   A.  No.
13   Q.  Have you ever served as chief or deputy
14 chief of staff for any congressman or
15 congresswoman?
16   A.  No.
17   Q.  So I'd like to take a look at the
18 statement you wrote and ask you some questions
19 about it.  You wrote in the statement that Kristie
20 never seemed to fully comprehend the subject
21 matter presented for her review.
22   A.  Yeah.

**38**

1    Q.  When was the first time that you believe
2  Kristie didn't fully comprehend subject matter?
3    A.  So that was definitely based on myself
4  becoming familiar with the subject matter since we
5  started at the same time.  But I mentioned in my
6  first observation that I observed a conversation
7  that she had over the phone.  That's -- that's the
8  first time that sticks out to me in my
9  recollection.
10       But -- but, generally, since the
11 congressman's on the appropriations committee, I
12 certainly was probably recognizing at some point
13 before that that she didn't really understand how
14 appropriations worked, generally.
15   Q.  Okay.  So when -- when was the earliest
16 that you can remember or that you thought she
17 didn't understand?
18   A.  Late July.
19   Q.  Late July.
20       What was it that you thought she didn't
21 understand in late July?
22   A.  That -- that was the phone call that I

**39**

1  was just referring to.  It was -- it was
2  legislation that the congressman was lead democrat
3  on and already signed onto.  And when you're --
4  when you're a lead democrat, an original
5  cosponsor, your name is actually printed on the
6  bill text.  And she was advising him to withdraw
7  his support, which was something that some people
8  in his district were asking for too.
9        And she didn't seem to understand that,
10 one, this was well-established policy for him, for
11 starters; and that, two, as an original cosponsor
12 and lead democrat, it's out of the question for
13 the congressman to remove his support at that
14 point.
15   Q.  And what -- when was the next time that
16 you observed Kristie failing to comprehend subject
17 matter?
18   A.  Nothing sticks out as specifically as
19 that, but regular course would be e-mails from the
20 boss asking for her input on press or talking
21 points and her -- she would reach out or discuss
22 it with Zack or I or Juan the next day to ask us

**40**

1  questions about what we thought about what she
2  should say to the congressman.  Which obviously
3  reflected that she didn't know the answer, and
4  these are all simple things that I consider to be
5  very straightforward.
6    Q.  I'm sorry.  You said they were e-mails
7  from who?
8    A.  So the boss would e-mail staff --
9    Q.  Oh.  From the boss?
10   A.  Yeah, yeah.  So he would -- he would --
11   Q.  Okay.
12   A.  -- send out an e-mail asking for
13 Kristie's input.  And she would often pull Zack or
14 Juan or I aside to ask us how should she respond,
15 which, to me, indicated that she didn't have a
16 personal understanding of -- of the policies.
17   Q.  When was the first time Kristie did
18 that?
19   A.  I would be -- I would be speculating if
20 I gave you a specific time.  But I can -- I can
21 tell you with certainty that it was a consistent
22 thing that I started to notice at the very least

49

1  agendas and demands is the wording you used.
2      A.  So the demands, she -- she would often
3  voice frustration about his work demands on staff.
4  So to staff not to --
5      Q.  When did she do that?
6      A.  -- him directly that I saw.
7          She did that -- I'm trying to think of a
8  specific example again.  And the one that comes to
9  mind is -- and I can't remember when this
10 happened.  I'm sure Dean could give you a better
11 timeline on it.  But she believed that all staff
12 should, essentially, I think, get a raise and was
13 calculating -- she -- she was tallying -- and the
14 reason I know this is she actually had me do the
15 math.  She was tallying what she perceived to be
16 our actual hours worked.  And this was either to
17 get us a raise or, actually, it might have been in
18 order to get us more paid leave.
19         But she was tallying what she believed
20 to be our actual hours worked.  And then, you
21 know, a comparative ratio to -- to what our -- our
22 listed hours were, official hours, and trying to

50

1  increase it by that same ratio to a higher amount
2  of leave time.  So it was leave time, not a raise.
3  I believe.
4      Q.  And when was that?
5      A.  Again, I -- I don't want to just throw
6  out a month.  This would have been most likely
7  during the August recess.
8      Q.  And so how do you know that Kristie was
9  frustrated about it?
10     A.  Because she would say that you all work
11 too hard and too much and you deserve more time
12 off.  Yeah.
13     Q.  And who did she say that to?
14     A.  Me.
15     Q.  Anybody else?
16     A.  Madeline might have been in the room.
17     Q.  So is it fair to say that she was -- she
18 was advocating for staff to get more time off?
19     A.  She was.
20     Q.  When was the next time that Kristie
21 voiced frustration?
22     A.  Again, August recess.  At least on a

