**Case No. 1:19-cv-01314-TNM**

# <u>ATTACHMENT AA</u>



# Transcript of Dean Lester

**Date:** March 25, 2020
**Case:** Small -v- Office of Congressman

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Dean Lester

1 (1 to 4)

Conducted on March 25, 2020

---

**Page 1**

```
1           UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3    - - - - - - - - - - - - - - - - - -x
4   KRISTIE SMALL,              : Case No.
5       Plaintiff,             : 1:19-cv-1314-TNM
6   v.                          :
7   OFFICE OF CONGRESSMAN HENRY  :
8   CUELLAR,                     :
9       Defendant.              :
10   - - - - - - - - - - - - - - - - - -x
11
12           DEPOSITION OF DEAN LESTER
13              CONDUCTED VIRTUALLY
14          Wednesday, March 25, 2020
15               7:03 a.m. PST
16
17
18
19
20  Job No.:  293143
21  Pages:  1 - 75
22  Reported By:  Charlotte Lacey, RPR, CSR No. 14224
```

---

**Page 2**

```
1       DEPOSITION OF DEAN LESTER, CONDUCTED VIRTUALLY
2
3
4
5       Pursuant to subpoena, before Charlotte Lacey,
6   Certified Shorthand Reporter, in and for the State of
7   California.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

---

**Page 3**

```
1               A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF KRISTIE SMALL:
3         SARA McDONOUGH, ESQUIRE
4         TAMARA SLATER, ESQUIRE
5         ALAN LESCHT AND ASSOCIATES, PC
6         1825 K Street, Northwest, Suite 750
7         Washington, D.C.  20006
8         (202) 463-6036
9
10   ON BEHALF OF DEFENDANT OFFICE OF CONGRESSMAN HENRY
11   CUELLAR:
12        TREVOR ST. GEORGE BLAKE, II, ESQUIRE
13        MARK STEWART HAYES, ESQUIRE
14        U.S. HOUSE OF REPRESENTATIVES
15        OFFICE OF HOUSE EMPLOYMENT COUNSEL
16        4300 O'Neill House Office Building
17        Washington, D.C.  20515
18        (202) 225-7075
19
20
21
22
```

---

**Page 4**

