Case No. 1:19-cv-01314-TNM

# ATTACHMENT BB



# Transcript of Henry Cuellar

**Date:** March 26, 2020
**Case:** Small -v- Office of Congressman

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

133
1  hundred percent."
2     Q.  Okay.  So let's go -- you said that
3  Kristie was also insubordinate when she took
4  personnel files from your office.  When did
5  Kristie take the files from your office?
6     A.  We don't know.  We found out after -- I
7  think it was that same day that she got let go
8  that, you know, we asked, "Hey, let's check things
9  here."
10         And they looked and they said,
11 "Congressman, every single employee file has been
12 taken."
13         So she took it sometime before.  We
14 don't know when she took it, but she went into
15 a -- a file cabinet that had my name, personal
16 information -- personal, and she went into my
17 personnel file and took every single file --
18 employee file out of the office.
19         She can say for whatever reason she did
20 it, but you cannot go into somebody's files and
21 take every personal employee's files out of the
22 office, you know, with the information that is

134
1  there on the employees.  You don't do that.  You
2  don't go into a congressman's desk or -- or their
3  drawer and take that information and not even tell
4  anybody about it.
5         And when she was asked to bring this
6  file, she said, "I will give you this file if you
7  give me access to the -- to the computer" or
8  something to that extent.  So she was even -- my
9  opinion, almost trying to extort, saying, "I'll
10 give you the files back if you give me access to
11 my computer."
12        Office policy --
13    Q.  Did you --
14    A.  The office policy also says that it is
15 -- I believe it says that -- you know, she
16 reviewed and she signed -- that she -- that is
17 somebody takes things out, it will be grounds
18 for -- for termination, I believe.  So she knew
19 what -- that she was not supposed to take any
20 files without asking anybody, without permission,
21 out -- outside of the congressional office.
22    Q.  So did you ever tell Kristie you are not

135
1  to take files out of the office without telling
2  someone?
3     A.  Yeah.  Policy manual says that.  I
4  mean --
5     Q.  What is the policy manual?
6     A.  It's -- it's an office policy manual
7  that everybody signs.  It's an office policy
8  manual that she reviewed and she signed.  It's an
9  office policy manual that will say that all
10 employees are subject to periodic reviews.
11 It's -- it's a policy manual that says that
12 employees work at-will at the -- for the office of
13 the congressman.  It's an office policy that says
14 what are grounds for, you know, disciplinary
15 actions.  And my understanding, if I recall
16 correctly, taking out -- I mean, removing files
17 from the office, that is one that is subject to
18 termination.  I believe that's what it says.  But
19 she --
20    Q.  Okay.  So when you --
21    A.  She reviewed it and she signed -- she
22 signed that office policy.

136
1     Q.  So when you say "office policy," I'm
2  aware of an employee handbook; is that the same
3  thing?
4     A.  Yes, ma'am.
5     Q.  And so I understand that the employee
6  handbook may have said that, but did you ever tell
7  Kristie that she could not take files from the
8  office without telling someone?
9     A.  I hate to say it this way, but if one of
10 your employees -- you, as an attorney -- and
11 I'm -- I'm an attorney also.  If one of your
12 employees took all the client files out, you would
13 not smile on that very favorably.  I think you
14 know that.  And I -- I, as an attorney, I would
15 know that that's something that you just don't do.
16        That's common sense, that you don't take
17 files out of the office.  So I think any -- common
18 sense to any individual, reasonable judgment,
19 would say that you don't take files out of -- of
20 a -- one, specifically out of the member's
21 designated area, file cabinet that it was
22 designated as my file -- my files.

137

And anybody that has 13, 14 years of experience working with members and staff, House Administration, would know that you just don't go into a member's personal space and take every single file outside of the office for whatever reason, period. You just don't do that.

Q. Congressman, you're not answering my question.

A. Sorry. That's my answer.

Q. Do you understand what I'm asking you?

A. I -- I just gave you the answer. I'm sorry. That's the answer. I'm sorry you don't like the answer, but that's my answer.

Q. So -- no. It's not that I don't like your answer. It's just that you didn't answer my question.

My question is did you, Henry Cuellar, ever personally tell Kristie you may not take files out of the office? Did you ever tell her that?

A. She signed the personnel file, employee file, that she says that she read, and it says

138

that instruction that you're not supposed to take documents out of the office. And there are grounds or steps that you take if you do that. She is an adult. She read it. She signed it.

I cannot -- if I bring in a professional. And I would assume with 13, 14 years of experience, do you really expect me to go down every single thing that she's supposed to be doing? No.

I mean, the answer is no. But she read it. She read it. It's in there. And she was not supposed to -- she violated the -- the employee handbook. She violated probably policy -- I mean, probably other rules and regulations when you take things out and then you try to extort and say, "I will give you the files back if you give me access to the computer."

