# Exhibit 1

Page 2

1     Deposition of Kristie Small held at:

2

3

4

5           Office of House Employment Counsel

6           U.S. House Of Representatives

7           4300 O'Neill House Office Building

8           Washington, D.C.

9

10

11

12

13

14    Pursuant to Notice, when were present on behalf

15    of the respective parties:

16

17

18

19

20

21

22

Page 4

1                    C O N T E N T S

2     EXAMINATION OF KRISTIE SMALL          PAGE

3     BY MR. BLAKE                9

4

5

6

7              EXHIBITS

8     Exhibit 1   Resume of Kristie E. Small    16
                  SMALL 00307-308

9

      Exhibit 2   Performance Review         44

10              HC001155

11    Exhibit 3   E-Mail Chain dated 9-28-18    54
                  HC000399

12

      Exhibit 4   Letter dated 7-8-19      61

13              HC003582

14    Exhibit 5   Letter dated 6-25-19       61
                  HC003586

15

      Exhibit 6   Letter dated 6-24-19      61

16              HC003595-3601

17    Exhibit 7   Memorandum dated 6-25-19       61
                  HC003602-3603

18

      Exhibit 8   Handwritten Notes        61

19              HC003604-3614

20    Exhibit 9   Letter dated 7-8-19       61
                  HC003615-3619

21

      Exhibit 10  Letter submitted 6-27-19      61

22              HC003621

Page 3

1     APPEARANCES:

2     On behalf of the Plaintiff:

3         ALAN LESCHT AND ASSOCIATES, P.C.

4         SARA McDONOUGH, ESQ.

5         1825 K Street, N.W.

6         Washington, D.C. 20006

7         202-463-6036

8         sara.mcdonough@leschtlaw.com

9

10    On behalf of the Defendant:

11        TREVOR S. BLAKE, ESQ.

12        SENIOR ASSOCIATE COUNSEL

13        MARK HAYES, ESQ.

14        OFFICE OF HOUSE EMPLOYMENT COUNSEL

15        U.S. HOUSE OF REPRESENTATIVES

16        Office of the Clerk

17        4300 O'Neill House Office Building

18        Washington, D.C. 20515

19        202-225-7075

20        trevor.blake@mail.house.gov

21        mark.hayes@mail.house.gov

22

Page 5

1     EXHIBITS (CONTINUED):

2     Exhibit 11  Letter submitted 6-27-19       61
              HC003626

3

      Exhibit 12  Letter submitted 6-21-19       61

4               HC003627

5     Exhibit 13  Letter submitted 7-3-19       62
              HC003628

6

      Exhibit 14  Acknowledgement of Receipt      93

7             of Employee Handbook for the
              Office of Henry Cuellar

8             HC000036

9     Exhibit 15  Confidentiality Agreement     108
              HC000038-39

10

      Exhibit 16  Protection of House Equipment  108

11            and Assets

12            HC000041-42

      Exhibit 17  Amended Complaint          124

13

      Exhibit 18  Kristie Small vs. Office of   124

14            Congressman Henry Cuellar and
              Henry Cuellar Summary

15            SMALL 00003-4

16    Exhibit 19  Leave Request           141
              HC001148

17

      Exhibit 20  Leave Request           141

18            HC001149

19    Exhibit 21  E-Mail Chain dated 6-25-18    159
              HC000168-169

20

      Exhibit 22  E-Mail dated 6-3-18         159

21            HC000174-175

22    Exhibit 23  E-Mail Chain dated 7-31-18    159
              HC001484-1487

Page 6

EXHIBITS (CONTINUED:)
1
2    Exhibit 24  E-Mail Chain dated 7-16-18    159
        HC000194
3
     Exhibit 25  E-Mail Chain dated 7-16-18    159
4        HC000195-199
5    Exhibit 26  E-Mail dated 8-2-18    160
        HC000212-213
6
     Exhibit 27  E-Mail Chain dated 7-16-18    160
7        HC000674-678
8    Exhibit 28  E-Mail dated 8-8-18    160
        HC001132
9
     Exhibit 29  E-Mail dated 8-9-18    160
10       HC001133
11   Exhibit 30  E-Mail dated 8-15-18    160
        HC001134
12
     Exhibit 31  E-Mail dated 8-17-18    160
13       HC001136
14   Exhibit 32  E-Mail dated 7-31-18    160
        HC001150
15
     Exhibit 33  E-Mail dated 10-12-18    160
16       HC001154
17   Exhibit 34  E-Mail dated 7-31-18    160
        HC000201-202
18
     Exhibit 35  E-Mail Chain dated 8-2-18    160
19       HC000210-211
20   Exhibit 36  E-Mail Chain dated 10-1-18    175
        HC002570-2575
21
     Exhibit 37  E-Mail Chain dated 10-16-18    175
22       Attachment
        HC002803-2806

Page 7

EXHIBITS (CONTINUED):
1
2    Exhibit 38  E-Mail dated 9-4-18    175
        Attachment
3       HC001847-1860
4    Exhibit 39  E-Mail Chain dated 9-10-18    175
        HC000373-375
5
     Exhibit 40  E-Mail dated 8-3-18    225
6       HC002408-2420
7    Exhibit 41  E-Mail Chain dated 8-8-18    225
        HC002439-2446
8
     Exhibit 42  E-Mail Chain dated 9-5-18    225
9       HC002470-2478
10   Exhibit 43  E-Mail dated 10-12-18    225
        HC000679
11
     Exhibit 44  E-Mail dated 8-31-18    225
12       Attachment
        HC002465-2469
13
     Exhibit 45  E-Mail Chain dated 9-7-18    225
14       Attachment
        HC000347-348
15
     Exhibit 46  E-Mail Chain dated 10-11-18    225
16       HC000405
17   Exhibit 47  E-Mail Chain dated 7-3-18    225
        HC000180-182
18
     Exhibit 48  E-Mail Chain dated 10-15-18    239
19       Attachment
        HC001158-1173
20
     Exhibit 49  E-Mail dated 10-25-18    250
21       HC001156-1157
22   Exhibit 50  E-Mail dated 7-19-18    252
        HC002311-2318

Page 8

EXHIBITS (CONTINUED):
1
2    Exhibit 51  E-Mail Chain dated 6-5-18    252
        HC002127-2130
3
     Exhibit 52  E-Mail dated 7-3-18    252
4       Attachment
        HC002255-2270
5
     Exhibit 53  Plaintiff's Answers to    265
6       Requests for Admission
7    Exhibit 54  E-Mail dated 3-3-20    270
        Attachment
8       HC003631-3647
9    Exhibit 55  Plaintiff's Answers to    293
        Interrogatories
10
11
12
13
14
15
16
17
18
19
20
21
22   (Exhibits bound separately.)

Page 9

1            P R O C E E D I N G S
2
3            KRISTIE SMALL,
4    was called for examination by counsel and,
5    after having been duly sworn by the Notary, was
6    examined and testified as follows:
7
8            MR. BLAKE:  All right.  Good
9    morning.
10            This is the deposition of Plaintiff
11   Kristie Small in the above-captioned case.  I
12   am Trevor Blake for the defendant, the office
13   of Congressman Henry Cuellar.  I'm here with
14   Mark Hayes, and Mrs. Small is here and
15   accompanied by her attorney, Sara McDonough.
16            And are we ready to go?
17            First of all, Counsel, I just want
18   to confirm that this is being taken pursuant to
19   the Federal Rules Of Civil Procedure, and that
20   as a result all objections except as to form
21   and privilege are preserved.
22            Is that your understanding?

Page 18

1    bit -- the application process initially for
2    the job at the Committee on House
3    Administration?
4        A.   The job application process was
5    nonexistent for that position.  I was formerly
6    in Congressman Brady's personal office.  I
7    began that position -- I began that position
8    directly out of college.  I graduated in
9    December of 2004, and I started the position in
10   February of 2005.  I had been looking at job
11   boards and getting recommendations of places
12   that might have openings on the Hill because I
13   interned for Senator Rockefeller during
14   college.  So I literally came up here and
15   stayed with friends and I knocked on doors and
16   handed out resumes, and when I went into Mr.
17   Brady's office, it was during a recess, and
18   nobody was at the front desk.  So I said,
19   "hello," and I heard a man behind the wall say,
20   "hello."  And I said, "May I drop off a resume,
21   please?"
22           And so I went back, it happened to

Page 19

1    be with the chief of staff, and he interviewed
2    me on the spot and called me the next day or
3    the day after, one or two days, and offered me
4    the job.
5        Q.   And that was in 2000-?
6        A.   '5.
7        Q.   Okay.  And then you started working
8    -- well -- and I should back up.  Again, just
9    to make sure we're on the same page, when I say
10   "office," I'm going to be referring to the
11   defendant office of Congressman Henry Cuellar.
12           Do you understand that?
13       A.   Yes.
14       Q.   When I say "congressman" or
15   "member," just congressman or member as opposed
16   to congressman so and so member such and such,
17   I'm going to be referring to Congressman Henry
18   Cuellar.
19           Do you understand that?
20       A.   Yes.
21       Q.   Okay.  And so you started working
22   for the personal office of Congressman Brady in

Page 20

1    2005.  And so how did that translate into
2    working for the Committee on House
3    Administration in 2007?
4        A.   I was a staff assistant and
5    scheduler, and I was there for, approximately,
6    a year in that position and then moved up to
7    legislative, and a legislative assistant.  And
8    then, at that time, Mr. Brady became chairman
9    of House Administration Committee, and so as he
10   was filling his staff they offered me to go to
11   the committee because of my great work record.
12       Q.   And can you, just for the record,
13   tell me what the Committee on House
14   Administration is, what it does?
15       A.   Yes.
16           The Committee on House
17   Administration has jurisdiction over multiple
18   facets of the House Of Representatives.  They
19   do everything from supervising federal
20   elections.  So when an election has a recount,
21   it is our team of -- was our team of lawyers
22   that would go to facilitate and make sure the

Page 21

1    rules were being followed for the recounts.
2           We did new member orientation every
3    two years for every new member of Congress that
4    would come in.  That was a huge job.  It took
5    planning starting two years ahead of time.  As
6    soon as one was over another one would start to
7    be planned for.
8           My direct responsibilities were
9    always helping with new member orientation.  My
10   areas of oversight were the house restaurants.
11   So all the cafeterias, all the vending, all of
12   the contracts, all of the people that we were
13   procuring to hire to come in was -- oversaw all
14   of that, and also day-to-day operations and
15   day-to-day complaints.  So that was one of my
16   main responsibilities.
17          My second responsibility was to have
18   oversight of the Capitol Visitor Center.  So I
19   had weekly meetings with the CEO of the Capitol
20   Visitor Center, Beth Plemmons, including the
21   senate rules staff and the -- including the
22   senate rules staff because we had jurisdiction

6 (Pages 18 - 21)  EX 1

Page 26

1    Q.   Would you say that it was important
2  for a member office to have a good relationship
3  with the Committee on House Administration?
4    A.   Yes.
5    Q.   And can you give a couple reasons
6  why?
7    A.   We were always known as the members'
8  committee, so they were told that, and that
9  they should come to us if they had any problems
10 with anything we had jurisdiction over.
11   Q.   So if you were working in a member's
12 office, you would want to have a good
13 relationship with the Committee on House
14 Administration?
15   A.   Yes.
16   Q.   During your time at the Committee on
17 House Administration, was there any
18 disciplinary action taken against you?
19   A.   Never.
20   Q.   Any performance deficiencies
21 identified to you?
22   A.   Never.

Page 27

1    Q.   No performance improvement plan?
2    A.   Never.
3    Q.   No promotions, though, right?
4    A.   There was not availability for
5  promotions.
6    Q.   Okay.  So, just to be clear for the
7  record, no promotions, though?
8    A.   No.
9    Q.   All right.  Performance-based raises
10 or COLAs?
11   A.   No COLAs.
12      Yes, I think three raises in the
13 time I was there.
14   Q.   That were performance-based?
15   A.   Yes.
16   Q.   And did you-all get bonuses on the
17 committee?
18   A.   Yes.
19   Q.   Were those performance-based?
20   A.   No.
21   Q.   So, like, everyone got $2,000 a year
22 or something like that?

