# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KRISTIE SMALL,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>OFFICE OF CONGRESSMAN<br>HENRY CUELLAR,<br><br>　　　　　　Defendant. | )<br>)<br>)　Case No. 1:19-cv-1314<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF KRISTIE SMALL

Pursuant to 28 U.S.C. § 1746, I, KRISTIE SMALL, do hereby declare:

1. I am submitting this declaration to provide additional information and to address issues raised in Defendant's Motion for Summary Judgment.

### General improvement of operations

2. When I began my job, staff had no accountability measures and no one to report to because the Chief of Staff and Deputy Chief of Staff positions had been vacant.

3. Within the first three weeks, I implemented a daily check-in procedure, established a reporting hierarchy, and reorganized responsibility for administrative tasks.

4. Within three weeks from my start date, the office was functioning like normal.

### Work hours/absences from office

5. I was almost always early to work, usually arriving before 8:30 a.m.

6. I worked late. My parents ended up coming to stay with us to take care of my daughter so that I could work late in the evenings.

7. I did not leave the office without authorization.

## **Training**

8. At my interview, Congressman Cuellar asked me about my training experience. I told him that I held a training for chiefs of staff on how to set up and run an office.

9. I explained that when I worked for the House Administration Committee, I did five cycles of New Member Orientation, so I knew how a congressional office is set up and run.

10. The Congressman did not ask me if I could train each category of his employees, like legislative staff, outreach staff, and press staff.

11. During the first week on the job, the Congressman asked me to talk to staff about confidentiality and the non-disclosure agreements employees were required to sign. I did not prepare any written materials for the training because the Congressman did not want anything in writing. I discussed confidentiality over a teleconference with all staff.

12. Other than the confidentiality training, Congressman Cuellar never asked me to conduct any specific training sessions. He never gave me any guidance or details about what to include in the confidentiality training or any other training. He just told me that he wanted me to run the office and help the staff.

13. In addition to the confidentiality training, I did several other trainings for staff.

14. I did a training on dealing with difficult constituents. The training was approximately 30 minutes long and was over teleconference with the Congressman's staff in DC and in Texas. I gave an oral presentation, and then we did role scenarios where staff members were asked to respond to challenging situations.

15. Around July 2018, I did an in-person, all-day training on best business practices for staff in Texas. I prepared an entire packet of materials and a slide show to go along with each module. The training included a guest speaker, and between each section there was a question and answer period.

16. I also asked for several staff members to be allowed to participate in training about legislative procedures that the House provides. I asked to attend an advanced legislative training course. Congressman Cuellar denied all of those requests.

### Jessica Hernandez

17. I was scheduled to travel to Congressman Cuellar's district in Texas in July 2018. In preparation for the trip, I asked Jessica to map out the route she thought we should take for the three-day trip.

18. I asked her to do that because it was my understanding that she lived in the area for her entire life and had worked on the Congressman's campaign in the district for 10 years.

19. Jessica refused to provide the information. She told me she did not know the district and could not map out the route.

20. I did not try to delegate any of my duties to her. I asked if she could help plan the route because she was familiar with the area and I was not.

### Nina Andrews

21. I did not tell the Congressman not to trust Nina; he told me not to trust her.

22. At my interview, he told me Nina was "out of control" and asked if I could help keep her "in her lane." I said I could because I had known her a long time and understood her personality.

23. When I worked for the Congressman, he repeatedly told me to "keep Nina in her lane." He also told me not to let Madeline take instruction from Nina.

### Madeline Abadie

24. I never told anyone not to trust Madeline.

25. Around August 2018, Congressman Cuellar went on CODEL. I asked Madeline for his travel schedule. She said that she did not feel comfortable giving it to me and asked me to call the

Congressman to ask for it.  I told her I would do that.

26. I never forced Madeline to give me the Congressman's CODEL schedule.  She never gave me the schedule.

27. I left the office to go to an appointment.  While I was at the meeting, the Congressman called me on the phone.  I answered, and he immediately started yelling at me that I could not have his schedule and not to ask Madeline for it.  It was shocking and upsetting.  The person I was meeting with could hear him yelling at me.

28. Before that, the Congressman never told me that I couldn't ask Madeline for his schedule.

### September review meeting

29. The Congressman criticized my performance during the 90-day review meeting in September. His comments weren't true.

30. I told him I agreed because he was my boss.  I was new, and I wasn't going to fight with him.

### October termination meeting

31. Congressman Cuellar called me on October 16, 2018.  I recorded the phone call; I think he did, too.  This is basically what we discussed about the reasons I was fired:

   HC. I want to go over the performance review that we talked about in September.

