# Exhibit 7

Transcript of Olya Voytovich  
Conducted on March 17, 2020

1 (1 to 4)

## Page 1

```
1              UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF COLUMBIA
3                                     )
4    KRISTIE SMALL,                   )
5              Plaintiff,             )
6                                     )
7         -vs-                        ) No. 1:19-cv-1314-TNM
8                                     )
9    OFFICE OF CONGRESSMAN HENRY      )
10   CUELLAR,                         )
11             Defendant.             )
12                                    )
13
14          TELEPHONIC DEPOSITION OF OLYA VOYTOVICH
15                     MARCH 17, 2020
16                   PASADENA, MARYLAND
17                      10:03 a.m.
18
19
20   JOB NO.: 293155
21   PAGES:  1 - 85
22   REPORTED BY:  LAURA MAES, CSR 9836
```

## Page 2

```
1   Deposition of OLYA VOYTOVICH, held telephonically from:
2         Baltimore, Maryland
3         888.433.3767
4
5
6
7
8
9
10
11
12
13
14        Pursuant to notice, before Laura Maes,
15  CSR 9836 and Notary Public for the State of
16  Maryland.
```

## Page 3

```
1                 A P P E A R A N C E S
2                 [ALL COUNSEL BY PHONE]
3
4   FOR THE PLAINTIFF:
5
6         ALAN LESCHT & ASSOCIATES, P.C.
7         BY:  SARA MCDONOUGH
8              TAMARA L. SLATER
9         1825 K Street, N.W.
10        Suite 750
11        Washington, D.C. 20006
12        202.463.6036
13
14  FOR THE DEFENDANT:
15
16        OFFICE OF HOUSE EMPLOYMENT COUNSEL
17        U.S. HOUSE OF REPRESENTATIVES
18        BY:  MARK STEWART HAYES
19             TREVOR ST. GEORGE BLAKE, II
20        4300 O'Neill House Office Building
21        Washington, D.C. 20515
22        202.225.7075
```

## Page 4

```
1                      I N D E X
2
3   WITNESS
4     OLYA VOYTOVICH
5
6   EXAMINATION                              PAGE
7     MS. MCDONOUGH                            6
8
9              E X H I B I T S
10             (NONE OFFERED)
```

Page 5

```
1           P R O C E E D I N G S
2
3           THE REPORTER:  This is Laura Maes.
4  Before I swear in the witness, I will ask counsel
5  to stipulate on the record that due to the
6  current national emergency pandemic, the court
7  reporter may swear in the deponent even though
8  she is not in the physical presence of the
9  deponent and that there is no objection to that
10 at this time, nor will there be an objection to
11 it at a future date.
12          MR. HAYES:  This is Mark Hayes for
13 Defendant -- counsel for Defendant.  We agree to
14 that stipulation.
15          MS. MCDONOUGH:  And this is Sara
16 McDonough for the Plaintiff, Kristie Small, and I
17 also agree to that stipulation.
18          THE REPORTER:  And, Counsel, can you
19 represent that, to the best of your knowledge and
20 belief, the witness appearing today via phone is,
21 indeed, Olya Voytovich?
22          MS. MCDONOUGH:  This is Sara McDonough.
```

Page 6

```
1  As far as I know, yes, this is Ms. Voytovich.
2          MR. HAYES:  This is Mark Hayes, and,
3  yes, I agree that, as far as I know, this is
4  Ms. Voytovich.
5
6  Whereupon, OLYA VOYTOVICH, being first duly sworn or
7  affirmed to testify to the truth, the whole truth, and
8  nothing but the truth via telephone, as stipulated, was
9  examined and testified as follows:
10
11         EXAMINATION BY COUNSEL FOR THE PLAINTIFF
12 BY MS. MCDONOUGH:
13    Q.   All right.  Good morning, Ms. Voytovich.
14         Before we start the questions, I just
15 want to -- and you probably already know this,
16 but just ask you to provide verbal answers today
17 so that the court reporter can take down
18 everything that we say.  So instead of nodding or
19 "Mm-hmm" or "Uh-uh," just say "Yes," "No," or
20 whatever your answer is.
21         Where are you right now?  Are you
22 located at home or at an office?
```

Page 7

```
1    A.   I'm located at home.
2    Q.   And what is your home address?
3    A.   132 E Street, S.E., Washington, D.C.
4  20003.
5    Q.   And for today's deposition, I'm going to
6  ask that you not refer to any documents or review
7  anything on a computer or on a phone.  I want to
8  ask you questions today and have you testify just
9  based on your knowledge and your memory.
10        Can you agree to that?
11   A.   Yes.
12   Q.   Great.
13        Okay.  And if at any time you need a
14 break, if there's a question pending, I just ask
15 that you answer the question and then just let me
16 know if you want to take a break, and that's not
17 a problem.
18        Is there any reason that you will be
19 unable to provide complete and honest testimony
20 today?
21   A.   No.
22   Q.   Who is your current employer?
```