51

1  weekly basis.  Often on Fridays.  So pretty much
2  pick any Friday during the August recess.  We
3  would have a call with the congressman and
4  district staff.  And those calls are pretty
5  demanding in terms of answering his logistical
6  questions.  And after those calls were concluded,
7  she would, you know, very bluntly state that she
8  thought he was being ridiculous.
9      Q.  My understanding is that the congressman
10 was a pretty difficult person to work for, that he
11 was demanding.
12     A.  Yeah.  Kristie --
13     Q.  Would you disagree with that?
14     A.  She wasn't wrong.  No.  He's a tough
15 boss.  That's for certain.
16     Q.  Were there any other times that Kristie
17 voiced frustration?
18     A.  Yes.  Like I said, you could pick any
19 Friday pretty much in August.
20     Q.  Okay.  So aside from saying that the
21 congressman was being ridiculous or that he was
22 too demanding, what else did Kristie say to voice

52

1  frustration?
2      A.  So, with regards to the paid leave, she
3  voiced frustration about us working too much.
4  With regards to logistical questions, she found
5  him to be too demanding and ridiculous in his need
6  for detailed answers.  And...
7          I suppose those kind of broadly sum it
8  up.  Again, I'll try to think of more specifics
9  for you, but those were the primary ones.
10     Q.  So is there anything that would help you
11 recall specific times when Kristie voiced
12 frustration?
13     A.  Just taking time to think about it, I
14 suppose.  Nothing else I can think of.
15     Q.  When was the first time Kristie
16 criticized the congressman in his presence?
17     A.  I don't recall her ever doing it in his
18 presence, when I was there to observe it at least.
19     Q.  So, I mean, is it -- are you saying --
20 so, as far as you know, did she criticize the
21 congressman in his presence?
22     A.  Not that I know of, besides maybe over

**Page 57**

Q. Okay. So what exactly did Kristie say?
A. "You don't need to do that."
Q. And she -- she said, "You don't need to add the -- the drive times"?
Or, I mean, like, how do you know for a fact she was referring to the drive times?
A. I think -- well, again, I don't want to speculate, but it was either part of an exchange that her and Madeline were having about that -- those drive times and that specific request or she said specifically to disregard the drive times, but it was clear to me what she was referring to.
Q. I mean, like, do you know that for a fact or are you making that -- are you assuming that?
A. No, I'm -- assuming what?
Q. Assuming that Kristie was telling Madeline not to add the drive times?
A. I know for a fact, but I can't give you a quoted exchange.
Q. And so then did you tell the congressman about that?

**Page 58**

A. No.
Q. Why not?
A. 'Cause I also found it somewhat ridiculous. And, also, because Kristie was my superior.
Q. What did you find ridiculous, that the congressman had asked Madeline to add the drive times to his agenda?
A. Yes.
Q. When was the next time that Kristie undermined the congressman?
A. Nothing specific sticks out.
Q. Were there any other times that Kristie told Madeline not to do something that the congressman had specifically instructed her to do?
A. Not that I can specifically recall, no.
Q. Anything that you can generally recall?
A. No.
Q. Is there anything that would help you recall?
A. Probably discussing it with Madeline, but that would be it.

**Page 59**

Q. When was the first time that Kristie left the office around noon when the congressman wasn't in DC?
A. I don't want to speculate about a specific date again. But -- let's see. In my recollection, it seemed to occur often during all the recess periods.
Q. So you're talking about August?
A. Definitely August.
Q. And so how often did Kristie leave work around noon during August?
A. I don't have a specific count, but it felt like probably three times a week, I'd say, if we were out for an entire week.
Q. Okay. So you think three times a week during each week in August?
A. I don't want to -- to speculate because, again, you know, this is just an impression I have in my recollection. But -- so she would certainly consistently leave around noon, but the actual count per week I can't be certain of. But I know that it was about three times a week, if I were to

**Page 60**

put a number on it.
Q. And what about before or after August?
A. What I would do is probably just simply look at a calendar from that congressional period. And, again, if we were on recess, it's assured that she left the office around -- early without speaking to staff at some point during that week and most likely about three times, but I can't -- I can't give you, you know, actual dates.
Q. And how do you know that? Or, I mean, how is it that you remember this, you know, two years later? Did you take notes or...
A. No. I just remember during the time when we started to notice it, at first, we would then continue to expect it. And then it would be confirmed that each of those weeks she would, at some point, multiple days in that same week, you know, suddenly be not in the office.
Q. So about three days a week each week in August, she was leaving work, it was always around noon?
A. Yeah, we would -- we would often have

**61**

staff calls with the congressman, just brief ones, in the mornings. So I remember her being there in the mornings often. And if she were to leave, it would be in the afternoon.