```
1               I N D E X
2   WITNESS                              PAGE
3   DEAN LESTER
4   Examination by        Ms. McDonough        6
5   Examination by        Mr. Blake           69
6
7
8         I N D E X   O F   E X H I B I T S
9   EXHIBITS       DESCRIPTION              PAGE
10  Exhibit 1      Subpoena to Produce Documents,    7
11                 Information, or Objects or to Permit
12                 Inspection of Premises in a Civil
13                 Action
14  Exhibit 2      Typewritten statement dated       37
15                 6/25/2019, Bates number HC003586
16
17
18
19
20
21
22
```

9

1  did have at one time but that you no longer have
2  for whatever reason?
3       **A.   Not to my recollection.**
4       Q.   Okay.  Is there anything that would help
5  you recall whether or not you have or had other
6  documents?
7       **A.   The only other thing that I may have had**
8  **was some text messages on my old cell phone which**
9  **had been changed out and all text messages were**
10 **lost.**
11      Q.   I understand.  And who are those text
12 messages with?
13      **A.   That would be Kristie Small.**
14      Q.   And what were --
15      **A.   They were very --**
16      Q.   -- the text messages?
17      **A.   They were very --**
18      Q.   I'm sorry?
19      **A.   -- minimal.**
20      Q.   And what were the text messages about?
21      **A.   Most related to after she was**
22 **terminated.  After October 16th, 2018, she had**

10

1  **tried to contact me asking about her documents and**
2  **files and contacts on her computer in the Cuellar**
3  **office.**
4       Q.   And did you respond to those text
5  messages?
6       **A.   From my recollection, I responded to**
7  **maybe one or two directing her to contact the**
8  **congressman's office directly.  I didn't have**
9  **anything to do with her electronic files or**
10 **anything.  I only handle --**
11      Q.   And were there --
12      **A.   -- financial and personnel matters.**
13      Q.   And were there any other text messages,
14 e-mails, anything else that you no longer have
15 that relate to the case?
16      **A.   No.**
17      Q.   Who is your current employer?
18      **A.   Well, I have nine of them.  I work for**
19 **several members of Congress all across the**
20 **country.  Each one of them, I have a specific**
21 **function or duty in those offices.**
22      Q.   And is one of those offices

11

1  Representative Cuellar's office?
2       **A.   Yes, it is.**
3       Q.   And how long have you worked for the
4  congressman?
5       **A.   I started working for him back in 2007**
6  **up until 2015.  Then was -- then left the office**
7  **and came back in 2017 and have been with him since**
8  **then.**
9       Q.   And during this deposition, I'm going
10 to -- if I say congressman, I'm referring to
11 Congressman Henry Cuellar, just to be clear,
12 because I was not aware that you work for others.
13          Mr. Lester, when you left your
14 employment with the congressman in 2015, was that
15 voluntary or involuntary?
16      **A.   It was voluntary.**
17      Q.   And what was the reason?
18      **A.   My status as a shared employee here in**
19 **the House of Representatives, where I work for**
20 **several members of Congress, changes from time to**
21 **time.  Sometimes members or offices want me to do**
22 **more in their office or less.  And I had an**

12

1  **opportunity to work for the committee on**
2  **agriculture in -- starting in 2015, and I took**
3  **that opportunity.  But I had to let some -- I had**
4  **to let another office go.  And, Mr. Cuellar's**
5  **office, I made a change and went to work for the**
6  **committee and left Mr. Cuellar's office.  But the**
7  **person who had been at the committee then worked**
8  **for Mr. Cuellar, so we sort of did a kind of swap**
9  **kind of thing.**
10      Q.   And so, from 2015 to 2017, did you
11 continue to work for any of the other congressmen
12 as well as --
13      **A.   Oh, yeah.**
14      Q.   -- the committee?
15      **A.   Yes.  I had eight different members at**
16 **that time.  Well, I had the committee and seven**
17 **other members at that time.**
18      Q.   And so why was it that you chose to
19 leave Mr. Cuellar's office as opposed to another
20 congressman's office?
21      **A.   Because the only -- because**
22 **Mr. Cuellar's office was the only one I was doing**

13

1 financial administration for only.  In my role
2 here in the House of Representatives with the
3 members I work with there is some I do financial
4 administration for only.  There's others that I do
5 office administration for as well.  And the others
6 that --
7    Q.   I understand.
8    A.   -- add to my slate were -- I had other
9 responsibilities in the office, so I decided after
10 chatting with the congressman and making the swap