I mean, did I have to explain everything to her? Of course not.

I'm sorry. I didn't. But common sense, common decency, would tell you that you just don't do that. And the policy, employee manual

139

specifically said you can't do that. And everyone would -- you know, would understand that you don't go into a member's designated area and take every single file and not tell the member or tell anybody that she took every single employee file, you know, with whatever confidential information is in there out of the office.

And we don't know -- I don't know who she shared it with. You know, did she share this with anybody? Did she make copies of all of that? We don't know. We don't know.

Q. So is it fair to say you have no proof that Kristie disclosed any personnel information to someone?

A. I don't. But I would tell you this is a reason the policy manual and probably other House rules say you don't go into a member's personal space, take every employee's files with whatever confidential information there, take it outside the office, not notify the congressman, not notify anybody that you take it out.

We don't know how long she had this

140

information. We don't know who she shared this information. We don't know if she made copies of confidential information. We don't know this.

But all I know is she violated policy manual. And -- and when she says, "I'll give you back the files if you give me access," that extortion -- extortion is -- is something people should not be doing.

Q. So did you file a police report against Kristie for extorting you?

A. We -- we thought about it. We certainly thought about it. And I did talk to House counsel about it.

Q. What do you say when you mean "we"? Are you talking about you and House counsel or someone else?

A. Me. Me. Myself.

Q. Okay. So did you file any kind of complaint to report with any other administrative agency about what Kristie did?

A. Again, I -- you know, I -- not that I recall. I don't know. We did talk to Capitol

**141**

police. But, again, with going into privileged information with counsel, I think I did -- well, I can't go -- I'll let one of my attorneys object on this, but it would go into attorney/client privilege as to what I said to House counsel.

  MR. HAYES: And this is -- this is Mark. Yes, don't -- I'm instructing you not to disclose any attorney/client privilege communications.

  Q. I'm not asking for any of that. I understand. I just wanted to know if -- if you had filed, because that's a very serious accusation. You know, you're -- you're accusing Kristie of -- of a crime. And so I -- it sounds very serious. And I was just interested to know what -- what action you took --

  A. Ma'am --

  Q. -- about it?

  A. Ma'am, I find this very serious; what she did. You know, you -- and, again, I -- and I'm sorry. I'm not trying to be facetious with you. But if you as an attorney, if somebody did that to you, if one of your personnel took all the

**142**

files out of your office, I mean, I think you would feel the same way.

  I did bring it up to House counsel. I'm not going to go into privileged information. I assume a statute of limitations is not over in this matter. I don't know. I'd have to check on that. But, yeah, this is serious when somebody takes personal confidential information files, and -- and we don't know what she did with that. We do not know who she shared it. She took it outside the office. I mean -- I mean, you just don't do that.

  And, again, I'm not trying to be facetious with you, and I apologize. But you, as an attorney, if somebody did that to you, you would not -- you would take some action on that.

  Q. Right. So --

  A. And she --

  Q. Mr. Cuellar, you just --

  A. Yeah. And I'm sorry.

  Q. You just -- you just mentioned a statute of limitations. I mean, it sounds like -- that

**143**

sounds like a threat. Are you saying --

  A. No --

  Q. -- that there's still a possibility you may file a --

  A. I'm not --

  Q. Please let me finish my question. Please let me finish my question.

  I mean, are you saying that there -- you are still considering filing some kind of criminal or administrative complaint against Kristie?

  A. No. I'm -- I'm not saying that at all. I'm not threatening anybody. I'm just saying what the facts are, and she does not deny it.

  She took the files outside my office. We do not know what she did with those files. We do not know if she made copies of those files. We do not know if she disclosed any confidential employees for all the employees in my office. I don't know what she did with that.

  I do know that when we asked her for the files back, she -- and this is all e-mailed. It's all documented. She said, "Give me -- I'll give

**144**

you the files back if you give me access to your computer."

  You can take it any way you want to. I'm just giving you the facts. They're serious. I agree with you. There are very serious accusations here.

  MR. HAYES: And, Counsel, this is Mark. I just want to point out that there were documents produced during discovery, e-mails back and forth over this very issue. And as those documents make clear, this issue was resolved, I believe within a few days. But -- but whatever the case, those documents will reflect that this issue has been resolved, you know, after --

  MS. McDONOUGH: Is there an objection?

  MR. HAYES: -- to his attention.

  MS. McDONOUGH: Is there an objection?

  MR. HAYES: Well, yeah, I guess there is an objection. Asked and answered. I mean, we're going over the same ground over and over and over again. It sounds like you just don't like the answer.