Page 28

1    A.   Yes.
2    Q.   Have you ever -- and I'm looking
3  before you started working for Congressman
4  Cuellar' office, for any job on the Hill did
5  you ever have a probationary period?
6    A.   No.
7    Q.   Okay.  Were you aware that some
8  offices on the Hill have probationary periods?
9    A.   Yes.
10   Q.   And how are you aware?
11   A.   Through word of mouth.
12   Q.   So going off the Hill, have you ever
13 had a probationary period for any job?
14   A.   No.
15   Q.   Ever?  Both before -- before you
16 started working on the Hill and since?
17   A.   There was nowhere before the Hill.
18 That was my first job, so no.
19   Q.   What prompted you to leave the
20 Committee on House Administration?
21   A.   Bob Brady was retiring, and I was
22 looking for opportunities to expand, you know,

Page 29

1  my profile and my knowledge and take a next
2  step.
3    Q.   Okay.  And do you know why did
4  Representative Brady retire?
5    A.   You would have to ask him that.
6    Q.   Do you know if his retirement was
7  voluntary?
8    A.   Yeah.
9       I mean, as far as I -- anything I
10 would know it was at his own will.  He was
11 ready.
12   Q.   Could you have stayed at the
13 Committee on House Administration after
14 Representative Brady retired?
15   A.   Yes.
16   Q.   So you voluntarily left the
17 Committee on House Administration?
18   A.   Yes.
19   Q.   And are there some people who stayed
20 on at the Committee on House Administration
21 after Congressman Brady retired?
22   A.   Yes.

8 (Pages 26 - 29)

EX 1

Kristie Small                                                          March 13, 2020

Page 34

1       A.   No.
2       Q.   Before Congressman Cuellar's office
3   on the Hill, did you have the ability to fire
4   or effectively recommend firing people?
5       A.   No.
6       Q.   Before Congressman Cuellar's office,
7   did you have the authority to promote or
8   effectively recommend promotions of people?
9       A.   No.
10      Q.   Before Congressman Cuellar's office,
11  while working on the Hill, did you have the
12  authority to discipline or effectively
13  recommend disciplining people who worked on the
14  Hill?
15      A.   No.
16      Q.   Before Congressman Cuellar's office,
17  did you have the ability to evaluate
18  performance in a formal way for anyone working
19  on the Hill?
20      A.   No.
21      Q.   Okay.  Before working for
22  Congressman Cuellar's office, did you have the

Page 35

1   ability to approve leave for anyone working on
2   the Hill?
3       A.   No.
4       Q.   And before working in Congressman
5   Cuellar's office, did you have the ability to
6   determine or effectively recommend compensation
7   such as salaries and bonus amounts?
8       A.   No.
9       Q.   Can you describe to ne the
10  application process with Congressman Cuellar's
11  office?  So how that job offer came about?
12      A.   As I was beginning the process of
13  finding a new position, I was reaching out to
14  colleagues to see where openings may be.  And a
15  colleague, Nina Andrews, notified me that her
16  chief of staff had just left and her deputy
17  chief had just quit, and that the office was a
18  mess, and he was probably looking to hire
19  someone.
20          And I said, oh, well, I'm looking.
21  So I believe she gave him my resume, and then I
22  had two or three interviews, and on my -- maybe

Page 36

1   it was just two.  On the -- no, it was two.
2   There was one in the members' dining room and
3   one where -- the second one where he hired me
4   was at a restaurant with Nina Andrews present,
5   and he offered me less money.  He offered me
6   what -- less money than I ended up making, and
7   he also offered me -- he -- he was thinking for
8   me to be legislative director, and I said to
9   him I think I would be better in a chief of
10  staff type position, is there anyone in your
11  office that you would trust to be your
12  legislative director?  And, at that point, he
13  and Nina discussed Juan Sanchez, and that's
14  what ended up happening.
15          So he took my recommendation to have
16  Juan become a legislative director, and hired
17  me as the deputy chief of staff, offering me
18  $80,000.  And I said that I would need to make
19  more, and so he ended up -- I ended up with
20  making $90,000.
21      Q.   Okay.  You said a lot.  So I just
22  want to make sure I understand everything.

Page 37

1           So you said that initially you were
2   in touch with Nina Andrews from Congressman
3   Cuellar's office; is that right?
4       A.   Uh-huh.
5       Q.   Okay.  So what was your relationship
6   with Nina Andrews before you spoke about
7   possibly joining Congressman Cuellar's office?
8       A.   Nina and I had been good friends for
9   approximately 10 years.  We were Washington
10  Wizard dancers together in 2008, and so that's
11  when our relationship began.  That's when we
12  met.
13      Q.   Did you have any professional
14  interaction with Nina on the Hill before you
15  started working in Congressman Cuellar's
16  office?
17      A.   As far as job duties, no.
18      Q.   So as a staffer on the Committee on
19  House Administration, which you were, and you
20  know as a staffer for Congressman Cuellar's
21  office, did you have any interaction between
22  the committee and the members' office?

10 (Pages 34 - 37)   EX 1

Page 38

1    A.   No.
2    Q.   So was anyone present at your
3  interview with the congressman, the first one
4  that was in the members' dining room?
5    A.   No.
6    Q.   Okay.  And besides Nina Andrews and
7  the congressman, obviously, and yourself, was
8  anyone present at the interview that took place
9  at the restaurant?
10   A.   No.
11   Q.   Do you know why Nina was there?
12   A.   You would have to ask him.
13   Q.   All right.  What were you making
14  salary-wise at the Committee on House
15  Administration at the time that you interviewed
16  with Congressman Cuellar?
17   A.   80,000.
18   Q.   And so he offered you what you were
19  making --
20   A.   Yes.
21   Q.   -- at the Committee on House
22  Administration?

Page 39

1       Can you tell me a little bit more
2  about why he was recommending that you be the
3  legislative director?
4    A.   I have no -- you would have to ask
5  him.
6    Q.   Was being the legislative director
7  anything that you and Nina discussed about a
8  possibility when you joined the office?
9    A.   Not that I recall.
10   Q.   Was Nina present when you were
11  talking about salary?
12   A.   I don't recall.
13   Q.   Was Nina present for all of the --
14  was it the dinner, lunch?
15   A.   Dinner.
16      And, at the end, before he
17  officially offered me the job, he did have her
18  leave, but I don't remember if salary had been
19  discussed before or after she was -- she left.
20   Q.   So at some point Nina left and then
21  the congressman offered you the job; is that
22  right?

Page 40

1    A.   Yes.
2    Q.   And then you stayed a little bit
3  longer and talked about the job; is that right?
4    A.   I believe so.
5    Q.   So there was some conversation with
6  the congressman about the job on that occasion
7  when Nina was not present, right?
8    A.   Yes.
9    Q.   Did the congressman agree to pay
10  $90,000 in that same conversation or at a later
11  time?
12   A.   I believe it was at a later time.
13   Q.   And do you know if it was a verbal
14  communication, like a phone call or meeting, or
15  a written communication like an e-mail or a
16  text?
17   A.   I don't recall.
18   Q.   Did you -- at the time of this
19  conversation when the congressman offered you
20  the position of deputy chief of staff, did the
21  congressman's office have a chief of staff?
22   A.   No.

Page 41

1    Q.   Okay.  And was there any talk about
2  filling the vacant chief of staff position?
3    A.   He told me that he was not filling
4  it.  That the woman who had left and taken
5  another job, he was going to give it a year to
6  make sure that she was happy and didn't want to
7  come back.
8    Q.   So was your understanding, then,
9  that you would be deputy chief of staff on a --
10  for at least a year?
11   A.   Yes.
12   Q.   There is no discussion about the
13  possibility of a promotion to chief of staff?
14   A.   There was.  He told me that that
15  could be a possibility.
16   Q.   Okay.  Did you talk about a timeline
17  for that at all?
18   A.   No, not -- not past the one year
19  that he had mentioned.
20   Q.   Do you know Patrick Malloy?
21   A.   Yes, that name sounds familiar.
22      Can you give me more information?

11 (Pages 38 - 41)    EX 1

Kristie Small                                             March 13, 2020

Page 42

1    Q.   Sure.
2         My understanding is Patrick Malloy
3    was your immediate predecessor in the
4    congressman's office, so I think he was the
5    deputy chief of staff until in or about May of
6    2018?
7    A.   I don't know.
8         The chief of staff -- the -- the
9    deputy chief of staff before me, I don't recall
10   her name, Amy Travieso maybe, but that's who
11   was right before me as deputy chief.
12   Q.   Okay.  So what's your recollection
13   about Patrick Malloy?
14   A.   Nothing really.
15        I'm not saying that there isn't
16   something, but I can't -- I can't think of
17   anything.
18   Q.   So did you know that Patrick Malloy
19   was one of the congressman's deputy chiefs of
20   staff at some point?
21   A.   I can't say yes or no.  I don't
22   know.

Page 43

1    Q.   What was your understanding of the
2    duties that you would be taking on as the
3    deputy chief of staff of the congressman?
4    A.   So my understanding was that -- and
5    I'm referencing my resume as well, that I would
6    oversee and run the staff.  I would do training
7    and I would provide an overall management to
8    both the district and D.C. office.
9    Q.   And just as we did before with the
10   Committee on House Administration, does your
11   resume, Small 307, Defendant's Exhibit 1,
12   accurately reflect your job duties while you
13   were the deputy chief of staff/acting chief of
14   staff for the congressman?
15   A.   Yes.
16   Q.   Okay.  Anything that's missing?
17   A.   Not that I can think of.
18   Q.   Going back to the -- around the
19   start of your employment, was there any
20   discussion about your salary and chances for
21   increasing that beyond the 90,000?
22   A.   At what point in time?

Page 44

1    Q.   So early on around the time that you
2    started, whether it was before or just after
3    you started.
4         Did you talk about, you know, the --
5    the prospect of making more than 90,000?
6    A.   I don't recall.
7         MR. BLAKE:  Let's make this
8    Defendant's Exhibit 2.  The Bates number is HC
9    1155.
10        (Deposition Exhibit 2 was marked for
11   identification.)
12        BY MR. BLAKE:
13   Q.   Mrs. Small, would you, please, just
14   review Exhibit 2 and let me know when you've
15   had a chance to fully read it?
16   A.   (Witness complies.)
17        Yes, I recall this.
18   Q.   Can you, just for the record,
19   explain what Exhibit 2 is?
20   A.   Exhibit 2 is my written explanation
21   of a discussion we had.  It was not at the very
22   beginning of my hiring.  I'm sure you would

Page 45

1    have the exact date if need be; but, yeah, we
2    -- we -- I discussed with him that in around
3    eight months from then when I would have been
4    having a baby that would be going to daycare,
5    that this is what it would look like for me to
6    be able to afford that.
7    Q.   Okay.  And do you know when this
8    Exhibit 2 was prepared?
9    A.   I do not.
10   Q.   You prepared Exhibit 2, right?
11   A.   Correct.
12   Q.   As far as you can tell, is this a
13   true and accurate copy of this document?
14   A.   Yes.
15   Q.   So I just want to call your
16   attention to the second bullet on Exhibit 2.
17   A.   Uh-huh.
18   Q.   It says "That said, I wanted to
19   discuss my financial future with you.  We had a
20   general discussion about salary and daycare
21   cost when I began my job.  I'd like to refresh
22   what we went over."

12 (Pages 42 - 45)   EX 1

Kristie Small                                          March 13, 2020

Page 46

1        Do you know when that general
2    discussion that you were referring to in
3    Exhibit 2 happened?
4        A.   I don't recall, but I do know that
5    we had to switch daycares, and it became
6    significantly more cost-wise because I was
7    switching -- we were switching her daycare to
8    accommodate what my new office hours would be,
9    which were very long.
10       Q.   Do you know about when you switched
11   daycares?
12       A.   Probably -- I have to think about
13   that.
14       What was my start day with
15   Congressman Cuellar?
16       Q.   June 1st, 2018.
17       A.   So around then.  It would be around
18   that time.  Maybe a month after, but it was
19   really close to that time frame of getting the
20   new job.
21       Q.   So would you then, based on that,
22   think that this general conversation referenced

Page 47

1    in Bullet 2 about salary and daycare costs
2    happened in June of 2018?
3        A.   I can't say.
4        Q.   Do you think it would have been any
5    later than June of 2018?
6        A.   I don't know.
7        Q.   Okay.  So if we can pinpoint when --
8    Kadence, right?
9        A.   Uh-huh.
10       Q.   When Cadence started at the new
11   daycare, that would give us a sense of when you
12   had this conversation, right?
13       A.   I don't know.
14       Q.   Do you know when, going back to
15   Exhibit 2 here, you talk about wanting to
16   refresh what -- when -- what we went over?  Do
17   you remember when that later conversation, the
18   refreshed conversation happened?
19       A.   It was later in my employment and
20   that's what brought this about.
21       Q.   So when you were hired by the
22   congressman, did he know that you had Cadence?