   KS. Yes.

   HC. We talked about the 90-day performance review and then I gave you the additional 30 days to give you an opportunity to address, some of the issues that were raised to you at that time.  …And, basically, those issues, as I mentioned to you, I wanted you to address a couple of those issues.

   One of them was, I told you, hey, I need your help to take things off, my plate, issues with the media, with the legislative team and we went over details from that.  We went over also of what my initial expectation was of you, you know, to train the staff, whether it was up here in dc or down here in [inaudible].  And you and I agreed to those issues that we needed to

      address.

      I have to say that after those additional 30 days of review, I was hoping that your performance would align with the needs of my office. But in my opinion those issues have not been addressed and your performance is not where you need to be. So this is just to notify you that I am giving you a termination. I can either give you an opportunity to resign or be terminated….

KS. Well, I was just wondering in what ways did you think that those were not addressed. Because we've definitely improved upon how the media have been performing. They're getting things to you on time. Their errors have been much less frequent. And then for, what was the other issue?

HC. The issue was the initial expectations of training that I had of you of training staff.

KS. Ok, and in what ways have I failed to train staff?

HC. Well, again, I don't want to argue with you on this, but, again—

KS. —Oh I'm not arguing, sir, but to be fair, I need answers to the questions, because, you know, I mean—

HC. —The again, the issues there are still the riders, there are five appropriations bills that passed, and we have, we have memor[anda], as I mentioned, we haven't gotten all of those done, so I need those. There are still—

KS. Those are all done, Sir.

HC. No, they're not.

KS. They are, and I have proof of that.

HC. Ok. And then there are issues with the, there are still mistakes in things that I need to address.

      Last week when we had a call after I was off on that trip, I got back and we still went over step by step that all of that work was still not done and I was hoping that during that week that I was gone that you would have taken the leadership to address those issues.

KS. I did sir, and we had many conference calls on that. And per your rule of when things need to be finished, we still had time.

    HC. Hey, listen, I, again, there, they were not done. We went over it step by step on that first day that I was back. And there was a lot of work that needed to be done, and with all due respect, it was not done. We were, we were working on it —

    KS. But per your expectations and your rule, we were on the right timeline. So I just want to make sure that I note that, and I want to note that, for the four months that I have been there, this office has run so much more smoothly. I have heard it from all of the staff, I've heard it from people outside of the office…. You know, I came in here with no knowledge of you and no knowledge of the staff and, um, your issues, and I know I've done an excellent job….

32. The Congressman's reasons for firing me were false.

33. The press team greatly improved during my employment. I reviewed the draft deliverables that were sent to me, there were fewer errors, and deliverables were submitted on time.

34. The Congressman was very demanding about press releases, but he usually didn't provide specific feedback about what he wanted us to change. Most of the edits he made were about formatting or his personal preferences, not about things that were actually wrong.

35. As I explained above, I trained staff.

36. The Congressman mentioned memoranda for the appropriations bills, which the legislative staff were responsible for drafting. The memoranda were complete.

37. The work the Congressman said should have been completed while he was on travel was to be performed by the legislative team, not me. I was monitoring the legislative staff's progress, and they were working within the timeline the Congressman set.

### Personnel files

38. One of my job duties was to review personnel files to make sure they included all required paperwork. When I worked for the Congressman, the personnel files were kept in an unlocked cabinet in my office. They were not stored in the Congressman's office.

**Recommendations on raises**

39. One of my job duties was making recommendations on employee raises.

40. My understanding was that the Congressman made decisions regarding raises in October.

41. Around September, I did research regarding staff pay levels. According to a Congressional Research Service report on House employee salaries, I discovered that the Congressman paid employees significantly lower than average.

42. I also talked to Jessica Hernandez to get her thoughts on which district employees should get raises. She said only three staff members were slated for raises. She did not recommend or request a raise for herself. I recommended raises for the three employees Jessica mentioned.

43. I also had several conversations with Dean Lester about the raises. I thought I sent Dean the increases I was requesting during the week of October 8, 2018. On Monday, October 15, I realized I had not sent him the information, so I forwarded it to him that morning. This was an oversight on my part.

44. Based on a Congressional Research Service report on House employee salaries, employee performance, cost of living, and other factors, I sent the Congressman recommendations for staff raises and bonuses.

45. My goals were to make sure that employees were fairly compensated and to help the Congressman keep good employees.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on my personal knowledge and belief.

Executed on: 6-19-2020                    *Kristie Small*
             Date                              Kristie Small