Page 8

```
1    A.   I work for the U.S. Senate Committee on
2  Veterans Affairs.
3    Q.   What's your job title?
4    A.   I am the Press Secretary.
5    Q.   When did you start that position?
6    A.   May 2019.
7    Q.   Where did you work before that?
8    A.   I worked for U.S. Congressman Henry
9  Cuellar.
10   Q.   When did you start working for the
11 Congressman?
12   A.   November 2017.
13   Q.   What was your job title?
14   A.   I was his Press Secretary.
15   Q.   Was your separation from your employment
16 with the Congressman voluntary?
17   A.   Can you elaborate on that as though --
18 can you just elaborate and clarify?
19   Q.   Sure.
20        When I say "voluntary," I meant that you
21 left of your own free will.  You were not
22 terminated.  You were not offered to resign in
```

**33**

1  do not recall anything else being brought up with
2  the Congressman present, no.
3     Q.  And did you ever hear about any of your
4  colleagues complaining to the Congressman about
5  Kristie?
6     A.  I don't recall specific scenarios or
7  situations where people were -- were bringing it
8  up except for what I had already mentioned for
9  when we were discussing our press items, and
10 then, yes, concerns were brought up as a team
11 with the Congressman.  That is, to my
12 recollection, the only thing that I can remember.
13    Q.  And so you mean that there were concerns
14 about whether Kristie was editing some of the
15 press releases.
16       Is that what you mean?
17    A.  Yes.  Like I said, I was working in a
18 press capacity, so that was my No. 1 priority,
19 and so that is why that is what I can recall
20 because that had a direct impact on my work
21 product.
22       So, yes, that is -- what comes to mind

**34**

1  is the fact that the Congressman was not happy
2  with the editing process and the product that we
3  had coming out of the office and when it was
4  getting to him, and so he had brought up
5  concerns.
6       And I know our District Director had
7  brought up concerns and we had discussed that
8  process.  That is what comes to mind.
9     Q.  Okay.  And so you and Leslie, were you
10 all responsible for drafting press releases?
11    A.  Yes.
12    Q.  Who was involved in proofreading or
13 reviewing the press releases aside from Kristie?
14    A.  Drafts would occasionally --
15       THE REPORTER:  I'm sorry.  Start again.
16 I didn't hear the beginning of the answer.
17       THE WITNESS:  Drafts would occasionally
18 go through an appropriate, like, staffer
19 depending on the topic as well.  I do not recall
20 if anybody else was a part of the process.  I
21 believe that Jessica Hernandez was as well.  I
22 just don't recall at what point she was sent

**35**

1  those releases and which ones they were.
2  BY MS. MCDONOUGH:
3     Q.  Okay.  So it really just kind of
4  depended on the topic of the release?
5     A.  Yes.
6     Q.  Before Kristie was hired, did the
7  Congressman ever have concerns with the
8  proofreading or editing of press releases?
9     A.  I don't recall him having an issue with
10 it.
11    Q.  So as best you can recall, he had no
12 issues with edits to the press releases until
13 Kristie starting working for him?
14    A.  [No audible response.]
15    Q.  Hello, Ms. Voytovich?
16       THE REPORTER:  Shall we go off the
17 record?
18       MS. MCDONOUGH:  Yes.
19       [Recess taken.]
20       [Record read back as requested.]
21       THE WITNESS:  And I said, to my
22 recollection, I do not remember there being

**36**

1  issues.  I just don't recall.
2  BY MS. MCDONOUGH:
3     Q.  And just to be clear, when you say you
4  don't recall, that just means you don't recall
5  one way or the other.  So there could have been,
6  but there might not have been?
7     A.  Yes, that is -- that is true.
8     Q.  Okay.  So, I mean, I just -- I'm just
9  trying to understand:  So the Congressman was
10 satisfied, happy with all the editing of the
11 press releases before Kristie came onboard, or at
12 least during the time you worked for him?
13    A.  No, that was not what I just said.  I
14 said I don't recall if he was satisfied
15 throughout that entire time before Kristie had
16 come -- come onboard.  I just don't recall.
17       I don't remember there being any
18 significant concerns or flags before Kristie came
19 on.  I don't remember that, so -- but I cannot
20 say for certain that there was never any issues.
21 I just don't remember there being any huge red
22 flags.