Q. And how do you know that she left for the day?

A. Well, I would leave the office around 6:00, and she wouldn't have returned by then.

Q. And you're certain?

A. Yeah, I'm certain.

Q. And so when did you report this to the congressman?

A. Oh, I never did.

Q. Why not?

A. I didn't want to get Kristie in trouble. And she was my superior. So it felt inappropriate for me to report my superior for that kind of an issue.

Q. But she was -- I mean, it sounds like she was basically working kind of halftime. And she was the deputy chief of staff. You didn't think that was important enough to talk to the

**62**

congressman about?

A. You know, I -- I didn't want to get my boss in any trouble, no. And we were managing fine without her, so I did not report it.

Q. So do you know for -- do you know for a fact that Kristie was not working when she was not at the office?

A. No, I do not know that for a fact.

Q. And Kristie was pregnant at this time, right?

A. Yes, she was. Yeah, she was.

Q. So you -- you don't know if or when she was leaving the office for doctor's appointments, do you?

A. No, I do not. She would occasionally let us know specifically when she was leaving for any sort of appointment, doctor or -- or errands or whatever it might be. So she -- there were -- there were more often times where she would leave and not give us any heads up. But she certainly did flag appointments for us occasionally.

Q. But Kristie was your supervisor, right?

**63**

You were not her supervisor?

A. No, I'm not her supervisor, nor was I.

Q. So which staff members was Kristie -- Kristie supposed to tell when she left the office?

A. I don't think she was answerable to us at all. So, to my knowledge, she did not have to flag that for any of us.

Q. So when was the first time that you couldn't get ahold of Kristie when she was not at the office?

A. I can undoubtedly say that occurred multiple times during August and continued.

Q. When was the first time that you recall?

A. At some point during the month of August, but I don't have a specific date.

Q. Do you have any -- or can you think of any specific time where you tried to contact Kristie and couldn't get ahold of her?

A. The only specifics that I recall were that it would be in regards to getting her final approval on press that I had helped draft with Olya or on talking points for a grant -- grant

**64**

announcement.

Q. So which -- what were the talking points about, the list that you needed her approval for and couldn't get ahold of her?

A. Specifically -- let me see if I can think of one.

Specifically, I know that there was a Surface Transportation grant awarded to Via in San Antonio. I know that there was a Health Center Cluster grant award in -- outside of Laredo. And that was through HHS. Those are two specific ones that I remember.

Q. Do you remember any other work products where you needed Kristie's approval but couldn't get ahold of her?

A. Not in -- not in those -- not in such specifics. Again, it would have been press or talking points. The only two specific grants I know that I ran by her during that period were those two.

Q. So this service report transportation grant, when did you need her approval for that?

65

1   A. I don't have an exact date.
2   Q. So how did you try to get ahold of her?
3   Did you e-mail her, go to her office, call her,
4   text her?
5   A. I would have at least e-mailed her. And
6   there would have been at least one occasion --
7   there -- there would have been at least some
8   occasions where I texted her as well.
9   Q. But you don't have those text messages
10  anymore?
11  A. No, I do not.
12  Q. Did you delete them?
13  A. My phone has an automatic deletion
14  setting on it. And it -- it got automatically
15  deleted at some point.
16  Q. How often does it automatically delete
17  messages?
18  A. I think it saves them for one month.
19  Q. What about the health cluster grant
20  award, how did you contact Kristie on -- for
21  approval for that?
22  A. I would have -- I would have at least

66

1   e-mailed her, I would think, and either text or
2   called if I hadn't e-mailed her or if I had
3   e-mailed her and I hadn't gotten a response.
4   Q. And so for both of those work products,
5   you e-mailed her, but she didn't respond; is that
6   right?
7   A. It would have been either e-mails, and
8   she didn't respond, which would certainly be --
9   normally, you would start with an e-mail, but
10  depending on what time period it was at, I would
11  have maybe called her first to see if she was
12  available to receive the e-mail before sending it.
13  Q. And then can you think of any other
14  times?
15  A. No. I just don't want to speculate,
16  'cause I can -- I can think of other grants that
17  he was awarding to the district during that time,
18  but I don't know if they were specifically run by
19  Kristie or if -- or if she, you know, didn't
20  respond or whatever it was. I just know that it
21  occurred quite often.
22  Q. What do you mean by "quite often"?