11 with the financial administrator at the committee
12 that it would be a -- that that would be a good
13 fit.
14    Q.   And so, since 2017, in your employment
15 with the congressman, what -- what is your title?
16    A.   Financial Administrator.
17    Q.   Have you ever listed or used the
18 congressman as a job reference?
19    A.   I've listed him as one of the offices I
20 work for on my resume.  I -- in the world of
21 Capitol Hill, when you work for a particular
22 office, that's sort of a reference, I guess, in

14

1 some cases but not necessarily a direct reference
2 as in -- would be in the private sector.
3    Q.   Okay.  So have you ever used Mr. Cuellar
4 as a -- I guess as a direct reference or listed
5 him --
6    A.   No.
7    Q.   -- personally as a reference?
8       Why not?
9    A.   Well, I don't really have to use people
10 as references in my line of work.
11    Q.   How would you describe your working
12 relationship with Kristie Small?
13    A.   At the time, back in 2018, when she came
14 on board, it was good.  It started to change in
15 September of 2018 and October, of course.
16    Q.   How did it change?
17    A.   She was -- it was just a -- she was
18 focused on getting bonuses and raises for the
19 staff, and I was recommending to her that that not
20 be her total focus.
21    Q.   When you say you recommended to her that
22 that not be her total focus, did you make that

15

1 recommendation verbally or in e-mail or in person?
2    A.   Verbally when she asked about -- when
3 she was describing that she was going to work on
4 bonuses and raises for the staff, I verbally said
5 to her that -- I said, "Well, this is how the
6 Cuellar office normally works.  They do bonuses at
7 the end of the year, in November or December.
8 They are not big bonuses, and the congressman
9 doesn't usually go for large pay raises either."
10       And I thought at the time that somebody
11 who had just come on board just a few months prior
12 was not in a position to try to make those kind of
13 changes within such a short period of time.
14    Q.   And why did you think that?
15    A.   Just, historically, with my dealings
16 with the congressman, his office, over the years.
17    Q.   So was your I guess -- and I'll say
18 concern.  Was your concern about Kristie's
19 request, was it about the fact that she was asking
20 for bonuses, the amount of the bonuses, or the
21 timing?
22    A.   One was the fact.  The other was the

16

1 timing.  I did not know the amounts that she was
2 thinking about at all up until October 15th, 2018,
3 when she sent --
4    Q.   -- October --
5    A.   -- me the e-mail.
6    Q.   -- 15th.  And so, on October 15th, 2018,
7 she sent you an e-mail that had the amounts of the
8 bonuses?
9    A.   Well, I wasn't sure if they were bonuses
10 or raises.  And I didn't look at the e-mail until
11 the 16th of October.
12    Q.   And so did you respond to her after you
13 looked at the e-mail?
14    A.   No, I did not.
15    Q.   Why not?
16    A.   Because later in the day on
17 October 15th, the congressman had called me and
18 asked why if -- why we had to have bonus paperwork
19 in on October 15th.
20       I told him, "We don't, sir.  You
21 normally do bonuses on November or December."
22       And he said, "Well, I'm not doing

17

1 bonuses" --
2       I recall him saying he was not going to
3 do bonuses in October.  And so I just left it --
4 let it go, because October the 15th of every month
5 is a payroll deadline for the House of
6 Representatives.  And I need to submit paperwork
7 by 5 o'clock that day if we're going to make any
8 changes to someone's payroll for that month.
9       So when he indicated he was not going to
10 do any bonuses for October, I chose not to -- I
11 had other meetings going on, and I hadn't looked
12 at it.  I thought I'd look at it tomorrow, the
13 16th.  And, by the time I did, then I had been
14 contacted about Kristie Small being let go.
15    Q.   Okay.  And so tell me about that.
16 When -- when exactly was it that you learned about
17 Kristie's termination?
18    A.   I believe it was the morning of the
19 16th.  But I don't have anything in writing on it.
20 I received a phone call.  But I do not recall what
21 time of day it was.  I believe it was in the
22 morning.

18

1    Q.   That's fine.
2       And -- okay.  So you learned about her
3 firing through a phone call?
4    A.   At first, yes.
5    Q.   Who called you?
6    A.   I believe it was the congressman
7 directly.
8    Q.   What did he say?
9    A.   That he was letting Kristie go.  And
10 that her last day was --
11    Q.   Did he --
12    A.   -- to be the 16th, I believe.
13    Q.   Did he provide any information about why
14 he was firing her?
15    A.   No, he did not.  And in my role as a
16 financial person, I do not ask those questions of
17 any of my chiefs of staff or members that call me