Page 48

1        A.   Yes.
2        Q.   Okay.  And he knew that you were
3    married?
4        A.   Yes.
5        Q.   Okay.  At the time, he did not know
6    that you were pregnant --
7        A.   I did not --
8        Q.   -- or did you --
9        A.   -- know I was pregnant.
10       Q.   Okay.  So he -- so he didn't know
11   that you were pregnant?
12       A.   Correct.
13       Q.   Okay.
14       A.   And dur- -- during our interviews, I
15   expressed to him that the one thing that was
16   extremely important to me was that if I needed
17   to take care of Cadence if she was sick, like,
18   that would be my first priority.  So just so,
19   you know, he was clear before he hired me that
20   I did have this beautiful daughter and that I
21   would have to take care of her if, you know,
22   circumstances where -- where she was not

Page 49

1    healthy.
2        Q.   Right.
3        Did you talk to the congressman
4    about the prospect of having a second child
5    somewhat imminently?
6        A.   I have never spoke to him about
7    that.
8        Q.   So when you were talking about -- if
9    you look at the third bullet, the second to
10   last sentence says "Eventually, we will have a
11   second child in daycare where another
12   approximately $2,000 will be spent."
13       A.   Yes.
14       Q.   This estimates approximately --
15       A.   Yes.
16       Q.   -- $15,000 a year in daycare?
17       A.   Well, it wasn't a prospect at that
18   point.  I was pregnant.
19       Q.   Okay.  Well, you were pregnant when
20   you prepared Defendant's Exhibit 2, right?
21       A.   Yes.
22       Q.   But did you talk about this

Kristie Small                                    March 13, 2020

Page 50

1  possibility --
2      A.  No.
3      Q.  -- in your initial conversation
4  that's referenced in Bullet 2?
5      A.  No.
6      Q.  But, just to be clear, you denote
7  that you had one child and he knew that you
8  were married at the time that he hired you,
9  right?
10     A.  Yes.
11         And before you ask, I will need to
12 take a bathroom break --
13     Q.  Sure?
14     A.  -- whenever --
15         MR. BLAKE:  Why don't we take a
16 break now.  So let's go off the record.
17         (A short recess was taken.)
18         BY MR. BLAKE:
19     Q.  I just want to ask you quickly about
20 your resume, Defendant's Exhibit 1.
21         So based on this resume, it looks
22 like your duties for the congressman were very

Page 51

1  different from your duties for the Committee on
2  House Administration.
3          Would you say that that's an
4  accurate assessment?
5      A.  Yes.
6      Q.  Also, just briefly going back to
7  your salary conversation with the congressman
8  around the time that you started a little bit
9  before, just to be clear, he offered $80,000,
10 right?
11     A.  Yes.
12     Q.  You countered with 90,000; is that
13 right?
14     A.  I don't recall.
15     Q.  You countered with some amount; is
16 that right?
17     A.  Correct.
18     Q.  And you agreed to 90,000; is that
19 right?
20     A.  Correct.
21     Q.  And did you talk about, you know, if
22 and when a future raise might happen?

Page 52

1      A.  Not that I recall.
2      Q.  Okay.  So there was no discussion
3  about we'll revisit this in, you know, six
4  months?
5      A.  Not that I recall.
6      Q.  Did you talk at all about the
7  possibility of getting a bonus, you know, not
8  just salary but also getting a bonus?
9      A.  Not that I remember.
10     Q.  All right.  So one of our
11 million-dollar questions in this case is the
12 probationary period.
13         When did you first learn about the
14 probationary period in the congressman's
15 office?
16     A.  When he responded to my e-mail
17 asking for maternity leave.
18     Q.  Okay.  And so that was in August of
19 2018 -- around August -- I think it was August
20 8th of 2018; is that right?
21     A.  That sounds approximate.  I don't
22 remember.

Page 53

1      Q.  Okay.  So your contention, then, is
2  that before this response to this e-mail in
3  20 -- in August of 2018 that you were unaware
4  of your probationary period; is that right?
5      A.  100 percent.
6      Q.  Did you -- let me back up.
7          When you learned about your
8  probationary period, then, from this e-mail,
9  did you -- how did you respond to the
10 congressman?
11     A.  I believe the way I responded to him
12 was just as an employee just saying okay, I
13 understand.  I don't -- I don't believe that I
14 pushed back.  You know, he was my boss.  So if
15 he wanted to say that there was a 90-day
16 probationary period at that point, I -- I
17 questioned my coworkers.  I said, what is this?
18 What -- have you -- were you on a probationary
19 period?  And no one that had currently -- that
20 was currently working in the office had ever
21 been on a probationary period, and I helped
22 hire two of those people, and I was with him

Kristie Small                                             March 13, 2020

Page 54

1  during all of the interviews and final
2  conversations and none of them were ever told
3  there was a 90-day probationary period.
4      Q.   Okay.  And who did you help hire?
5      A.   Travis and Madeline.
6      Q.   And that's Travis Knight, and how do
7  you say Madeline's last name?
8      A.   Abadie.
9      Q.   So, to be clear, you did not push
10  back when the congressman sent you this e-mail
11  talking about your probationary period even
12  though you were surprised by that e-mail?
13      A.   I believe that's correct.
14      Q.   Okay.  Did you ever -- I'll make HC
15  399, Exhibit 3.
16      (Deposition Exhibit 3 was marked for
17  identification.)
18      BY MR. BLAKE:
19      Q.   So Exhibit 3 appears to be a -- an
20  e-mail from you to yourself indicating, "Note
21  for the record, I did not agree to this."  And
22  it says some other things.

Page 55

1      So would it be fair to say that this
2  e-mail is a note to self just kind of setting
3  forth a contemporaneous record indicating that
4  you disagreed with something that the
5  congressman stated you had agreed to?
6      And, yes, please take your time to
7  read the document.  I'm sorry.
8      A.   So the bottom e-mail, it's the first
9  correspondence?
10      Q.   I believe so.
11      A.   From him?
12      Oh, yeah.
13      Q.   Do you want me to repeat my
14  question?
15      A.   Yes.
16      Q.   Okay.  So this e-mail -- and, just
17  to be clear, so this is an e-mail from -- an
18  e-mail chain from September 28th, 2018, between
19  the congressman and you and then between you
20  and you.  This e-mail looks to me to be a note
21  to self from you to you indicating that you
22  disagreed with the congressman's

Page 56

1  characterization in -- that's in the e-mail at
2  the bottom of this page; is that accurate?
3      A.   I disagreed with not having an
4  option to when the meeting would be --
5      Q.   Okay.
6      A.   -- because I -- he did not give me
7  an option.
8      Q.   Okay.  So the note for the record
9  was you were just making a record that you did
10  not agree with something that he had indicated;
11  is that right?
12      A.   Note to self.
13      Q.   Note to self, yes.
14      A.   Yes.
15      Q.   So this is not about whether a
16  probationary period exist.  This, Exhibit 3, is
17  about, I guess, whether or not you agreed to
18  meet at a certain time; is that right?
19      A.   Can you repeat the question?
20      MR. BLAKE:  Would you mind reading
21  it back?  I just want to make sure it's
22  accurate.

Page 57

1      (The record was read as requested.)
2      THE WITNESS:  Well, no, because it
3  says here he wrote, which is the 30-day
4  performance review date.
5      BY MR. BLAKE:
6      Q.   Okay.  So let me try to make this a
7  little easier.  In the first -- the second
8  sentence after a note for the record, at the
9  top e-mail you say, "I did not agree to this."
10      What did you not agree to?
11      A.   I did not agree to extending it with
12  -- after he was gone.
13      Q.   Okay.
14      A.   It was just told to me and I
15  accepted it.
16      Q.   Okay.  So did you ever write a
17  similar note to self or note for the record
18  about disagreeing that you had been told that
19  there was a 90-day probationary period when you
20  started?
21      A.   I don't understand the question.
22      Q.   So when Congressman Cuellar said "We

Kristie Small                                                March 13, 2020

Page 106

1    done, right?

2        A.   No.

3             I do have basis from his end.  When

4    I told him I was pregnant he was not -- he did

5    not really show any emotion.  He might have

6    said congratulations; but, again, it wasn't,

7    like, yay, congratulations.

8             And then we were having a staff

9    meeting right after, and I was like, hey, I was

10   referring to him, should I share the good news?

11            And he was, like, what news?

12            And I was, like, I'm pregnant.

13            He was, like, oh, oh, that's up to

14   you.  Just kind of just, like, shoved it off,

15   and we really never talked about it again.

16   Never asked me, like, how I was doing, you

17   know.  It was kind of just, like, I don't know.

18   It -- it wasn't a welcoming response.

19       Q.   We will do a few more exhibits.

20            So I have the congressman's

21   handbook, but I think you might know the answer

22   to this without having to go through --

Page 107

1        A.   I'm sure I do.

2        Q.   -- the whole rigamarole.

3             So you did receive a handbook from

4    the congressman, correct?

5        A.   I did.

6        Q.   And you did look at the FMLA policy

7    in the handbook; is that right?

8        A.   I did.

9        Q.   And the congressman's policy, when

10   you were working there, was to provide paid

11   FMLA leave; is that right?

12       A.   Yes.

13       Q.   And you know that the law does not

14   require employers to provide paid leave --

15       A.   I do.

16       Q.   -- maternity leave; is that right?

17       A.   Uh-huh.

18       Q.   Okay.  So the congressman was

19   providing paid leave, but was not legally

20   required to do that, right?

21       A.   That's what the handbook said.  He

22   never approved my leave.

Page 108

1             (Deposition Exhibit 15 was marked

2    for identification.)

3             (Deposition Exhibit 16 was marked

4    for identification.)

5             BY MR. BLAKE:

6        Q.   So I passed around two exhibits, 15

7    and 16.  15 is Bates labeled HC 38 and 39.  16

8    is Bates labeled HC 41 and 42.

9             Looking at Exhibit 15, Mrs. Small,

10   this is -- the title of this is

11   "Confidentiality Agreement."

12            Do you recall signing this

13   confidentiality agreement when you started

14   working for the congressman?

15       A.   Yes.

16       Q.   Okay.  And it says that you signed

17   this June 1st, 2018.

18            Does that seem accurate?

19       A.   Yes.

20       Q.   Did you read and understand this

21   confidentiality agreement?

22       A.   Yes.

Page 109

1        Q.   Okay.  So just I want to say for the

2    record -- so Paragraph 3 says, "Staff shall

3    maintain in the strictest confidentiality all

4    written or oral information learned or

5    discussed with staffing member and/or his

6    employing office.  Staff will not directly or

7    indirectly communicate or divulge to or for the

8    benefit of any person or other legal entity any

9    of the members and/or employing office's files,

10   documents, correspondence, practices,

11   procedures or other confidential information."

12            Do you -- did I read that

13   accurately?

14       A.   Yes.

15       Q.   Paragraph 5 also says that employee

16   reads and under -- read and understand, and you

17   indicated that you read and understood that,

18   right?

19       A.   Yes.

20       Q.   And Paragraph 6 says, "Staff

21   understands and agrees that any violation of

22   this agreement may result in immediate

EX 1

Kristie Small                                          March 13, 2020

Page 122

1    where it wasn't just being a tough boss.  It
2    was being just a truthfully not nice person.
3    There's a difference between a mean boss and a
4    person that's genuinely not nice.
5       Q.   So taking out, like, discrimination,
6    your claim, I just want to focus on.  So what,
7    besides that, made him, like, not a nice boss,
8    including anything that you think was unethical
9    under house rules?
10      A.   I mean, just everything I've already
11   stated about his demands and his fickleness of
12   knowing whether he approved things or not, and
13   whether had they been approved in the past and
14   he still -- he's acting like they still need
15   changed, and it's never really pleasant in
16   general.  He's always a crab around the office.
17   Cutting up the apples, eight pumps of creamer
18   in the coffee.  It was just difficult.
19      Q.   So if you had not been let go in
20   October of 2018, do you think you would have
21   stayed there longer -- much longer?
22      A.   I had no plans of leaving.  I don't

Page 123

1    know.  I can't say how long I would have
2    stayed.
3       Q.   I just want to go back.  So we
4    talked about ethics again.  So, for the record,
5    you never formally made an ethics complaint
6    against the congressman, right?
7       A.   It was informal.
8       Q.   Okay.  And you -- and -- and you
9    never made a formal anonymous complaint against
10   the congressman --
11      A.   It was not anonymous.
12      Q.   Okay.  So you made an inquiry?
13      A.   Informal inquiry.
14      Q.   Okay.  And it was not anonymous?
15      A.   No.
16      Q.   To ethics?
17      A.   I did.
18      Q.   While you were employed by the
19   congressman?
20      A.   No.
21      Q.   Okay.  After you left or before you
22   started?