Transcript of Olya Voytovich
Conducted on March 17, 2020

12 (45 to 48)

---

**45**

1  was comfortable with and I responded as was
2  necessary in my job.
3      Q.  So what did the Congressman say to you
4  during those conversations about how to respond?
5      A.  I don't recall what he said verbatim.  I
6  just remember him saying that he would have to
7  get in touch with his counsel and then he would
8  get back to me as to how he would respond.  I
9  really don't remember the specifics.  I just
10 remember the fact that, you know, people were
11 consulted and that I had sent out a statement to
12 the reporters.
13      MR. HAYES:  I'm going to -- this is Mark
14 Hayes here.  I'm going to object to questions
15 that call for privileged communications,
16 attorney/client privileged communications.
17 BY MS. MCDONOUGH:
18     Q.  Okay.  Ms. Voytovich, did the
19 Congressman ever say anything to you or in front
20 of you about Kristie's pregnancy?
21     A.  I do not recall the Congressman saying
22 something about Kristie's pregnancy to me

**46**

1  personally, no.
2      Q.  Is there -- is there anything that would
3  help you recall?
4      A.  Once again, I don't -- I don't know.
5      Q.  But you can't say with certainty that he
6  never said anything to you about Kristie's
7  pregnancy?
8      A.  I cannot say with certainty.
9      Q.  Did the Congressman ever say anything to
10 you or in front of you about Kristie's request
11 for leave?
12     A.  I do not recall the Congressman saying
13 something to me directly regarding her leave, no.
14     Q.  Has anyone else ever asked you -- and
15 I'll say since Kristie was fired.  So after her
16 termination, has anyone else asked you about
17 Kristie or the reasons that she was fired?
18     A.  Has somebody asked me about the reasons
19 why she was fired; is that your question?
20     Q.  Yes.
21     A.  Nobody has reached out to me
22 specifically, from what I can recall, and asked

**47**

1  me why Kristie was fired -- unless it might have
2  been in a work capacity.  Like I said, it might
3  have been a reporter, but I just don't recall.
4      Q.  When you started working for the
5  Congressman, were you on a probationary period?
6      A.  When I started working for the
7  Congressman, I -- I was not told that I was on a
8  probationary period, no, from what I can recall.
9      Q.  So, I mean, is that a no, you were not
10 on a probationary period, whether someone told
11 you you were or not?
12         Did you ever have any reason to believe
13 that your employment began with a probationary
14 period?
15     A.  No, I was not given any reason to
16 believe that I was on a probationary period when
17 I started working for the Congressman.
18     Q.  And to be clear, when I say, like, any
19 reason to believe that your employment -- you
20 know, that you began -- strike that.
21         I just want to make sure.
22         So you're saying that when you started

**48**

1  your job, no one told you that you were on a
2  probationary period; right?
3      A.  That is correct.
4      Q.  Did you ever learn later or at any time
5  that you were, in fact, on a probationary period
6  when you worked for the Congressman?
7      A.  There were -- yes.  So what ended up
8  happening was after, you know, we started hearing
9  about the fact there was a probationary period
10 involved with Kristie and her role, then at one
11 point we were told, I believe as an office, the
12 fact that we were supposedly all on probationary
13 periods, yes.
14     Q.  Who told you that?
15     A.  I don't recall who specific -- I don't
16 recall if it was that specific.  I'm not sure if
17 somebody, you know, came and said, "You are --
18 you were on a probationary period."
19         What I do remember was that we had a
20 staff call with Colin Strother and he had asked
21 staff "Were you" -- was anybody unsure whether or
22 not they were on a probationary period.  And

49

1 there was a pause, and then some individuals
2 responded that "We were not informed of the fact
3 that we were on a probationary period."
4     Q.   That call with Colin Strother, did that
5 happen before or after Kristie was fired?
6     A.   It happened after.
7     Q.   Was the Congressman on that call?
8     A.   I do not recall if he was on it.  I
9 don't believe he was, but I don't recall
10 100 percent.  I just -- I don't have -- I don't
11 have any recollection of him being on the call,
12 so that would, like, lead me to believe that he
13 was not on it.
14    Q.   Do you -- do you remember about when
15 that call was conducted, even if you remember,
16 like, a year and a season or a month, anything?
17    A.   Sure, because that must have happened on
18 -- and, forgive me, I don't have the date in
19 front of me.  I'd have to look it up.  It must
20 have happened about a day or so after the
21 Washington Post article came out regarding
22 Kristie's firing because I remem- -- I just