67

1   A. I'd say the majority of the talking
2   points that we had for her approval were not
3   responded to during the recess period. Yeah.
4   Q. And how many?
5   A. He probably awarded -- he probably
6   awarded three to four, I'd say, per week during --
7   during any given recess week. But certainly we
8   tried to schedule a -- a great majority of them
9   that may have been awarded in the past during that
10  recess break because it's so long, and he'll be in
11  the district for such a long period.
12  Q. So you're saying there were, like, three
13  to four sets of talking points per week that were
14  sent to Kristie that she didn't respond to?
15  A. Three to four per week that she -- that
16  were sent to her for review. I can't say whether
17  or not she didn't respond to all of them. And she
18  certainly --
19  Q. And did --
20  A. -- she certainly did not not respond to
21  all of them. She definitely gave us feedback on a
22  handful of them. But, again, I would say the

68

1   majority of them went un-responded to. Yeah. And
2   then --
3   Q. And so then what -- what did you all do
4   if she didn't respond? Would you just go ahead
5   and submit them to the congressman?
6   A. Yeah. So, at that point, we sort of --
7   the adapted strategy we -- we ended up using was
8   to just get Juan's approval for the time he was
9   still there as legislative director. And then,
10  after he left, I'd have Zack look at mine. And --
11  and, to my understanding, Zack would just send
12  them directly to him.
13  Q. Did you tell the congressman that
14  Kristie wasn't reviewing all the talking points?
15  A. No.
16  Q. Why not?
17  A. Because, again, I didn't want to get her
18  in any trouble. And I found that not mentioning
19  it and cc'ing her, he probably assumed that she
20  had, but I don't know for certain.
21  Q. And so are there any other examples you
22  can think of where Kristie didn't respond or

69

1  didn't provide, you know, edits or feedback?
2      A.  No.  The talking points and press --
3      Q.  In your statement --
4      A.  -- were the -- were the primary for both
5  that we didn't get responses on.
6      Q.  I'm sorry.  The talking points and what?
7      A.  Press.
8      Q.  Okay.
9      A.  Talking press releases.
10     Q.  Okay.  So the talking points and the
11 press releases?
12     A.  Uh-huh.
13     Q.  Okay.  In your statement, you wrote that
14 it was assumed that Kristie would not be around
15 during recess.  Are you referring to her leaving
16 the office early, or was it something else?
17     A.  I -- I meant leave the office early;
18 that she couldn't -- she -- we wouldn't presume
19 her to be around for the entire given -- given day
20 during any given recess.
21     Q.  What are fly-out days?
22     A.  Those are days when the last votes have

70

1  occurred for that week, which is when the majority
2  of congresspersons fly home.  So they'll --
3  they'll vote and then they'll head to the airport.
4      Q.  So did the congressman typically leave
5  at the same time on all of those fly-out days, or
6  did it vary?
7      A.  It varied.
8      Q.  When is the first time that Kristie left
9  soon after the congressman on a fly-out day?
10     A.  When was the first time what?
11     Q.  That Kristie left the office shortly
12 after the congressman did on a fly-out day.
13     A.  Oh.  I couldn't -- I couldn't give you
14 an exact date.
15     Q.  An approximate date?
16     A.  Certainly after August.  September.
17     Q.  After August?  Okay.  So in September?
18     A.  Yeah.  When we were back in session.
19     Q.  And what time did Kristie leave?
20     A.  I'd be speculating.
21     Q.  About how long after the congressman
22 left did Kristie leave?

71

1      A.  I don't want to speculate.  Again, you
2  know, my impression was it was probably 30 minutes
3  to an hour after he would depart the office with
4  Madeline to go to the airport, but I can't give
5  you a firm amount of time.
6      Q.  And on how many fly-out days did Kristie
7  leave shortly after the congressman did?
8      A.  I don't have an exact number.
9      Q.  What about a range?
10     A.  I don't -- I don't want to speculate,
11 you know.  I'll tell you it was more than two.
12     Q.  Was it more than five?
13     A.  I'd be speculating.
14     Q.  Was it more than ten?
15     A.  I don't think she was around for ten
16 fly-out days after August.
17     Q.  Would you say it was every time, every
18 other time?
19     A.  I'd be speculating.
20     Q.  And how did you know that Kristie left
21 for the day?
22     A.  Again, I would leave the office around