18 with that kind of termination.  When it's abrupt
19 like that, I just go -- move forward and prepare
20 the paperwork accordingly.
21    Q.   At any point, did you learn about the
22 congressman's reasons for firing Kristie?

19

1    A.   I presume his reason may -- is because
2 of the bonuses and -- that she was proposing.
3 But --
4    Q.   Why do you presume that?
5    A.   Because -- well, one, because they were
6 so large.  And, two, she was pushing him to get
7 them done in October.
8    Q.   Did he ever tell you that that's why he
9 fired her?
10    A.   I don't recall specifically what the
11 congressman said to me at that time.  I --
12    Q.   Do you recall -- do you recall if he
13 ever told you or indicated to you that he fired
14 Kristie because she requested bonuses or pay
15 raises?
16    A.   That was part of it.  There were
17 other -- if I recall correctly, there were other
18 performance matters of which I didn't even -- I
19 did not ask about.  And since she was under her
20 probationary period, he felt it was time to -- to
21 let go.
22    Q.   So did the congressman -- it sounds like

20

1 the congressman at some point told you about the
2 reasons that he fired Kristie; is that accurate?
3    A.   As I stated, I don't recall specifically
4 what he said.  But I know --
5    Q.   But do you recall a -- do you recall a
6 specific conversation is -- is what I'm asking.
7    A.   I recall being in the office with him
8 after he had terminated Ms. Small.  And he
9 indicated that due to her performance issues, what
10 he was -- and I knew he was upset about the
11 bonuses, he says -- I recall him being quite upset
12 about that, that he was -- she was proposing high
13 bonuses and raises for people.  That's all I
14 recall though.
15    Q.   So this was an in-person conversation?
16    A.   Yes.
17    Q.   And was anyone else present?
18    A.   I don't recall.
19    Q.   And do you know when this conversation
20 occurred in terms -- was it shortly after the
21 termination, the same day, several weeks later?
22    A.   It was within the same week.  I --

21

1  probably a day or two later.
2      Q.   Okay.  And so, when he mentioned
3  Kristie's performance issues, did he provide any
4  examples?
5      A.   Not that I recall.
6      Q.   So all he mentioned was the performance
7  issues and the request for pay increases; is
8  that --
9      A.   Right.
10     Q.   -- accurate?
11     A.   Yes.
12     Q.   And do you have any firsthand knowledge
13  of Kristie's job performance?
14     A.   What do you mean by "firsthand
15  knowledge"?
16     Q.   Did you ever observe her performing her
17  job duties?
18     A.   With the role that I have, she would be
19  in meetings with her -- with myself and the
20  congressman when we would talk about budgetary
21  expenses.  There were other financial matters that
22  we would e-mail one another back and forth on.

22

1  That is all the interaction I had.
2      Q.   So prior to Kristie starting to -- to
3  talk to you about the request for bonuses, did you
4  have any reason to think that she was at risk of
5  being fired?
6      A.   No.  None whatsoever.
7      Q.   During -- during Kristie's employment,
8  did you ever complain to the congressman about
9  Kristie?
10     A.   No.
11     Q.   And, during Kristie's employment, did
12  you ever complain to anyone else about Kristie,
13  like another staff member or anything like that?
14     A.   No.
15     Q.   During the time that Kristie worked for
16  the congressman, did anyone complain to you about
17  Kristie?
18     A.   The only complaint I would have, I
19  would -- I would get from some of the staff was
20  when I would visit the office, if she was not
21  there, I would ask where she was, and they said --
22  they would say something like, "Who knows?  We

23

1  never know where she goes."
2      Q.   And who were the staff members that said
3  that?
4      A.   Mostly it would be from Madeline, who
5  was our scheduler at the time, or Nina Andrews, or
6  Patrick at the front desk.  Not all of them would
7  say it that way, but that was the overall gist of
8  what -- you know, when I would ask, "Is Kristie
9  in?"
10         They would say, "No.  We don't know
11  where she is."
12     Q.   When was the first time that you can
13  recall that Madeline or Nina or Patrick -- or, I
14  guess, that you went to the office to find Kristie
15  and that people indicated they didn't know where
16  she was?
17     A.   That would be during the August recess
18  time period of 2018.  Congress is not in session
19  during the weeks of August.  And, oftentimes,
20  offices do some kind of reduced working hours for
21  certain -- for staff, but I -- normally the
22  Cuellar office does not engage in that.  Normally,

24

1  they keep regular working hours.  Although, some
2  people do take vacations during that time.