Page 124

1       A.   After I left.
2       Q.   All right.  So during your
3    employment with the congressman, you made no
4    formal or informal ethics complaint against the
5    congressman; is that right?
6       A.   Correct.
7       Q.   So we started talking about this.
8            Actually, do you mind if we take a
9    break?
10      A.   I don't mind.
11           (A short recess was taken.)
12           (Deposition Exhibit 17 was marked
13   for identification.)
14           (Deposition Exhibit 18 was marked
15   for identification.)
16      BY MR. BLAKE:
17      Q.   We have a couple new exhibits.  One
18   is 17, which is your amended complaint, Mrs.
19   Small, and then the second new exhibit is 18,
20   and that's Bates labeled Small 3 and 4.
21           In Paragraph 32 of your amended
22   complaint, you allege that "Plaintiff

Page 125

1    immediately encountered significant challenges.
2    Cuellar's office was disorganized and lacked
3    policies and procedures."
4            So can you tell us a little about --
5    well, first of all, does that accurately
6    reflect your impression of the congressman's
7    office at the time that you started working
8    there?
9       A.   Yes.
10      Q.   Okay.  And can you explain a little
11   bit about what made you think that -- what
12   challenges you encountered and what made you
13   think that the office was disorganized and
14   lacked policies and procedures?
15      A.   The office was disorganized and
16   lacked policies and procedures due to the fact
17   that the position had been vacant, and so the
18   staff had no direction.  They really had nobody
19   to report to, and so they were actually
20   thankful and said so to me, that I was there,
21   and that things could quote/unquote, like,
22   come -- get back together.  Because, I guess,

32 (Pages 122 - 125)

Page 126

1    it had just been, like -- there had been no
2    direction and no boss there directly to them.
3    Of course, the congressman was their boss, but
4    he's busy so he wasn't keeping up with the
5    day-to-day administrative functions.
6         Q.   Do you have any examples of the
7    kinds of policies and procedures that were
8    lacking at that time?
9         A.   I think mainly it was the reporting.
10   They didn't really have anyone to report to.
11   They were still doing reports.  But, again, I
12   don't know that he was able to, you know --
13   able to pay the attention to them that someone
14   in my position would be able to.
15        Q.   So a minute or so ago you said that
16   you think some of the problems stem from the
17   fact that the position was vacant.  And, just
18   for the record, what position were you
19   referring to?
20        A.   Deputy chief of staff and also his
21   chief of staff position had been vacant.
22        Q.   All right.  So when you first

Page 127

1    started there, did you have any thoughts about
2    things that were working well in the office?
3         A.   Staff members were competent, and
4    they were working well.  It was just
5    disorganized again because there was no
6    authority boss figure for them to go to in that
7    deputy chief or chief role.
8         Q.   So would you say that you inherited
9    a mess when you started?
10        A.   Correct.  It was messy.
11        Q.   Messy?
12        A.   Yeah.
13        Q.   Are there some things that you
14   recall thinking at that time when you started
15   needed to be improved in the office?
16        A.   Improvements would have been the
17   reporting procedure because there was none
18   existing at that time because the positions
19   were vacant.  Improvements on the education of
20   the young staffers just because they were
21   young, and coming from the background that I
22   came from at House Administration knowing, you

Page 128

1    know, a lot of the rules and policies and
2    procedures, I was able to extend that knowledge
3    to them, which was good.  So that was one of
4    the things.
5         Q.   So when you say "education to the
6    staffers," like, what specifically do you think
7    was lacking education-wise for the young
8    staffers?
9         A.   I don't -- I don't think they knew a
10   whole lot about actual, like, house rules in
11   regard to -- and also house resources.  Like,
12   they had to be introduced, not all of them, but
13   some of them to, like, CRS to know that they
14   could go and get research there, and other
15   resources that were available to them.  Library
16   of Congress, like, you know, you can go over
17   there and do things, and then there was some
18   every -- you know, everyday things.
19            I recall I think -- I don't remember
20   exactly what the particular issue was, but it
21   was something that Zack Linick -- I showed him,
22   like, something really simple on the computer

Page 129

1    that was, like, a resource.  And he was, like,
2    oh, my god, that changed my life.  Like, how
3    did I not know that?  It was a directory maybe
4    or -- I don't know.  I don't remember exactly
5    what it was, but it was just things that young
6    staffers wouldn't necessarily know unless
7    someone told them.
8         Q.   And do you think, like, some of the
9    things that staffers didn't know was that those
10   things were adversely impacting how the office
11   was running?
12        A.   Yes.  Yes.
13        Q.   And do you think that that bothered
14   the congressman?
15        A.   I think the disorganization did.
16        Q.   Okay.  So when you were talking to
17   the congressman about taking this job and
18   shortly after you started -- started in his
19   office, did you talk about how in your role you
20   might address some of these failings in the
21   office?
22        A.   Yes.

EX 1

Kristie Small                                    March 13, 2020

Page 130

1    Q.   Okay.  And do you remember
2    specifically anything that you-all talked about
3    needing to improve or fix or otherwise develop?
4    A.   I don't recall.
5    Q.   When you left the office in October
6    of 2018, how did your impressions about the
7    state of the office change, if at all, from
8    when you started in June?
9    A.   The office was much more well
10   organized.  The staffers were trained much more
11   appropriately to be able to use resources that
12   they had not known about, and just a general
13   sense of planning and organization coming from
14   my end saying, you know, here's the timelines,
15   here's a deadline, here's a this, here's a
16   that, here's a this.  That definitely improved.
17   Q.   I just want to call your attention
18   to Exhibit 18.  Exhibit 18 is a letter, I
19   believe, from your former attorney, and it
20   indicates that the press team doing a bad job
21   was the direct result of their work product,
22   helping the press team was not something for

Page 131

1    which Mrs. Small was deficient or failed to do.
2    Do you agree with that statement?
3    A.   Yes.
4    Q.   And can you just explain a little
5    bit about why you believe that to be the case?
6    A.   I believe the case is that they were
7    learning.  I do think that they were doing the
8    job that they were supposed to be doing.  I
9    think that the difficulty wherein he would
10   approve things and then disapprove them, and
11   then not remember that things, you know, had
12   been approved.  Am I answering your question.
13   What was the question?
14   Q.   Yes.
15   That in a nutshell -- I mean, and
16   it's in the document, so if I'm not
17   representing it accurately in your view you can
18   look at what's in the document.  But,
19   basically, I think your attorney wrote that the
20   press team was not necessarily doing a great
21   job, but that that wasn't your fault, and so I
22   was asking for your thoughts about that?

Page 132

1    A.   So I don't think that she -- it's
2    saying that they weren't doing a good job.  I
3    think she's saying that I wasn't the press
4    people.  So as far as I could guide them and
5    help them and review things, if Congressman
6    Cuellar had a problem with the press team and
7    how they were doing, then that should have been
8    addressed with them, and it wasn't.
9    Q.   So what was your role, then, like --
10   A.   To oversee --
11   Q.   -- with respect to the press team?
12   A.   -- to proofread.  And if I'm being
13   terminated because of one of the reasons he's
14   saying is that the press was bad, I -- I don't
15   understand how I could be held responsible for
16   the direct actions and work of other
17   individuals.
18   Q.   Okay.  But were you the supervisor
19   of the press team?
20   A.   Yes.
21   Q.   And who's the -- who's the head of
22   the press team at that time?  What was -- what

Page 133

1    position, the comms director?
2    A.   There was no comms director, but I
3    would say that Olya was the one that had the
4    most tenure.
5    Q.   And what was her position when you
6    were there?  Was she press secretary?
7    A.   Yeah, something like -- something to
8    that effect.
9    She wanted to be the director, but
10   he would -- did not -- he didn't give her that
11   title.
12   Q.   Did you have any problems with
13   staffers in your office, like personally or
14   professionally when you were in Congressman
15   Cuellar's office?
16   A.   The only problem I had with -- with
17   staff was really just trying to have Nina be
18   accountable for her whereabouts.  Everyone else
19   I really got along with.
20   Q.   Did you have any issues with Jessica
21   Hernandez?
22   A.   So at the very beginning, Jessica

34 (Pages 130 - 133)   EX 1

Page 134

1   and I, I think, were two strong women trying to
2   figure out our new roles, and we didn't have
3   any sort of argument or anything.  But when I
4   traveled to Texas to do the training, we had
5   spent the whole couple of days together and
6   ended up being really, like, pretty close.
7       Q.   How many trips to the district did
8   you make?
9       A.   Just one.
10      Q.   What was your relationship like with
11  Madeline?
12      A.   Madeline was new.  Madeline was
13  fresh out of college.  Madeline had never been
14  in a position like this, and I was her boss; so
15  it was a professional relationship.  If things
16  were -- if she was doing things that were
17  outside of good practice, then I relayed those
18  to her.
19      Q.   So would you say that you had a good
20  relationship with her?
21      A.   I would say I had a professional
22  relationship with her.  And she wasn't -- we

Page 135

1   didn't work together very long.
2       Q.   Okay.  So, in your resume, Exhibit
3   1, under -- actually, your complaint, sorry.
4           Complaint Exhibit 17, Paragraph 34,
5   you indicate that you made significant
6   improvements in the office by establishing
7   policies and procedures, conducting staff
8   training and improving overall efficiency.
9           Could you just specify the things
10  that you did to establish policies, trained
11  staff, and improve overall efficiencies?
12      A.   So policy-wise, one of the things I
13  did was make sure that everyone was -- did
14  their ethics training on time.  Training-wise,
15  my first day on the job I did a polycom video
16  training speech about confidentiality and
17  proper rapport and how to deal with difficult
18  constituents.  I actually think those might
19  have been separate.  The constituent one was
20  later.  So that's two trainings.
21          One on confidentiality, one on
22  rapport, and how to deal with difficult

Page 136

1   constituents.  And I went to Texas and did a
2   staff training that went over those things.
3   Also had a speaker on best business practices.
4   And I -- I don't remember exactly what the
5   order was of everything I went over, but I'm
6   sure we have that somewhere.  And the training
7   was, you know, really well thought out and
8   staff -- district staff really thanked me, and
9   said we've never don anything like this before.
10  This was really great.  We sometimes -- like,
11  D.C. ignores us.  So doubling of learning
12  this -- these things and just having you here
13  is really nice.
14          There were -- I did -- I did
15  approximately five or six trainings, so that
16  was three.  The other three I would have to
17  look back on to tell you exactly what they
18  were, but I -- I know that I did five or six
19  different trainings within the short period
20  that I was there.  I think I counted ethics as
21  one of them, so that would have been four.  And
22  then I -- I would have to look back for the

Page 137

1   other two.
2       Q.   How -- so, in your resume, Exhibit
3   1, you say that you managed the legislative
4   plan of the member.
5           What was the legislative plan of the
6   member?
7       A.   During my tenure, the main
8   legislative plan of the member was
9   appropriations and the border wall.  So those
10  two things were plenty to take up all of --
11  pretty much the time that we had, and those
12  were his two focuses and self-expressed, by
13  him, those were the two main things he cared
14  about.
15      Q.   So at -- when you were there, he was
16  on the appropriations committee, right?
17      A.   Correct.
18      Q.   Was he on a subcommittee at that
19  time?
20      A.   No, not that I recall.
21          He was part of the Blue Dogs, which
22  is not a committee.

Page 138

1    Q.   Okay.  What is Blue Dogs?
2    A.   The Blue Dogs are a group of
3  conservative democrats.
4    Q.   And, at the time, was there a
5  specific legislation that you were overseeing
6  during your time there that had to do with
7  appropriations?
8    A.   It wasn't specific, it was as a
9  whole.  Because appropriations has, like, a ton
10  of things going on at once, and so all of that
11  combined is what I was overseeing.
12    Q.   When you -- you were a legislative
13  assistant for Congressman Brady; is that right?
14    A.   Yes.
15    Q.   So what were your legislative areas
16  at that time?
17    A.   My legislative areas were labor,
18  government reform, postal services -- can I
19  look at my resume?
20    Q.   Yeah, absolutely.
21    A.   I was -- very long time ago.
22  Agriculture was the one that I missed.