50

1 remember -- [inaudible] -- being around that
2 time.
3        THE REPORTER:  You just remember what?
4 I couldn't hear the end.
5        THE WITNESS:  I remember being around
6 that time following the -- the Washington Post
7 article.  I believe it was the Washington Post
8 article that came out regarding Kristie's firing.
9 BY MS. MCDONOUGH:
10    Q.   Colin Strother, what was his -- he
11 was -- he was one of the Congressman's employees
12 when he conducted that call?
13    A.   I believe that he was a campaign
14 employee.  I don't have the details or specifics
15 or knowledge of -- of how he was employed.  I
16 just know that he was a campaign staffer.  I
17 believe he was a campaign staffer.
18    Q.   And was it your understanding that the
19 Congressman had asked Colin Strother to conduct
20 that call?
21    A.   I -- I do not have an answer, but -- I
22 do not know if -- if the Congressman instructed

51

1 him to conduct that phone call.
2    Q.   And so was that a -- was it, like, a
3 teleconference?
4    A.   It was -- yeah, it just was a -- was a
5 phone call with -- with many staff on it, so,
6 yes.
7    Q.   And do you remember when -- okay.  So
8 let me back up.
9        How did you all learn about that call,
10 that the call had been scheduled?  Did you get an
11 e-mail invite?  Did somebody tell you in person?
12       How did you learn about it?
13    A.   I don't recall.  I really don't recall.
14 I'm assuming it was an e-mail invite, but I don't
15 remember.
16    Q.   And so tell me everything you can
17 remember that was said on that call.
18    A.   All that I can remember is that, like I
19 said, we had staff on the call; Colin Strother
20 had asked -- had asked us if we knew that we had
21 been on a probationary period when we had first
22 started working for the Congressman; a few people

52

1 responded saying that they were not certain.  I
2 don't know -- I can't remember who they were, and
3 I don't remember anything else from that phone
4 call, to be honest.
5    Q.   Is that when you learned that you had
6 supposedly been on a probationary period?
7    A.   I don't remember if that's when I
8 learned.  I really don't remember if I had been
9 given any indication prior to that phone call.  I
10 don't remember.  I don't remember.  I just
11 remember thinking that I was not aware of ever
12 being on a probationary period.
13    Q.   So after people answered -- or several
14 people indicated that they didn't know that, did
15 Colin say anything else?
16    A.   I don't remember.  I truthfully don't
17 remember what he -- what his response was.
18    Q.   I mean, did he say anything like, you
19 know, "Well, you all were on a probationary
20 period," or did he say how long the period was
21 supposed to be?
22    A.   I can't -- I can't say for certain what

Page 73

1  case was about.
2     Q.  Have you talked to anyone aside from
3  House counsel about your deposition?
4     A.  Yes.
5     Q.  Who is that?
6     A.  The same parties that I just mentioned
7  before; my family, my partner, my supervisors at
8  work, and House counsel.
9     Q.  Has anyone asked you to provide any
10 information or documents or a statement in
11 connection with this case?
12    A.  Yes, I believe that I was requested to
13 produce documents by March 13th regarding this
14 case.  I believe that was on my subpoena.
15    Q.  And you did not have any documents?
16    A.  I did not have any documents, no, none
17 that I could find.
18    Q.  No text messages, personal e-mails,
19 anything?
20    A.  No, I could not find anything.
21    Q.  Did anyone ever ask you to provide a
22 written statement about Kristie?

Page 74

1     A.  Yes, they did.
2     Q.  Who asked you?
3     A.  The Congressman asked us to provide a
4  statement.
5     Q.  When you say "us," do you mean his
6  staff?
7     A.  I'm sorry.  Yes, it was -- it was -- he
8  had asked his staff.  I don't remember if it was
9  full staff or just a handful of staff, but I was
10 amongst the staff that was asked to provide a
11 statement, yes.
12    Q.  When was that?
13    A.  I do not recall.  I -- I do not recall.
14    Q.  Might it have been at --
15    A.  This -- this was after Kristie had been
16 terminated.
17    Q.  And was that in person that he asked you
18 or by e-mail or phone?
19    A.  I believe it was a phone call.
20    Q.  Where were you during that phone call?
21    A.  I believe I was in the office at work in
22 D.C.