72

1  6:00, and she wouldn't be back by then.  So...
2      Q.  So when you would leave the office at
3  6:00, would you go in and check in with her and...
4      A.  I'd go and check in with Madeline, and
5  she wouldn't be in there.
6      Q.  And so how do you know that Kristie
7  actually had not been there the whole day?
8      A.  Well, she hadn't come back since she had
9  left.  And, I guess, I presumed if her purse
10 wasn't there, that she had left.
11     Q.  What time -- how late was Kristie
12 supposed to stay every day?
13     A.  We're all supposed to stay until 6:00
14 when we're out of sessions.
15     Q.  And so you know for a fact that Kristie
16 was required to stay until 6:00 every day?
17     A.  Unless she had worked out an -- an
18 exception with the congressman, all staff are
19 required to stay until 6:00.
20     Q.  So do you know for a fact that she had
21 not worked out some kind of arrangement or altered
22 schedule with the congressman?

73

1    A.  I do not, no.
2    Q.  And do you know if -- on the days when
3  she left after the congressman, do you know if --
4  that she was not taking approved leave?
5    A.  No, I do not know that.
6    Q.  And do you know for a fact that on those
7  days that there's no way she could have been
8  working remotely or at out-of-office meetings?
9    A.  Yeah, I don't know that for a fact.  No,
10 I do not.
11   Q.  So it looks like we've already talked
12 about Kristie not providing edits to documents.
13       Okay.  So you wrote "I believe she was
14 not reviewing any staff work with little exception
15 during her last two months at the office."
16       So what was it that Kristie was not
17 reviewing?
18   A.  Talking points and press releases.
19   Q.  So aside from the things that we've
20 already discussed, was there anything else?
21   A.  Nothing specific, no.
22   Q.  When was the first time that Kristie

74

1  accused Madeline of lack of planning, poor
2  performance, or general ineptitude?
3    A.  She would after those calls that I
4  mentioned during August when I was helping to
5  organize his grant announcement.  When those calls
6  would conclude, that's when I -- when I saw it at
7  least a couple of times.  And then Madeline would
8  report to us instances that I did not directly
9  observe.
10   Q.  Okay.  So what were the instances that
11 you directly observed?  When was the first one?
12   A.  It would be after the conclusion of one
13 of those calls.
14   Q.  In August?
15   A.  Yeah.
16   Q.  And so what did Kristie say?
17   A.  I don't remember anything specific.  But
18 I do recall that she would blame Madeline for not
19 anticipating the things that the congressman was
20 frustrated with.
21   Q.  But you don't -- I mean, you said "Lack
22 of planning, poor performance, general

75

1  ineptitude."
2        So did Kristie use any of those phrases?
3    A.  No.
4    Q.  Okay.  So those are your words?
5    A.  Those are my words characterizing her --
6  her criticisms of Madeline, yes.
7    Q.  And you don't remember any specific
8  comment that Kristie made criticizing Madeline?
9    A.  To quote her, I wouldn't want to
10 speculate on what exactly was said, but it was
11 very close to "Why didn't you do this?  Why didn't
12 you anticipate this?  You should have anticipated
13 this.  You should have done this."
14   Q.  And what was Kristie referring to?  What
15 was she saying Madeline should have anticipated?
16   A.  I don't want to speculate, again, but it
17 would be something small.  I know the drive time,
18 she shared that frustration.  So that wasn't a
19 critique.  But, you know, maybe -- I would just be
20 speculating, but it would be small details, like a
21 phone number for a point of contact not being in
22 there.  I can almost recall that specifically, but

76

1  I don't want to speculate, but it would be
2  something small.
3    Q.  So did Kristie ever say that Madeline
4  was a poor performer, like, in general?
5    A.  No, I don't think so.  I do think that's
6  my impression of that, and the reason I used that
7  word or that phrase is because that -- I think
8  that was the implication.  And, certainly,
9  Madeline was under the impression that that's what
10 Kristie thought.
11   Q.  So you mentioned this phone number for a
12 point of contact.  During the call, had the -- the
13 congressman asked for the phone number?
14   A.  If it had been some -- if it had been
15 the phone call in particular, he would have
16 mentioned it during the call.  But, again, it
17 would have been something small like a phone
18 number, not critical to the announcement itself,
19 but maybe important for logistics.  And he would
20 have mentioned it on the call, whether or not it
21 was actually a phone number or something like a
22 room number or an agenda having all of the people

Case 1:19-cv-01314-TNM   Document 20-29   Filed 05/22/20   Page 11 of 16

Transcript of Travis Knight
Conducted on March 25, 2020

24 (93 to 96)