3         But I would go over a -- you know, a
4  couple times and -- during the month, and she
5  wasn't around at all.  She had not come in all
6  day.
7      Q.   And what were the dates that you went to
8  find Kristie and she wasn't in the office?
9      A.   I don't recall, specifically.
10     Q.   Just that there were a couple of times
11  during the month of August?
12     A.   Yes.  I visit my --
13     Q.   About how --
14     A.   I visit my -- I visit the Cuellar office
15  like once every week or once every couple of
16  weeks, depending on how busy it is, to pick up
17  financial papers and any financial matters that
18  need to be discussed.  I do not recall --
19     Q.   So do you --
20     A.   -- dates.
21     Q.   So do you think that you went during the
22  month of August?  Do you think you went to the

29

1  any paperwork I had and check in with staff and
2  see if they needed anything and then take whatever
3  papers I needed and do that and process them.
4      Q.  Do you recall a time when you were
5  unable to get in touch with Kristie and it was
6  about an urgent matter?
7      A.  The only one that comes to mind is about
8  the bonuses and raises that she was proposing back
9  in -- in October.  She did reply to me, to my
10  e-mail, but not till Monday, the October 15th.
11         She indicated on that Friday, the 12th,
12  that she had told the congressman that she had run
13  the bonus and pay raise numbers by me and I had
14  approved them, but I had not, and she had not
15  shared that information with me.  And I wrote her
16  back quite directly and pointedly.
17      Q.  I'm sorry.  You said that Kristie said
18  that she told the congressman that you had
19  approved the bonuses?
20      A.  Correct.  She even e-mailed him and put
21  it in writing to him.  But she had not run those
22  numbers by me at all.  In fact, earlier that week,

30

1  on Tuesday or Wednesday, she and I met very
2  briefly for a few seconds in the Rayburn building,
3  in the tunnel between the Longworth and Rayburn
4  building, and she was very excited and said to me,
5  "I figured out the bonuses and raises.  We're
6  going to get -- we're going to use that money."
7         And I said to her very pointedly, "You
8  need to send me your numbers, Kristie, because I
9  have to run those figures into the budget."
10         And she said, "Oh, I will.  I will."
11      Q.  Okay.  So that was on Friday,
12  October 12th?
13      A.  No.  That was two days prior, on the
14  Tuesday or Wednesday.
15      Q.  Okay.
16      A.  I don't recall which day, but I remember
17  that incident very clearly.
18      Q.  And so then she sent you the numbers on
19  the 15th; is that right?  Or on the 12th?
20      A.  Right.  She sent me the numbers on the
21  15th.  However, she told the congressman on the
22  12th that I had seen the numbers and I had

31

1  approved them.  Which I had not.
2      Q.  And so then when you got that e-mail
3  from her -- or -- I'm sorry.  When did you say --
4  when did you learn that she had told the
5  congressman that you had approved the numbers?
6  Was that on the 12th?
7      A.  Yes.  She sent me an e-mail on the 12th.
8      Q.  So did you ever contact the congressman
9  to tell him that you had not approved the numbers?
10      A.  No, I didn't go that far, at that time.
11  But I was waiting for her to send me something.
12  It is not my position to throw her under the bus
13  in front of the congressman.  But if she had not
14  on that Monday, I would have gone to him.
15      Q.  Okay.  And so were there any other times
16  that you couldn't get in touch with Kristie about
17  an urgent matter?
18      A.  No.  I cannot recall any.  And I also do
19  not recall any other urgent matters.  That I had.
20      Q.  And this issue with the bonuses and
21  Kristie asking for the bonuses, the timing, the
22  amounts, in your opinion, was there anything, I

32

1  guess, unethical or illegal about her request, or
2  was it just inconsistent with the congressman's
3  procedure?
4      A.  There's nothing unethical or illegal.
5  It was just inconsistent with what the -- the
6  office has done in the past and how the
7  congressman approaches raises and bonuses for
8  people.  In fact, her even asking for a raise or
9  bonus within the first few months of her
10  employment was quite -- how do I put it?
11         The right word.  It was quite
12  courageous, I guess -- or, actually, no, that's
13  not the word I want.  She was in -- acting
14  inappropriately, I thought.
15      Q.  So that was your opinion?
16      A.  Yes, but it also comes from 25 years of
17  experience of being on the Hill.  And I've never
18  had a chief of staff in all the years I've worked
19  here suggest a bonus or raise to me about their
20  own pay.
21         Other offices handle it, and even the
22  prior chiefs of staff at Cuellar's office never