Page 139

1    Q.   But you did not do any
2  appropriations --
3    A.   I did not.
4    Q.   -- work for Congressman Brady?
5    A.   I did not.
6    Q.   So just drawing your attention to
7  your resume, Exhibit 1, under Congressman
8  Cuellar, you don't have a bullet, I don't
9  think, that talks about training specifically.
10    Why is that?
11    A.   I guess it's an oversight.  I need
12  to add that.
13    Q.   Okay.  So adding that to the resume,
14  just want to make sure, again, what is -- what
15  you have under Congressman Cuellar, otherwise,
16  is -- is accurate and nothing is missing or
17  otherwise needs to be changed, right?
18    A.   Not that I can think of.
19    Q.   Okay.  When you started at
20  Congressman Cuellar's office, did you carry
21  over any leave from the Committee on House
22  Administration?

Page 140

1    A.   No.
2    Q.   Okay.  So you started with no
3  leave -- no sick leave and no annual leave; is
4  that right?
5    A.   None that was carried over, no.
6    Q.   So you started to accrue leave when
7  you started in the congressman's office?
8    A.   Yes.
9    Q.   Now, while you were working for the
10  congressman, did he ever deny an annual leave
11  request of yours?
12    A.   Not that I recall.
13    Q.   Okay.  And did he ever deny -- and I
14  know -- did he ever deny an FMLA request that
15  was made during, like, the course of your
16  employment?
17    So not, you know, looking forward to
18  after you delivered, but, like, during the
19  course of your employment with him?
20    A.   He did not approve or deny.
21    Q.   Okay.  Well, you took FMLA leave for
22  prenatal appointments during your time with

Page 141

1  him, right?
2    A.   No, not FMLA.
3    I would just take sick leave -- or
4  not sick leave, vacation leave.
5    (Deposition Exhibit 19 was marked
6  for identification.)
7    (Deposition Exhibit 20 was marked
8  for identification.)
9  BY MR. BLAKE:
10    Q.   Exhibits 18 and 19 -- I'm sorry --
11  19 and 20.  19 is HC 1148, and it is an annual
12  leave request form.  And 20 is HC 1149, and it
13  is a sick leave request form.
14    So just looking at Exhibit 19, this
15  was a request for four days of annual leave
16  that you made on or about June 15th, 2018; is
17  that correct?
18    A.   No, it was four hours.
19    Oh, no, you're right.  I'm sorry.
20  It was four days.
21    Q.   Okay.  And so you -- and -- and you
22  made this request on or about June 15th, 2018?

Page 142

1    A.   I don't recall what this was for.  I
2  believe I had a trip planned prior to being
3  hired.
4    Q.   It might have been for your
5  sister-in-law's wedding.  Colorado?
6    A.   Yes.
7    Q.   I know I know too much about your
8  life.  I'm sorry.
9    A.   No, that's good.  I appreciate the
10  reminder.
11    Q.   So -- okay.  So at the time that you
12  requested this leave a couple of weeks into
13  starting with the congressman, you did not yet
14  have four days of annual leave; is that right?
15    A.   I don't recall, but that sounds
16  right.
17    Q.   Okay.  But he did approve --
18    A.   He did.
19    Q.   -- the leave request?
20        And, then, looking at Exhibit 20,
21  this was a request made on or about -- I'm
22  sorry, not Canadian.

Page 143

1        On or about July 5th, 2018, and it
2  is for sick leave pregnancy, is what's
3  indicated, for 1.5 hours of leave; is that
4  right?
5    A.   Correct.
6    Q.   Okay.  And so you made this request
7  on or about July 5th, 2018, and it looks like
8  the congressman approved it on or about July
9  8th, 2018.
10        Does that sound right?
11    A.   Correct.
12    Q.   All right.  So did the congressman
13  ever deny any sick leave request that you made
14  related to pregnancy?
15        So not FMLA.  For, you know,
16  delivery and post delivery, but did he deny any
17  request for prenatal care or anything like
18  that?
19    A.   He never responded to my document
20  that listed all of my doctors' appointments, so
21  he did not approve nor deny that.  But,
22  specifically, for Document 20, yes, he approved

Page 144

1  it.
2    Q.   Do you know was there ever a
3  neonatal appointment that you had during the
4  time -- that you had scheduled during the time
5  that you were working for the congressman that
6  he didn't allow you to attend?
7    A.   Okay.  He allowed me attend my
8  appointments.
9    Q.   Are you aware of the congressman
10  ever denying anyone else in the office, anyone
11  besides you, an FMLA leave request?
12    A.   I don't have knowledge to that.
13    Q.   Okay.  So while you were there, did
14  anyone make an FMLA leave request that you're
15  aware of?
16    A.   No.
17    Q.   Do you think the congressman treated
18  you differently than he treated other people?
19        And, I mean, in any way, just
20  day-to-day, did he treat you differently?
21    A.   I think after I told him I was
22  pregnant he treated me differently.  He was

Page 145

1  coming up with much more criticism.
2    Q.   Whom do you think he treated more
3  favorably than you in the office?
4    A.   The guys.
5    Q.   Do you think he was also treated --
6  also treated other women decides you
7  unfavorably?
8    A.   I do.
9    Q.   Compared to the men in the office?
10    A.   I do.
11    Q.   And do you have any examples showing
12  differential treatment based on gender by the
13  congressman?
14    A.   I saw harsher criticism on the young
15  women than I did on the young men.
16    Q.   Were there any -- when you say
17  "young," what age are you talking about?
18    A.   The young staffers were probably
19  anywhere from 22 to 25, 26, and that was the
20  majority of the staff.  The other people were
21  the military fellows who were more tenured in
22  age.

EX 1

Page 146

1    Q.   Okay.  So both male and female
2    staffers were in that kind of early to mid-20s
3    range, for the most part?
4    A.   For the most part.
5    Q.   Okay.  And you believe that the
6    congressman treated the male employees more
7    favorably than the female employees?
8    A.   Yes.
9    Q.   Okay.  And so in one way it was more
10   harsh criticism directly toward women.
11       Anything else?
12   A.   Not at this time.  I would have to
13   think about it more.
14   Q.   So at any time are you aware of any
15   other discrimination complaints besides yours
16   that has been made against the office?
17   A.   I'm unaware.
18   Q.   Okay.  So --
19   A.   I would -- I wouldn't know.
20   Q.   So while you were deputy, you
21   weren't looped in about any claims of
22   discrimination, formal or informal?

Page 147

1    A.   No.
2    Q.   And, again, I'm not asking about
3    your communications with your attorney, so
4    don't tell me about those communications.
5        But when did you first decide to
6    make a discrimination complaint against the
7    office?
8    A.   The evening that he fired me.
9    Q.   So at any time before October 16th,
10   2018, did you think about initiating any kind
11   of discrimination complaint against the office?
12   A.   No.
13       But I had thought about the fact
14   that this was all really strange, and so it was
15   a red flag to me, but I had not specifically
16   thought about filing anything.
17   Q.   And, just to be clear for the
18   record, what do you mean by "this" -- "this" --
19   "this whole thing is strange"?
20   A.   The escalation of discourse that
21   happened after I asked him for maternity leave
22   and told him I was pregnant.

Page 148

1    Q.   Right.
2        So this -- your e-mail to the
3    congressman about needing maternity leave was
4    August 8th, 2018.
5        Before August 8th, 2018, can you
6    describe feedback that you received from the
7    congressman about your work?
8    A.   Not specifically.  There's nothing
9    that jumps out at me.  There was nothing that
10   was tagged as an infraction or something I was
11   doing wrong.  We had a good rapport.  I believe
12   even after the maternity leave e-mail was sent
13   and he said I was on 90 days probation, it
14   changed a little, but there still wasn't --
15   there was no, like, outstanding conflict or
16   anything -- there wasn't really a change in
17   attitude, I don't believe.  I mean, the
18   attitude was poor on his part, naturally, how
19   he was to everybody.  So, like, there was no
20   change.  But, I mean, we would have
21   conversations where once in a while we might
22   laugh or crack a smile.  Like, it was -- there

Page 149

1    was nothing -- you know, the -- I didn't feel
2    the relationship was not normal.  The normal
3    that it had been.
4    Q.   Like his normal?
5    A.   His normal.
6    Q.   So would you say, then, from the
7    start of your time in his office -- in the
8    congressman's office, until the end, that your
9    relationship was flat, like pretty consistent?
10   A.   I would say that after the maternity
11   leave e-mail, those complaints about my work
12   ramped up; but, yes, I would say that it was --
13   it was pretty flat.  And not flat, but just,
14   like, normal.
15   Q.   So in your complaints, Paragraph 36,
16   you said that Cuellar and his staff gave
17   Plaintiff positive feedback about her
18   performance and the changes she was
19   implementing in the office.
20       Do you recall any kind of
21   specifically positive feedback that you were
22   referencing?

Page 150

1    A.   Yeah.
2         The first thing he said when he
3    brought me in for the probationary meeting was
4    that I was doing a great job and I had a really
5    great attitude, but there was just a few things
6    he wanted me to work on, which were things that
7    he knew when he hired me, which was learning
8    his legislative issues.  And I don't recall
9    what the other one was.  I'm sure we have it
10   here.  But, yeah, I mean, the -- the
11   conversation, to me, didn't seem like oh,
12   you're doing really bad, you're on the line to
13   be fired.
14   Q.   What conversation are you talking
15   about?
16   A.   The probationary conversation.
17   Q.   Did any -- I'm sorry.
18        So you, in Paragraph 36 of the
19   complaint, reference positive feedback from the
20   staff.
21        Do you remember anything specific
22   that the staff told you?

Page 151

1    A.   Yeah.
2         Specifically that it was more
3    organized, that they were glad that they had a
4    figure there that could -- that could be that,
5    you know, boss figure that would keep
6    everything together and organized.  Multiple
7    people told me that.
8    Q.   Are you still in touch with anyone
9    that you worked with while you were at the
10   congressman's office?
11   A.   No.
12   Q.   Anyone who was there at the time but
13   has left the office?
14   A.   No.
15   Q.   Is there any reason why?
16   A.   I can't say a specific for a fact,
17   but I would assume it's because they're all
18   going through this court case as well and
19   they're probably told not to speak to me.
20   Q.   What about former employees?
21   A.   No.  Not from his office.
22   Q.   Yeah, but why do you think that

Page 152

1    you're not in touch with any former employees
2    from his office?
3    A.   I think because they were told not
4    to speak to me when we're in this court case.
5    Q.   So assuming, again, that people take
6    their oath seriously and testify truthfully and
7    fully, are there people from the congressman's
8    office who you think would be good witnesses
9    for you in this case?
10   A.   If people are truthful, yes.
11   Q.   And who do you think would be a good
12   witness in this case for you?
13   A.   Yikes.  I really don't want to
14   answer that, but I have to, right?
15   Q.   Yeah.  Sorry.
16   A.   I think if everyone was telling the
17   truth that everyone, excluding Nina and
18   Madeline, would tell truth that would be
19   supportive of what I'm saying.
20   Q.   Okay.  So everyone other than Nina
21   and Madeline?
22   A.   Yes.

Page 153

1    Q.   And so, specifically, that would be
2    Travis, right?
3    A.   Correct.
4    Q.   And --
5    A.   Travis, Olya, Zack.
6    Q.   Juan?
7    A.   I'm not sure whether he would be
8    good or not.  Not because of personalty or
9    conflicts, just because I don't know the -- I
10   don't know where his head of thinking is on it,
11   so...
12        He was gone before -- I don't know
13   if -- I think he was gone before this happened.
14   He was gone when it happened.  I believe he was
15   there when I said I was pregnant, when I told
16   everyone I was pregnant, but then he left.
17   Q.   What about David Kolcun?
18   A.   I think he would be if he were
19   honest, yeah.
20   Q.   He would be a good witness for you?
21   A.   I think so.
22   Q.   Anyone else who stands out?