Page 75

1     Q.  And was that a conference call, or did
2  he call you all individually?
3     A.  I don't recall.  I don't recall.
4     Q.  And so what did he say?
5     A.  I do not remember verbatim what he said.
6  I do not remember.
7         All that I remember is that it was
8  discussed that, you know, if staff was able to
9  provide a statement regarding Kristie's work
10 performance, then -- so then provide one because
11 it would help us, you know, down the line to just
12 remember while, you know, Kristie and her work
13 performance was still fresh in our mind -- in our
14 minds, to just kind of write something down so if
15 we ever had to reference it for whatever reason,
16 we had a statement to reference.
17        That was my understanding.
18    Q.  Did he mention the lawsuit?
19    A.  I don't remember.
20    Q.  What did you say?
21    A.  I did not -- I did not say anything.  I
22 don't believe I said anything at that time on the

Page 76

1  phone call, which leads me to believe that it was
2  a conference call with multiple people present.
3  I did not say anything.  I didn't have to say
4  anything.
5     Q.  Do you remember if anyone else said
6  anything?
7     A.  I don't remember.
8     Q.  Do you remember if the Congressman gave
9  you all suggestions about what to write or what
10 types of things to write?
11    A.  Like I mentioned before, he just asked
12 us to write a statement based on our thoughts on
13 Kristie's work performance.
14    Q.  And you don't recall anyone else saying
15 anything on the call?
16    A.  I don't recall, no.
17    Q.  Did he ask you all to give him copies of
18 the statements?
19    A.  I'm sorry.  Can you repeat that?
20    Q.  Did he ask you all to provide him with
21 copies of your statements?
22    A.  Yes.

**77**

1   Q.   And when -- did he give you a deadline
2   for providing them or..?
3   A.   I believe he had asked -- I can't -- I
4   don't remember specifically.
5        I believe that this might have been
6   asked sometime mid-week.  The only -- the only
7   reason why I say that is because I think that he
8   had asked for them by Friday, but I'm not -- by
9   the end of the week, but I'm not 100 percent
10  sure.
11       But that's just -- for whatever reason,
12  that's what comes to mind.
13  Q.   And so did you -- did you write down a
14  statement about Kristie?
15  A.   I don't recall writing one.
16  Q.   Why not?
17  A.   I don't recall.
18  Q.   You don't recall?
19  A.   No, I don't -- I don't recall.
20  Q.   I mean, your boss asks you to provide a
21  statement and you don't -- you didn't do it, but
22  you don't remember why you did or didn't do it?

**78**

1   A.   Well, our boss asked us to provide a
2   statement regarding somebody who had been fired,
3   so there might -- there might have been a
4   multitude of reasons why I had just wished to not
5   participate in that process, but I don't recall
6   what the specific reasoning at that time was now.
7   Q.   So he didn't indicate that it was
8   mandatory?
9   A.   I don't recall him indicating that it
10  was mandatory, no.
11  Q.   Did he ever follow up with you when he
12  didn't receive a statement?
13  A.   I don't think so.  I don't remember him
14  ever following up.
15  Q.   Did you talk to any of your colleagues
16  about the Congressman's request for statements?
17  A.   Yes, we had discussed as work colleagues
18  in just -- I'd asked simply, you know, if
19  somebody was going to be writing one or not.
20  That's the conversation.  So those were the types
21  of conversations that were held.
22  Q.   And so what do you remember?

**79**

1   Who -- who indicated that they did not
2   plan to provide a statement?
3   A.   Oh, I don't recall.  I don't recall who.
4   I don't recall.
5   Q.   Do you recall any discussions about what
6   people planned to include in their statement?
7   A.   No.  I don't remember anybody detailing
8   the specifics of their statement, no, and what
9   they were going to include and not include.  I
10  don't remember that.
11  Q.   I mean, this was pretty salacious.  I
12  mean -- I mean, your boss asked you all to write
13  statements about someone you all know who's suing
14  him, and you don't remember any of these
15  conversations?
16  A.   Well, I think that's because I don't
17  think that they were in-depth conversations for
18  that exact reason.  I don't think that anybody
19  wanted to discuss their personal statements with
20  their co-workers because we weren't sure in what
21  capacity they were going to be used later on, if
22  they were going to be used in the courtroom.

**80**

1        So, yes, I don't think they were
2   discussed in detail.
3   Q.   So nobody asked Mr. Cuellar how he
4   intended to use the statements?
5   A.   I had already explained to you, from
6   what I can recall, he had mentioned the fact that
7   if, at some point down the line, we were going to
8   need to discuss Kristie Small's firing -- not
9   necessarily discuss, but if, in some capacity, it
10  was going to be brought up -- I'm not sure in
11  what kind of capacity -- then to have something
12  on paper that we could reference from that
13  specific time.
14       That's what I remember.  That's --
15  that's honestly all that I can remember.
16  Q.   And so you're certain that he asked you
17  to provide these statements shortly after Kristie
18  was fired?
19  A.   I -- I believe that it was around that
20  time, yes.  I -- I believe it was the
21  Congressman.  It might have been Colin Strother.
22  I genuinely just don't recall.  I believe it was