93

1 more pressure. The hours are pretty consistent.
2     Q. Now, earlier, Ms. McDonough asked you
3 how you knew if Mrs. Small was not working when
4 she was not in the office; do you remember that?
5     A. Yes.
6     Q. And, you know, when Mrs. Small was not
7 in the office, did you ever have occasion to try
8 to contact her, whether by, you know, phone or
9 text or e-mail and have her not respond?
10    A. Yes.
11    Q. Okay. And when you are out of the --
12 when you are out of the office during working
13 hours, for instance, at lunch, for coffee, are you
14 generally available by phone or e-mail or some
15 other way to people in the office?
16    A. Yes.
17    Q. Okay. One more question -- line of
18 question. So in your statement when you
19 referenced feuding with Jessica and -- and that
20 Mrs. Small said about Madeline and/or Nina that
21 they're unreliable, what particularly bothered you
22 about those kind of open expressions of her, being

94

1 Mrs. Small, feelings about the work performance of
2 her subordinates to others?
3     A. Well, it was just that -- it was that
4 she outranked them and was sharing, you know, her
5 critiques with other junior staff.
6     Q. Okay. So you felt it was inappropriate
7 to do that?
8     A. I did.
9     Q. Okay. One more thing. When you were
10 out of the office, do you typically let
11 subordinates know that you're not going to be
12 around?
13    A. Yes, I certainly do.
14    Q. Okay. I don't have anything else right
15 now.
16         MS. McDONOUGH: Oh. Sorry. This is
17 Sara. I just have one follow-up question, Travis.
18         FURTHER EXAMINATION
19 BY MS. McDONOUGH:
20    Q. I just want to confirm that -- because I
21 know you thought of some other examples you
22 didn't -- you didn't mention in the statement, but

95

1 I just -- can you confirm that prior to Kristie's
2 firing that you never complained to the
3 congressman about any of the issues that we
4 discussed?
5     A. Yes, I -- I can confirm that.
6         MS. McDONOUGH: All right. That's all I
7 have. Thanks very much, Travis.
8         MR. BLAKE: Yeah. Thank you, Travis.
9         THE WITNESS: You're welcome. Thank
10 you.
11        (The deposition concluded at 11:07 a.m.)

96

1         CERTIFICATE OF SHORTHAND REPORTER
2
3     I, Charlotte Lacey, the officer before whom the
4 foregoing deposition was taken, do hereby certify that
5 the foregoing transcript is a true and correct record of
6 the testimony given; that said testimony was taken by me
7 stenographically and thereafter reduced to typewriting
8 under my direction; that reading and signing was not
9 requested; and that I am neither counsel for, related
10 to, nor employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13
14    IN WITNESS WHEREOF, I have hereunto subscribed my
15 hand this 6th of April, 2020.
16
17                    _____
18
19                    Charlotte Lacey, RPR, CSR #14224
20
21
22

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Travis Knight – Statements on Kristie Small's Employment            July 8, 2019

I, Travis Cowles Knight, am providing the following statements voluntarily. They concern my personal experiences and observations, during my employment in the U.S. House Offices of Congressman Henry Cuellar (TX-28). I am writing them in reference to events and subject matter, which I believe may be of relevance to the ongoing administrative proceedings/litigation, involving Congressman Cuellar's former Deputy Chief, Kristie Small.

- I currently serve as Congressman Cuellar's Legislative Director / Counsel in his Washington, D.C. office.
- I was hired by Congressman Cuellar in May 2018 to serve as his Legislative Assistant / Counsel in his D.C. office.
- I have been promoted twice during my employment in Congressman Cuellar's D.C. office: first to Senior Legislative Assistant / Counsel in January 2019, and most recently to Legislative Director / Counsel in May 2019.
- My duties primarily involve working to help enact the Congressman's legislative priorities on the U.S. House Appropriations Committee. In doing so, I work very closely with all of Congressman Cuellar's staff in the D.C. office, on a daily basis. I also have frequent contact with his District staff.

### Background/Brief Summary

- Kristie Small was hired shortly before me, as the Congressman's Deputy Chief of Staff. Her start date was approximately a week after mine. During her time in the office, the Congressman had no Chief of Staff, as I've come to learn is common procedure. Kristie was the highest-ranking staffer in his offices, during the entirety of her employment.
- I felt I had a good professional relationship with Kristie. As I accustomed myself to the D.C. office, I felt she supported me. I also felt she properly tailored expectations on my performance to match my relative inexperience in a Congressional office. She was always kind to me and understanding, as I strove, initially, to sufficiently fulfill my responsibilities. I still value her contributions to my career in this regard, and, in no small part, credit her with providing me time to develop and eventually find success on Capitol Hill.
- As I became more experienced, I was gradually able to recognize that Kristie was increasingly struggling within her own role. Especially as I grew to require less management and guidance, myself.
- As I've learned is standard practice, she was tasked with final review of the majority of deliverables drafted by legislative staff and press staff, before final approval by the Congressman. She never seemed to fully comprehend the subject matter presented for her review, and eventually ceased participation altogether.
- She was also tasked with maintenance of high-level policy guidance to staff. By this I mean how the Congressman defines his Congressional service via major policy initiatives. To my understanding, this is the basic role of any Chief or Deputy Chief of Staff. She never seemed to fully comprehend these basic and critical positions. She