EX 1

Page 166

1    many corrections" and five exclamation points;
2    is that right?
3        A.   Correct.
4        Q.   All right.  Exhibit 26, HC 212, this
5    is an e-mail chain from August 2nd, 2008,
6    between the congressman, you and other
7    staffers; is that right?
8        A.   Correct.
9        Q.   The congressman is asking for a
10   clean draft and saying, "Can we all focus?;" is
11   that right?
12       A.   Correct.
13       Q.   In his -- in the e-mail chain in his
14   4:43 e-mail, August 2nd, he says, "Crossing is
15   not capitalized.  Who is reading this, guys.
16   Kristie?;" is that right?
17       A.   Correct.
18       Q.   And did you respond that same day at
19   11:45 p.m. saying:  "I'm sorry, sir, that
20   particular one was not sent to me before you."
21       A.   Correct.
22       Q.   Okay.  Do you know why it wasn't

Page 167

1    sent to you?
2        A.   No.
3        Q.   Was it the ordinary practice for
4    things to be sent to you before they were sent
5    to the congressman?
6        A.   Yes.
7        Q.   Was that expected of the staffers,
8    to send it to you before sending it to the
9    congressman?
10       A.   Yes.
11       Q.   And you would have to approve it
12   before it went to the congressman; is that
13   right?
14       A.   Yes.
15       Q.   So, here, that did not happen?
16       A.   Correct.
17       Q.   But you don't know why?
18       A.   I don't recall.
19       Q.   All right.  27 is HC 674.  This --
20   actually -- so 27 is in the record, but I
21   think it's a repeat.  So I don't think we need
22   go through that, but we'll just leave it so we

Page 168

1    don't affect the numbers.
2        Q.   Okay.  During communications you had
3    with the congressman throughout your
4    employment, did he multiple times ask you to
5    walk the floor?
6        A.   Yes.
7        Q.   And what did he mean by "walk the
8    floor"?
9        A.   Every morning and multiple times
10   throughout the day I would go back to the
11   legislative office and talk to everyone and see
12   where they were on their projects and what they
13   were working on.
14       Q.   So that's what the congressman meant
15   by walk the floor?
16       A.   Yes.
17       Q.   And is that something he told you he
18   wanted you to do, like, throughout your
19   employment?
20       A.   Yes.
21       Q.   Okay.  And is that something that
22   you did?

Page 169

1        A.   Yes.
2        Q.   Every day?
3        A.   Every day multiple times.
4        Q.   Okay.  So, Exhibit 28, HC 1132,
5    seems to be an e-mail from you to the staff
6    asking for daily tasks to send to the boss; is
7    that right?
8        A.   Uh-huh.
9        Q.   Okay.  So what is the point of an
10   e-mail like this?
11       A.   Firstly, it serves as a reminder.  I
12   had already walked the floor.  And, secondly,
13   he and I had discussed and -- about walking the
14   floor, and I told him that I did do that and it
15   was a good practice and I would continue to do
16   that, but I also like to have their items in
17   writing.
18       Q.   Okay.
19       A.   Because for me, having it in writing
20   from their desk is a good practice, and also
21   then I could copy and paste and there would be
22   no room for error of me, you know, having an

43 (Pages 166 - 169)    EX 1

Kristie Small                                          March 13, 2020

Page 174

1    are dailies.  Talk to me or e-mail me if you
2    want me to know;" is that right?
3        A.   Yes.
4        Q.   Okay.  And you said "Yes, sir,"
5    right?
6        A.   Yes.
7             And I would like to point out that I
8    believe -- whether it gets mentioned again or
9    not, I don't know, but I believe there is a
10   comment made about these not being specific,
11   but I would like to point out right here is
12   where he tells me don't be specific.  Like,
13   those things are things we talk about.  We
14   don't put in our dailies.  If that comes up
15   later, that's the --
16       Q.   Okay.
17       A.   -- proof that I was doing what he
18   asked me to do by being brief.
19       Q.   I understand.
20            MR. BLAKE:  Can we go off the
21   record?
22            (A short recess was taken.)

Page 175

1             (Deposition Exhibit 36 was marked
2    for identification.)
3             (Deposition Exhibit 37 was marked
4    for identification.)
5             (Deposition Exhibit 38 was marked
6    for identification.)
7             (Deposition Exhibit 39 was marked
8    for identification.)
9    BY MR. BLAKE:
10       Q.   So Exhibit 36, HC 2570, this is an
11   e-mail chain involving you, Mrs. Small, and the
12   member and the member staff at the time, dated
13   on or about October 1st, 2018, to Congressman
14   Rhodes at 6:20 p.m., "Can we redo the press
15   releases on the approps?  Use the format I
16   like.  Kristie, please take the lead on all of
17   them;" is that right?
18       A.   Correct.
19       Q.   Exhibit 37, HC 2803, is an e-mail
20   between -- at the top is between you and Olya.
21   This is from October 16th, 2018.  Below that,
22   similar chain of e-mails between the member and

Page 176

1    the staff including you.  The member says
2    around 10:44 a.m. that he changed the titles in
3    this press release to past tense, and it looks
4    like you wrote to Olya "How did I miss that?;"
5    is that right?
6        A.   Correct.  I made a mistake.
7        Q.   Exhibit 38, HC 1847, this is an
8    e-mail chain from on or about September 4th,
9    2018, between the congressman and staffers,
10   including yourself.  He writes:  "Where is FBI
11   director testimony in the senate?  You are
12   missing things, Kristie?;" is that right?
13       A.   Correct.
14       Q.   And just below that Leslie had
15   written to the congressman:  "Please see blow.
16   Attached talking points for this interview.
17   They were reviewed and approved by Stacy and
18   Kristie;" is that right?
19       A.   Correct.
20       Q.   And then Exhibit 39, HC 373, this is
21   an e-mail at the very top from you to the
22   congressman, sent on September 10th, 2018.  The

Page 177

1    congressman has expressed some dissatis- --
2    dissatisfaction about an issue.  You explained
3    in your e-mail and indicated this wasn't a
4    part.  A little falls on everyone.  We will be
5    more diligent in the future and make sure this
6    doesn't happen in the future."  Is that right?
7        A.   Correct.
8             MR. BLAKE:  All right.  Let's go to
9    lunch.
10            (A short recess was taken.)
11            BY MR. BLAKE:
12       Q.   Welcome back, everyone.
13            For the record, I'm going to be
14   playing a recording that the congressman, I
15   believe, made of the 90-day probationary
16   meeting between Mrs. Small and the congressman,
17   and Bonnie is going to do her best to
18   transcribe it, and then I'm going to ask you
19   some questions about that.
20            (Whereupon, the audiotape was
21   played.)
22

45 (Pages 174 - 177)  EX 1

Page 178

1        MR. CUELLAR: I wanted to do your
2   90-day performance. A few things. Again,
3   you've been doing a -- a very good job on the
4   90-day performance. You've been doing a good
5   job. You've got the right attitude. I
6   appreciate everything you're doing.
7        A couple of things I need for you to
8   work on to improve. One, if you remember when
9   I hired you I said, hey, I need for you to take
10  things off -- you know, help me with the
11  overload that we have here and that's one thing
12  that I think you need to improve on -- you need
13  to work on. Let me give you a couple of
14  examples. You know, there's a couple times
15  when I'll say, Kristie, Kristie, that means
16  help me out, help me out.
17       Main thing is -- is the -- for
18  example, there's a series of them, but the main
19  one is the press releases. There has been
20  times where I -- it's, like, four or five
21  times, like, front, back, front, back, front,
22  back, front, back. You had to sit down with

Page 179

1   them. There is a format that -- you know,
2   that -- that I like is very outline, you know,
3   explain it instead of just putting one large
4   paragraph. You have to sit down with them --
5   with them and -- and -- and that's one example
6   that I need for you to work on.
7        I mean, the other thing is, you
8   know, remember that time there was an e-mail
9   sent out by mistake where you say, hey, give me
10  a TP. You can't do that. You have to go back
11  there. You have to sit down with them. You
12  have to know what everybody is working on and
13  the only way you can do that is not by asking
14  them to send you a TP, what they're working on,
15  you know, the target points, you need to sit
16  down with them and say, okay, what are you
17  working on, how is this, all that.
18       From the legislative team to
19  Patrick, you know, everybody, you've got to
20  know, hey, Patrick, how are the letters coming
21  along? Are they going out? Where are they
22  going to? Not just say, are the letters there?

Page 180

1   Yeah, they're going out. No. Break it down.
2   Break it down. So I need for you to help me
3   take some of that load off me, and that's, you
4   know, what your job is supposed to be, number
5   one.
6        Number two, you know, I don't know
7   how you work on this, but, you know, my -- my
8   expectations when you came was that you were
9   training people. So I said, this is something
10  that I need is for her to come in and train
11  staff. I think I brought it up to you and you
12  said, well, I was training members, not staff.
13  I said, well, that's even easier to train
14  staff. If you are training members, new
15  members and you should be able to -- I mean, I
16  need for you to be able to sit down and --
17  and -- and help train, you know, bring the
18  staff up to a different level on that.
19       The third thing is just simply I
20  don't like when somebody goes against an
21  instruction that I left. Example, the agenda
22  or when I was -- or I was I -- I don't know

Page 181

1   what -- I think I was in a Codel, and you asked
2   her -- and you asked Madeline, hey, I want
3   this, and she kept saying no, you know, you
4   describe those in one [inaudible], you know
5   unless you ask me and you overwrote my
6   instructions. You just never do that, you
7   know. If I have certain instructions, then
8   that's it. You ask me and I can say, okay,
9   let's do that, but you cannot override and put
10  her in a very difficult situation. Okay?
11       I believe in you. Okay? I want to
12  extend this for another 30 days. I want you to
13  work hard the next 30 days. I know you can do
14  it. I know you can do it. So let's talk again
15  in 30 days and see where we're at at that time
16  with the evaluations and improvement at that
17  time.
18       MS. SMALL: Okay.
19       MR. CUELLAR: Ask me whatever
20  questions you might want to ask me.
21       MS. SMALL: So I will.
22       So with the staff more, I have been

Kristie Small                                                    March 13, 2020

Page 182

1    doing that.  I don't want you to think that I
2    just sent out an e-mail.  I do both.  I like to
3    have it in writing as well just for reference
4    and so I can make sure I have it, but I do sit
5    down with them first.  So I just don't want you
6    to think that that's all I'm doing, but I will
7    do it more.
8         MR. CUELLAR:  You have to walk the
9    floor.
10        MS. SMALL:  Yeah.
11        MR. CUELLAR:  You go back there and
12   go one -- go one -- one -- one booth, go
13   another one.
14        MS. SMALL:  Absolutely.
15        MR. CUELLAR:  You have to know --
16   you know, when we have the meetings, you know,
17   I hope you know what everybody is talking
18   about.
19        The other thing is I used to have --
20   and there is forms that are charts.  Every week
21   I used to have a chart of, you know, hey, guys,
22   whatever projects you're working on, give me

Page 183

1    your project before I leave, you know.  Due on
2    Thursday, due on Friday, depending on what my
3    last day is, and then that would tell you and
4    then they -- they'll say what they're working
5    on.
6         I don't know if anybody there has
7    done it before, but there's a lot of examples.
8    We can ask Juan and he can give us a copy of
9    that.  But it was -- you know, that way, you
10   know, when I'm flying for you and I to look at
11   it, plus the district office so they know what
12   everybody is working on.
13        MS. SMALL:  Okay.
14        MR. CUELLAR:  By that, I'm talking
15   about everybody has a whole bunch of projects
16   and -- and I'll tell them this is important,
17   this is -- everything is important, but I'll
18   prioritize the -- the things on that.  But you
19   just have to just go and spend time with them.
20        MS. SMALL:  Yes.
21        So I think that that's my number one
22   priority moving forward is to make sure that

Page 184

1    I'm getting everyone's tasks and knowing them
2    myself.  I think for the first three months I
3    was just trying to figure everything out, and
4    the administrative side now is smooth.  I've
5    got -- that's easy.  That's down.  So now I
6    want to definitely -- you know, not that I
7    haven't been learning the legislation, but
8    really dive into knowing -- yeah, actually,
9    with Juan gone, I mean, you're going to -- I
10   want you to be able to lean on me and be able
11   just to take that -- that void away for you.
12        MR. CUELLAR:  Because Sag is good,
13   but he's only been here a year or less than a
14   year -- in that position a year.  So, I mean,
15   that's why you got to dive into it a lot more.
16        MS. SMALL:  Yes, and I want to.
17        MR. CUELLAR:  Okay.
18        MS. SMALL:  I don't even --
19        MR. CUELLAR:  And most of it is just
20   spending time with them.
21        MS. SMALL:  Right.
22        MR. CUELLAR:  You know, like, with