HC003615

Travis Knight – Statements on Kristie Small's Employment                             July 8, 2019

would often reach out to me or other legislative staff, after being directly asked for her opinion/guidance by the Congressman.
- Often, she privately voiced frustration to individual D.C. staff members regarding the Congressman's legislative agenda and his demands on staff.
- She would increasingly openly criticize and undermine the Congressman, both in his presence and privately to staff.
- She became increasingly distant from staff. At times, she appeared to dislike and have personal issues with certain individual staff members.
- She seemed increasingly unmotivated and uninterested. Specifically, she would leave work around noon, consistently, when the Congressman was not in D.C. To my knowledge, she rarely told any staff where she was going or how she could be reached.
- Eventually, it was assumed that Kristie would not be around during recess and would leave the office soon after the Congressman would depart on fly-out days.
- By this point, we would text Kristie only to get her necessary approval on final products for the Congressman's review. She would rarely reply with edits to items sent to her for review. I believe she was not reviewing any staff work, with little exception, during her last two months in the office.
- When she was eventually terminated, I had sympathy for her on a personal level, but believe the decision was unquestionably warranted given her performance. I consider it to be a matter of fact that she was terminated based solely on poor job performance. I've never heard any other past or current staffer suggest or comment otherwise.

### Observation #1

- In late July or early August 2018, Kristie Small came into the staffroom to take a call with Press Secretary, Olya Voytovich; Legislative Director, Juan Sanchez; Legislative Assistant, Zack Linick; Homeland Security Fellow, Stacy Forbes; and the Congressman on speaker phone.
- I was not participating on the call, but could hear the entire open conversation, which concerned somewhat controversial legislation.
- The Congressman's well-established policies dictated his support for the measure, and the phone call was not planned to discuss whether he should withdraw this support. The phone call was intended only to address how to handle any subsequent controversy in press.
- Kristie Small urged the Congressman, multiple times, to withdraw his support. It was well understood among legislative staff, and D.C. staff generally, that this was not an option that could or should be considered. I found the suggestion to be poor advice, void of any reasoning, running contrary to our office's legislative agenda.
- The Congressman was initially cordial and genuinely seemed to consider her opinion; engaging her in a brief discussion before deciding to move forward with the call's original purpose.
- Kristie continued to interrupt the Congressman and other staffers, insisting that he withdraw support from the measure. I found this very odd and could tell other staff in the

Travis Knight – Statements on Kristie Small's Employment                                       July 8, 2019

- room were growing uncomfortable. Eventually, the Congressman politely asked her to stop interrupting and, again, firmly stated that he would not be withdrawing his support.
- The following quoted exchange is my best recollection of what was said immediately subsequent: Kristie conceded by referencing his authority as a Congressman. He replied, "[o]kay, Kristie…," after which she responded, "[o]kay fine, sir! Nevermind!" As he started to reply, Kristie had already begun to leave the room and projected, "I'm clearly not needed on this call!" And slammed the staffroom door on her way out.
- The Congressman did not address what had occurred, and the call concluded after deciding, with remaining staff, on how to proceed regarding the legislation.
- Kristie stayed in her office for the remainder of the day (several hours) and, to my knowledge, spoke to no staff.
- She never addressed the incident with any staff to my knowledge.