Page 185

1    David -- David, tell me what you're working on,
2    what can I help you with and --
3         MS. SMALL:  I may not be standing
4    there every minute now.  I'll probably be back
5    there more, so just yell for me or Madeline
6    yell for me.
7         MR. CUELLAR:  Okay.  One is the, you
8    know, take things off me.
9         MS. SMALL:  Yes.
10        MR. CUELLAR:  You got to spend time
11   with Olya.
12        MS. SMALL:  Yes.
13        MR. CUELLAR:  Olya -- Olya is good,
14   but, you know, you have to -- when something
15   gets to me, you know, you just can't say, looks
16   good, and then that's it.  You have to really
17   look into it on that.
18        MS. SMALL:  So this is what I wrote
19   down.  I do want to revisit this with you.
20        MR. CUELLAR:  Okay.
21        MS. SMALL:  Pending that everything
22   moves forward and everything goes well.  So I

47 (Pages 182 - 185)  EX 1

Page 186

```
 1    do intend to stay here as long as you will have
 2    me.
 3              MR. CUELLAR:  Okay.
 4              MS. SMALL:  I'm very loyal.  I'm
 5    looking out for the best for you.  I'm not
 6    looking to run off.  So if you want me here for
 7    the long run, I'll be here.  I don't want you
 8    to be afraid that I'm leaving or looking for
 9    something, I'm not.
10              So this is hard for me to talk
11    about, but I did want to discuss the future of
12    my salary.  So this is not because I'm being
13    greedy or being -- you know, this is just
14    financially for my family.  We had a general
15    discussion about salary and daycare when I took
16    the job, so I just wanted to refresh what we
17    went over.  A raise of $10,000 is approximately
18    $500 a pay period.  I have -- if you want
19    the --
20              MR. CUELLAR:  Okay.  Can we -- and
21    I'll be happy to discuss, but --
22              MS. SMALL:  It doesn't have to be --
```

Page 187

```
 1              MR. CUELLAR:  -- can we -- on the
 2    performance review, can we just stick to the
 3    performance and then, you know, in 30 days
 4    let's talk about salaries, let's talk about
 5    everything?
 6              MS. SMALL:  Okay.  And it's -- I'm
 7    not asking for right now --
 8              MR. CUELLAR:  Okay.
 9              MS. SMALL:  -- but I just wanted
10    to --
11              MR. CUELLAR:  Go ahead.  But, I
12    mean, I -- I -- I -- I --
13              MS. SMALL:  Yeah.
14              MR. CUELLAR:  I -- the way this
15    thing -- you know how it is --
16              MS. SMALL:  Uh-huh.
17              MR. CUELLAR:  I mean, first, you've
18    got to get past an extra 30 days.  And the
19    reason I'm giving you 30 days is I want you to
20    succeed.  I mean, you've got the attitude.
21    You've got everything.  You've got the smarts,
22    everything.  I just need for you to work on
```

Page 188

```
 1    those --
 2              MS. SMALL:  Is this more of a review
 3    after 30 days, or is my job on the line?
 4              MR. CUELLAR:  We'll talk in 30 days.
 5              MS. SMALL:  Okay.  So when I took
 6    the job we had discussed that daycare would be
 7    $500 a week at this point, which is $2,000 a
 8    month, or as August was, $2,500 a month because
 9    there was five weeks.  So eventually we will
10    have this, you know, second baby, and it's
11    approximately $50,000 a year in daycare.
12              MR. CUELLAR:  50, 5-0?
13              MS. SMALL:  And the reason I'm
14    getting emotional is because it's such a heavy
15    burden, and I -- I don't want to necessarily,
16    you know, be a stay-at-home mom, but I have to
17    be able to afford the daycare in order to work.
18    So that's why I'm bringing this to your
19    attention.  And so a consideration of money in
20    the future will depend on if I'm able to work
21    or if I have to stay home, and that's why I'm
22    telling you about it.  I'm sorry.  I just get
```

Page 189

```
 1    emotional about my family.
 2              MR. CUELLAR:  I mean, we'll talk
 3    about this; but, basically, you're asking for
 4    it to go $40,000 increase?
 5              MS. SMALL:  Not at this time, but
 6    over time that's what I would need to sustain
 7    two children in daycare.
 8              MR. CUELLAR:  Yeah.
 9              MS. SMALL:  And I -- you know, I
10    won't have a baby in daycare maybe for another
11    eight months.
12              MR. CUELLAR:  Yeah.
13              MS. SMALL:  But that's just why I
14    just don't want to -- I want to bring it out
15    now and be professional about it.
16              MR. CUELLAR:  All right.  I
17    appreciate it.  But we'll -- we'll talk about
18    that.  I mean, let's get past your next 30
19    days.  At the end of 30 days, I mean, I want
20    you to improve.  I mean, I'll be very honest,
21    at that time we'll decide whether you stay or
22    go, so that's why I want to leave everything
```

48 (Pages 186 - 189)  EX 1

Page 190

1   until you stay here.
2           I just need somebody -- you know, I
3   mentioned the three reasons.  Same things, I
4   just want things off my back because next year
5   is going to be -- well, you know, how it is.
6   It's -- you've seen -- I think you came in at
7   the end, but at the beginning it's like the
8   busiest on that, so we need to -- but we'll
9   talk about, you know, the 40,000.  We can talk
10  about that, but let's first get past that.
11  It's a little premature to talk about this.
12  Let's get past the -- the next 30 days.
13          MS. SMALL:  Okay.  I wasn't
14  expecting that extension, so that's why I have
15  this, but I'm able just to -- it stresses me
16  out, so I'd rather just you have that.
17          MR. CUELLAR:  Yeah.  I know.
18          MS. SMALL:  And also -- I mean, I
19  know it's -- 30 days isn't intended to put
20  pressure on me.
21          MR. CUELLAR:  I'm not trying to put
22  pressure on you.  I'm trying to get you to

Page 191

1   elevate things.
2           MS. SMALL:  And I can do that and
3   I'm fully willing to work on everything, but if
4   you truly think in 30 days you might fire me, I
5   don't want to have to worry about that for 30
6   days.  So maybe it would be better if you made
7   some sort of decision if you don't want me
8   here.
9           MR. CUELLAR:  No, I want you -- if I
10  didn't have faith in you, I would not be giving
11  you the 30 days on that.  I mean, I -- I have
12  faith that you can elevate it and I want you to
13  do that.  I want you to do that.  I mean, I
14  want you to do your best.  We'll talk in 30
15  days and see where we are at that time.
16          MS. SMALL:  Okay.  Is there anything
17  else performance review wise?
18          MR. CUELLAR:  Well, I want you to
19  ask me questions.  I mean, it's just basically,
20  you know, the three things I -- you know,
21  the -- the -- the first two are the -- are the
22  key ones.  You have to take things off my --

Page 192

1   my, you know --
2           MS. SMALL:  Yes.
3           MR. CUELLAR:  Help me with more
4   things because I am doing a lot with the staff.
5           MS. SMALL:  And I completely agree
6   with that and that's all on me.
7           MR. CUELLAR:  I mean, it's -- you
8   know, I mean, by the time they bring something
9   to me, you have to scrub it and make sure
10  because otherwise I'm editing.  I'm editing
11  most of the work for you.  I mean, I really
12  really am, and I need -- before it gets to me,
13  you have the sit down and say, no, change this,
14  change this.
15          I mean, sometimes I think you just
16  put, okay, thanks, but it's a little bit more
17  because, I mean, you know, they're -- they're
18  smart, they're hardworking individuals, but
19  they need --
20          MS. SMALL:  Yes.
21          MR. CUELLAR:  -- you know, a little
22  assistance also with themselves, and that's

Page 193

1   where you come in.
2           MS. SMALL:  I know.  I will dive
3   deeper into that and I promise you I never just
4   put "okay."  I do read everything.  And, yeah,
5   I mean, I agree with all that, and that's all
6   stuff I was aware of and want to work on, so...
7           MR. CUELLAR:  I mean, tell them you
8   have to have a look before someone gives it to
9   Mr. Cuellar.
10          MS. SMALL:  I 100 percent agree.
11          That's all.  I don't really have any
12  questions because I agree with everything you
13  said, so I'll just keep --
14          MR. CUELLAR:  And that says if
15  any -- you have any questions as we go on
16  during this week and next week, I don't know
17  what's going to happen.  Like I said, the
18  fourth week of September we're going to be on
19  and off.  I mean, I don't know if we're going
20  to be here.  I mean, I assume we're going to be
21  here.  October, I don't know if we're going to
22  be here, you know, so...

49 (Pages 190 - 193)

EX 1

Kristie Small                                    March 13, 2020

Page 194

1    MS. SMALL: Okay. Sounds good.
2    MR. CUELLAR: Let me know.
3    MS. SMALL: I totally agree with all
4  of that, so that's all I have for a performance
5  review wise. I do have, like, 10,000 things to
6  go over with you --
7    MR. CUELLAR: Okay.
8    MS. SMALL: -- if you'd like to go
9  over them.
10   MR. CUELLAR: Let's go over first
11 the -- I think the media interview. There's a
12 deadline before 11:30, so why don't we --
13   MS. SMALL: Okay.
14   MR. CUELLAR: -- have you sit down
15 with Olya and make sure that -- how long is the
16 interview, et cetera, et cetera, et cetera.
17 You know, just package everything by the time
18 it gets to me.
19   MS. SMALL: Okay.
20   MR. CUELLAR: Okay.
21   MS. SMALL: All right. Thank you.
22   MR. CUELLAR: All right.

Page 195

1    (Whereupon, the audiotape
2  concluded.)
3    MR. BLAKE: Can we go off the
4  record.
5    (A short recess was taken.)
6    BY MR. BLAKE:
7    Q.  Mrs. Small, we just played a
8  recording of your 90-day probationary meeting
9  with the congressman.
10   To your recollection, was that
11 recording a complete recording of the
12 conversation that you had about your
13 performance with the congressman at that time?
14   A.  Yes.
15   Q.  You did say in -- backing up, in
16 that meeting the congressman identified a
17 number of performance concerns, things that he
18 didn't like, and things that he wanted you to
19 work on, right?
20   A.  Correct.
21   Q.  And you said several times in
22 response to the congressman when he was telling

Page 196

1  you about things that he wanted to see
2  improvement on that you completely agree, you
3  agree a hundred percent, and words you totally
4  agree, and words to that effect; is that right?
5    A.  Correct.
6    Q.  What is your understanding about, at
7  that time, what your employment status was
8  following that meeting with the congressman?
9    A.  I truthfully didn't think that I was
10 going to get fired. I thought that he was just
11 being tough on me, and although I did say that
12 I agreed, I did agree, but I thought these were
13 all reasonable things for the short time frame
14 that I had been there to keep learning. That
15 wasn't anything that was majorly [sic] lacking
16 or any huge issues that would self-correct by
17 just being there longer.
18   So I heard him say that he didn't
19 know what would happen in 30 days, but I
20 just -- in my mind, I just never fathomed
21 that -- because I knew I was doing a good job.
22 I knew that everyone in the office -- we all --

Page 197

1  you know, we were having a good rapport, and I
2  just never just really thought honestly that it
3  would -- I would be fired.
4    Q.  So at some point, at least as of
5  August 8th, 2018, I believe, the congressman
6  indicated that you were subject to a 90-day
7  probationary period, right?
8    A.  Can you repeat the question?
9    Q.  So at some point at least as of --
10 or at latest as of August 8th, 2018, the
11 congressman indicated to you that you were on a
12 90-day probationary period, right?
13   A.  Correct.
14   Q.  But in this meeting that we just
15 heard a transcript of or just listened to you,
16 rather, the congressman did indicate that he
17 was going to extend that probationary period by
18 30 days; is that right?
19   A.  Correct.
20   Q.  In this meeting of yours, this
21 90-day probationary meeting -- probationary
22 period meeting, you started to talk about a

Kristie Small                                                    March 13, 2020

Page 222

1   with any part of that.  She had nothing to do
2   with press.  She had nothing to do with
3   editing.  She didn't sit near me.  She didn't
4   know what work I was or was not doing.
5       Q.   Okay.  Was she on -- I know there --
6   we talked about some of these e-mails and a
7   bunch of exhibits, how the congressman would go
8   back and forth with staff about edits or were
9   talking points and press releases.
10      Do you know -- was Nina one of the
11  people on those e-mails?
12      A.   I'm not sure.  Was she?
13      Q.   Sometimes I don't know the answer.
14      A.   It wouldn't have been her -- it
15  wouldn't have been her role to be, so I --
16      Q.   Right.
17      A.   I don't think so.
18      Q.   Do you have any reason -- I'm sorry.
19      Do you know whether Nina ever
20  communicated with the congressman her thoughts
21  about your performance?
22      A.   I do not know.