### Observation #2

- At some point after the 2018 August recess, I was informally serving as interim Grants Coordinator, in addition to my other legislative duties.
- This required my involvement on frequent scheduling conference calls with the Congressman's Scheduler, Madeline Abadie; his Special Assistant, Nina Andrews; his District Director, Jessica Hernandez; Kristie Small; and the Congressman.
- During the vast majority of these calls, the Congressman would be in the District, preparing to present federal grant awards to district stakeholders. I would gather with Kristie, Madeline, and Nina in Kristie's office, with Jessica, various District staff, and the Congressman all on speaker phone.
- Kristie's friction with everyone involved on these calls became more and more apparent over time.
- She would often accuse Madeline of lack of planning, and, occasionally, poor performance and general ineptitude should the Congressman note small details overlooked. I found this to be inappropriate to do in front of staff, and completely unwarranted. Conversely, I believe Madeline reluctantly absorbed many of Kristie's responsibilities overtime due to Kristie's disinterest and poor job performance.
- Kristie would ignore Nina's contributions and often tell her to disregard specific items the Congressman had tasked her with directly. I found this to be inappropriate to do in front of staff, and that it was often done with a clear dislike for Nina.
- I believe that as Kristie struggled to perform her own role in the office, she began to dislike Nina and Madeline. I believe Kristie became defensive regarding their slightly overlapping roles in the office, stating often that Nina was a bad influence on Madeline, and implying that neither should be depended on.
- Similarly, Kristie would increasingly openly feud with Jessica regarding her management of District staff during these calls (after the Congressman had hung up); which she would increasingly do on Monday "All Staff" calls as well. Eventually, Kristie began to sit quietly during the District scheduling calls, not participating, except to confirm that she

Travis Knight – Statements on Kristie Small's Employment                                   July 8, 2019

was on the call should the Congressman ask. These confirmations were often stated with a clear tone of insubordination towards the Congressman.

**Observation #3**

- At some point during the 2018 August recess, various staff were gathered in the staffroom having a casual conversation regarding the probation policy in the Congressman's offices.
- Those present included Kristie Small, Juan Sanchez, Olya Voytovich, Zack Linick, Nina Andrews, and myself.
- Specifically, staff discussed the ambiguity of the Congressman's probation policy, but fully acknowledged its existence in doing so.
- Kristie was inquiring as to the duration of longer-employed staff's initial probationary periods. During this time, Olya commented, "[o]h…I'm still on probation." This was done, partially, in jest. However, all longer-employed staff, including Juan and Zack, confirmed that one should essentially assume themselves to be on probation, as did Olya.
- My personal understanding of these policies has come through multiple conversations with staff. I was not made aware of any probation policy at the time of my hiring, but was shortly informed in the following days, by Nina Andrews; and later by Zack Linick, Olya Voytovich, Juan Sanchez, and Andi Trevino. The existence of our initial probationary status was mentioned often among staff. I considered it to be well-known by all staff either at the time of their hiring or soon after on-boarding.
- Kristie never approached me about the status of my probation or discussed the policy with me directly. She did, however, engage in several public conversations that I witnessed, which were similar to the pre-mentioned.
- There was one occasion, soon after the August 2018 recess, that Kristie entered the staffroom in tears. She stood silently behind me near the door, which I was seated directly in front of. As my back was to her, I did not notice initially. However, once I did, I offered her my seat, which she quickly took. I briefly exchanged a concerned look with Olya, who was seated next to my desk, and left the room to give Kristie privacy.
- I later learned from other staff, and from Kristie directly, that her emotional state was based on her unhappiness in her role and that she believed she was not performing up to the Congressman's expectations. This was several weeks before her termination.

**Final Observations**

- I have developed, what I consider to be, close professional and personal relationships with all of Congressman Cuellar's D.C. staff. This includes former staffers who have left since I joined, with the addition of some staffers who departed before I began my employment.
- I have never heard even the suggestion that the Congressman places added expectations on or unfairly targets individual staff for any reason whatsoever. This includes Kristie Small, who to my knowledge, never made such an accusation to any staffer during her time in the office.

HC003618

Travis Knight – Statements on Kristie Small's EmploymentJuly 8, 2019

- To the best of my knowledge, there is a widely-held consensus, among current and former staff, that Congressman Cuellar places high expectations on all his staff; but that these are second to the expectations he places on himself.
- All complaints I have ever heard regarding the Congressman's high demands of his staff, have always been tempered with a firm belief that he does so only in service to his constituents.
- I have never heard any staffer undermine their own genuine respect for the Congressman, even if they disagree with certain instances that reflect his demanding managerial style.
- I do not believe that the Congressman places expectations on any staffer that they cannot reasonably perform.
- I unequivocally believe that Congressman Cuellar ended Kristie Small's employment in his offices due to her poor job performance, and for no other reason. I base this firm belief on my well-founded perceptions of the Congressman's character and demanding, yet fair, managerial style. I also base this firm belief on my ample observations of Kristie Small's poor job performance during her employment.

No one has directed me as to the statements herein provided. They have not been embellished or knowingly altered in any way. I submit that they truthfully and accurately reflect my personal observations and experiences.

Signed: _____ [Travis Cowles Knight]

Date:July 8, 2019