Page 223

1       Q.   Okay.  Do you think that she did
2   that?
3       A.   I do not know.
4       Q.   Do you have any reason to think that
5   she did not do that?
6       A.   To my knowledge, no one ever went to
7   the congressman about me.
8       Q.   I think Jessica did, but we'll talk
9   about that.
10      Was -- was there -- was there an
11  incident with either Madeline or Nina where
12  they went to -- is that Codel?  Is that how you
13  say that?
14      A.   Yes.
15      Q.   Somebody went to --
16      A.   Yes.
17      Q.   Okay.  Can you tell me --
18      A.   Yes.
19      Q.   Can you, just for the record, just
20  explain what that is?
21      A.   The congressman went on a Codel.
22      Q.   Right.

Page 224

1       A.   I asked Madeline for his schedule.
2   She said she wasn't comfortable giving it to
3   me.
4       Q.   Oh, this is something different.
5       A.   Oh.
6       Q.   Sorry.
7       I believe it was Madeline or Nina at
8   the last minute went to a briefing on an
9   upcoming Codel, and so did not go to the office
10  first.  And then I think there was a discussion
11  potentially even with the congressman about the
12  fact that one of them came in late?
13      A.   That could have been.
14      Q.   So might that have been a situation
15  where Madeline or Nina went to the congressman
16  and gave her side of the story?
17      A.   I don't know.
18      And if they were going to be
19  somewhere, they should have reported that to me
20  because I keep attendance.
21      MR. BLAKE:  Can we go off the record
22  to get more exhibits ready.

Page 225

1       (A short recess was taken.)
2       (Deposition Exhibit 40 was marked
3   for identification.)
4       (Deposition Exhibit 41 was marked
5   for identification.)
6       (Deposition Exhibit 42 was marked
7   for identification.)
8       (Deposition Exhibit 43 was marked
9   for identification.)
10      (Deposition Exhibit 44 was marked
11  for identification.)
12      (Deposition Exhibit 45 was marked
13  for identification.)
14      (Deposition Exhibit 46 was marked
15  for identification.)
16      (Deposition Exhibit 47 was marked
17  for identification.)
18      BY MR. BLAKE:
19      Q.   So we just went through a number of
20  statements from past and present employees in
21  the congressman's office, kind of summarized a
22  little bit for you some of the feedback they

57 (Pages 222 - 225)   EX 1

Kristie Small                                    March 13, 2020

Page 230

1  practices.
2      Q.   Okay.  Exhibit 44, HC 2465, is the
3  first page.  E-mails from August 31st, 2018, at
4  3:59 p.m. Olya writes:  "Please review the
5  below statement on NAFTA, sending to HC ASAP.
6  Thank you."
7          You wrote back "Approved" over two
8  hours later at 6:04 p.m.; is that right?
9      A.   Correct.
10     Q.   Is there some e-mail missing where
11 you approved it sooner than two-plus hours
12 later?
13     A.   I don't know.
14     Q.   Do you have any reason to believe
15 that there would be such an e-mail?
16     A.   I don't know.
17     Q.   Exhibit 45, Pages HC 347, some
18 e-mails on September 7th, 2018, and September
19 6th, 2018.  On September 6th, 2018, 8:58 p.m.
20 the congressman wrote:  "Kristie, give me vote
21 recommendation."
22         The next morning, 7:38 on September

Page 231

1  7th, you wrote back "Sorry, sir.  I fell asleep
2  early.  Let me look at this."  Is that right?
3      A.   Yes.
4      Q.   So you did not give him a vote
5  recommendation the same day that he asked for
6  one, that's correct?
7      A.   At 9:00 p.m. at night outside of
8  business hours I did not, and I was pregnant
9  and I fell asleep.
10     Q.   Exhibit 46, HC 405, these are some
11 e-mails from October 11th, 2018, which I will
12 note is close to your last day in the office.
13 The congressman wrote at 3:49 p.m. "Thank you
14 is wrong.  Did I add this in what year?
15 Kristie, did you review?"
16         You responded to the congressman and
17 said: "I did not, sir.  Let me look over."
18         So does that indicate that you did
19 not review these draft talking points before
20 they went to the congressman?
21     A.   Repeat the question, please.
22     Q.   You wrote in -- response to the

Page 232

1  congressman asking if you reviewed something
2  you wrote:  "I did not, sir.  Let me look
3  over."
4          So was that a truthful statement
5  when you said you had not reviewed these
6  talking points before they went to the
7  congressman?
8      A.   I had not reviewed Zack's draft.
9      Q.   Okay.  Before it went to the
10 congressman?
11     A.   Correct.
12     Q.   Exhibit 47, HC 180, this is an
13 e-mail from July 3rd, 2018, from Jessica
14 Hernandez to the congressman forwarding some
15 e-mails between you and Jessica from July 3rd,
16 2018, about some training that you-all were
17 putting together for the district.
18         Did you know that Jessica sent this
19 e-mail to the congressman?
20     A.   I don't know what this e-mail is.
21         What is this in reference to?
22     Q.   Take a chance to look at it and then

Page 233

1  I'll ask you about it.
2      A.   (Witness complies.)
3          Okay.  What is your question?
4      Q.   Did you know that Jessica sent this
5  e-mail to the congressman?
6      A.   I'm not sure.
7      Q.   So does it suggest, this e-mail that
8  she sends to congressman, that she was alerting
9  him to some communications that she -- you and
10 she were having?
11     A.   I don't know.
12     Q.   So the e-mail here is -- the chain
13 seems to talk a little bit about your request
14 or direction for Jessica to devise part of the
15 training that you were working on to present to
16 the district office.  She pushed back a little
17 bit.  You responded, and she sent this to the
18 congressman; is that right?
19     A.   Okay.
20     Q.   Does that --
21     A.   I don't know.  Is that what you're
22 telling me?  She did --

59 (Pages 230 - 233)

EX 1

Page 258

1    Let me see.  I just don't really
2  remember a lot about this, to be honest.  I
3  don't think there was any huge communication
4  about it.
5    BY MR. BLAKE:
6    Q.  Okay.  Exhibit 52, HC 2255 through
7  2270.  This is an e-mail from July 3rd, 2018,
8  from you to yourself and to Jeff with a
9  PowerPoint staff -- training PowerPoint; is
10 that right?
11   A.  Correct.
12   Q.  Okay.  So you did forward this to
13 Jeff; is that right?
14   A.  Correct.
15   Q.  Did you ask for the congressman's
16 position -- permission, rather, to send this to
17 Jeff?
18   A.  No.
19   Q.  And did you think that there was an
20 issue with sending something like this to your
21 husband?
22   A.  I didn't think there was an issue

Page 259

1  sending it to another staffer, and I don't even
2  recall if I did it so I could just work on it
3  from home.  I think that that's what I did, but
4  there's nothing sensitive in here.
5    Q.  But, just to be clear, you just --
6  you sent it, you didn't get permission to send
7  it?
8    A.  Correct.
9    Q.  Okay.  On your last day of work with
10 the office, I think it was October 16, 2018,
11 seems that you removed some personnel files
12 from the office; is that correct?
13   A.  No.
14   Q.  Okay.  Why would somebody think that
15 you removed personal files?
16   A.  Because I did, but it wasn't that
17 day.  I had them home and I was going through
18 all of them to make sure they were complete.
19 That's part of my job, to make sure all their
20 documents were signed.  They had, you know,
21 multiple documents that -- for on boarding and
22 things like that, and I was going through the

Page 260

1  old ones as well to make sure everything was
2  there.
3    Q.  Okay.  So, on October 16th, you had
4  employee personnel files at your home?
5    A.  I did.
6    Q.  Okay.  And did you have permission
7  to have them at home?
8    A.  It was a task that I -- was under my
9  responsibilities, was to make sure those files
10 were complete, and I was expected to work from
11 home and be available at all hours.  So I would
12 never see a reason why I wouldn't be able to
13 take those home and work on them.  I did work
14 at home all the time.
15   Q.  But did you specifically have
16 permission to bring employee personnel files at
17 home?
18   A.  Yes, because it was under my job
19 jurisdiction.  So if anything that was under my
20 job jurisdiction I would be allowed to take
21 home to work on.
22   Q.  I mean -- but I'm asking, like, not

Page 261

1  in a general sense.  Like, very specifically,
2  did anyone ever say you can bring personnel
3  files, complete personnel files at home,
4  specifically those files as opposed to files
5  related to your work?
6    A.  Specifically, I was never told that
7  for anything.
8    Q.  So just --
9    A.  I was expected to take my work home.
10   Q.  So just to be clear for the record,
11 you did not have expressed permission from the
12 congressman to bring employee personnel files
13 home?
14   A.  I did not need it and no, I did not
15 have it.
16   Q.  Your complaint is Exhibit -- I
17 forget which one.
18     THE REPORTER:  17.
19     BY MR. BLAKE:
20   Q.  So, Mrs. Small, Exhibit 17 is your
21 First Amended Complaint, correct?
22   A.  Correct.

Kristie Small                                                    March 13, 2020

1    Q.   And did you provide the information
2    that is in that complaint?
3    A.   Yes.
4    Q.   Did you review the complaint?
5    A.   Yes.
6    Q.   Did you understand the complaint?
7    A.   Yes.
8    Q.   Did you approve the complaint?
9    A.   Yes.
10   Q.   Is there anything missing from that
11   complaint related to your claims?
12   A.   No.
13   Q.   Is there anything else that you
14   think should be included in your amended
15   complaint -- your First Amended Complaint
16   that's not there?
17   A.   No.
18   Q.   Okay.  For the claims in your
19   complaint, basically all relate to your
20   termination from the congressman's office, what
21   are your specific reasons for thinking that the
22   congressman has terminated your employment

1    because of your pregnancy and/or desire to use
2    FMLA leave to take parental leave after Kendall
3    was born?
4    A.   His response to my e-mail requesting
5    leave in writing was the 90-day probationary
6    period sentence, which I had never been aware
7    of or never been told of or it was not in the
8    employee handbook.  It was never mentioned to
9    me, so that is the first reason.
10        The second reason is that after he
11   mentioned in the e-mail the 90-day probationary
12   period, the complaints from him became much
13   more frequent, and it was evident to me that
14   things were just being said to be documented
15   and -- because some of the stuff wasn't even
16   true.  It was just -- it was excelled after I
17   made my -- after I told him I was pregnant.
18   Q.   Anything else?
19   A.   Repeat the question.
20   Q.   What are your specific reasons for
21   believing that the congressman terminated your
22   employment because of your pregnancy and/or

1    your desire to use FMLA leave for maternity
2    leave?
3    A.   Okay.  So I stated the e-mail.  I
4    stated the uptick in corrections.  Those are my
5    main reasons.
6    Q.   So both of those are in your
7    complaint.  So there is nothing that is not in
8    your complaint that makes you think that you
9    were discriminated against based on pregnancy
10   for FMLA?
11   A.   Rephrase without the double
12   negative.  I don't want to answer it
13   improperly.
14   Q.   I went to law school to confuse
15   people.
16   A.   I'm very detailed oriented.
17   Q.   What do you think -- in the -- in
18   the affirmative as opposed to the negative,
19   every basis that you have for believing that
20   the congressman discriminated against you based
21   on pregnancy or the FMLA is in your complaint;
22   is that correct?

1    A.   Correct.
2    Q.   Okay.  So your complaint does not
3    have anything in it about the congressman
4    saying anything disparaging about pregnancy or
5    women or children or medical leave or FMLA
6    leave?
7    A.   Correct.
8    Q.   Okay.  So -- and that is because he
9    did not say those things, right?
10   A.   Correct.
11   Q.   Okay.  So --
12        MR. BLAKE:  Can we go off the
13   record?
14        (A short recess was taken.)
15        (Deposition Exhibit 53 was marked
16   for identification.)
17        BY MR. BLAKE:
18   Q.   Exhibit 53 are Plaintiff's answers
19   to request for admission.
20        Mrs. Small, do you recognize Exhibit
21   53?
22   A.   I do.